IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUSORO MINING LIMITED,<br>1500-1055 West Georgia Street,<br>Vancouver, British Columbia V6E 4N7<br>Canada,<br>　　　　　　　　　Petitioner,<br><br>　　　　　　v.<br><br>BOLIVARIAN REPUBLIC OF<br>VENEZUELA,<br>Ministerio del Poder Popular para Relaciones<br>Exteriores<br>Oficina de Relaciones Consulares<br>Avenida Urdaneta<br>Esquina de "Carmelitas" a "Puente Llaguno"<br>Edificio anexo a la Torre "MRE"<br>Caracas, 1010<br>República Bolivariana de Venezuela,<br><br>　　　　　　　　　Respondent. | Civil Action No. 16-cv-2020 |

## PETITION TO CONFIRM ARBITRAL AWARD

Petitioner Rusoro Mining Limited ("Petitioner" or "Rusoro"), by and through the undersigned counsel, hereby petitions this Court for an Order: (i) confirming, recognizing, and enforcing the final award (the "Award")[1] rendered by an arbitral tribunal (the "Tribunal") on August 22, 2016 in an arbitration (the "Arbitration") between Petitioner and Respondent the Bolivarian Republic of Venezuela ("Respondent" or "Venezuela"), pursuant to the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes (the "ICSID Additional Facility Arbitration Rules"), and the July 1, 1996 Agreement between the

---

[1] A duly-certified copy of the Award is attached as Exhibit 1 to the Declaration of Elliot Friedman ("Friedman Decl.") filed concurrently with and in support of this Petition.

Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments; (ii) entering judgment in Petitioner's favor against Respondent in the amount of the Award plus interest and costs awarded therein, post-judgment interest pursuant to 28 U.S.C. § 1961, and the costs of this proceeding; and (iii) awarding Petitioner such other and further relief as this Court may find just and proper.

## Parties, Jurisdiction, and Venue

1. The Arbitration was seated, and the Award was rendered, in Paris, France. Petitioner brings this summary proceeding under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* (the "FAA") and the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention") to confirm a final arbitration award issued in its favor and against Respondent in its entirety.

2. Petitioner Rusoro is a gold mining company incorporated in Canada, with its head office in Vancouver, British Columbia. Petitioner's registered address is 1500-1055 West Georgia Street, Vancouver, British Columbia V6E 4N7, Canada.

3. Respondent the Bolivarian Republic of Venezuela is a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602-11.

4. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1330(a), because a foreign state does not enjoy sovereign immunity from a proceeding brought to confirm an arbitral award that "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B). Because the arbitration concerned property expropriated in

Venezuela and an international treaty (*inter alia*), the Award is subject to the New York Convention, which is in force in the United States.  *See* 9 U.S.C. § 201.

5.   This Court also has subject matter jurisdiction over this proceeding pursuant to 9 U.S.C. § 203, which provides that any "proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States," and, consequently, under 28 U.S.C. § 1331.

6.   This Court may exercise personal jurisdiction over the Respondent pursuant to 28 U.S.C. § 1330(b).

7.   Venue is proper in this district pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4).

## The Arbitration Agreement

### A.   Respondent's Consent to Arbitration

8.   Respondent consented to arbitrate its disputes with Canadian investors such as Petitioner through a bilateral investment treaty, the July 1, 1996 Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments (the "Treaty"), which entered into force on January 28, 1998.[2]

9.   Respondent's consent is found at Article XII of the Treaty.  Specifically, Article XII(5) provides:

> Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.

10.   Respondent is defined in the Treaty as a "Contracting Party." *See* Treaty at 1 (referring to "[t]he Government of Canada and the Government of the Republic of Venezuela, hereinafter

---

[2] Friedman Decl., Ex. 2.

referred to as the 'Contracting Parties'"). As is further set out below and in the Award at paragraphs 188 through 344, Petitioner submitted its claim to arbitration in accordance with the provisions of Article XII of the Treaty and the Tribunal had jurisdiction over the dispute. Article XII(5) therefore represents Respondent's written consent to arbitration.

**B.     Petitioner's Consent to Arbitration**

11.    As the Award establishes, Petitioner is a protected investor under the Treaty with the right to commence arbitration against Respondent. *See* Award ¶¶ 289-340.

12.    Article I(g)(ii) of the Treaty defines an "investor" to include "any enterprise incorporated or duly constituted in accordance with applicable laws of Canada, who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela."

13.    Article I(a)(i) of the Treaty defines an "enterprise" to include "any entity constituted or organized under applicable law, . . . including any corporation . . . ." Petitioner is a corporation incorporated under the laws of Canada.

14.    Article I(f) of the Treaty defines an "investment" to mean "any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly . . . in the territory of the other Contracting Party in accordance with the latter's laws." This definition includes "movable and immovable property and any related property rights," *id.* art. I(f)(i), and "rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources," *id.* art. I(f)(vi).

15.    As the Tribunal found, Petitioner's investments in Venezuela fall within this definition of protected investments. *See* Award ¶ 340 (rejecting Venezuela's arguments to the contrary); *see also id.* ¶¶ 289-340.

16. The Tribunal further found that Petitioner properly submitted its investment-based claims against Respondent to arbitration in accordance with Article XII of the Treaty. *See id.* ¶¶ 203-240.

17. Under Article XII(3) of the Treaty, an investor may submit a dispute to arbitration if it has: (i) consented in writing thereto; (ii) waived its right to initiate or continue any other proceedings in certain alternative forums in relation to the alleged breach of the Treaty; and (iii) initiated the arbitration within three years of the date on which the investor acquired (or should have acquired) knowledge of the alleged breach and knowledge of incurred loss or damage.[3]

18. Petitioner satisfied each of these requirements. *First*, on December 15, 2011, Petitioner delivered to Venezuela a Notice of Dispute,[4] in which Petitioner expressed its unconditional consent pursuant to Article XII(3) of the Treaty to submit the dispute to arbitration. *Second*, on July 17, 2012, Petitioner confirmed that no other related proceedings were pending before the courts or tribunals of Venezuela and waived its right to initiate any such proceedings. *See Rusoro Mining Limited v. The Bolivarian Republic of Venezuela*, Request for Arbitration, July 17, 2012 ("Request for Arbitration") ¶ 138.[5] *Third*, Petitioner submitted claims within the specified three-year time period. *See* Award ¶¶ 209 (establishing July 17, 2009 as the cut-off date for arbitrable claims), 211-12 (listing Venezuela's acts giving rise to Petitioner's claims).[6]

---

[3] Article XII(3) also requires an investor to satisfy additional conditions if the matter involves taxation. *See* Treaty art. XII(3)(c). As the Arbitration did not concern matters of taxation, this requirement did not apply to Petitioner.

[4] Friedman Decl., Ex. 3.

[5] Friedman Decl., Ex. 4.

[6] Pursuant to Article XII(3) of the Treaty, claims submitted to arbitration must be raised within three years of "the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage." The Tribunal observed that Petitioner's claims were based on a number of Venezuela's measures, some of which occurred before that three-year cutoff date. *See* Award ¶ 211. The Tribunal determined that it would consider each of those measures individually, and ruled that any alleged breaches based solely on measures that occurred before the three-year cutoff date were time-barred. *Id.*

Thus, as the Tribunal found, Petitioner submitted arbitrable claims under the Treaty. *See id.* ¶¶ 203-40.

19.     The Tribunal also found that Petitioner properly commenced arbitration under the ICSID Additional Facility Arbitration Rules.[7] *See id.* ¶¶ 255-73. Article XII(4)(b) of the Treaty provides that an investor may submit a dispute to arbitration under the ICSID Additional Facility Arbitration Rules if "either the disputing Contracting Party [Venezuela] or the Contracting Party of the investor [Canada], but not both, is a party to the ICSID Convention."[8] At the time the Arbitration was initiated, Venezuela was a party to the ICSID Convention, but Canada was not.[9]

## Summary of the Underlying Dispute

20.     Petitioner is a gold mining company incorporated in Canada. Award ¶ 77.

21.     Petitioner's claims in the Arbitration arose from Venezuela's breach of its Treaty obligations towards the Petitioner and Petitioner's investments in Venezuela's mining sector. *See id.* ¶ 179. Petitioner was the controlling shareholder in 24 Venezuelan mining companies that, in turn, held valuable contractual rights to explore, develop, and exploit gold and other minerals in Venezuela's Bolívar State. *Id.* ¶ 78.

22.     These mining rights were granted to Petitioner's subsidiaries through an array of agreements with the Venezuelan government and Venezuelan state-owned corporations. *Id.* ¶ 79

---

¶¶ 231-32; *see id.* ¶¶ 228-40. Accordingly, for the purposes of determining liability, the Tribunal only considered alleged breaches based on Venezuela's post-July 2009 measures.

[7] Friedman Decl., Ex. 5.

[8] *See* Convention on the Settlement of Investment Disputes Between States and Nationals of Other States ("ICSID Convention"), *opened for signature* March 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159.

[9] *See* Friedman Decl., Ex. 6, International Centre for Settlement of Investment Disputes, List of Contracting States and other Signatories of the Convention 1, 5. Venezuela denounced the ICSID Convention on January 24, 2012, and in accordance with Article 72 of the Convention, that denunciation took effect on July 25, 2012. *See id.* at 5. However, Venezuela's withdrawal did "not affect the rights or obligations . . . arising out of consent to the jurisdiction of [ICSID] given . . . before" the effective date of denunciation. ICSID Convention, art. 72. Petitioner initiated the Arbitration on July 17, 2012, prior to the effective date of denunciation. Award ¶¶ 259-261; *see also id.* ¶¶ 259-68.

(referencing rights derived from mining concessions directly granted by the Venezuelan Ministry of Energy and Mines, contracts entered into with state-owned corporations, leasing agreements with state-owned corporations, and joint venture agreements with mining rights holders).

23.     The Tribunal found that Petitioner invested more than $750 million between 2006 and 2008 to acquire and develop these mining interests. *Id.* ¶ 678. Petitioner did so at a time when Venezuela's regulatory environment was favorable to and encouraging of private gold production for export to foreign markets. *See id.* ¶¶ 138-39, 144.

24.     However, beginning in 2009, the Venezuelan government introduced measures that "significantly altered the legal regime for the export of gold." *Id.* ¶ 145. These measures placed stringent new controls on gold exports and restricted the ability of Rusoro's subsidiaries to deal in any foreign currency earned from exports. *See id.* ¶¶ 144-59. In particular, the Venezuelan government passed Resolution BCV No. 10-07-01 (the "July 2010 Resolution"), which required private gold producers to sell at least 50 percent of their gold directly to the Venezuelan Central Bank, in exchange for payment in Venezuelan currency. *Id.* ¶ 157. In addition, certain of the measures passed by Venezuela afforded preferential treatment to state-owned gold producers. *See, e.g., id.* ¶¶ 150-51.

25.     These alterations to the regulatory framework were designed to serve Venezuela's admitted political and financial objective "to convert all private mining activities to mixed [public-private] enterprises, and [to] expropriate[e] holders of substantial mining rights who resisted the change." *Id.* ¶ 414. That goal was fully realized in 2011, when Venezuela's then-President Hugo Chávez declared the "immediate nationalization" of the Venezuelan gold mining sector. *Id.* ¶ 160. President Chávez executed the written decree carrying out the nationalization

(the "Nationalization Decree") with the declaration, "¡Oro, oro, oro!" ("Gold, gold, gold!") beneath his signature. *Id.* ¶ 653.

26. The Nationalization Decree required Petitioner to negotiate with the Venezuelan government for 90 days to establish a purchase price for the seizure of Rusoro's investments, and to determine the feasibility of a joint public-private enterprise between Rusoro and the government. *Id.* ¶ 164.

27. The negotiations were doomed to fail. As a Canadian investor, Rusoro was entitled under the Treaty to compensation for the fair market value of its investments. *Id.* ¶¶ 404, 751. Yet Venezuela failed to pay, or even offer, fair market value compensation. Instead, as the Tribunal observed, it was "undisputed that in accordance with the Nationalization Decree, the maximum amount of compensation which could be offered by Venezuela was capped at the 'valor en libros' ['book value'] of the investment." *Id.* ¶ 400. "In reality, however, Venezuela's offer did not even reach the cap provided for in the Nationalization Decree." *Id.* ¶ 406.[10]

28. Given Venezuela's position and Petitioner's unwillingness to sacrifice its rights under the Treaty, in March 2012, all mining rights held by Rusoro through its subsidiaries were formally extinguished pursuant to the Nationalization Decree. *Id.* ¶ 171. Thus, as a result of Venezuela's actions, Petitioner was forced to cede control of all of its subsidiaries' assets and operations to the Venezuelan government without any compensation whatsoever. *Id.* ¶ 173.

---

[10] *See also* Award ¶ 408 ("In the present case, the Nationalization Decree provided for the payment of compensation to investors in the gold sector, but established a cap, which was not foreseen either in the [Treaty] or in domestic Venezuelan law. The Bolivarian Republic then submitted an offer, for an amount which was significantly below the cap established by the Decree. The reason for this reduction was the alleged illegality of Rusoro's investment – an argument which has been analysed and dismissed by the Tribunal. Furthermore, the amount offered was never actually paid to, nor deposited in escrow in favour of [Petitioner].").

## The Arbitration

29. Petitioner commenced the Arbitration by submitting a Request for Arbitration to ICSID, which ICSID received on July 17, 2012. Award ¶ 1; *see* Request for Arbitration. The Request for Arbitration was registered by the Secretary-General of ICSID, pursuant to the ICSID Additional Facility Arbitration Rules, on August 1, 2012.[11] Award ¶ 3.

30. In the Request for Arbitration, Petitioner asserted multiple breaches of the Treaty by Venezuela and requested an award of compensation plus interest, other relief as the Tribunal considered appropriate, and the legal fees and costs incurred by Petitioner in the arbitral proceedings. *See* Request for Arbitration ¶ 151.

31. A three-member arbitral Tribunal was constituted on January 4, 2013. Award ¶ 8. Professor Juan Fernández-Armesto, a Spanish national, was appointed President of the Tribunal by agreement of both parties. Professor Francisco Orrego-Vicuña, a Chilean national, was appointed arbitrator by Petitioner, and Judge Bruno Simma, a German national, was appointed arbitrator by Venezuela. *Id.* ¶¶ 5-7.

32. Respondent was represented by counsel throughout the Arbitration, namely the Attorney-General of Venezuela and attorneys based in Washington, D.C. from the law firm of Foley Hoag LLP. *Id.* ¶ 15.

33. The legal seat of the Arbitration was Paris, France. *Id.* ¶ 18. By agreement of the parties, the Arbitration hearings physically took place in Washington, D.C. *Id.*

34. The first session of the Tribunal was held by telephone conference on February 8, 2013. *Id.* ¶ 18.

---

[11] A more detailed summary of the procedural history of the Arbitration is available on the ICSID website. *See* ICSID, Case Details, *Rusoro Mining Limited v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB (AF)/12/5), https://icsid.worldbank.org/apps/ICSIDWEB/cases/Pages/casedetail.aspx?CaseNo=ARB(AF)/12/5&tab=PRD (last accessed October 10, 2016).

35. The Tribunal held a partial hearing on jurisdiction and the merits from December 7 through 12, 2014, in Washington, D.C. *Id.* ¶ 62. A second hearing on jurisdiction and the merits was held in Washington, D.C. from February 1 through 4, 2015. *Id.* ¶ 66.

36. The proceedings were declared officially closed on June 29, 2016. *Id.* ¶ 76.

37. The Tribunal issued the Award on August 22, 2016. The Tribunal's ruling was unanimous.

38. The Tribunal's unanimous Award was the culmination of an arbitration proceeding that lasted more than four years. During that time, the parties submitted over 1400 pages of written pleadings, 17 witness statements, 12 reports by damages and other experts, and over 1700 exhibits and legal authorities. The parties also participated in ten days of hearings, at which they made legal submissions and cross-examined witnesses and experts before the Tribunal.

## The Arbitral Award

39. The resulting Award is 198 pages and comprises 904 separate, numbered paragraphs.

40. The dispositive section of the Award finds, in relevant part, that "the Bolivarian Republic of Venezuela breached Art. VII of the [Treaty] by expropriating Rusoro's investment in Venezuela without payment of compensation," and that "the Bolivarian Republic of Venezuela breached paragraph 6 of the Annex to the [Treaty] by issuing [certain legislative measures, specifically the July 2010 Resolution] and imposing additional restrictions on the export of gold." Award ¶ 904.

41. The Tribunal rejected Venezuela's various claims that its actions towards Petitioner's investments had been justified, observing that Venezuela "failed to establish that the offending measures were necessary to reinforce Rusoro's solvency, to protect the purchasers of gold or to safeguard Venezuela's financial system." *Id.* ¶ 509.

42. The Award orders Venezuela to pay to Petitioner compensation in the amount of $967,777,002; plus interest "calculated at an interest rate [per annum] equal to USD LIBOR for one year deposits, plus a margin of 4%, with a minimum of 4% [per annum], to be compounded annually," and accruing from September 16, 2011 until the date of actual payment; and a further $3,302,500 in legal costs associated with the Arbitration. *Id.* ¶ 904. As of the date of this Petition, the total amount owed by Venezuela under the Award amounts to $1,227,045,573.

43. Petitioner has requested that Venezuela pay the Award but Venezuela has failed to do so.

## THE AWARD MUST BE CONFIRMED

44. Petitioner repeats and re-alleges the allegations in paragraphs 1 through 43 as if set forth fully herein.

45. The Award is subject to the New York Convention, which applies to the recognition and enforcement of foreign and non-domestic arbitral awards, such as the present Award. New York Convention, art. I(1); *see also* 9 U.S.C. § 201 ("The [New York Convention] shall be enforced in United States courts in accordance with this chapter.").

46. Article IV of the New York Convention provides that a party applying for recognition and enforcement of an award "shall, at the time of the application, supply: (a) [t]he duly authenticated original award or a duly certified copy thereof; [and] (b) [t]he original agreement [to arbitrate] referred to in article II or a duly certified copy thereof." A copy of the Award, duly authenticated and transmitted by the arbitral tribunal, is submitted herewith.

47. The parties' agreement to arbitrate is found in Article XIII of the Treaty and in Petitioner's submission of its claim to arbitration by accepting the standing offer to arbitrate found in the Treaty.[12] *See supra* ¶¶ 8-19.

48. The Award arose out of a legal relationship that is commercial within the meaning of 9 U.S.C. § 202.

49. Pursuant to Article 20(3) of the ICSID Additional Facility Arbitration Rules, the Award was made at the place of arbitration, Paris, France. France is a signatory to the New York Convention (as are Venezuela, Canada, and the United States).[13]

50. Pursuant to Article XII(10) of the Treaty, the Award is "final and binding" on Venezuela. In addition, Article 52(4) of the ICSID Additional Facility Arbitration Rules provides that an award "shall be final and binding on the parties." The Award is therefore final and binding within the meaning of the New York Convention and Chapter 2 of the FAA.

51. Section 207 of the FAA provides that a court "shall confirm" an award covered by the New York Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in [the New York] Convention." 9 U.S.C. § 207. None of the New York Convention grounds for denying recognition and enforcement of an award apply in this case.[14]

---

[12] *See Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 66-67 (D.D.C. 2013), *aff'd* 795 F.3d 200 (D.C. Cir. 2015) ("Because the [Treaty] constitutes Ecuador's 'standing offer' to arbitrate, all Chevron must show is that it was a U.S. 'company or national' that submitted an 'investment dispute' in order for the Court to find it had a binding arbitration agreement with Ecuador."); *see also* Treaty art. XII(6)(a)(ii) ("The consent given under paragraph (5), together with either the consent given under paragraph (3), or the consents given under paragraph (12), shall satisfy the requirements for . . . an 'agreement in writing' for purposes of Article II of the [New York Convention].").

[13] *See* New York Arbitration Convention, Contracting States, http://www.newyorkconvention.org/countries (last accessed October 10, 2016).

[14] *See Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 120 (D.D.C. 2015) ("[T]he FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." (quoting *Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012))); *see also Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011) ("Confirmation proceedings under the Convention are summary in

52.     For the foregoing reasons, Petitioner is entitled to an order confirming, recognizing, and enforcing the Award pursuant to 9 U.S.C. § 207 and Article IV of the New York Convention.

**WHEREFORE**, Petitioner prays that the Court enter an Order pursuant to 9 U.S.C. § 207 and Article IV of the New York Convention:

 (a) confirming, recognizing, and enforcing the Award against Venezuela;

 (b) entering judgment against Venezuela in an amount equal to the full amount of the Award, $967,777,002, plus (i) interest as provided by the arbitral tribunal, accruing through the date of this Court's confirmation Order (currently calculated to be $259,268,571); (ii) post-judgment interest, pursuant to 28 U.S.C. § 1961, accruing thereafter through the date of payment; (iii) costs as provided by the arbitral tribunal, in the amount of $3,302,500; as well as (iv) the costs of this proceeding; and

 (c) granting Petitioner such other and further relief as may be just and proper.

A proposed order is attached.

Dated: October 10, 2016
   New York, N.Y.

Respectfully submitted,

/s/ Elliot Friedman
Gabrielle Gould (*pro hac vice*)
Elliot Friedman (D.C. Bar No. NY0106)
Robert J. McCallum (*pro hac vice*)

FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st Floor
New York, New York 10022

---

nature, and the court must grant the confirmation unless it finds that the arbitration suffers from one of the defects listed in the Convention."). A party resisting confirmation "bears the heavy burden" of establishing that one of the enumerated grounds for denying confirmation in Article V of the New York Convention applies. *Gold Reserve*, 146 F. Supp. 3d at 120; *see also Republic of Argentina v. BG Group PLC*, 715 F. Supp. 2d 108, 116 (D.D.C. 2010) ("[T]he showing required to avoid summary confirmation of an arbitration award is high . . . ." (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997))).

Telephone: (212) 277-4000
Facsimile: (212) 277-4001
gabrielle.gould@freshfields.com

*Counsel for Rusoro Mining Limited*