# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  USA
TELEPHONE (202) 458 1534  |  FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**RUSORO MINING LTD.**

v.

**BOLIVARIAN REPUBLIC OF VENEZUELA**

**(ICSID CASE NO. ARB(AF)/12/5)**

I hereby certify that the attached document is a true copy of the English version of the Arbitral Tribunal's Award dated August 22, 2016, rendered in English and Spanish.

Martina Polasek
Acting Secretary-General

Washington, D.C., August 22, 2016

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

WASHINGTON, D.C.

IN THE MATTER OF AN ARBITRATION UNDER THE ICSID ADDITIONAL FACILITY RULES

between

RUSORO MINING LIMITED

(Claimant)

and

THE BOLIVARIAN REPUBLIC OF VENEZUELA

(Respondent)

ICSID Case No. ARB(AF)/12/5

---

# AWARD

---

*Members of the Tribunal*

Prof. Juan Fernández-Armesto, Chairman of the Tribunal

Prof. Francisco Orrego Vicuña, Arbitrator

Judge Bruno Simma, Arbitrator

*Secretary of the Tribunal*

Ms. Alicia Martín Blanco

*Date of dispatch to the Parties:* 22 August 2016

# <u>REPRESENTATION OF THE PARTIES</u>

**Representing Rusoro Mining Ltd.:**

Mr. Nigel Blackaby
Mr. Noah Rubins
Mr. Alex Wilbraham
Mr. Jean-Paul Dechamps
Mr. Ben Love
Mr. Robert Kirkness
Mr. Gustavo Topalian
Mr. Ricardo Chirinos
Mr. Juan Pomés
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

Ms. Alejandra Figueiras
Mr. Guillermo Iribarren
Figueiras Abogados
Edificio Cavendes
Piso 8, Oficina 806
Los Palos Grandes
Caracas, 1060
Venezuela

Mr. Andrés Mezgravis
Ms. Militza Santana
Mezgravis & Asociados
Avenida Venezuela
Torre Oxal, Piso 5, Oficina 5-A
Urbanización El Rosal
Caracas, 1060
Venezuela

**Representing the Bolivarian Republic of Venezuela:**

Dr. Reinaldo Enrique Muñoz Pedroza
*Procurador General de la República*
Dr. Felipe Daruiz
*Coordinador de Juicios Internacionales*
*Procuraduría General de la República*
Bolivariana de Venezuela
Av. Los Ilustres, c/c calle Francisco Lazo
Marti, Urb. Santa Mónica
Caracas
Venezuela

Mr. Derek Smith
Mr. Alberto Wray
Mr. Thomas Ayres
Mr. Diego Cadena
Ms. Analía González
Mr. Christopher Hart
Ms. Christina Beharry
Ms. Erin Argueta
Mr. Ofilio Mayorga
Ms. Melinda Kuritzky
Mr. José Rebolledo
Foley Hoag LLP
1717 K Street, NW
Suite 1200
Washington, DC. 20006
United States of America

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................... 15

II.    THE PARTIES TO THE ARBITRATION ........................................ 17

        1.    The Claimant – Rusoro Mining Limited ........................................ 17

        2.    The Respondent – The Bolivarian Republic of Venezuela ........... 18

III.   PROCEDURAL HISTORY ................................................................. 20

IV.   FACTS ................................................................................................... 33

        1.    Background: From Grupo Agapov to Rusoro ................................. 33

        2.    Government policy regarding mining ............................................. 36

        3.    Rusoro acquires Cradock's assets ................................................. 37

        4.    Rusoro acquires Mena's assets ..................................................... 39

        5.    Rusoro acquires Gold Fields' Venezuelan assets ......................... 39

        6.    Rusoro acquires Hecla's assets ..................................................... 41

        7.    The Venrus Joint Venture .............................................................. 42

        8.    The Venezuelan gold and exchange control regulations .............. 43

        9.    The Nationalization Decree ........................................................... 47

        10.   The first negotiation period ........................................................... 48

        11.   The second negotiation period ....................................................... 49

        12.   The taking of control of Rusoro's assets ....................................... 50

V.     RELIEF SOUGHT BY THE PARTIES ............................................ 51

        1.    The Parties' requests in brief ......................................................... 51

        2.    Claimant's request for relief in full ............................................... 52

        3.    The Respondent's Request for Relief ............................................ 53

VI.   JURISDICTIONAL OBJECTIONS ................................................. 54

      VI.1. THE FIRST JURISDICTIONAL OBJECTION: THE DISPUTE IS TIME-BARRED 54

        1.    Respondent's position ................................................................... 55

        2.    Claimant's position ....................................................................... 56

        3.    The Tribunal's decision ................................................................. 57

      VI.2. THE SECOND JURISDICTIONAL OBJECTION: NO JURISDICTION BEFORE
          THE ICSID ADDITIONAL FACILITY                         64

        1.    Respondent's position ................................................................... 65

     2.    Claimant's position ................................................................ 66

     3.    The Tribunal's decision ....................................................... 66

VI.3. THE THIRD JURISDICTIONAL OBJECTION: ILLEGALITY IN THE OWNERSHIP OF MINING ASSETS   **71**

     1.    The Respondent's position ................................................... 71

     2.    The Claimant's position ....................................................... 73

     3.    The Tribunal's decision ....................................................... 74

**VII.**  **RUSORO'S CLAIMS** ............................................................. **86**

  **VII.1.**   PRELIMINARY ISSUES   **86**

     1.    Legal framework ................................................................. 86

     2.    Claimant's good faith ........................................................... 86

  **VII.2.**   EXPROPRIATION   **88**

     1.    Claimant's position ............................................................. 88

     2.    Respondent's position ......................................................... 89

     3.    The Tribunal's decision ....................................................... 90

          3.1   Direct expropriation ................................................. 91

          3.2   Requirements established in art. VII.1 ..................... 92

          3.3   Creeping expropriation ............................................ 98

  **VII.3.**   ANCILLARY CLAIMS   **103**

     1.    Claimant's position ............................................................. 103

     2.    Respondent's position ......................................................... 106

     3.    The Tribunal's decision ....................................................... 111

          3.1   Proven facts ............................................................. 111

          3.2   Preliminary defences ............................................... 112

          3.3   FET .......................................................................... 116

          3.4   FPS .......................................................................... 122

          3.5   Discrimination ......................................................... 123

          3.6   Free transfer of funds .............................................. 125

          3.7   Conclusion .............................................................. 130

  **VII.4.**   VENEZUELA'S COUNTER-CLAIM   **130**

     1.    Respondent's counter-claim ................................................. 131

     2.    Claimant's position ............................................................. 133

     3.    The Tribunal's decision ....................................................... 134

**VIII.**  **QUANTUM** ............................................................................ **138**

| | | | |
|---|---|---|---|
| VIII.1. | | COMPENSATION FOR EXPROPRIATION | 140 |
| | 1. | The price of gold and the value of gold mining companies | 142 |
| | 2. | Rusoro's investments in Venezuela | 144 |
| | 3. | Rusoro's investment adjusted | 149 |
| | 4. | The book value of Rusoro's investment | 150 |
| | 5. | Rusoro's market capitalization | 154 |
| | 6. | The valuation of Rusoro proposed by Claimant's expert | 156 |
| | 7. | The Tribunal's decision | 164 |
| VIII.2. | | DAMAGES FOR BREACH OF TREATY | 174 |
| | 1. | The experts' calculation | 174 |
| | 2. | The Tribunal's decision | 176 |
| VIII.3. | | INTEREST | 179 |
| | 1. | Claimant's position | 179 |
| | 2. | Respondent's position | 180 |
| | 3. | The Tribunal's decision | 180 |
| VIII.4. | | TAXES | 182 |
| | 1. | The Parties' position | 182 |
| | 2. | The Tribunal's decision | 183 |
| IX. | | COSTS | 185 |
| | 1. | Claimant's position | 185 |
| | 2. | Respondent's position | 186 |
| | 3. | The Tribunal's decision | 186 |
| X. | | SUMMARY | 190 |
| | 1. | Jurisdiction | 191 |
| | 2. | Liability | 193 |
| | 3. | Quantum | 195 |
| XI. | | DECISION | 197 |

# GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **1996 BCV Resolution** | Resolution of the BCV No. 96-12-02 published in *Gaceta Oficial* No. 36.124 on 13 January 1997 |
| **2009 Measures** | April 2009 BCV Resolution, June 2009 BCV Resolution and the Convenio Cambiario No. 12 |
| **2010 Measures** | The July 2010 BCV Resolution and the Amendment to Convenio Cambiario No. 12 |
| **Adjusted Investment Valuation** | Valuation based on the Investment Valuation adjusted to the gold price evolution from the acquisition of Rusoro's investment until the date of the Nationalization Decree |
| **AF Rules** | ICSID Additional Facility Rules in effect as of 10 April 2006 |
| **Amendment Decree** | Decree No. 8.683 published in the *Gaceta Oficial Ext.* No. 6.063 on 15 December 2011 |
| **Amendment to Convenio Cambiario No. 12** | Amendment to Convenio Cambiario No. 12 and Resolution of the BCV No. 10-07-01 published in the *Gaceta Oficial* No. 39.485 on 11 August 2011 |
| **Ancillary Claims** | Rusoro's claims in this arbitration for breach of the Fair and Equitable Treatment and Full Protection and Security standards, the prohibition against discrimination, the restriction of transfer of funds and the restriction of exports of gold |
| **April 2009 BCV Resolution** | Resolution of the BCV No. 09-04-03 published in the *Gaceta Oficial* No. 39.169 on 30 April 2009 |
| **Arbitration AF Rules** | ICSID Arbitration Additional Facility Rules in effect as of 10 April 2006 |
| **Barrios** | Witness statement submitted by Mr. Fernando Barrios dated 10 January 2014 |
| **BBA** | BBA Inc. |
| **BBA I** | BBA's first report dated 30 January 2014 |
| **BBA II** | BBA's second report dated 10 October 2014 |
| **BCV** | Central Bank of Venezuela |
| **BIT or Treaty** | Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, dated 1 July 1996 |
| **Bolívar Gold** | Bolívar Gold Corporation |
| **Book Valuation** | Valuation based on Rusoro's net book value |
| **Brim** | Mr. John G. Brim's expert opinion dated 13 October 2013. |

6

| | |
|---|---|
| **C I** | Claimant's Memorial dated 20 March 2013 |
| **C II** | Claimant's Reply dated 12 June 2014 |
| **C PHB** | Claimant's Post Hearing Brief dated 3 June 2015 |
| **C PHB/SM** | Claimant's Post Hearing Brief on the Swap Market dated 19 March 2015 |
| **C SC** | Claimant's Statement of Costs dated 1 July 2015 |
| **CADIVI** | *Comisión de Administración de Divisas* |
| **Claimant** | Rusoro Mining Ltd. |
| **Commitment Agreement** | Joint venture agreement between MIABAM and Rusoro |
| **Convenio Cambiario No. 1** | Convenio Cambiario No. 1 published in the *Gaceta Oficial* No. 37.653 on 19 March 2003 |
| **Convenio Cambiario No. 12** | Convenio Cambiario No. 12 published in the *Gaceta Oficial* No. 39.207 on 25 June 2009 |
| **Convenio Cambiario No. 19** | Convenio Cambiario No. 19 published in the *Gaceta Oficial* No. 39.779 on 17 October 2011 |
| **Costs of the Proceeding** | Advance on costs paid by the Parties to ICSID |
| **CPTC Valuation** | Navigant's valuation of Rusoro's enterprise value based on the comparable public traded companies approach |
| **CRA** | Charles River Associates |
| **CRA I** | Charles River Associates's first report dated 30 January 2014 |
| **CRA II** | Charles River Associates's second report dated 13 October 2014 |
| **Cradock** | Cradock United Inc. |
| **CT Valuation** | Navigant's valuation of Rusoro's enterprise value based on the comparable transactions approach |
| **Cut-Off Date** | The relevant date which triggers the time bar set forth in Art. XII.3(d) of the BIT, which in the present case is 17 July 2009 |
| **CVG** | Corporacion Venezolana de Guayana |
| **CVG Contracts** | Contracts of exploration, development or Exploitation entered into between Rusoro and CVG or CVG Minerven |
| **CVG Minerven** | CVG Minerven Compañía General Minera de Venezuela |
| **Date of Registration** | Date on which ICSID's Secretary-General registered Rusoro's Request for Arbitration, i.e. 1 August 2012 |

| | |
|---|---|
| **Date of Request** | Date on which Rusoro submitted its Request for Arbitration and applied for approval to ICSID's Secretary-General of the agreement to arbitrate between the Parties pursuant to Article 4(1) of the ICSID AFR, i.e. 17 July 2012 |
| **DCF** | Discounted Cash Flow |
| **DCF Valuation** | Navigant's valuation of Rusoro's enterprise value based on the Discounted Cash Flow approach |
| **Defense Expenses** | Legal fees and other expenses incurred by the Parties in the proceeding |
| **Doc. CLA-XXX** | Legal authorities presented by Claimant |
| **Doc. C-XXX** | Documentary evidence presented by Claimant |
| **Doc. H-XXX** | Presentations used by expert witnesses during the Hearing |
| **Doc. JB-XXX** | Documentary evidence presented by CRA |
| **Doc. JMB-XXX** | Documentary evidence attached to Professor Muci's expert report |
| **Doc. NAV-XXX** | Documentary evidence presented by Navigant |
| **Doc. RLA-XXX** | Legal authorities presented by Respondent |
| **Doc. R-XXX** | Documentary evidence presented by Respondent |
| **ENA** | Empresa Nacional Aurífera |
| **FET** | Fair and Equitable Treatment |
| **Figuera I** | First witness statement submitted by Mr. Rubén Figuera dated 29 January 2014 |
| **Figuera II** | Second witness statement submitted by Mr. Rubén Figuera dated 13 October 2014 |
| **Final Market Valuation** | Valuation based on the value of Rusoro's equity in the stock market on 5 August 2011 |
| **FPS** | Full Protection and Security |
| **Gold Fields** | Gold Fields Limited |
| **Grupo Agapov** | Grupo Agapov Corp. |
| **Hearing** | Hearing held at the World Bank, Washington, DC between 7 and 12 December 2014, and 1 and 4 February 2015. |
| **Hecla** | Hecla Limited |
| **Hecla Transaction** | Rusoro's acquisition of Hecla on 19 June 2008 |
| **HT** | Hearing Transcript |

| | |
|---|---|
| **ICSID** | International Centre for Settlement of Investment Disputes |
| **IFRS** | International Financial Reporting Standards |
| **ILC Articles** | ILC Articles on Responsibility for Internationally Wrongful Acts |
| **Index** | S&P/TSX Global Index |
| **Investment Valuation** | Valuation based on the amounts invested by Rusoro in acquiring its Mining Rights in Venezuela from 2006 to 2008 |
| **Joint-Tables** | Tables jointly presented by CRA and Navigant with different figures for Rusoro's enterprise value |
| **July 2010 BCV Resolution** | Resolution of the BCV No. 10-07-01 published in the *Gaceta Oficial* No. 39.485 on 11 August 2010. |
| **June 2009 BCV Resolution** | Resolution of the BCV No. 09-06-03 published in the *Gaceta Oficial* No. 39.201 on 16 June 2009 |
| **LECUPS** | Law of Expropriation for Public or Social Interest, published in the *Gaceta Oficial* No. 37.475 on 1 July 2002 |
| **Ley de Reforma Cambiaria** | Amendment to the Law against Foreign Exchange published in the *Gaceta Oficial* No. 5.975 on 17 May 2010 |
| **Lost Cash Flows** | Rusoro's claim for damages as a consequence of the 2009 and 2010 Measures |
| **Matías Herrero I** | Witness statement submitted by Mr. Matías Herrero dated 20 March 2013 |
| **Maximum Market Valuation** | Valuation based on the value of Rusoro's equity in the stock market on 28 February 2008 |
| **MEM** | Ministry of Energy and Mines |
| **Mena** | Mena Resources Inc. |
| **Micon 2007 Technical Report** | Micon International Limited, Technical Report on the PMG (Gold Fields) Choco 10 Concession and Mine, Estado Bolivar, Venezuela, 21 November 2007. |
| **Micon Report I** | Micon International Limited, Rusoro Mining Ltd., NI 34-101 Technical Report, Feasibility Study, Expansion of Gold Production at Choco 10 and Increible 6, Bolivar State, Venezuela, 30 December 2011. |
| **Micon Report II** | Micon International Limited, Technical Report on the Mining and Processing Operations of Hecla Mining Company, Bolivar State, Venezuela, 1 August 2008 |
| **Minera Hecla** | Minera Hecla Venezolana C.A. |
| **Mining Law** | Decree No. 295 of 5 September 1999, *Gaceta Oficial No. 5.382 Extraordinario*, published on 28 September 1999. |

| | |
|---|---|
| **Mining Rights** | Rusoro's mining rights held in Venezuela through its subsidiaries prior to September 2011 |
| **Mixed Companies** | Joint public-private companies, in respect of which the State held an equity participation of 55% or more, and exercised control over corporate decisions |
| **Mouriño I** | Legal opinion of Professor Carlos E. Mouriño dated 17 January 2014 |
| **Mouriño II** | Legal opinion of Professor Carlos E. Mouriño dated 8 October 2014 |
| **MPM** | Ministry of People's Power for Petroleum and Mining |
| **Muci** | Legal opinion of Professor José Antonio Muci Borjas dated 12 June 2014 |
| **Nationalization Decree** | Decree No. 8.413 published in the *Gaceta Oficial* No. 39.759 on 16 September 2011 |
| **NAV I** | Navigant's first report dated 20 March 2013 |
| **NAV II** | Navigant's second report dated 12 June 2014 |
| **Navigant** | Navigant Consulting Inc. |
| **Navigant Valuation** | Navigant's proposed valuation |
| **Negotiation Commission** | Commission created by the Resolution 88 to negotiate the transfer of the gold industry to the State in the framework of the Nationalization Decree |
| **NI 43-101** | National Instrument 43-101 |
| **Official Exchange Rate** | Exchange rate between the VEF and the USD established by the BCV |
| **OTC** | Operational transition Committee entrusted with the authority under Resolution 89 to take control over and managing the gold assets nationalized pursuant to the Nationalization Decree |
| **Paragraph 6 (d)** | Paragraph 6 (d) of Part II of the Annex to the BIT |
| **Parties** | Rusoro Mining Ltd. and the Bolivarian Republic of Venezuela |
| **PDVSA** | Petróleos de Venezuela S.A. |
| **PDVSA Mining Blocks** | Mining deposits transferred on 2012 by the MPM through Resolution No. 177 of the MPM published in the *Gaceta Oficial Ext.* No. 6.094 |
| **PMG** | Promotora Minera de Guayana P.M.G. S.A. |
| **Promisur** | Proyectos Mineros del Sur, PROMISUR, C.A. |
| **R I** | Respondent's Counter-Memorial dated 30 January 2014 |
| **R II** | Respondent's Rejoinder dated 13 October 2014 |

| | |
|---|---|
| **R PHB** | Respondent's Post Hearing Brief dated 3 June 2015 |
| **R PHB/SM** | Respondent's Post Hearing Brief on the Swap Market dated 20 February 2015 |
| **R SC** | Respondent's Statement of Costs dated 1 July 2015 |
| **Request for Arbitration** | Claimant's Request for Arbitration submitted on 17 July 2012 |
| **Resolution 88** | Resolution No. 088/2011 published in the *Gaceta Oficial* No. 39.776 on 11 October 2011 |
| **Resolution 89** | Resolution No. 089/2011 published in the *Gaceta Oficial* No. 39.776 on 11 October 2011 |
| **Reasonable Defense Expenses** | Reasonable legal fees and other expenses incurred by the Parties indispensable to adequately defend its position in the proceeding |
| **Respondent** | Bolivarian Republic of Venezuela |
| **RPM** | Runge Pincock Minarco |
| **RPM I** | Runge Pincock Minarco's report dated 11 June 2014 |
| **Rusoro** | Rusoro Mining Ltd. |
| **SITME** | Sistema de Transacciones con Títulos en Moneda Extranjera |
| **Smith I** | First witness statement submitted by Mr. Gregory Smith dated 20 March 2013 |
| **Smith II** | Second witness statement submitted by Mr. Gregory Smith dated 6 June 2014 |
| **SREP** | San Rafael y El Placer mines |
| **Swap Market** | Currency market by which currencies could be converted through the use of the securities market |
| **USD** | United States Dollars |
| **VEF** | Venezuelan Bolívares |
| **Venezuela** | Bolivarian Republic of Venezuela |
| **Venrus** | Minera Venrus C.A. |
| **Vladimir Agapov I** | First witness statement submitted by Mr. Vladimir Agapov dated 20 March 2013 |
| **Vladimir Agapov II** | Second witness statement submitted by Mr. Vladimir Agapov dated 12 June 2014 |
| **WACC** | Weighted Average Cost of Capital |

| **Whillans Report** | Whillans Mines Studies Ltd, Preliminary Feasibility Study, NI 43-101 Technical Report on the San Rafael and El Placer Deposits, Bolivar State, Venezuela, 7 May 2010 |
|---|---|

# LIST OF CASES

| | |
|---|---|
| **Amoco** | *Amoco International Finance Corp v Islamic Republic of Iran*, Partial Award (1988) 27 ILM 1314. |
| **Bilcon** | *William Ralph Clayton, William Richard Clayton, Douglas Clayton, Daniel Clayton and Bilcon of Delaware, Inc. v. Government of Canada*, UNCITRAL, PCA Case No. 2009-04, Award on Jurisdiction and Liability, 17 March 2015. |
| **Chorzów** | *Case Concerning the Factory at Chorzów (Germany v Poland) (Merits)* PCIJ Series A No 17 (1928). |
| **Exxon Mobil** | *Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd., and Mobil Venezolana de Petróleos, Inc. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award, 9 October 2014. |
| **Feldman** | *Marvin Roy Feldman Karpa v. United Mexican States*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002. |
| **Flughafen Zürich** | *Flughafen Zürich A.G. and Gestión e Ingenería IDC S.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, November 18, 2014. |
| **Glamis** | *Glamis Gold Ltd. v. United States of America*, UNICITRAL, Award, 8 June 2009. |
| **Gold Reserve** | *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014. |
| **Grand River** | *Grand River Enterprises Six Nations, Ltd., et al. v. United States of America*, UNCITRAL, Decision on Objections to Jurisdiction, 20 July 2006. |
| **Hamester** | *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010. |
| **Ioannis Kardassopoulos** | *Ioannis Kardassopoulos v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007. |
| **Lemire (Award)** | *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011. |
| **Lemire (Jurisdiction)** | *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 14 January 2010. |
| **Merrill & Ring** | *Merrill & Ring Forestry L.P. v. Government of Canada*, UNICITRAL, Award, 31 March 2010. |

| | |
|---|---|
| ***Mondev*** | *Mondev International Ltd v. United States,* ICSID Case No. ARB(AF)/99/2, Award, 11 October 2002. |
| ***Neer*** | *L. F. H Neer and Pauline Neer (U.S.A.) v. United Mexican States*, Opinion of the Commissioners, 15 October 1926. IV R. Int'l Arb. Awards 60-66. |
| ***Nova Scotia*** | *Nova Scotia Power Incorporated v. Bolivarian Republic of Venezuela*, UNCITRAL, Award on Jurisdiction, 22 April 2010. |
| ***OI European*** | *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Award, 10 March 2015. |
| ***Phoenix*** | *Phoenix Action, Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009. |
| ***Pope & Talbot*** | *Pope & Talbot, Inc. v. The Government of Canada*, UNCITRAL, Award in Respect of Damages, 31 May 2002. |
| ***Roberts*** | *Harry Roberts (U.S.A.) v. United Mexican States*; 2 November 1926; U.N. Report of International Arbitral Awards, IV. |
| ***RosInvest*** | *RosInvest Co UK Ltd. v. The Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010. |
| ***Roussalis*** | *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award, 7 December 2011. |
| ***Rumeli*** | *Rumeli Telekom AS and Telsim Mobil Telekomunikasyon Hitzmetleri AS v. Republic of Kazakhstan,* Award, ICSID Case No. ARB/05/16, 29 July 2008 |
| ***Saur*** | *Saur International S.A. v. Republic of Argentina*, ICSID Case No. ARB/04/4, Decision on Jurisdiction and Liability, 6 June 2012. |
| ***Starrett Housing*** | *Starrett Housing Corp and ors v The Government of the Islamic Republic of Iran and ors (1987)* 16 Iran-US CTR 112. |
| ***UPS*** | *United Parcel Service of America Inc. v. Government of Canada*, UNCITRAL, Award on the Merits, 24 May 2007. |
| ***Venoklim*** | *Venoklim Holding B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/22, Award, 3 April 2015. |

# I.   INTRODUCTION

1.      On 17 July 2012, the International Centre for Settlement of Investment Disputes ["**ICSID**"] received a request for arbitration [the "**Request for Arbitration**"] submitted by Rusoro Mining Ltd ["**Rusoro**" or "**Claimant**"], a corporation constituted in Canada, against the Bolivarian Republic of Venezuela ["**Venezuela**" or "**Respondent**"].

2.      The Request was made pursuant to the ICSID Additional Facility Rules of 10 April 2006 ["**AF Rules**"], and the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, dated 1 July 1996 [the "**BIT or Treaty**"][1].

3.      On 1 August 2012, the ICSID Secretary-General approved access to the Additional Facility pursuant to Article 4 of the AF Rules, and registered the Request for Arbitration pursuant to Articles 4 and 5 of the AF Rules. On the same day, the Secretary-General, in accordance with Article 5(e) of the ICSID Arbitration (Additional Facility) Rules ["**Arbitration AF Rules**"] invited the Parties to proceed to constitute the Arbitral Tribunal as soon as possible.

4.      By letter of 2 October 2012, Claimant invoked the procedure for the constitution of the Arbitral Tribunal established in Article 9 of the Arbitration AF Rules, *i.e.*, one arbitrator appointed by each party, and the third arbitrator, who would serve as President of the Tribunal, to be appointed by agreement of the parties.

5.      By letter of 9 October 2012, Claimant appointed Prof. Francisco Orrego-Vicuña, a national of Chile, as arbitrator. Prof. Orrego Vicuña accepted his appointment on 15 October 2012. By letter of 31 October 2012, Respondent appointed Judge Bruno Simma, a national of Germany, as arbitrator. Judge Simma accepted his appointment on 12 November 2012.

6.      By e-mail of 15 November 2012, Claimant notified the ICSID Secretariat about the parties' efforts to reach an agreement on the identity of the President and requested the ICSID Secretariat not to make any proposal or nomination in respect of the President for a period to expire on 23 November 2012. By e-mail of 27 November 2012, Respondent notified the Centre that the Parties agreed to continue to consult through 30 November 2012, requesting ICSID to refrain from making any proposals or nomination in respect of the President until after that date. By e-mail of 7 December 2012, Respondent notified the Centre about the Parties' agreement on a further extension through 14 December 2012.

7.      By letter of 3 January 2013, Claimant informed ICSID that the Parties had agreed to the appointment of Prof. Juan Fernández-Armesto as the President of the Tribunal. Prof. Fernández-Armesto, a national of Spain, accepted his appointment as President of the Tribunal on 4 January 2013.

---

[1] Doc. C-102 – Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and the Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, hereinafter referred to as the **Treaty** or the **BIT**.

8.     On 4 January 2013, ICSID informed the Parties that all of the arbitrators had accepted their appointments and that, pursuant to Article 13(1) of the Arbitration AF Rules, the Tribunal was deemed to have been constituted, and the proceedings to have begun on that date. Ms. Alicia Martín Blanco, ICSID Legal Counsel, was designated by the Secretary-General of ICSID to serve as the Secretary of the Tribunal.

9.     Henceforth, the Claimant and the Respondent will together be referred to as the **Parties**. Further details on the Parties and their representatives can be found in section II of the present Award.

## II.  THE PARTIES TO THE ARBITRATION

10.   The present arbitration takes place between Rusoro Mining Ltd. and the Bolivarian Republic of Venezuela.

1.   THE CLAIMANT – RUSORO MINING LIMITED

11.   The Claimant is RUSORO MINING LIMITED, a publicly traded Canadian company trading under the symbol "RML" on the Canadian TSX-Venture stock exchange. The Claimant was initially incorporated in 2000 under the *Company Act* (replaced in 2002 by the *Business Corporations Act*) of the Province of British Columbia, Canada, as "Hollingfield Capital Corporation", having subsequently changed its name several times: to "PKI Innovations (Canada) Inc." in 2001, to "Newton Ventures Inc." in 2005, and finally to "Rusoro Mining Ltd." on 6 November 2006.[2] The Claimant's head office is located at:

> 355 Burrard Street
> Suite 520
> Vancouver, BC (V6C 2G8)
> Canada

12.   The Claimant's main business is the exploration and production of gold. Through a series of complex mergers and acquisitions between 2006 and 2008, the Claimant acquired several gold mining rights and projects in Venezuela.[3] Its gold mining properties were mainly located in the districts of El Dorado, El Callao and Cuyuni.[4]

13.   The Claimant is represented in this arbitration by:

### A.   Freshfields Bruckhaus Deringer US LLP

> Mr. Nigel Blackaby
> Mr. Noah Rubins
> Mr. Alex Wilbraham
> Mr. Jean-Paul Dechamps
> Mr. Ben Love
> Mr. Robert Kirkness
> Mr. Gustavo Topalian
> Mr. Ricardo Chirinos
> Mr. Juan Pomés
> 700 13th Street, NW
> 10th Floor
> Washington, D.C. 20005-3960
> United States of America
> Tel:      +1 202 777 4500
> Fax:      +1 202 777 4555
> E-mail:  nigel.blackaby@freshfields.com

---

[2] Doc. C-196.
[3] CRA I, Exhibit 2.
[4] CRA I, Exhibit 2.

noah.rubins@freshfields.com
alex.wilbraham@freshfields.com
jean-paul.dechamps@freshfields.com
ben.love@freshfields.com
robert.kirkness@freshfields.com
gustavo.topalian@freshfields.com
ricardo.chirinos@freshfields.com
juan.pomes@freshfields.com

**B.**     **Figueiras & Fischbach**

Ms. Alejandra Figueiras
Mr. Guillermo Iribarren
Edificio Cavendes
Piso 8, Oficina 806
Los Palos Grandes
Caracas, 1060
Venezuela
Tel:      +58 212 286 39 30
Fax :     +58 212 286 81 30
E-mail:   afigueiras@alfa.net.ve
          giribarren@alfa.net.ve


**C.**     **Mezgravis & Asociados**

Mr. Andrés Mezgravis
Ms. Militza Santana
Avenida Venezuela
Torre Oxal, Piso 5, Oficina 5-A
Urbanización El Rosal
Caracas, 1060
Venezuela
Tel:      +58 212 952 73 71
Fax:      +58 212 952 73 07
E-mail:   aam@mezgravis.com
          msp@mezgravis.com

**2.**    **THE RESPONDENT – THE BOLIVARIAN REPUBLIC OF VENEZUELA**

14.    The Respondent is the Bolivarian Republic of Venezuela.

15.    The Respondent is represented in this arbitration by:

**A.**     **Procuraduría General de la República Bolivariana de Venezuela**

Dr. Reinaldo Enrique Muñoz Pedroza
*Procurador General de la República*
Dr. Felipe Daruiz
*Coordinador de Juicios Internacionales*
Av. Los Ilustres, c/c calle Francisco Lazo Marti

Urb. Santa Mónica
Caracas
Venezuela
Tel:     +58 212 597 3902
Fax:     +58 212 693 2928
E-mail:  casosinternacionalesvzla@gmail.com
         felipedf63@gmail.com

**B.     Foley Hoag LLP**

Mr. Derek Smith
Mr. Alberto Wray
Mr. Thomas Ayres
Mr. Diego Cadena
Ms. Analía González
Mr. Christopher Hart
Ms. Christina Beharry
Ms. Erin Argueta
Mr. Ofilio Mayorga
Ms. Melinda Kuritzky
Mr. José Rebolledo
1717 K Street, NW
Suite 1200
Washington, D.C. 20006
United States of America
Tel:     +1 202 223 1200
Fax:     +1 202 785 6687
E-mail:  dcsmith@foleyhoag.com
         awray@foleyhoag.com
         tayres@foleyhoag.com
         dcadena@foleyhoag.com
         agonzalez@foleyhoag.com
         chart@foleyhoag.com
         cbeharry@foleyhoag.com
         eargueta@foleyhoag.com
         omayorga@foleyhoag.com
         mkuritzky@foleyhoag.com
         jrebolledo@foleyhoag.com

# III. PROCEDURAL HISTORY

16.     On 24 January 2013, following the Tribunal's constitution on 4 January 2013, the ICSID Secretariat circulated a draft agenda and a draft procedural order to help the Parties with the preparation for the first session. On 4 February 2013, the Claimant submitted a joint procedural agreement, which was confirmed by the Respondent on the same date.

17.     By letter of 6 February 2013, the Respondent requested that Prof. Orrego Vicuña provide additional information concerning the statement accompanying his declaration. On 7 February 2013, ICSID transmitted to both Parties Prof. Orrego Vicuña's response, which was supplemented by letters of 16 February 2013 and 11 March 2013 following exchanges between the Parties regarding Respondent's above-mentioned request.

18.     The Tribunal held a first session with the Parties by telephone conference on 8 February 2013. During the first session, the Tribunal addressed the items on the draft procedural agenda and order as revised and agreed by the Parties, confirmed the Parties' agreements and decided on the points in dispute. The Parties confirmed that each Member of the Tribunal had been validly appointed in accordance with the AF Rules and Arbitration AF Rules. It was agreed *inter alia* that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, that the place of the arbitration would be Paris, France, and that the hearings would take place in Washington D.C, U.S.A.

19.     Present at the session were:

        Members of the Tribunal:

        Prof. Juan Fernández Armesto            President of the Tribunal

        Prof. Francisco Orrego Vicuña           Arbitrator

        Judge Bruno Simma                       Arbitrator

        ICSID Secretariat:

        Ms. Alicia Martín Blanco            Secretary of the Tribunal

        On behalf of the Claimant:

        Mr. Nigel Blackaby                  Freshfields Bruckhaus Deringer LLP

        Mr. Noah Rubins                     Freshfields Bruckhaus Deringer LLP

        Mr. Jean-Paul Dechamps              Freshfields Bruckhaus Deringer LLP

        Mr. Robert Kirkness                 Freshfields Bruckhaus Deringer LLP

        Ms. Alejandra Figueiras             Figueiras & Fischbach S.C.

20

| Ms. Nosemí Fischbach | Figueiras & Fischbach S.C. |
| Mr. Gerardo Bello | Figueiras & Fischbach S.C. |
| Ms. Ariana Contreras | Figueiras & Fischbach S.C. |
| Mr. Andrés Mezgravis | Mezgravis & Asociados |
| Ms. MilitzaSantana | Mezgravis & Asociados |

On behalf of the Respondent:

| Mr. Manuel Coronado | PDVSA |
| Mr. David Díaz | PDVSA |
| Mr. Andrés Domínguez | PDVSA |
| Dr. Ronald E. M. Goodman | Foley Hoag LLP |
| Ms. Mélida Hodgson | Foley Hoag LLP |
| Mr. Luis Parada | Foley Hoag LLP |
| Mr. Diego Cadena | Foley Hoag LLP |

20. On 7 March 2013, the Tribunal circulated Procedural Order No. 1 containing the Parties' agreements and the Tribunal's decisions, including a schedule of the proceedings.

21. By letter of 15 March 2013, the Claimant notified the Members of the Tribunal about the Parties' agreement to extend the deadlines for submission of the Memorial and the Counter-Memorial respectively, which the Tribunal confirmed on 18 March 2013.

22. The Claimant submitted its Memorial and accompanying materials on 21 March 2013.

23. On 28 March 2013, the Respondent filed a Proposal for the Disqualification of Prof. Orrego Vicuña and accompanying materials.

24. On 29 March 2013, the ICSID Secretariat informed the Parties that, in accordance with Article 15(7) of the Arbitration AF Rules, the proceeding was suspended pending the decision by the other two Members of the Tribunal regarding the Proposal for the Disqualification of Prof. Orrego Vicuña.

25. On 18 April 2013, the Claimant filed its Response to the Respondent's Proposal for the Disqualification of Prof. Orrego Vicuña and accompanying documents.

26. On 22 April 2013, the Respondent requested the other two Members of the Tribunal to advise the Parties whether, despite the suspension of the proceeding, the Parties were to abide by the original calendar with respect to their filings on bifurcation, as

provided for in Procedural Order No. 1. On 23 April 2013, the non-challenged Members of the Tribunal acknowledged the Parties' willingness to accelerate the proceeding, confirmed the Parties' proposal to adhere to the original calendar, and invited the Parties to confirm by 24 April 2013 whether they agreed to the transmission of the bifurcation request to Prof. Orrego Vicuña, despite the Proposal for Disqualification being pending.

27.   By email of 24 April 2013, the Respondent argued that it would be inappropriate to transmit the filings on bifurcation to Prof. Orrego Vicuña as well as for the Tribunal to deliberate or adjudicate any filings while the proceeding was suspended to consider the Proposal for Disqualification.

28.   On the same date, the Respondent submitted its Request for Bifurcation and accompanying documentation, pursuant to which it requested the Tribunal to determine its jurisdiction as a preliminary matter.

29.   On 29 April 2013, Prof. Orrego Vicuña submitted his comments to the Proposal for Disqualification, pursuant to Article 15(4) of the Arbitration AF Rules. By emails of 13 May 2013, the Parties submitted additional simultaneous comments to the Proposal for Disqualification.

30.   On 15 May 2013, the Claimant filed its response and accompanying documents to Respondent's Request for Bifurcation.

31.   On 14 June 2013, Prof. Fernández Armesto and Judge Simma issued their Decision on the Proposal to Disqualify Prof. Orrego Vicuña.  The Decision rejected the Proposal for Disqualification.

32.   On 16 July 2013, the Tribunal issued its Decision on the Request for Bifurcation. The Tribunal decided not to bifurcate *pro tem*, and reserved its right to revisit this decision upon review of the Respondent's full arguments on the jurisdictional objections in its Counter-Memorial. With the same decision, the Tribunal also lifted the suspension of the proceeding and invited the Parties to try to reach an agreement regarding the new dates for the remaining submissions and to report to the Tribunal by 29 July 2013. On 29 July 2013, the Parties notified their agreement concerning the procedural calendar.

33.   On 4 October 2013, following exchanges between the Parties and the Tribunal about availability for possible hearing dates, the Tribunal and the Parties agreed on the weeks of 8 December 2014 (for the first session of the hearing) and 19 January 2015 (for the second session of the hearing).

34.   On 11 November 2013, the ICSID Secretariat transmitted to the Parties a request by the President of the Tribunal to appoint Ms. Deva Villanúa Gómez as an Assistant to the Tribunal in this case. The Parties agreed to the appointment of Ms. Villanúa Gómez as Assistant to the Tribunal by emails of 13 November 2013 and 15 November 2013 respectively.

35.   Following a request for an extension granted by the Tribunal, the Respondent filed its Counter-Memorial and accompanying documents on 30 January 2013.

36. On 28 February 2014, the Parties exchanged document production requests in the form of Redfern Schedules, pursuant to their agreement of 13 February 2014. On 17 March 2014, the Parties exchanged responses and objections to their respective requests for the production of documents. The Parties produced non-disputed documents on 20 March 2014. Following an agreed extension, on 28 March 2014, both Parties submitted replies to their respective requests for production of documents.

37. On 29 April 2014, the ICSID Secretariat notified the Parties that the Tribunal would not be able to issue its decision within 20 days following the Parties' respective reply submissions as provided in Section 14(6) of Procedural Order No. 1, and that a decision would be issued shortly.

38. On 1 May 2014, the Tribunal issued Procedural Order No. 2, in which it decided on the Parties' respective requests for production of documents.

39. On 12 May 2014, the Parties submitted their agreement to extent the time limit for the submission of the Reply and Rejoinder. The agreement provided that the hearing dates would be maintained.

40. On 23 May 2014, the Claimant submitted two letters: one addressed to the Respondent concerning the Claimants' production of documents pursuant to Procedural Order No. 2; and another one seeking the Tribunal's assistance in relation to certain alleged deficiencies in Respondent's production of documents pursuant to the same order. Venezuela submitted a response on 28 May 2014 requesting that the Tribunal deny all of the Claimant's requests contained in its letter of 23 May 2014, to which the Claimant replied on 30 May 2014 seeking the production of certain documents. After obtaining leave from the Arbitral Tribunal, the Respondent submitted further observations on 4 June 2014.  The Parties exchanged further communications on this issue on 5 and 6 June 2015.

41. By letter of 10 June 2014, the Respondent sought clarification regarding the Parties' different interpretations of the Tribunal's decision on certain requests for document production that had been formulated by the Respondent and addressed in Procedural Order No. 2.  Venezuela requested that the Tribunal order the Claimant to produce certain documents in accordance with its interpretation of the Tribunal's decision. By letter of 18 June 2014, the Claimant responded requesting the Tribunal to confirm its existing order and reject Venezuela's request for production of what it considered to be additional documents beyond the scope of the order.  The Parties exchanged further communications on this issue on 20 and 24 June 2014.

42. The Claimant filed its Reply and accompanying documents on 12 June 2014.

43. On 30 June and 8 July 2014, the Tribunal issued Procedural Orders Nos. 3 and 4 respectively, in which it addressed outstanding issues relating to document production.

44. By letter of 15 July 2014, the Claimant sought permission from the Tribunal to submit additional relevant evidence that was not available when it filed its Reply on 12 June 2014. On 21 July 2014, following the Tribunal's instructions, the Respondent filed its observations with respect to the Claimant's request. With the

Tribunal's permission, the Parties submitted further comments on 23 and 28 July 2014.

45. The Tribunal issued its Decision on the Request for the Submission of New Evidence on 15 September 2014.

46. On 25 September 2014, following a consultation with the Parties about availability during the dates established for the second session of the hearing, the Tribunal and the Parties confirmed the hearing dates as follows: 7-12 December 2014 (for the first session of the hearing) and 2-4 February 2015 (for the second session of the hearing).

47. Following an extension agreed by the Parties, on 13 October 2014, Venezuela submitted its Rejoinder and accompanying materials.

48. With the submission of its Rejoinder, Venezuela noted that due to communication issues it had not received one witness statement in time to file it with the Rejoinder. Venezuela anticipated that it would receive it in the following days and submit it by then. By letter of 16 October 2014 addressed to the Tribunal, the Claimant noted that no statement from the unidentified witness had been submitted by Venezuela by that date and requested that the Tribunal issue an order declaring the evidence of Venezuela's unidentified witness to be inadmissible. On 17 October 2014, the Respondent requested permission by the Tribunal to include the witness statement of former Minister of Basic Industries and Mining Mr. José Salamat Khan as part of its Rejoinder. On 24 October 2014, the Claimant requested that Mr. Khan's statement be excluded from the record.

49. On 20 October 2014, the Claimant requested that the Tribunal issue an order declaring that the witness statements of Mr. Ramón Calderón and Mr. José A. Ferrer Monasterio, as well as the expert opinion of Mr. John G. Brim, were inadmissible and that they be stricken from the record.

50. By letter of 29 October 2014, the Respondent addressed Claimant's three previous communications seeking the dismissal of the Claimant's requests concerning the witness statements of Messrs. Calderón, Ferrer and Khan, as well as the expert opinion of Mr. Brim. On the same date, by means of a second letter, the Respondent informed that Prof. García Montoya, one of its expert witnesses, had become a partner in a law firm with Venezuela's local counsel on 22 September 2014, and had thenceforth been retained as Venezuela's counsel. The Respondent requested that his legal opinion still be deemed appropriate, since it was issued prior to having been retained as counsel. The Claimant reacted to Respondent's second letter on 10 November 2014 seeking the exclusion of Prof. Montoya's report from the record or, should his report be retained, that Prof. Montoya be ordered to make himself available for cross-examination at the hearing. The Respondent provided further comments on 11 November 2014.

51. On 6 November 2014, the Respondent sought permission from the Tribunal to present new evidence. Venezuela argued that the new evidence only came into its possession after having submitted its Rejoinder. On 14 November 2014, the Claimant did not object to the production of new evidence subject to certain conditions [production of certain documents] and reserved its right to submit

responsive evidence once it had had the opportunity to review it.  Further to the production of the documents requested by the Claimant, on 29 November 2016 Venezuela requested that the new evidence be entered into the record.

52.  On 10 November 2014, the Claimant requested that the Tribunal order Venezuela to produce the documents listed in the Claimant's request of 28 November 2014 addressed to the Respondent, to which Venezuela had responded on 7 November 2014. On 11 November 2014, Venezuela noted that it would have no objection to this new request should the Claimant petition the Tribunal for leave to submit a further document production request or should the Tribunal decide to treat Claimant's letter as such a petition.  On 12 November 2014, the Tribunal informed the Parties that it had no objection to further rounds of document production, in accordance with Section 14(12) of Procedural Order No. 1.

53.  On 12 November 2014, the Tribunal issued its Decision on Admissibility of Evidence and Hearing Dates, in which it decided on the admissibility of the witness statements of Messrs. Khan, Ferrer and Calderón and of the expert reports of Messrs. Brim and Montoya.  The Tribunal further addressed the need for an additional hearing day and offered 1 February 2015.  The Parties confirmed that they wished to make use of the additional day on 19 November 2014. In light of the Tribunal's Decision of 12 November 2014, Respondent submitted the witness statement of Mr. Khan on 14 November 2014 as part of its Rejoinder.

54.  On 17 November 2014, the President of the Tribunal informed the Parties that Mr. Rafael Bittencourt Silva would replace Ms. Deva Villanúa as Assistant to the Tribunal and that his appointment would be subject to the same terms as Ms. Villanúa's.

55.  On 19 November 2014, the Tribunal took note of the Parties' agreement to have a pre-hearing conference call.  The Tribunal further noted that it had agreed that Prof. Fernández Armesto would take the conference call on behalf of the Tribunal.

56.  On 19 November 2014, the Claimant submitted a document incorporating their agreed procedural arrangements for the hearing, as well as the areas where the Parties had been unable to reach an agreement. The Respondent submitted its confirmation of the Parties' agreement on 21 November 2014.

57.  On 24 November 2014 and further to the Tribunal's Decision of 12 November 2014, the Claimant sought orders addressing certain specific evidentiary issues arising out of Venezuela's Rejoinder and accompanying witness statements.

58.  The pre-hearing conference call was held on 25 November 2014.  During the call, the Parties addressed the points of disagreement concerning procedural arrangements for the hearing as well as the Claimant's application of 24 November 2014.  The Tribunal issued Procedural Order No. 4A on 26 November 2014 containing the Parties' procedural agreements and the Tribunal's orders on these issues.  Pursuant to these agreements, on the same date Venezuela communicated the additional documents and legal authority that it sought to enter into the record prior to the first session of the hearing.

59.   On 2 December 2014, the Claimant communicated to the Tribunal an agreement reached by the Parties concerning document production procedure. The agreement was confirmed by the Respondent on the same date. In accordance with this agreement, (i) the Parties filed simultaneous submissions on 2 November 2014 concerning requests that had already been submitted to the Tribunal (namely, the Parties' respective communications of 24 and 26 November 2014); and (ii) the Claimant submitted a letter to the Tribunal on 2 December 2014 concerning requests that had so far been sent to Venezuela with no corresponding request to the Tribunal reflecting the basis for its request, to which Venezuela responded on 3 December 2014. Further comments were sent by the Claimant on 3 December 2014.

60.   On 4 December 2014, the Tribunal indicated that it was working to issue a procedural order dealing with outstanding document production and procedural issues, and requested that the Parties refrain from sending further communications in this regard.  Procedural Order No. 5 was issued on the same date.

61.   On 5 December 2014, the Parties sought leave to submit a new documents into the record.  The Tribunal addressed pending and new procedural and evidentiary issues during the first session of the hearing.

62.   The first session of the hearing on jurisdiction and the merits was held in Washington, D.C. from 7 December to 12 December 2014. In addition to the Members of the Tribunal and the Secretary of the Tribunal, the following persons attended the hearing in whole or in part:

For the Tribunal:

Mr. Rafael Bittencourt Silva          Assistant to the Tribunal

On behalf of the Claimant:

Mr. Nigel Blackaby                    Freshfields Bruckhaus Deringer

Mr. Noah Rubins                       Freshfields Bruckhaus Deringer

Mr. Alex Wilbraham,                   Freshfields Bruckhaus Deringer

Mr. Jean-Paul Dechamps,               Freshfields Bruckhaus Deringer

Mr. Robert Kirkness,                  Freshfields Bruckhaus Deringer

Mr. Gustavo Topalian,                 Freshfields Bruckhaus Deringer

Mr. Ricardo Chirinos                  Freshfields Bruckhaus Deringer

Mr. Juan Pedro Pomes                  Freshfields Bruckhaus Deringer

Mr. Christian Skinner-Klee            Freshfields Bruckhaus Deringer

Mr. Ranamit Banerjee                  Freshfields Bruckhaus Deringer

Mr. Jaime Aranda                      Freshfields Bruckhaus Deringer

26

Mr. Israel Guerrero                     Freshfields Bruckhaus Deringer

Ms. Deborah Blake                      Freshfields Bruckhaus Deringer

Mr. Andre Agapov                       Rusoro Mining Limited

Mr. Vladimir Agapov                    Rusoro Mining Limited

Witnesses:

Mr. Andre Agapov
Mr. Vladimir Agapov
Mr. Gregory Smith
Mr. Matías Herrero

Experts:

Mr. José Antonio                       Muci Borjas

Mr. Brent Kaczmarek,                   Navigant Consulting

Mr. Garrett Rush                       Navigant Consulting

On behalf of the Respondent:

Dr. Ronald E.M. Goodman                Foley Hoag LLP

Mr. Derek Smith                        Foley Hoag LLP

Dr. Alberto Wray                       Foley Hoag LLP

Ms. Analía González                    Foley Hoag LLP

Mr. Thomas Ayres                       Foley Hoag LLP

Mr. Christopher Hart                    Foley Hoag LLP

Ms. Christina Beharry                  Foley Hoag LLP

Ms. Erin Argueta,                      Foley Hoag LLP

Mr. Diego Cadena,                      Foley Hoag LLP

Mr. Ofilio Mayorga,                    Foley Hoag LLP

Ms. Melinda Kuritzky,                  Foley Hoag LLP

Ms. Diana Tsutieva,                    Foley Hoag LLP

Mr. Yuri Parkhomenko                   Foley Hoag LLP

Mr. Ivan Urzhumov                      Foley Hoag LLP

| | |
|---|---|
| Ms. Katherine Guevara | Foley Hoag LLP |
| Mr. José Rebolledo | Foley Hoag LLP |
| Mr. Rodrigo Tranamil | Foley Hoag LLP |
| Ms. Kathryn Kalinowski | Foley Hoag LLP |
| Mr. Pedro Ramírez | Foley Hoag LLP |
| Ms. Angélica Villagrán | Foley Hoag LLP |
| Ms. Paula Mercier | Foley Hoag LLP |
| Ms. Gabriela Guillén | Foley Hoag LLP |
| Mr. Peter Hakim | Foley Hoag LLP |
| Dr. Luis García Montoya | Attorney |
| Ms. Stephanie O'Connor | DOAR Litigation Consulting |
| Mr. Danis Brito | DOAR Litigation Consulting |
| Mr. Isaías Medina | Attorney |

Witnesses:

| | |
|---|---|
| Mr. Víctor Álvarez | Bolivarian Republic of Venezuela |
| Mr. Fernando Barrios | Bolivarian Republic of Venezuela |
| Mr. Ramón Calderón | Bolivarian Republic of Venezuela |
| Mr. Rubén Figuera | Bolivarian Republic of Venezuela |
| Mr. José A. Ferrer M. | Bolivarian Republic of Venezuela |
| Mr. José S. Khan, | Bolivarian Republic of Venezuela |
| Mr. Reinaldo Marcano | Bolivarian Republic of Venezuela |
| Mr. Oscar Roa Rojas | Bolivarian Republic of Venezuela |

Experts:

| | |
|---|---|
| Mr. James C. Burrows | Charles River Associates |
| Mr. Aaron Dolgoff | Charles River Associates |
| Mr. Michael Loreth | Charles River Associates |
| Mr. Kevin Moran | Charles River Associates |

| | |
|---|---|
| George Rainville | Charles River Associates |
| Mr. Angelo Grandillo | BBA |
| Mr. Patrice Live | BBA |
| Mr. Nicolas Szwedska | BBA |
| Mr. John Brim | |
| Dr. Carlos Mouriño | |
| Mr. Carmine Pascuzzo | Assistant to Dr. Carlos Mouriño |

63.  On 16 January 2015, the Parties notified the Tribunal of their agreement on procedural aspects concerning certain submissions ordered by the Tribunal (namely the submissions on the decision in *Caso Motores de Venezuela C.A. (MOTORVENCA) c. Banco De Venezuela* and the submissions on the sanctions imposed on operators and users of the swap market) and also concerning post-hearing briefs. Following the Parties' request, on 23 January 2015, the ICSID Secretariat notified the Parties that the Tribunal had conferred on the possibility of having reports from legal experts on the submissions ordered by the Tribunal and decided that the Parties' submissions on these issues should be sufficient.

64.  On 23 January 2015, the Claimant sought orders from the Tribunal addressing certain specific evidentiary issues arising out of the first session of the hearing and/or Venezuela's Rejoinder and accompanying documents.  On 27 January 2015, the Respondent requested that the Claimant's requests be denied except in so far as they concerned documents that had been previously requested by the Tribunal, and reserved its rights to submit responsive documents should the Tribunal decide to grant the Claimant's requests.

65.  On 28 January 2015, the Tribunal issued Procedural Order No. 6 addressing the Claimant's 23 January requests. Further evidentiary and procedural issues arose and were addressed by the Tribunal during the second session of the hearing.

66.  The Tribunal held the second session of the hearing on jurisdiction and the merits from 1 February through 4 February 2015 in Washington, D.C. In addition to the Members of the Tribunal, and the Secretary of the Tribunal, present at the Second Session were:

For the Tribunal:

| | |
|---|---|
| Mr. Rafael Bittencourt Silva | Assistant to the Tribunal |

On behalf of the Claimant:

| | |
|---|---|
| Mr. Noah Rubins | Freshfields Bruckhaus Deringer |
| Mr. Alex Wilbraham | Freshfields Bruckhaus Deringer |
| Mr. Ben Love | Freshfields Bruckhaus Deringer |

Mr. Gustavo Topalian                    Freshfields Bruckhaus Deringer

Mr. Juan Pedro Pomes                    Freshfields Bruckhaus Deringer

Mr. Jaime Aranda                        Freshfields Bruckhaus Deringer

Mr. Israel Guerrero                     Freshfields Bruckhaus Deringer

Mr. Drake Starling                      Freshfields Bruckhaus Deringer

Ms. Deborah Blake                       Freshfields Bruckhaus Deringer

Mr. Andre Agapov                        Rusoro Mining Limited

Experts:

Mr. Tim Swendseid                       RungePincockMinarco (Expert)

Mr. Brent C. Kaczmarek                  Navigant Consulting (Expert)

Mr. Garrett Rush                        Navigant Consulting

Mr. Gabriel Perkinson                   Navigant Consulting

On behalf of the Respondent:

Dr. Ronald E.M. Goodman                 Foley Hoag LLP

Mr. Derek Smith                         Foley Hoag LLP

Dr. Alberto Wray                        Foley Hoag LLP

Ms. Analía González                     Foley Hoag LLP

Mr. Thomas Ayres                        Foley Hoag LLP

Mr. Christopher Hart                     Foley Hoag LLP

Ms. Christina Beharry                   Foley Hoag LLP

Mr. Ofilio Mayorga                      Foley Hoag LLP

Ms. Melinda Kuritzky                    Foley Hoag LLP

Mr. José Rebolledo                      Foley Hoag LLP

Mr. Rodrigo Tranamil                    Foley Hoag LLP

Ms. Kathryn Kalinowski                  Foley Hoag LLP

Ms. Gabriela Guillén                    Foley Hoag LLP

Mr. Peter Hakim                         Foley Hoag LLP

| | |
|---|---|
| Ms. Stephanie O'Connor | DOAR Litigation Consulting |
| Mr. Danis Brito | DOAR Litigation Consulting |

Experts:

| | |
|---|---|
| Mr. James C. Burrows | Charles River Associates (Expert) |
| Ms. Rebecca Newman | Charles River Associates |
| Mr. Michael Loreth | Charles River Associates |
| Mr. Kevin Moran | Charles River Associates |
| Mr. George Rainville | Charles River Associates |
| Ms. Rebecca Newman | Charles River Associates |
| Mr. Angelo Grandillo | BBA (Expert) |
| Mr. Patrice Live | BBA (Expert) |
| Mr. Nicolas Szwedska | BBA |
| Mr. Jorge Torrealba | BBA |
| Mr. John Brim | Expert (Expert) |
| Mr. Yves Thomassin | Roche (Expert) |

67. On 13 February 2015, Venezuela submitted a request to introduce a new document into the record (the Mine Development Associates Report), which the Claimant opposed on 27 February 2015. On 12 March 2015, the Tribunal issued Procedural Order No. 7 rejecting Respondent's request for lack of exceptional circumstances or reasonable cause justifying its untimely introduction.

68. On 20 February 2015, the Claimant filed a Submission on the Decision by the Constitutional Chamber of the Venezuelan Supreme Court of 2 November 2011 in the *Motorvenca* Case, and the Respondent filed a submission on the sanctions imposed to the users of the swap market and legal authorities. Further to an agreed extension, the Parties submitted their respective responses on 19 March 2015.

69. Pursuant to the Tribunal's request during the second session of the hearing, on 27 February 2016, the Parties submitted (i) a letter to the Tribunal and a DCF matrix prepared jointly by Navigant and Charles River Associates; as well as (ii) separate letters from their respective experts.

70. On 3 March 2015, ICSID circulated a letter from the Tribunal concerning documentary issues that arose during and after the hearing as well as procedural post-hearing matters.

71.  On 2 April 2015, Venezuela notified the Tribunal that it was prepared to provide to the Claimant copies of the Block Models given to BBA during its site visit to certain properties at issue, and requested certain information from the Claimant concerning information used to prepare various reports. The Claimant commented on Respondent's submission by letter of 15 April 2015 and requested that the Tribunal disregard all submissions contained therein. On 5 May 2015, the Tribunal issued Procedural Order No. 8 rejecting the submission of the Block Models for the time being, with the possibility to request their submission after reviewing the Parties' post-hearing briefs.

72.  On 11 May 2015, the Parties communicated their agreement to seek a joint extension of the deadline to submit their post-hearing briefs, to which the Tribunal did not object. On 31 May 2015, the Parties agreed to a further extension of the deadline, which was also approved by the Tribunal.

73.  On 3 June 2015, each Party filed a post-hearing brief.

74.  Following an agreed extension, on 1 July 2015, each Party filed a summary of costs.

75.  Following the Tribunal's request, on 23 May 2016, the Parties confirmed their agreement that: (i) the Award be deemed to have been made at the place of arbitration; (ii) the Members of the Tribunal need not sign the Award at the place of arbitration; and (iii) neither Party will subsequently refuse compliance, seek to challenge or refuse enforcement of the Award on any ground connected with the place where the Award was signed.

76.  The Tribunal declared the proceeding closed on 29 June 2016, in accordance with Article 44(1) of the Arbitration AF Rules.

# IV. FACTS

77. Rusoro is a public company existing under the laws of British Columbia, Canada, with its head office in Vancouver[5], its principal business activities being the acquisition, exploration, development and operation of gold mineral properties.

78. Between 2006 and 2008 Rusoro acquired controlling interests in 24 Venezuelan companies, which held a total of 58 mining concessions and contracts for the exploration, development and exploitation of gold and other minerals in the south-eastern Bolívar State [together, the "**Mining Rights**"].

79. These Mining Rights derive from:

    - <u>concessions</u> granted by the Ministry of Energy and Mines [the "**MEM**"][6];

    - <u>contracts</u> ["**CVG Contracts**"] entered into by the State-owned Corporación Venezolana de Guayana ["**CVG**"], and by CVG Minerven – Compañía General de Minería de Venezuela C.A. ["**CVG Minerven**"], a company controlled by CVG[7];

    - <u>leasing agreements</u> (the MEM granted concessions to the CVG, which were then on-leased to companies controlled by Rusoro)[8]; and

    - <u>joint venture agreements</u> between companies controlled by Rusoro and the legal holders of CVG Contracts[9].

80. The following section will detail Rusoro's investment in gold mining in Venezuela, explaining how it succeeded in acquiring 58 Mining Rights between 2006 and 2008.

## 1. BACKGROUND: FROM GRUPO AGAPOV TO RUSORO

81. In the early 2000s Vladimir Agapov and his son Andre Agapov, two Russian businessmen, decided to invest in Venezuela through a Panamanian company called Grupo Agapov Corp. ["**Grupo Agapov**"][10].

82. In 2002 Grupo Agapov acquired control over a group of Venezuelan companies – Inversora Maryate C.A., Minería MS, C.A. and Inversora Técnica de Minas INTEMIN, C.A. – that held several gold exploration rights in the Sifontes Municipality in Bolívar State, including in the Emilia, Virginia and Belkis Imining areas.

83. Grupo Agapov further expanded its Venezuelan interests in 2003 by acquiring control of a group of companies – LAMIN Laboreos Mineros, C.A., Corporación

---

[5] Doc. C-196 – Notarial Certificate of Articles of Incorporation of Rusoro.
[6] MEM was replaced by the Ministry of People's Power for Petroleum and Mining ["**MPM**"] in November 2011.
[7] For example see Doc. C-90 – Exploration, Development and Exploitation Contract for Angelito.
[8] For example see Doc. C-93 – Leasing Contract for Choco 4.
[9] For example see Doc. C-139 – Joint Venture Agreement for the Exploitation of Urupagua.
[10] Doc. C-257 – Articles of Incorporation of Grupo Agapov.

80.000, C.A. and Corporación Cabello Gálvez, C.A. – holding rights to explore the San Rafael and El Placer ["**SREP**"] and Atlántida mining areas, also in Bolívar State.

84. Grupo Agapov continued its expansion in 2005 by acquiring a majority interest (76%) in Balandria Limited, a British Virgin Islands holding company that (through the Venezuelan companies General Mining de Guayana, C.A., Krysos Mining, S.A. and Corporación Minera 410879, C.A.), owned the mining rights to the Increíble 6, Valle Hondo and Anaconda mining areas, near the town of El Callao in Bolívar State. The minority partner of Grupo Agapov in this transaction was Mena Resources Inc. ["**Mena**"].

Rusoro acquires Grupo Agapov

85. By 2006 the managing directors of Grupo Agapov decided that, in order to continue with their expansion and development plans, a substantial capital injection was required. To achieve this, Grupo Agapov decided to transform into a public listed company on the TSX Venture Exchange[11]. Thus, in November 2006 Grupo Agapov merged with Newton Ventures (Panama) Inc., a wholly owned subsidiary of Rusoro, a Canadian corporation already listed on the TSX Venture Exchange (the Claimant in these proceedings). As a consequence of the merger, a new company, Rusoro Mining (Panama) Inc., was incorporated. The merger was structured as a reverse takeover, whereby Grupo Agapov's shareholders acquired a majority shareholding in Rusoro. Vladimir Agapov was appointed Chairman of Rusoro's Board of Directors[12].

86. Through Rusoro Mining (Panama) Inc., Rusoro became the owner of Grupo Agapov's ten Venezuelan subsidiaries, which, in turn, held various Mining Rights in Bolívar State:

**A.    Increíble 6**

87. General Mining de Guayana, C.A. held the mining rights to the Increíble 6 area in the El Callao Municipality. The rights to exploit gold in that area were held through a concession lease granted by CVG in 1991. The lease was to run for 20 years from the publication of the certificate of exploitation, which had occurred in September 2009, with the possibility of extending the term for subsequent periods of up to ten years[13].

**B.    SREP – San Rafael and El Placer**

88. LAMIN, Laboreos Mineros, C.A. had a CVG contract that authorized the exploitation of vein gold in the San Rafael area, for a period of 25 years from April 1991[14]. The rights to mine the El Placer property were held by Corporación 80.000

---

[11] Vladimir Agapov I at 15 and 16.
[12] Vladimir Agapov I at 16.
[13] Doc. C-49 – Leasing Contract of Increible 6.
[14] Doc. C-46 – Exploration Contract of San Rafael.

C.A. through a concession granted by the MEM; the concession was due to run until 2017[15].

### C.    Valle Hondo I-V, Valle Hondo 89 and 90

89.   Krysos Mining, S.A. held a concession for the exploitation of alluvial gold and diamonds in the Valle Hondo area, located in the Sifontes Municipality. The concession had been granted by the MEM in 1988 for a period of 20 years from the publication of the certificate of exploitation, which took place in September 1995[16].

90.   Krysos Mining, S.A. also held five additional concessions granted in 1990 to mine vein gold in the Valle Hondo I, II, III, IV and V areas for a period of 20 years[17], and two CVG Contracts for the exploitation of gold and diamonds in the Valle Hondo 89 and 90 areas granted in 1991, with a duration of 25 years[18].

### D.    Emilia and Emilia II

91.   Minería MS S.A. had entered in March 1991 into two contracts with CVG to exploit gold and diamonds in the Emilia and Emilia II areas, located in the Sifontes Municipality, for a period of 25 years[19]. Additionally Minería MS S.A. entered into two joint venture agreements with cooperatives holding CVG Contracts[20].

### E.    Atlántida

92.   Corporación Cabello Gálvez, C.A., a Venezuelan company 50% owned by Rusoro through Inversiones Mineras El Dorado, C.A., held a concession for the exploitation of alluvial gold and diamonds in the Atlántida area, located in the Sifontes Municipality. The concession had been granted by the MEM in August 1991 and was due to expire 20 years after the publication of the certificate of exploitation[21].

### F.    Anaconda

93.   Corporación Minera 410879, C.A. held a CVG contract granted in June 1992 for the exploitation of gold and diamonds in the Anaconda area, located in the Sifontes Municipality, for a period of 20 years[22].

### G.    Virginia I and II

94.   Inversora Maryate, C.A. had two concessions for the exploration and exploitation of alluvial gold in the Virginia I and Virginia II areas, both located in the Sifontes

---

[15] Doc. C-62 – Mining Title (concession) of El Placer.
[16] Doc. C-97 – Certificate of Exploitation of Valle Hondo.
[17] Doc. C-107 – Mining Titles of Valle Hondo I, II, III, IV and V.
[18] Doc. C-47 – Exploration, Development and Exploitation Contract for Valle Hondo 89; Doc. C-48 – Exploration, Development and Exploitation Contract for Valle Hondo 90.
[19] Doc. C-44 – Exploration, Development and Exploitation Contract for Emilia; Doc. C-45 – Exploration, Development and Exploitation Contract for Emilia II.
[20] Doc. C-139 – Joint Venture Agreement for Exploitation of Urupagua; Doc. C-134 – Joint Venture Agreement for Exploitation of Ceiba II.
[21] Doc. C-53 – Mining Title of Atlántida.
[22] Doc. C-61 – Exploitation Contract for Anaconda.

Municipality. These concessions had been granted in November 1988 for a period of 20 years from the publication of the certificate of exploitation (which had not occurred at the time of the nationalization of Rusoro's assets by the Venezuelan Government)[23].

### H.    Belkis I

95.    Inversora Técnica de Minas, INTEMIN C.A. held a CVG contract granted in August 1991 for the exploration, development and exploitation of gold and diamonds in the Belkis I area, located in the Sifontes Municipality, for a period of 25 years[24].

### I.    Guaicamacuare

96.    Mineral Ecological Technology de Venezuela M.E.T. C.A. held a CVG contract for the exploration, development and exploitation of gold in the Guaicamacuare area, located in both the Roscio and Sifontes Municipalities, for a period of 20 years as of 5 September 1991, which was extendable for subsequent periods of ten years[25].

### 2.    GOVERNMENT POLICY REGARDING MINING

97.    In 2005 President Chávez approved a general government policy, which implied that in a time horizon of between 5 and 10 years, the State would assume control of the gold (and diamond) mining activities. The approval of this policy is proven by an internal document, the "Cuenta al Señor Presidente de la República nº 11", submitted by the "Ministro del Ambiente y de los Recursos Naturales", and countersigned by President Chávez[26]. There is no evidence in the file whether this policy was publicly announced at that time.

98.    However, a year later in May 2006 the then "Ministro de Industria Básicas", Mr. Víctor Álvarez published an article[27] in which he set forth the "Principios rectores de la nueva política minera venezolana". The first principle was the suppression of all mining concessions granted to private persons, and the incorporation of mixed enterprises to carry out mining activities[28]:

> "Rescate de la soberanía nacional sobre los recursos minerales, metálicos y no metálicos. En 24 de octubre de 1829, Simón Bolívar expidió memorable Decreto, en la ciudad de Quito, determinando que "la propiedad sobre las minas de cualquier clase pasa del dominio de la Real Corona de España al dominio de la República". Aunque conste en la Ley de Minas actual – concebida bajo los principios de la Constitución de 1961– el célebre mandato del Libertador no ha sido respetado. Casi 177 años después, el MIBAM defiende la efectiva nacionalización de nuestras riquezas y la creación de un

---

[23] Doc. C-24 – Mining Title of Virginia I; Doc. C-25 – Mining Title of Virginia II.
[24] Doc. C-50 – Exploration, Development and Exploitation Contract for Belkis I.
[25] Doc. C-54 – Exploration, Development and Exploitation Contract for Guaicamacuare.
[26] Doc. R-4 – Cuenta No. 11 al Presidente de la República Bolivariana de Venezuela, 2005.
[27] Doc. R-6 – Aporrea, 18 May 2006.
[28] Doc. R-6 – Aporrea, 18 May 2006, p. 2.

> régimen transitorio, que sustituya las actuales concesiones mineras por empresas mixtas. La palabra de orden es "No más concesiones".

99. The second principle was the abolition of "mining latifundia", including those owned by "private groups from Russia", except for those companies "que trabajan y cumplen apropiadamente sus funciones"[29]

> "Erradicación del latifundio minero. Estudios demuestran que el 71,1% de los derechos mineros vigentes (cerca de 988.921 hectáreas) son latifundios mineros y que un 20,3% se encuentra en manos de cuatro grandes grupos privados de Venezuela, Rusia, Canadá y Holanda. El control de estas importantes áreas por el Estado venezolano es de fundamental interés estratégico: abarca los equilibrios social, político, económico, territorial, internacional. Nuestra orientación es intensificar la revisión de todos los contratos, de todas las concesiones, activas o inactivas, otorgadas a transnacionales o a grupos privados nacionales, para que el Estado asuma soberanamente su absoluto control, respetando las empresas que trabajan y cumplen apropiadamente sus funciones".

### 3.   RUSORO ACQUIRES CRADOCK'S ASSETS

100. The publication of this policy, which supported nationalization of all mining industries and the suppression of "mining latifundia", did not affect Rusoro's expansion plans.

101. In December 2006 Rusoro acquired, through its subsidiary Rusoro Mining (Panama) Inc., all of the issued and outstanding shares of Cradock United Inc. ["**Cradock**"][30].

102. The acquisition of Cradock gave Rusoro control over five additional Venezuelan companies:

- Corporación Minera Sor Teresita, C.A.,

- Inversiones Vipago, C.A.,

- Inversiones Yuruan, C.A.,

- Minera Tapaya, C.A. and

- Representaciones Carson Gold Int., S.A.

103. These five companies held a number of different mining rights in the following mining areas located in the Sifontes Municipality in Venezuela:

### A.   Sor Teresita 1,2,3,4 and Bloque B and Sor Teresita 5

104. Corporación Minera Sor Teresita, C.A. had four 20 year contracts which had been granted by CVG in 1992 for the exploitation of gold, for the areas Sor Teresita 1,

---

[29] Doc. R-6 – Aporrea, 18 May 2006, p. 2.
[30] Doc. C-151 – Purchase Agreement of Cradock United Inc.

Sor Teresita 2, Sor Teresita 3 and Sor Teresita 4[31]. It held an additional contract under the same terms for the exploitation of gold and diamonds in the area Bloque B and Sor Teresita 5 dated 1993[32].

**B.   Unin**

105.   Inversiones Vipago, C.A. held a concession for the exploration and subsequent exploitation of alluvial gold and diamonds in the Unin area, originally granted in 1988 for a period of 20 years. This concession had initially been granted by the MEM to Arapco Administración de Proyectos C.A. and was later transferred to Inversiones Vipago C.A.; the transfer was approved by the MEM in 1992[33].

**C.   Yuruan I**

106.   Inversiones Yuruan, C.A. held a CVG contract executed in November 1993 for the exploration, development and exploitation of gold and diamonds in the Yuruan I area for a period of 20 years since its execution[34].

**D.   Tapaya No. 1 and Libertad No. 1**

107.   Minera Tapaya. C.A. held two concessions granted in 1988 for the exploitation of alluvial gold and diamonds in the Tapaya No. 1 and Libertad No. 1 areas.

108.   The concession for the area Tapaya No. 1 had originally been granted by the MEM to Mr. Camilo Bruno Nicoli in July 1988; it was then transferred to Minera Tapaya, C.A. and such transfer was approved by the MEM in 1991[35].

109.   The concession for the area Libertad No. 1 had originally been granted by the MEM to China Clay Guayana, C.A. in May 1988, it was then transferred to Minera Tapaya, C.A. and such transfer was approved by the MEM in 1991[36].

110.   Both concessions had been granted by the MEM for 20 years from the date of issuance of the certificate of exploitation (which had not happened by the time of nationalization of Rusoro's assets by the Venezuelan Government).

**E.   Bloque A and Bloque C.**

111.   Representaciones Carson Gold Int., S.A. held a CVG contract for the exploration, development and exploitation of gold and diamonds in the Bloque A and Bloque C areas granted in 1992 for 20 years[37].

---

[31] Doc. C-63 – Exploitation Contract for Sor Teresita 1; Doc. C-64 – Exploitation Contract for Sor Teresita 2; Doc. C-65 – Exploitation Contract for Sor Teresita 3; Doc. C-66 – Exploitation Contract for Sor Teresita 4.
[32] Doc. C-72 – Exploitation Contract for Bloque B y Sor Teresita 5.
[33] Doc. C-67 – Mining Title of Unin.
[34] Doc. C-87 – Exploration, Development and Exploitation Contract for Yuruan.
[35] Doc. C-55 – Mining Title of Tapaya No. 1.
[36] Doc. C-56 – Mining Title of Libertad No. 1.
[37] Doc. C-69 – Exploration, Development and Exploitation Contract for Bloque A and Bloque C.

**4.   RUSORO ACQUIRES MENA'S ASSETS**

112.   In March 2007 Rusoro further increased its portfolio of mining properties in Venezuela through the acquisition of Mena. Mena held a 24% ownership interest in General Mining de Guayana, C.A., Krysos Mining S.A. and Corporación Minera 410879, C.A. (which were already 76% owned by Rusoro through the initial acquisition of Balandria Limited by Grupo Agapov[38]). The transaction thus allowed Rusoro to consolidate its control over these three subsidiaries and their mining rights.

113.   The acquisition of Mena also resulted in Rusoro's control of two additional Venezuelan subsidiaries that were controlled by Mena:

-   Corporación Minera 6560433, C.A. and

-   Inversiones Goldwana, C.A.

114.   The two Venezuelan subsidiaries held mining rights in the following areas located in Sifontes Municipality:

**A.   Angelito**

115.   Corporación Minera 6560433, C.A. had in 1993 entered into a contract with CVG for the exploitation of gold in the Angelito area for a period of 20 years[39].

**B.   La Trinidad.**

116.   Inversiones Goldwana, C.A. had a contract with CVG dated 1993 for the exploitation of gold and diamonds in the La Trinidad area, for the period of 20 years[40].

**5.   RUSORO ACQUIRES GOLD FIELDS' VENEZUELAN ASSETS**

117.   In October 2007 Rusoro purchased through a share deal the Venezuelan assets of a South Africa-based gold mining company known as Gold Fields Limited ["**Gold Fields**"]. This transaction made Gold Fields a 38% shareholder in Rusoro and gave Rusoro control over Gold Fields's subsidiaries in Venezuela, namely:

-   Promotora Minera de Guayana P.M.G. S.A. ["**PMG**"];

-   Corporación Aurífera de El Callao, C.A.;

-   Proyectos Mineros del Sur, PROMINSUR, C.A. ["**Prominsur**"];

-   Corporación Minera Choco 9, C.A.

---

[38] See para. 84 *supra*.
[39] Doc. C-90 – Exploration, Development and Exploitation Contract for Angelito.
[40] Doc. C-84 – Exploration, Development and Exploitation Contract for La Trinidad.

118. The Venezuelan subsidiaries acquired by Rusoro through Gold Fields in turn held mining rights in the following areas:

### A.   <u>Choco 10 mine</u>

119. The Choco 10 mine is located close to the gold mining town of El Callao in Bolívar State. The mining rights over this area were first granted by the MEM to CVG in 1993 and were effective for 20 years[41] and were effective for 20 years[41], a Venezuelan subsidiary of Bolívar Gold Corporation ["**Bolívar Gold**"][42], which initiated production at the mine in 2005[43]. In February 2006 Gold Fields had acquired the rights to the Choco 10 site from Bolívar Gold.

120. The acquisition of the Choco 10 mine by Rusoro marked its transition from an exploration company to a gold producer[44].

### B.   <u>Choco 4</u>

121. The concession over this area had been granted in 1993 by the MEM to CVG for a period of 20 years[45]. The Choco 4 concession had been leased by CVG to Bolivar Gold in February 1994[46].

### C.   <u>Bochinche B1, Bochinche B2 and Bochinche Zero</u>

122. Two concessions in relation to these areas had been granted in 1990 by the MEM to CVG for the exploration and subsequent exploitation of several minerals for a period of 20 years, from the publication of the certificate of exploitation (which had still not happened at the time of the nationalization)[47]. The Bochinche B1 and Bochinche B2 concessions were leased by CVG to Bolivar Gold under a 1991 joint lease agreement[48].

123. In June 1993 Bolivar Gold had also entered into a contract with CVG for the exclusive exploration, development and exploitation of gold in the Bochinche Zero area located in the Sifontes Municipality for a period of 20 years[49].

### D.   <u>Choco 1, Choco 2 and Choco 12</u>

124. The mining rights over Choco 1, Choco 2 and Choco 12 had initially been granted by the MEM to CVG via concessions for a period of 20 years[50]. These concessions

---

[41] Doc. C-82 – Mining Title of Choco 10.
[42] Doc. C-94 – Leasing Contract for Choco 10.
[43] Doc. C-137 – Certificate of Exploitation of Choco 10.
[44] Vladimir Agapov I at 22-26.
[45] Doc. C-79 – Mining Title of Choco 4.
[46] Doc. C-93 – Leasing Contract of Choco 4.
[47] Doc. C-31 – Mining Title of El Bochinche B1 and El Bochinche B2.
[48] Doc. C-37 – Leasing Contract of El Bochinche B1 and El Bochinche B2.
[49] Doc. C-86 – Exploration, Development and Exploitation Contract for Bochinche Zero.
[50] Doc. C-77 – Mining Title of Choco 1; Doc. C-78 – Mining Title of Choco 2; Doc. C-83 – Mining Title of Choco 12.

were subsequently leased by CVG to Corporación Aurífera de El Callao, C.A. in 1998[51].

### E.   Choco 6 and Increíble 16

125.   The mining rights over Choco 6 area had initially been granted via a concession by the MEM to CVG in May 1993 for a period of 20 years. CVG then leased the concession to Prominsur in 1994.

126.   Prominsur had also been granted in 1992 a contract by the CVG for the exploration, development and exploitation of gold and diamonds in the Increíble 16 area, which was expected to run for a period of 20 years.

### F.   Choco 9

127.   The rights over the Choco 9 area had initially been granted by the MEM to CVG in 1993 for a period of 20 years[52]. This concession was subsequently leased by CVG to Corporación Minera Choco 9 C.A. in 1998[53].

## 6.   RUSORO ACQUIRES HECLA'S ASSETS

128.   On 19 June 2008 Rusoro and Hecla Limited ["**Hecla**"] entered into a Stock Purchase Agreement under which Rusoro indirectly acquired 100% of the issued share capital in Hecla Limited's Venezuelan assets [the "**Hecla Transaction**"][54].

129.   This transaction granted Rusoro additional mining rights, as follows:

### A.   Bloque B – Isidora and Twin Shear Deposit

130.   The mining rights to the Bloque B (which included the Isidora mine and the Twin Shear deposit) had initially been granted through a concession to CVG Minerven and were later transferred to Hecla through a lease agreement in 2002[55].

131.   The lease agreement was assigned by Hecla to its Venezuelan subsidiary – El Callao Gold Mining Company de Venezuela S.C.S – in January 2003[56].

### B.   Niña I-IV, Niña VI and Niña VII

132.   Minera Hecla Venezolana C.A. ["**Minera Hecla**"] owned the mining rights deriving from a CVG contract originally granted in 1991 by the CVG to Monarch

---

[51] Doc. C-103 – Leasing Contract for Choco 1; Doc. C-104 – Leasing Contract for Choco 2; Doc. C-105 – Leasing Contract for Choco 12.
[52] Doc. C-81 – Mining Title of Choco 9.
[53] Doc. C-106 – Leasing Contract for Choco 9.
[54] Doc. C-169 – Stock Purchase Agreement between Rusoro and Hecla.
[55] Doc. C-115 – Leasing Contract for Bloque B.
[56] Doc. C-120 – Assignment of the Leasing Contract for Bloque B.

Resources de Venezuela, C.A., for 25 years, to explore, develop and exploit gold and diamonds in these areas[57].

**C.    El Sudor, Yessica, La Medusa, El Puyero I, Choco 7 and Canaima**

133.    Minera Hecla also held a second set of CVG Contracts, comprising five contracts granted to Monarch Resources de Venezuela, C.A., between 1992-1993, for 20-year periods, extendable for subsequent periods of ten years, to exploit gold and diamonds in these areas[58].

134.    Minera Hecla also held a 50-year MEM concession to exploit gold in the Canaima area in the Roscio Municipality that was due to expire in late 2013[59]. This concession had initially been granted to Ms. Dolores Herrera de Rassi and was subsequently transferred to Suramericana de Minería, S.A., which in turn transferred it to Suramericana de Mineria II, C.A. (currently Minera Rusoro Venezolana, C.A.)[60].

**7.    THE VENRUS JOINT VENTURE**

135.    In order to approve the Hecla Transaction, the Government of Venezuela required that the mining rights to be acquired by Rusoro operated through a joint venture, 50 % held by Rusoro and 50% held by the Government.

136.    Thus, shortly after finalizing the Hecla Transaction, on 4 July 2008 Rusoro entered into a joint venture agreement with the Venezuelan Government (through MIBAM) [the "**Commitment Agreement**"][61] and formed Minera Venrus C.A. ["**Venrus**"], a joint venture 50% owned by Empresa de Producción Social Minera Nacional C.A., a company owned indirectly by MIBAM, and 50% owned by Rusoro Mining de Venezuela C.A.[62].

137.    Pursuant to the Commitment Agreement, Rusoro agreed to transfer Hecla's assets (including Isidora) into Venrus, and MIBAM, for its part, would transfer La Camorra's assets[63].

---

[57] Doc C-38 – Exploration, Development and Exploitation Contract for Niña I; Doc. C-39 – Exploration, Development and Exploitation Contract for Niña II; Doc. C-40 – Exploration, Development and Exploitation Contract for Niña III; Doc. C-51 – Exploration, Development and Exploitation Contract for Niña IV; Doc. C-41 – Exploration, Development and Exploitation Contract for Niña VI; Doc. C-42 – Exploration, Development and Exploitation Contract for Niña VII.

[58] Doc. C-58 – Exploration, Development and Exploitation Contract for Choco 7; Doc. C-74 – Exploration, Development and Exploitation Contract for El Sudor; Doc. C-57 – Exploration, Development and Exploitation Contract for El Puyero I; Doc. C-75 – Exploration, Development and Exploitation Contract for Yessica; Doc. C-76 – Exploration, Development and Exploitation Contract for La Medusa.

[59] Doc. C-3 – Mining Title of Canaima.

[60] Doc. C-32 – Transfer of Mining Title of Canaima to Minera Rusoro Venezolana C.A.

[61] Doc. C-173 – Commitment Agreement.

[62] Doc. C-181 – Rusoro Mining de Venezuela C.A. is 100% owned by Rusoro.

[63] Doc. C-173 – Commitment Agreement, clause 5.

8.    THE VENEZUELAN GOLD AND EXCHANGE CONTROL REGULATIONS

138. At the time when Rusoro made its investments, the export of gold was regulated by a Resolution of the Banco Central de Venezuela ["**BCV**"], No. 96-12-02 ["**1996 BCV Resolution**"][64]. The overarching principle established in this Resolution was that of liberty of export:

> "Artículo 1 – Se permiten las operaciones de exportación de oro y sus aleaciones, tanto amonedado como en barras, fundido o refinado, manufacturado o en cualquier otra forma, en los términos y condiciones establecidos en la presente Resolución".

139. The only requirements for Venezuelan gold producers to export gold were[65]

- the registration of the gold producer at a special registry held by the BCV,

- a (non-discretionary) authorization of the BCV, and

- that at least 15% of the total production be sold in the private domestic market.

A.    **The 2003 exchange control regime**

140. In 2003 the Bolivarian Republic was confronted with the situation that the reduction in oil exports caused a shortage of foreign currency; as a reaction it decided to impose an exchange control regime, in order to guarantee the stability of the Venezuelan currency[66]. This was accomplished by way of a "*Convenio*" entered into between the BCV and the Government of Venezuela, which was then published in the *Gaceta Oficial* and became a binding rule of law ["**Convenio Cambiario No. 1**"][67].

141. The Convenio Cambiario No. 1 created a strict exchange control regime, with a public agency, the *Comisión de Administración de Divisas* ["**CADIVI**"] to supervise and manage the system and to grant the requisite authorizations. The general principles of the regime can be summarized as follows:

- The BCV is authorized to establish a fixed exchange rate between the VEF and the USD (and other currencies) [the "**Official Exchange Rate**"];

- The system differentiates between public and private sector entities, the former enjoying a more liberal regime: Petróleos de Venezuela S.A ["**PDVSA**"] and its affiliates are authorized to hold and to freely use foreign

---

[64] Doc. C-101 – Resolution of the BCV No. 96-12-02 published in Gaceta Oficial No. 36.124 on 13 January 1997; this Resolution was complemented by an "Instructivo" dated 30 January 1997 (Doc. C-255).

[65] Doc. C-101 – Resolution of the BCV No. 96-12-02, Arts. 2, 4 and 5.

[66] Doc. C-122 – Convenio Cambiario No. 1, Recitals. The first version of the Convenio Cambiario No. 1 was published on 5 February 2003; certain amendments were approved on 18 March 2003, and a revised version was published on 19 March 2003; this is the version referred to in the text.

[67] Doc. C-122 – Convenio Cambiario No. 1.

currency held in foreign accounts up to certain limits authorized by the BCV[68];

- For private persons the general rule is that all foreign currency holdings from the export of any goods, services or technologies, have to be sold to the BCV at the Official Exchange Rate[69];

- The exporter can, however, retain up to 10% of the income received in foreign currency to cover expenses connected with export activities, upon authorization from CADIVI[70];

- Purchase by private persons of foreign currency, for payment of imports or for any other purpose, can only be made within the limits set forth by CADIVI and subject to its authorization[71].

142. Thus, in accordance with Convenio Cambiario No. 1, a private company operating in Venezuela was obliged to sell its foreign currency to the BCV at the Official Exchange Rate, and could only purchase the foreign currency required for its import and other activities prior authorization of CADIVI and subject to CADIVI'S discretionary authorization.

143. Further to this official market, there was always the possibility of buying and selling foreign currency against VEF through a parallel currency market. In essence, the parallel market [known as the "**Swap Market**"] implied the purchase of sovereign bonds issued by Venezuela or its agencies in the domestic market in Venezuela, and the subsequent swapping of these bonds against equivalent bonds traded in the international market (or vice-versa). The VEF/USD exchange rate in the Swap Market was consistently higher than the Official Exchange Rate imposed by the BCV[72].

B.   **The 2009 Measures regarding the export of gold**

144. The 1996 BCV Resolution, which had created a liberal gold export regime, continued in force until April 2009, when the BCV decided to repeal it and to enact Resolution No. 09-04-03 [the "**April 2009 BCV Resolution**"][73].

145. The April 2009 BCV Resolution significantly altered the legal regime for the export of gold, by providing that 60% of the quarterly production had to be sold to the BCV. The BCV would pay the price in VEF by converting the international price of gold, denominated in USD, at the Official Exchange Rate (which was consistently lower than the market rate prevailing in the Swap Market).

---

[68] Doc. C-122 – Convenio Cambiario No. 1,Art. 15
[69] Doc. C-122 – Convenio Cambiario No. 1, Arts. 6 and 27.
[70] Doc. C-122 – Convenio Cambiario No. 1, Art. 27, Parágrafo Primero.
[71] Doc. C-122 – Convenio Cambiario No. 1, Art. 26.
[72] See chart comparing the evolution of the Official Exchange Rate and the Market Exchange Rate from January 2003 to May 2010, *Banco Central de Venezuela*, May 2010, available at http://www.bcv.org.ve/c7/pdf/prensa1080610.pdf.
[73] Doc. C-186 – April 2009 BCV Resolution.

146. Another 10% of the quarterly production could be freely sold to the domestic processing sector.

147. The April 2009 BCV Resolution permitted the export of up to 30% of production subject to BCV authorization, but any gold for which permission to export was denied, had to be sold in its entirety to the BCV[74].

148. In June 2009 Venezuela adopted two additional resolutions:

   - Resolution BCV No. 09-06-03 [the "**June 2009 BCV Resolution**"][75] and

   - Convenio Cambiario No. 12 [the "**Convenio Cambiario No. 12**"][76].

149. The June 2009 BCV Resolution reaffirmed the April 2009 BCV Resolution, but only for privately owned gold producing companies: it reiterated the rule that such companies had to sell 70% of their gold production in the domestic market – 60% to the BCV and 10% to private buyers; only up to 30% of the production could be exported, subject to discretionary authorization by the BCV; absent such authorization, this percentage had to be sold to the BCV.

150. The June 2009 BCV Resolution, however, offered a more relaxed regime for state-owned gold producers (e.g. those where the Republic or its agencies hold more than 50% of the capital); in such companies the percentage earmarked for the domestic market was reduced from 70% to 50%, 25% to be offered to the BCV and the remaining 25% to private domestic buyers. The other 50% could be exported[77].

151. The Convenio Cambiario No. 12 introduced a further differentiation between private companies and state-owned gold producing companies. While the former were now obliged to repatriate all foreign currency from gold exports and sell it to the BCV at the Official Exchange Rate, state-owned companies were exempted from that rule and allowed to maintain foreign currency in bank accounts located abroad, and to freely use such funds to make payments in foreign currency[78].

152. The April 2009 BCV Resolution, the June 2009 BCV Resolution and the Convenio Cambiario No. 12 [together, the "**2009 Measures**"] left Rusoro's subsidiaries at a disadvantage: while State-owned companies could sell their gold to the (domestic and export) market enjoying nearly complete freedom, Rusoro's subsidiaries were compelled to sell 90% of their gold to the BCV or to export it, subject to BCV's authorization and to repatriate the funds at the (lower) Official Exchange Rate.

153. The 2009 Measures had a significant impact on the business model of private Venezuelan gold producers. The impact was such that two months after adoption of the June 2009 BCV Resolution, Minister Sanz himself wrote to the President of the BCV, suggesting a modification to Art. 2 of the June 2009 BCV Resolution. Minister Sanz's proposal was that domestic and export sales requirements

---

[74] Doc. C-186 – April 2009 BCV Resolution, Art. 1.
[75] Doc. C-187 – June 2009 BCV Resolution.
[76] Doc. C-188 – Convenio Cambiario No. 12.
[77] Doc. C-187 – June 2009 BCV Resolution Arts. 2 and 4.
[78] Doc. C-188 – Convenio Cambiario No. 12, Arts. 1 and 2.

established should apply uniformly to private and state-owned companies[79]. However, no immediate action was adopted by the BCV – in fact the rules were not changed until July 2010. Before that, the exchange control regime was made even more stringent, and the Swap Market was closed.

### C.    Elimination of the Swap Market

154.   On 17 May 2010 the *Asamblea Nacional* of Venezuela passed the "*Ley de Reforma Parcial de la Ley contra Ilícitos Cambiarios*" ["**Ley de Reforma Cambiaria**"], making the use of the Swap Market for the obtaining of foreign currency illegal[80]. The sale and purchase of foreign currency became the exclusive purview of the BCV, through CADIVI, and the penalty for circumventing this law was a fine of twice the amount of the transaction, and possible imprisonment.

155.   In June 2010 the Government of Venezuela created the *Sistema de Transacciones con Títulos en Moneda Extranjera* ["**SITME**"][81], a system which allowed individuals or companies meeting certain requirements to access foreign currency at a preferential exchange rate, but subject to a limit of USD 350.000 per month. SITME simulated the operation of the extinct Swap Market, because it allowed companies to buy USD denominated government bonds in VEF at the Official Exchange Rate and to resell these bonds abroad for USD, at a market discount.

### D.    The 2010 Measures regarding the export of gold

156.   A month and a half later, in July and early August of 2010, the BCV passed two new rules, which amended the existing regulations and reduced the discrimination between publicly and privately owned gold producers.

157.   The first rule was Resolution BCV No. 10-07-01 [the "**July 2010 BCV Resolution**"][82] which gave some breathing space to the private gold industry: the mandatory requirement that private gold producers sell a portion of their production in the domestic market was reduced from 70 to 50%. However, the rule was now that the totality of these domestic sales had to be made to the BCV, at a price expressed in VEF and converted at the Official Exchange Rate (the 10% allowance for the private domestic gold market was scrapped). The remaining 50% could be exported, subject to authorization from the BCV, but would have to be sold to the BCV if such authorization was denied.

158.   The July 2010 BCV Resolution did not imply any change for publicly owned gold companies: the mandatory requirements remained in place (50% for the domestic market, of which 25% was to be sold to the BCV and 25% to private buyers, and the remaining 50% available for export).

159.   Simultaneously the Convenio Cambiario No. 12 was amended ["**Amendment to Convenio Cambiario No. 12**"], partially liberalizing the exchange control regime

---

[79] Doc. C-192 – Letter from MIBAM to BCV.
[80] Doc. C-200 – Ley de Reforma Cambiaria.
[81] Doc. C 202 – SITME Guidelines.
[82] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No.12.

of gold producers, and unifying the different regimes applicable to private and to public gold producers. All gold producers were now required to sell 50% of their foreign currency income from export operations to the BCV at the Official Exchange Rate, and were authorized to keep the other 50% in foreign accounts and to use the funds for payments in foreign currency outside the Bolivarian Republic[83].

**9.   THE NATIONALIZATION DECREE**

160.   On 17 August 2011 (one year after the publication in the *Gaceta Oficial* of the July 2010 BCV Resolution and the Amendment to Convenio Cambiario No. 12), President Chávez publicly announced the immediate nationalization of the gold mining industry in Venezuela, with the stated purpose of combating illegal mining[84]. President Chávez was quoted in the press saying that in the next few days the Bolivarian Republic would adopt "a decree to take the gold sector", which still remains in the hands of a "mafia and smugglers"[85].

161.   On 16 September 2011 Venezuela adopted Supreme Decree No. 8.413 [the "**Nationalization Decree**"][86]. The Nationalization Decree, which had "rango, valor y fuerza de Ley Orgánica" introduced a new legal framework for gold mining in Venezuela and reserved the gold extraction and exploitation activities to the State. The Nationalization Decree defined its purpose with the following words:

> "[…] con el propósito de revertir los graves efectos del modelo minero capitalista, caracterizado por la degradación del ambiente, el irrespeto de la ordenación territorial, el atentado a la dignidad y la salud de las mineras mineros y pobladoras pobladores de las comunidades aledañas a las áreas mineras, a través de la auténtica vinculación de la actividad de explotación del oro con la ejecución de políticas públicas que se traduzcan en el vivir bien del pueblo, la protección ambiental y el desarrollo nacional".

162.   To achieve this purpose all assets and operations associated with the mining and exploitation of gold in Venezuela were considered to be of "public utility and social interest". The Nationalization Decree provided for State control of the property and mining rights of all gold producing companies. All the activities related to the mining of gold could only be performed either by:

-   The State or companies wholly owned by the State or its affiliates; or by

-   Joint public-private companies, in respect of which the State held an equity participation of 55% or more, and exercised control over corporate decisions ["**Mixed Companies**"].

---

[83] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No.12.
[84] Doc. C-212 – "Venezuela Moves to Take Over Gold Sector", Wall Street Journal, 18 August 2011.
[85] Doc. C-212 – "Venezuela Moves to Take Over Gold Sector", Wall Street Journal, 18 August 2011.
[86] Doc. C-214 – Nationalization Decree.

163. According to the Nationalization Decree, all gold was to be sold to the State[87] and any concessions or contracts granted prior to the Nationalization Decree were to be transferred to Mixed Companies[88].

164. The Decree further provided for negotiations between companies holding mining rights and the Government for a period of 90 days from the date of its publication, in order to facilitate the migration to Mixed Companies. Failure to agree within the 90-days period of negotiations would lead to an automatic extinction of the concessions and contracts granted prior to the Nationalization Decree[89]. Once time was up, the competent Ministry would assume control over these assets and operations[90].

165. The Nationalization Decree further established that investors be compensated with an amount equal to the book value of the investment, provided that the investment had been duly registered with the competent authority[91].

**10.   THE FIRST NEGOTIATION PERIOD**

166. Soon after the implementation of the Nationalization Decree, on 7 October 2011, MIBAM issued Resolutions No. 88/2011 ["**Resolution 88**"][92] and No. 89/2011 ["**Resolution 89**"][93] which governed the procedures to be applied for the nationalization of the gold industry and the taking of control by the Bolivarian Republic:

- Resolution 88 created a single negotiation commission [the "**Negotiation Commission**"] for the whole gold industry, with the task of transferring all gold concessions, contracts and leases to new Mixed Companies, controlled by the Republic and including participation of the investors; the mandate granted to the Negotiation Commission would expire 90 days after publication of the Nationalization Decree in the *Gaceta Oficial* (i.e. the mandate expired on 15 December 2011);

- Resolution 89 established an Operational Transition Committee ["**OTC**"] entrusted with the authority of taking control over and managing all gold assets to be nationalized; OTC's mandate was also scheduled to last for a period of 90 days, until 15 December 2011, but could be extended by the Minister.

167. While the negotiations with the investors were developing, the Government decide to implement a new exchange control regulation, **Convenio Cambiario No. 19**[94], authorizing privately controlled gold producers to purchase foreign currency from the BCV at the Official Exchange Rate, if required for regular payments owed to

---

[87] Doc. C-214 – Nationalization Decree, Art. 21.
[88] Doc. C-214 – Nationalization Decree, Art. 12.
[89] Doc. C-214 – Nationalization Decree, Art. 14.
[90] Doc. C-214 – Nationalization Decree, Art. 15.
[91] Doc. C-214 – Nationalization Decree, Art. 16.
[92] Doc. C-220 – Resolution 88.
[93] Doc. C-221 – Resolution 89.
[94] Doc. C-223 – Convenio Cambiario No. 19.

foreign suppliers. Acquisition of foreign currency was conditional on the obtaining of a certificate issued by the OTC, confirming the regularity of the transaction and the existence of the debt.

168. Negotiations between Rusoro and the Negotiation Commission started in September 2011 and continued through December, but the 90-day period expired without an agreement regarding compensation having been reached. On 15 December 2011, the last day of the negotiation period, Rusoro sent a letter notifying Venezuela[95] of the existence of a dispute under the BIT.

## 11. THE SECOND NEGOTIATION PERIOD

169. Without prior communication or consultation, on 15 December 2011, the last day of negotiations, Venezuela adopted Decree No. 8.683 [the "**Amendment Decree**"][96], extending the deadline for reaching an agreement by another 90 days. During this extension, the meetings between the Negotiation Commission and Rusoro continued, but it proved impossible to find a settlement. On 17 February 2012 Rusoro wrote to the Government drawing attention to its economic difficulties, exacerbated by the extension of the negotiation period[97].

170. On 13 March 2012 a final meeting between Rusoro and PDVSA (a State-owned oil company that was undertaking a due diligence on Rusoro's subsidiaries on behalf of the State) took place. It became clear that no agreement on compensation could be reached, and negotiations were suspended. On the next day, 14 March 2012, the negotiation period expired with no agreement between Rusoro and the Government having been reached.

171. Accordingly, all Mining Rights held by Rusoro through its subsidiaries were automatically extinguished by law as of 15 March 2012[98].

172. On the same date, the Vice-Minister of Mines informed Rusoro's negotiating team that the Government would take control of all assets and operations on 19 March 2012. To facilitate the take-over process, Rusoro was instructed to prepare a draft document of transfer; this was done and submitted to the Vice-Minister of Mines on 18 March 2012[99].

173. On 26 March 2012 Rusoro requested the Government to provide an urgent schedule outlining how the transfer of operations and assets to the Republic would be performed[100]. Rusoro added that if the schedule was not received by 28 March 2012, it would cease operations by 31 March 2012. In the face of no formal response from the Government, on 31 March 2012 Rusoro formally withdrew from the mining areas.

---

[95] Doc. C-233 – Letter from Rusoro to Venezuelan authorities, 15 December 2011.
[96] Doc. C-232 – Amendment Decree.
[97] Doc. C-240 – Letter from Rusoro to Venezuelan authorities, 17 February 2012.
[98] Doc. C-214 – Nationalization Decree, Art. 14.
[99] Doc. C-243 – Document of Transfer Draft.
[100] Doc. C-244 – Letter from Rusoro to MPM, 26 March 2012.

**12.   THE TAKING OF CONTROL OF RUSORO'S ASSETS**

174.  All of Rusoro's Mining Rights and other assets were taken over by the Bolivarian Republic immediately after Rusoro's withdrawal. The taking was under the total control of the Government, since no representatives of Rusoro were present. The only written evidence is the "*Acta de Toma de Posesión*" of Choco 4 and Choco 10 mining areas, recording the transfer of these mines to the Republic, which was signed on 2 April 2012 [101]. Another document in the record is a letter dated 10 April 2012, sent by the Vice-Minister of Mines to Rusoro, requesting a meeting to execute a document for transfer for Bloque B[102].

175.  Eight months later, on 28 December 2012, the MPM issued Resolution No. 177, transferring a newly created mining area in Bolivar State to PDVSA ["**PDVSA Mining Blocks**"][103]. This new mining area included the following deposits:

-   Bloque El Callao-Guasipati: this deposit includes the producing Choco 10 mine, Choco 4 and the neighbouring Increíble 6 deposits, formerly controlled by Rusoro[104];

-   Bloque El Callao: which includes the Isidora mine, also formerly controlled by Rusoro[105].

-   Bloque Sifontes Sur.

176.  The PDVSA Mining Blocks contain 81.4 million ounces of gold[106]. Rusoro alleges that Rusoro's properties of Choco 10, Choco 4, Increible 6 and Isidora count for approximately one ninth of these mineral resources (i.e. 10.175 million ounces)[107].

177.  By the end of 2013 PDVSA established the Empresa Nacional Aurífera ["**ENA**"] a gold mining subsidiary which holds the rights over the 81.4 million ounces in the PDVSA Mining Blocks, plus a further 10.6 million ounces from other unspecified sites[108].

178.  In 2013 PDVSA sold to the BCV a 40% shareholding in ENA for USD 9.524 billion[109].

---

[101] Doc. C-246 – Acta de Toma de Posesión Choco 4 and 10.
[102] Doc. C-248 – Letter from MPM to El Callao Gold Mining Company, 10 April 2012.
[103] Doc. C-332 – Resolution No. 177 of the MPM, published in the *Gaceta Oficial* Ext. 6.094, 28 December 2012.
[104] See paras. 84 *et seq supra*.
[105] See para. 130 *supra*.
[106] Doc. C-401 – "Proyecto aurífero espera por la AN" Diario Ciudad CCS, 30 January 2013.
[107] C II at 133; Doc. C-329 – Memorandum from Mr. Gregory Smith to Mr. Andre Agapov.
[108] Doc. C-404 – "PDVSA y BCV crean empresa mixta aurífera", Agencia Venezolana de Noticias, 16 December 2013.
[109] Doc. C-407 – Cuenta 2013 del MPM, p. 361.

# V.  <u>RELIEF SOUGHT BY THE PARTIES</u>

1.    THE PARTIES' REQUESTS IN BRIEF

<u>Claimant</u>

179.  Rusoro claims that Venezuela violated six of its obligations under the Canada-Venezuela BIT. In particular, the Claimant avers that Venezuela expropriated the Claimant's investment without payment of compensation. It further considers that Respondent:

-     Failed to accord Claimant's investments fair and equitable treatment;

-     Failed to accord Claimant's investments full protection and security;

-     Failed to accord Claimant treatment no less favourable than the treatment it grants to its own investors;

-     Failed to guarantee to Claimant the unrestricted transfer of its investments and returns;

-     Imposed restrictions on the exportation of gold, in contravention of the BIT.

180.  Hence, Rusoro requests the Tribunal to order Venezuela to pay a compensation in the amount of USD 2,318,898,825[110], net of Venezuelan taxes, plus pre- and post-award interest at Venezuela's sovereign borrowing rate, compounded annually, until payment is made in full.

181.  Claimant further demands that the Tribunal dismisses Respondent's counter-claim. Finally, it requests that Venezuela be ordered to pay all the costs and expenses relating to the present arbitration.

<u>Respondent</u>

182.  First and foremost, Respondent asks the Tribunal to declare its lack of jurisdiction to hear Rusoro's claims and to order Claimant to pay all costs associated with the arbitration since the date of the Tribunal's refusal to bifurcate the proceedings, with interests.

183.  Should the Tribunal find that it has jurisdiction to decide on the present case, Respondent requests the dismissal of all of Claimant's claims on the merits.

184.  Should the Tribunal find that Venezuela is by any means responsible, Respondent asks the Tribunal to declare that Rusoro failed to prove the quantum of its damages and that therefore Venezuela is not required to pay any compensation. Should the Tribunal award damages to Claimant, Respondent asks these be limited to the amount of USD 1,555,308[111].

---

[110] C PHB at 219(i).
[111] R PHB at 268 and Joint-Tables, p. 7, final column.

185. Additionally, if the Tribunal holds that it has jurisdiction to hear this dispute, Respondent asserts a counter-claim for Claimant's improper mining practices which caused damage to Venezuela's natural resources.

**2.    CLAIMANT'S REQUEST FOR RELIEF IN FULL**

186. In its Post Hearing Brief, the Claimant requests that the Tribunal grant the following relief[112]:

> "219. [...]
> (a) DISMISS all Venezuela's objections to the jurisdiction of the Tribunal;
> (b) DECLARE that Venezuela violated Article VII(1) of the Treaty by expropriating the Claimant's investment without payment of compensation;
> (c) DECLARE that Venezuela violated Article II(2) of the Treaty by failing to accord the Claimant's investments fair and equitable treatment;
> (d) DECLARE that Venezuela violated Article II(2) of the Treaty by failing to accord the Claimant's investments full protection and security; and
> (e) DECLARE that Venezuela violated Article IV of the Treaty by failing to accord the Claimant treatment no less favorable than the treatment it grants to its own investors;
> (f) DECLARE that Venezuela violated Article VIII of the Treaty by failing to guarantee to the Claimant the unrestricted transfer of its investments and returns; and
> (g) DECLARE that Venezuela violated paragraph 6 of the Annex to the Treaty by imposing restrictions on the exportation of gold.
> (h) DISMISS Venezuela's Counter-claim;
> (i) ORDER Venezuela to pay compensation to the Claimant of no less than US $2,318,898,825 and, to the extent applicable, DECLARE that the sum awarded has been calculated net of Venezuelan taxes;
> (j) ORDER Venezuela to pay pre- and post-award interest at Venezuela's sovereign borrowing rate (as updated), compounded annually, accruing until payment is made in full or such other rate as the Tribunal deems appropriate;
> (k) ORDER Venezuela to indemnify the Claimant in full with respect to any Venezuelan taxes imposed on the compensation awarded to the extent that such compensation has been calculated net of Venezuelan taxes;
> (l) ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimant's reasonable legal and expert fees, and the fees and expenses of the Tribunal; and
> (m) AWARD such other relief to the Claimant as the Tribunal considers appropriate.
> 220. To the extent this Tribunal finds that Venezuela's Measures constituted a creeping expropriation in violation of Article VII of the Treaty (paragraph 219(b) above) and that the compensation to be awarded to Rusoro includes the effects of each of those measures calculated by reference to Fair Market Value, Rusoro would be content for the Tribunal to make those findings without proceeding to consider the additional violations of the Treaty (paragraph 219 (c)-(g) above)".

---

[112] C PHB at 219-220.

### 3.   THE RESPONDENT'S REQUEST FOR RELIEF

187. In its Post Hearing Brief, the Respondent asks that the Tribunal issue the following Award[113]:

> "[…] stating it lacks jurisdiction to hear Rusoro's claims under the Treaty and the Additional Facility, and order Rusoro to pay all the fees, expenses, and costs associated with defending against these proceedings since the date of its opposition to Venezuela's request for bifurcation (15 May 2013), with interest;

- Should the Tribunal find that it has jurisdiction to hear Rusoro's dispute,
  - o   only consider claims for compensation for alleged breaches and harm after 17 July 2009,
  - o   issue an Award dismissing all of Rusoro's claims in their entirety for lack of factual and legal merit, and
  - o   find that Venezuela is entitled to compensation for injury suffered based on the counter-claim specified in Part IV;

  Should the Tribunal find Venezuela has breached any provision of the Treaty or is otherwise legally responsible,

  - o   issue an Award indicating that Rusoro has failed to meet its burden to prove the quantum of its damages and finding that Venezuela is not required to pay Rusoro any compensation;
- Should the Tribunal award damages,
  - o   find that damages are limited to compensation for alleged reserves based on DCF values included in the final column of Table 6 of the Experts' Joint Matrix;
  - o   reduce damages by at least 50% for contributory fault; and
  - o   for any liability based on *venire contra factum proprium*, *confianza legítima*, or estoppel, limit damages to injury caused by detrimental reliance; and
- Grant Venezuela any other remedy that the Tribunal considers appropriate".

---

[113] R PHB at 268.

# VI. JURISDICTIONAL OBJECTIONS

188. Venezuela argues that Rusoro bears the burden of proving the facts and requirements necessary to establish jurisdiction and that it has failed to do so for three reasons[114]:

- First, because Rusoro's dispute is time-barred under Art. XII.3(d) of the Treaty [**VI.1.**],

- Second, because there is no jurisdiction before the ICSID Additional Facility [**VI.2.**], and

- Third, because Rusoro did not own or control the assets upon which it bases its claims in accordance with Venezuelan law [**VI.3.**].

189. Claimant submits that each of these three jurisdictional objections is meritless[115].

## VI.1.   THE FIRST JURISDICTIONAL OBJECTION: THE DISPUTE IS TIME-BARRED

190. Art. XII.1 of the Treaty[116] provides as follows:

> "**ARTICLE XII – Settlement of Disputes between an Investor and the Host Contracting Party**
>
> 1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them".

191. Art. XII.3 adds:

> "**ARTICLE XII – Settlement of Disputes between an Investor and the Host Contracting Party**
>
> 3. An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) [ICSID Convention Arbitration or ICSID Additional Facility Rules Arbitration] only if:
>
> […]

---

[114] R PHB at 17.
[115] C II at 135.
[116] Doc. C-102 – BIT.

(d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage".

192.     Both Parties agree that the relevant date for triggering the time bar is three years before Claimant filed its Request for Arbitration, *i.e.* 17 July 2009 [the "**Cut-Off Date**"][117].

## 1.    RESPONDENT'S POSITION

193.     Venezuela avers that Rusoro identified in its Request for Arbitration several measures adopted by Venezuela "starting in 2009" which amounted to a breach of the Treaty: these included the so-called 2009 Measures, (i.e. the April and June 2009 BCV Resolutions and the Convenio Cambiario No. 12). In a letter dated 3 July 2009, Rusoro explained to the Venezuelan authorities that the 2009 Measures were having a severe impact on its operations[118].

194.     Venezuela says that Rusoro's basic claim is that the 2009 Measures breach the expropriation provision of Art. VII of the Treaty. Rusoro consequently includes the resulting losses in its claim for compensation and seeks lost cash flows from June 2009 onwards. In Respondent's opinion, these claims are time-barred under Art. XII.3 (d), because Rusoro knew about the alleged breach and resulting harm before the Cut-Off Date[119].

195.     Venezuela adds that Rusoro's final effort to avoid the time bar, namely the argument that the 2009 Measures were components of a composite breach that crystallized within the three-year period, also lacks merit[120]. Rusoro knew of the 2009 Measures and their effects as proven by the 3 July 2009 letter, so that even if the Measures were considered part of a composite act, the date of breach would still be outside the three-year limit[121].

196.     In Venezuela's opinion, the time limit in the Treaty applies to the entire dispute, not to individual claims: an investor may not submit a dispute to arbitration if more than three years have elapsed since the investor acquired knowledge of a breach giving rise to a dispute and resulting in the occurrence of damage[122]. This derives from the wording of Art. XII.3 (d) of the Treaty, which uses the expression "dispute" – not "claim" like Art. 1116(2) NAFTA[123].

197.     Alternatively, if the Tribunal were to disregard the use of the word "dispute" in the Treaty and equate the time bar provision to the "claim" formulation of NAFTA – a position with which the Respondent disagrees – there can be no compensation for damage caused by the 2003 foreign exchange regime or the 2009 Measures. If the Tribunal allows any claims to proceed, compensation based on alleged breaches

---

[117] C II at 158; R PHB at 18.
[118] R PHB at 20.
[119] R PHB at 21-24.
[120] HT at 194:15.
[121] R PHB at 31.
[122] R PHB at 35.
[123] R PHB at 36.

before the Cut-Off Date must be excluded. This is the solution adopted by the Tribunal in *Bilcon*[124].

## 2. CLAIMANT'S POSITION

198. Rusoro avers that its claims are not time-barred.

199. Rusoro is submitting only breaches committed by Venezuela that occurred within the three-year limitation period. Rusoro does not allege that any of the measures adopted before the Cut-Off Date, standing alone, breached the Treaty. All of the breaches resulted either from a series of measures that began before the Cut-Off Date, but continued afterwards, or from measures that occurred after the Cut-Off Date. In each instance the breach occurred, or the composite crystallized, within the three-year limitation period[125].

200. The Treaty does not provide – unlike some other treaties – that the limitation period commences when the investor learns of facts which may later constitute part of an alleged breach. The Treaty requires the investor's actual or constructive knowledge of a breach and resulting damage[126]. The mere possibility that a loss may occur cannot trigger the limitation period[127]. The 3 July 2009 letter sent by Rusoro regarding the June 2009 BCV Resolution does not suggest that Rusoro was aware of the nature or extent of the losses that would result from Venezuela's actions. It records Rusoro's concern – not that Rusoro had already recognized a loss under the Treaty for which Venezuela was liable[128].

201. In composite acts, the Commentary to the 2001 ILC Articles on State Responsibility contradicts Venezuela's position: when enough of the series of acts have occurred to constitute a wrongful act, the act is regarded as having occurred over the whole period from the commission of the first act in the series to the last[129]. There is no inconsistency between claiming breach of an international obligation by a composite act and seeking damages for the losses caused by each element of such breach. Rusoro is entitled to compensation for losses caused by all actions and omissions comprising the composite act, including measures adopted before the Cut-Off Date, which form part of the composite act[130].

202. Claimant also disagrees with Venezuela's contention that if any of Rusoro's claims is time-barred, the entire dispute must be dismissed. Venezuela's submission is unsupported by the plain meaning of Art. XII.3 (d) and by common sense: a dispute arises out of a claim by an investor that a measure breached the Treaty. If a party submits multiple claims, the limitation period can only apply to those individual claims where the breach and the loss occurred more than three years before the submission of the request[131].

---

[124] R PHB at 39.
[125] C PHB at 100.
[126] C PHB at 102.
[127] C II at 168, quoting *Pope & Talbot*.
[128] C II at 170.
[129] C PHB at 103; HT at 110:16.
[130] C PHB at 104.
[131] C PHB fn. 285.

**3.** **THE TRIBUNAL'S DECISION**

203. Art. XII.1 of the Treaty (which has been reproduced at the beginning of this section) regulates the settlement of disputes between investors and host states. In its first paragraph, it defines the scope of the disputes which can be settled by arbitration: arbitrable disputes are those

> "relating to a claim by the investor that a measure taken or not taken [by a Contracting Party] is in breach of this Agreement and that the investor [...] has incurred loss or damage by reason of, or arising out of that breach".

Thus a dispute is arbitrable if an investor protected by the Treaty submits (one or more) claims alleging that (i) a measure taken or omitted by a State, (ii) is in breach of the Treaty and (iii) has caused damage to the investor.

204. Paragraph 3 (d) of the same Article then creates a statute of limitations applicable to arbitrable disputes. An investor may only submit a dispute involving (one or more) claims for breach of the Treaty to arbitration, if

> "no more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage".

Application of the time bar thus requires that more than three years have elapsed between

- the date when the investor for the first time obtained actual or constructive knowledge (i) of a breach of the Treaty and (ii) of a loss or damage caused by such breach and suffered by the investor, and

- the date of submission to arbitration of the dispute which involves claims for that breach of the Treaty.

205. The Tribunal notes the similarities between Art. XII.3 (d) of the Treaty and NAFTA Art. 1116(2), which reads:

> "An investor may not make a claim if more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage".

206. The similarity of the wording of the provisions of the BIT applicable in the present case with that of the rules governing NAFTA arbitrations recalls the case law developed in the context of such arbitrations. The Tribunal is mindful in this respect that NAFTA jurisprudence is not at one in answering the question of how time concerning continuing and composite acts should be computed.

207. In point of fact, while some tribunals have excluded events prior to the critical date and their relationship with other measures that followed – as was the case in *Grand*

*River*[132], *Feldman*[133] and *Mondev*[134], and more recently in *Bilcon*[135] – other tribunals have opted for the opposite conclusion – as *UPS*[136] did – or did not need to determine the matter in the light of the facts of the case – as in *Merrill & Ring*[137].

208. In certain situations, the view that time concerning limitation should be extended so as to begin at the moment the act ceases to exist has been supported, but with the limit that it should not result in a continued extension of the limitations period as this might end affecting the necessary certainty and legal stability. Otherwise claims might be introduced years after the first events took place. It is of course necessary to avoid a consequence that the rule was precisely meant to prevent.

<u>Cut-Off Date</u>

209. The Parties agree that the date which triggers the time bar is three years before Claimant filed its Request for Arbitration. Since the Request was filed on 17 July 2012, the Cut-Off Date is 17 July 2009[138].

210. The discussion centres on whether the breaches allegedly committed by Venezuela, and which give rise to the claims submitted in this arbitration, predate or not the Cut-Off Date and whether their existence and effects were known (or should have been known) to Rusoro. To answer this question, the Tribunal must identify the dates when the alleged breaches to the Treaty occurred (**A.**). Thereafter the Tribunal will be able to assess when the investor first obtained actual or constructive knowledge of such breaches, and of the loss or damage caused thereby (**B.**), and decide on the application of the time bar to the three claims submitted by Rusoro (direct expropriation, creeping expropriation and ancillary claims) (**C.**); finally the Tribunal will address Venezuela's argument that application of the time bar should lead to the dismissal of the whole dispute (**D.**).

### A.  Dates of Venezuela's alleged breaches

211. The Claimant in its Memorial identifies the following acts of Venezuela which gave rise to breaches of the Treaty:

-   The April 2009 BCV Resolution, dated 30 April 2009[139];

-   The June 2009 BCV Resolution, dated 11 June 2009[140];

-   Convenio Cambiario No. 12, dated 11 June 2009[141]; (these three acts are collectively referred to as the **2009 Measures**);

---

[132] *Grand River* at 83.
[133] *Feldman* at 63.
[134] *Mondev* at 87.
[135] *Bilcon* at 281.
[136] *UPS* at 28.
[137] *Merrill & Ring* at 269.
[138] C II at 158; R PHB at 18.
[139] C I at 138.
[140] C I at 144.
[141] C I at 145.

- Ley de Reforma Cambiaria, dated 13 May 2010, which closed the Swap Market[142];

- The July 2010 BCV Resolution, dated 15 July 2010[143]

- The Amendment to the Convenio Cambiario No. 12, on 11 August 2010[144] (these last two acts are collectively referred to as the **2010 Measures**);

- The Nationalization Decree (Decree No. 8.413), dated 23 August 2011[145];

- MIBAM Resolutions 88 and 89, dated 7 October 2011[146];

- Convenio Cambiario No. 19, dated 17 October 2011[147];

- Decree No. 8.683 dated 8 December 2011[148];

- Resolution No 177 of the Ministry of People's Power for Petroleum and Mining, dated 28 December 2012[149].

212. Of all these measures adopted by Venezuela, the only ones which could be affected by the time bar are the 2009 Measures, because these are the only ones that predate the Cut-Off Date.

**B.   Claimant's knowledge of the 2009 Measures**

213. The relevant date for time bar purposes is when Claimant obtained actual or constructive knowledge of the adoption of the 2009 Measures and of their consequences for Rusoro's investment. It is undisputed that the 2009 Measures were published in the *Gaceta Oficial* of the Bolivarian Republic before the Cut-Off Date; thus by that date the Claimant was aware, or should have been aware, of the enactment of the 2009 Measures.

214. However, Art. XII.3 (d) requires, for the time bar to apply, not only that the investor knows about the alleged breach, but also that the investor is aware that such breach would cause loss or damage to its investment.

215. Did this happen before the Cut-Off Date?

216. Respondent has drawn the Tribunal's attention to a letter dated 30 June 2009 (i.e. before the Cut-Off Date), sent by Grupo Agapov to the Vice-President of the

---

[142] C I at 151.
[143] C I at 156.
[144] C II at 116.
[145] C I at 163.
[146] C I at 171.
[147] C I at 179.
[148] C I fn. 372.
[149] C I fn. 387.

Republic[150]. In this letter, Claimant complains about the June 2009 BCV Resolution and the Convenio Cambiario No. 12, and states that these measures establish

> "[…] new rules for the sale of gold which harm our gold production companies alone".

217. In accordance with established NAFTA case law, what is required is simple knowledge that loss or damage has been caused, even if the extent and quantification are still unclear[151]. The letter proves beyond any reasonable doubt that as of end of June 2009, and before the occurrence of the Cut-Off Date, Claimant was aware that 2009 Measures could cause loss or damage to its investment.

218. Claimant thus had knowledge, before the Cut-Off Date, that the 2009 Measures had been adopted, that they might imply a breach of the Treaty and cause damage to the investment.

C. **Implication of the time bar for Rusoro's claims**

219. The Tribunal will next review the various claims submitted by Rusoro, and analyse whether any of these claims can be affected by the time bar. Rusoro is submitting claims for direct expropriation (**a.**), for creeping expropriations (**b.**) and for certain "**Ancillary Claims**" (**c.**):

a. **Direct expropriation**

220. Rusoro's first claim is for direct expropriation of its investment in violation of Art. VII of the Treaty. This expropriation was allegedly accomplished by the Nationalization Decree, which postdates the Cut-Off Date and consequently is unaffected by any time bar issue[152].

b. **Creeping expropriation**

221. Rusoro's second claim is for creeping expropriation: starting in April 2009, Venezuela allegedly enacted a series of interconnected measures targeting Rusoro's gold mining business and culminating in the outright nationalization of Rusoro's investment through the Nationalization Decree. Claimant submits that taken together Venezuela's chain of actions resulted in the expropriation of Rusoro's investment[153] and that this creeping expropriation implied a composite breach of the Treaty. All events pre-dating the Cut-Off Date, including the 2009 Measures, are at most part of a composite breach that crystallized after the time bar became applicable[154].

222. Respondent disagrees. In its opinion, a composite act should be regarded as having occurred as of the first action or omission committed by the State. In this case, the total claim for creeping expropriation should be excluded as a consequence of the

---

[150] Doc. C-190 – Letter from Rusoro to the Vice-President of the Republic, 3 July 2009.
[151] *Mondev* at 87, *UPS* at 29, *Bilcon* at 275.
[152] C II fn. 409.
[153] C II at 210.
[154] C II at 161.

application of the time bar, because the first action occurred before the Cut-Off Date[155].

<u>ILC Articles</u>

223. Both parties rely on the ILC Articles on Responsibility of States for Internationally Wrongful Acts ["**ILC Articles**"][156]. Art. 15 provides the following criteria for composite acts:

> "*Article 15. Breach consisting of a composite act*
>
> 1. The breach of an international obligation by a State through a series of actions or omissions defined in aggregate as wrongful occurs when the action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act.
>
> 2. In such a case, the breach extends over the entire period starting with the first of the actions or omissions of the series and lasts for as long as these actions or omissions are repeated and remain not in conformity with the international obligation."

224. Art. 15.1 defines the moment when the composite act is deemed to occur and Art. 15.2 the date and extension in time of the breach. The composite act is deemed to occur when the action or omission happens which, taken together with the previous actions or omissions, is sufficient to constitute the wrongful act. And the breach starts with the date of the first act of the series of the composite act, and extends over the entire period.

225. The Commentary to the ILC Articles contains the following explanation:

> "*Article 15. Breach consisting of a composite act*
>
> *Commentary*
>
> (8) Paragraph 1 of article 15 defines the time at which a composite act "occurs" as the time at which the last action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act, without it necessarily having to be the last in the series.
>
> [...]
>
> (10) Paragraph 2 of article 15 deals with the extension in time of a composite act. Once a sufficient number of actions or omissions has occurred, producing the result of the composite act as such, the breach is dated to the first of the acts in the series. The status of the first action or omission is equivocal until enough of the series has occurred to constitute the wrongful act; but at that point, the act should be regarded as having occurred over the whole period from the commission of the first action or omission. If this were not so, the effectiveness of the prohibition would thereby be undermined."

---

[155] HT at 195:17.
[156] Doc. RLA-55 – 2001-II(2) Yearbook of the ILC, which includes the text of the ILC Articles plus commentaries.

226. The drafters of the Commentary reiterate that the purpose of Art. 15.1 is to set a criterion to determine the occurrence of a composite act (i.e., when the last action has occurred, which taken with the previous ones is sufficient for the breach to have occurred); while Art. 15.2 determines the relevant date of the breach (i.e., the date of the first of the acts in the series).

227. Although the general thrust of the ILC Articles regarding composite acts is clear, the Articles do not address every single question, and in particular do not solve how time bar affects a string of acts which gives rise to a composite breach of a treaty.

<u>The Tribunal's approach</u>

228. There are two possible approaches for solving this question.

229. (i) A first approach would be to consider that a connection exists between the acts performed before the Cut-Off Date (the 2009 Measures) and those which occurred thereafter (the 2010 Measures and the Nationalization Decree). If such linkage is found the continuing character of the acts and the composite nature of the breach may justify that the totality of acts be considered as a unity not affected by the time bar. Certain investment tribunals have found that the linkage existed and disregarded the time-bar defence[157].

230. This approach, although legally sound, is very fact specific and depends on the circumstances of the case. In the present dispute, there is no clear linkage between the 2009 Measures, the 2010 Measures and the Nationalization Decree. The 2009 Measures imposed strict limitations on the export of gold, increased the exchange control requirements for gold exporters and created two distinct regimes, one for privately owned, and the other for Government owned gold companies. The 2010 Measures went in the opposite direction: export limitations were reduced, the regime was unified and the general exchange control system was overhauled. The Nationalization Decree took a totally different stance: it ordered the nationalization of the whole gold sector.

231. (ii) For this reason, the Tribunal finds that, in the specific circumstances of this case, the better approach for applying the time bar consists in breaking down each alleged composite claim into individual breaches, each referring to a certain governmental measure, and to apply the time bar to each of such breaches separately. This approach is the one adopted by other investment tribunals[158] and respects the wording of Art. XII.3 (d), which defines the starting date for the time bar period as the date when the investor acquired knowledge that a breach had occurred and a loss had been suffered.

232. The result is that breaches allegedly committed by Venezuela through the adoption of the 2009 Measures have become time barred, cannot result in enforceable claims

---

[157] *UPS* at 28.

[158] See e.g *Bilcon* at 266 where "the Tribunal finds it possible and appropriate, as did the tribunals in *Feldman, Mondev* and *Grand River*, to separate a series of events into distinct components, some time-barred, some still eligible for consideration on the merits".

and cannot be taken into consideration to decide whether a creeping expropriation has occurred (while claims relating to later breaches are not affected).

233. Another precision is relevant: while Art. XII.3 (d) of the Treaty bars claims concerning alleged breaches which occurred before the Cut-Off Date, this does not imply that the measures underlying such breaches become irrelevant. They provide the necessary background and context for adjudicating the case, and the legitimate expectations of an investor may depend crucially on matters that occurred before such Cut-Off Date[159].

### c.   Ancillary Claims

234. Rusoro has also filed several ancillary claims [the "**Ancillary Claims**"]:

- that Venezuela failed to accord Rusoro's investment Fair and Equitable Treatment ["**FET**"][160]

- and Full Protection and Security ["**FPS**"][161],

- that Venezuela discriminated against Rusoro and its investments[162],

- that Venezuela impeded the free transfer of funds related to Rusoro's investments[163],

- and that Venezuela imposed an illegal export ban on gold[164].

235. Claimant alleges that the 2009 Measures form part of the breaches which resulted in the Ancillary Claims.

236. The Tribunal has already found that any alleged breach committed by Venezuela and based solely on the 2009 Measures is time-barred[165]. This principle also applies to the Ancillary Claims. To the extent that the Ancillary Claims concern breaches of the Treaty supported by measures having occurred after the Cut-Off Date, such claims are enforceable and are not affected by Art. XII.3 (d). The 2009 Measures may however have some relevance as background and context and to establish the legitimate expectations of the investor.

### D.   Dismissal of the whole dispute?

237. Venezuela submits a final argument: in its opinion, if any of Rusoro's claims is time-barred, the entire dispute must be dismissed[166].

238. The Tribunal disagrees.

---

[159] *Bilcon* at 282.
[160] C I at 224.
[161] C I at 248.
[162] C I at 262.
[163] C I at 266.
[164] C PHB at 138.
[165] See para 231 *supra*.
[166] HT at 198:14; R PHB at 35.

239. Venezuela's argument is contrary to the plain reading of Art. XII of the Treaty. Art. XII does not forbid that an arbitrable dispute include multiple claims. If a party submits multiple claims to a single arbitration, the time bar established in Art. XII.3 (d) can only apply to those individual claims where knowledge (actual or construed) of the breach and the resulting loss had occurred before the time bar kicked in. The remaining claims cannot be affected. To hold the contrary leads to untenable consequences: a claim which is not time barred cannot become unenforceable because in the same arbitration a separate claim is deemed affected by the time bar.

240. Applying this principle to our case, the fact that any claim based on the 2009 Measures may be declared time-barred, cannot lead to the consequence that Rusoro's other claims, based on other alleged breaches committed by the Republic, automatically also become unenforceable by application of Art. XII.3 (d) of the Treaty.

## VI.2.   THE SECOND JURISDICTIONAL OBJECTION: NO JURISDICTION BEFORE THE ICSID ADDITIONAL FACILITY

241. Art. XII.4 of the Treaty offers investors a triple choice of venues for submitting a dispute to arbitration:

- First, the investor can select the ICSID Convention, "provided that the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention";

- Second, the investor can choose the ICSID AF Rules, "provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention";

- Third, "in case neither of the procedures mentioned above is available", the investor can finally submit the dispute to UNCITRAL arbitration.

242. It is undisputed that at the relevant time Canada was not a party to the ICSID Convention, so that the investor had no access to the first alternative. It is also undisputed that the Bolivarian Republic, which historically had been a party to the ICSID Convention, denounced the Convention on 24 January 2012, and that such denunciation took effect as of 25 July 2012.

243. On 17 July 2012, i.e. before the denunciation took effect, Rusoro submitted its Request for Arbitration, including its application for approval for the AF Rules [the "**Date of Request**"]. On 1 August 2012. i.e. once the denunciation had become effective, ICSID gave its approval and registered the dispute [the "**Date of Registration**"][167].

---

[167] Doc. R-42 – Letter from ICSID Secretary-General to Rusoro and Venezuela.

1.   **RESPONDENT'S POSITION**

244.   The Bolivarian Republic submits that in a case brought under the AF Rules, either the State Party to the arbitration, or the State of nationality of the investor must be an ICSID Contracting State. If neither State is a Contracting State, the arbitration cannot proceed in this forum[168]. There are two moments at which this requirement has to be met:

-   first, when the Secretary-General approves the agreement to access the AF Rules and

-   second, when she registers the request for arbitration and thereby institutes proceedings.

245.   In the present case, at both of these moments, neither Canada nor Venezuela were Contracting States[169].

246.   Art. 4(2) of the AF Rules regulates the approval by the Secretary General and only permits the Secretary General to give her approval if she is satisfied that the requirements are fulfilled "at the time" – and "at the time" means at the moment when the Secretary General makes her determination[170]. In the present case, when the Secretary General gave her authorization on 1 August 2012, Venezuela was no longer a Party to the ICSID Convention (and Canada had never been; Canada acceded to the Convention later on, on 1 December 2013[171]).

247.   But this is not enough: a second assessment of the jurisdictional requirements is required at the time of institution of the proceedings, because the application for approval to access the AF could be made and approved years before the filing of proceedings[172]. This is expressly permitted by Art. 4(1) of the AF Rules[173].

248.   In any case, even if the Tribunal were to conclude that the approval by the Secretary-General had been timely, Rusoro would still be unable to overcome the obstacle that when this proceeding was registered, the *ratione personae* requirements were indisputably not met anymore[174]. Art. 4(2)(b) of the AF Rules specifically refers to the "time when proceedings are instituted" – and that occurs on the date the request for arbitration is registered[175].

249.   In sum, when assessing jurisdiction *ratione personae*, the date for determining Contracting State status is the date of the institution of proceedings. Under ICSID, including the AF Rules, proceedings are instituted upon registration[176]. And in this

---

[168] R PHB at 42.
[169] R PHB at 43.
[170] R II at 170.
[171] C II at 138; Doc. C-411 – ICSID press release.
[172] R PHB at 57.
[173] R II at 178.
[174] R II at 177.
[175] R II at 179; R PHB at 217.
[176] R I at 226.

case, the requirements for jurisdiction were not met at the time the agreement to access the AF Rules was approved or when proceedings were instituted[177].

**2.   CLAIMANT'S POSITION**

250.   Rusoro disagrees.

251.   Claimant says that the only relevant date in the present arbitration is the Date of Request, when it submitted its Request for Arbitration, including its application for access to ICSID's AF Rules[178]. Rusoro's position is confirmed by the AF Rules. Art. 4(1) provides that a party must apply to the Secretary-General to access the AF Rules. Art. 4(2) then provides that where either the claimant's home State or the respondent State is not an ICSID Contracting State, the Secretary-General shall give her approval only if she is satisfied that the other State involved is a party to the Convention "at the time"[179].

252.   The phrase "at the time" refers to the claimant's application for approval to access the AF Rules (which was set out in the Request). The French and Spanish versions are absolutely clear that the relevant time for determining whether the preconditions have been satisfied is the moment of claimant's application[180].

253.   Rusoro disagrees with the argument that the *ratione personae* jurisdiction must be determined twice, once at the date of approval and a second time at the date of registration of the procedure, which coincides with the date of "institution". According to Claimant, Respondent's interpretation would lead to arbitrary results, depending on the efficiency of the ICSID Secretariat[181]. The tribunal in *Venoklim* already had the opportunity to review this issue, and decided that Venezuela's reasoning was "illogical"[182].

254.   Summing up, Rusoro argues that the only point in time at which the assessment of ICSID membership should take place is, in accordance with Art. 4(2)(a) of the AF Rules, the date of claimant's application for approval – which in this case was made on the Date of Request, when Venezuela was still an ICSID member State[183].

**3.   THE TRIBUNAL'S DECISION**

255.   Art. XII.4 of the Treaty reads as follows:

> "**ARTICLE XII – Settlement of Disputes between an Investor and the Host Contracting Party**
>
> 4. The dispute may, by the investor concerned, be submitted to arbitration under:

---

[177] R I at 229.
[178] C PHB at 93.
[179] C PHB at 94.
[180] C PHB at 95.
[181] C PHB at 97.
[182] C PHB at 98.
[183] C PHB at 99.

(a) The International Centre for the Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and National of other States, opened for signature at Washington 18 March, 1965 (ICSID Convention), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or

(b) the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or

In case neither of the procedures mentioned above is available, the investor may submit the dispute to an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)".

256. Under this rule, a prospective claimant thus has the option of submitting the arbitration proceedings to the ICSID Convention (if both States are parties to the Convention), to the AF Rules (if only one State is party to the Convention), or to UNCITRAL arbitration, in case neither of these procedures "is available".

257. Rusoro opted to submit this dispute to the AF Rules, because at the relevant time Canada was not a party to the Convention (although it eventually acceded in 2013) and consequently arbitration under the ICSID Convention was not possible.

258. Respondent's jurisdictional objection challenges Rusoro's decision and submits that the appropriate venue should have been an UNCITRAL arbitration. Venezuela argues that it denounced the Convention effective as of 25 July 2012[184], while ICSID only registered the case thereafter, on the Date of Registration, 1 August 2012, when neither Canada nor Venezuela were parties to the Convention. The Bolivarian Republic contends that at that time no jurisdiction was available under the AF Rules, which require that at least one of the affected States be a party to the Convention. Venezuela asserts that, given the unavailability of the AF Rules, Rusoro should have initiated UNCITRAL arbitration.

Time line

259. *Pro memoria*: the time line of the relevant facts is as follows.

- On 24 January 2012 the Bolivarian Republic denounced the Convention;

- On 17 July 2012, the Date of Request, Rusoro submitted its Request for Arbitration, including its application for approval to access ICSID's AF Rules;

- On 25 July 2012 the denunciation became effective;

- On 1 August 2012, the Date of Registration, the Secretary-General gave her approval and ICSID registered the case.

---

[184] The denunciation was made on 24 January 2012, and pursuant to Article 71 of the Convention that denunciation became effective on 25 July 2012.

<u>Decision</u>

260. In essence, the dispute between Rusoro and the Bolivarian Republic comes down to the following question: which is the relevant date for meeting the requirement that at least one State be a party to the ICSID Convention? Rusoro argues that the relevant date is the Date of Request, while Venezuela avers that it is the Date of Registration[185].

261. The Tribunal unhesitatingly sides with Rusoro.

262. The relevant provisions of the AF Rules read as follows:

"**Article 2**

**Additional Facility**

The Secretariat of the Centre is hereby authorized to administer, subject to and in accordance with these Rules, proceedings between a State (or a constituent subdivision or agency of a State) and a national of another State, falling within the following categories:

(a) conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State;

[…]

**Article 4**

**Access to the Additional Facility in Respect of Conciliation and Arbitration Proceedings Subject to Secretary-General's Approval**

(1) Any agreement providing for conciliation or arbitration proceedings under the Additional Facility in respect of existing or future disputes requires the approval of the Secretary-General. The parties may apply for such approval at any time prior to the institution of proceedings by submitting to the Secretariat a copy of the agreement concluded or proposed to be concluded between them together with other relevant documentation and such additional information as the Secretariat may reasonably request.

(2) In the case of an application based on Article 2(a), the Secretary-General shall give his approval only if (a) he is satisfied that the requirements of that provision are fulfilled at the time, and (b) both parties give their consent to the jurisdiction of the Centre under Article 25 of the Convention (in lieu of the Additional Facility) in the event that the jurisdictional requirements *ratione personae* of that Article shall have been met at the time when proceedings are instituted".

---

[185] Venezuela says that the requirement has to be fulfilled twice: at the time of authorization by the Secretary General plus at the time of institution of the proceedings (R PHB at 43); these two dates can differ in time, although in the present case they coincide.

263.  Art. 2(a) of the AF Rules authorizes the ICSID Secretariat to administer arbitration disputes between a State and a national of another State, even if one of the two States involved is not a party to the ICSID Convention. Such arbitrations are governed by the AF Rules, and not subject to the provisions of the Convention. Art. 4 then provides that a claimant, to have access to the AF Rules, requires approval from the Secretary-General of ICSID, which can be requested "at any time prior to the institution of the proceedings". Upon receiving the application, the Secretary-General shall only give her approval if she is satisfied

-     That the dispute arises directly out of an investment,

-     That one the two States involved is "at the time" party to the ICSID Convention; and

-     That the arbitration agreement contains a contingent clause by which the parties consent to jurisdiction of the Centre under the Convention (and not the AF Rules) if, by the time proceedings are instituted, both States have become parties to the Convention[186].

<u>The approval by the Secretary-General</u>

264.  In the present case, on the Date of Request, and together with the filing of its Request for Arbitration, Rusoro asked the Secretary-General of ICSID for her approval to administer the arbitration under the AF Rules. On the Date of Registration, the Secretary-General gave her approval to the use of the AF Rules, and the arbitration was registered.

265.  In reaching her decision to grant the authorization, the Secretary-General concluded that the two requirements set forth in Art. 4(2) of the AF Rules had been complied with. The Tribunal sees no reason to disagree with the Secretary-General's decision:

266.  (i) Art. 4(2)(a) requires that the dispute must arise directly from an investment (which is undisputed) and that "at the time" one of the two relevant States must be a party to the Convention. The Tribunal agrees with the Secretary-General that "at the time" can only refer to the time when the request for authorization was filed and not to the date when the authorization is granted. This derives from the plain language of the provision, and is confirmed by the French and Spanish versions of the AF Rules, which read as follows[187]:

> "Dans le cas d'une demande fondée sur l'article 2(a), le Secrétaire général ne donne son approbation que si (a) il a la preuve que les conditions stipulées par cette disposition sont remplies au moment <u>où la demande est soumise</u> [...]" [Emphasis added]

---

[186] SCHREUER (MALINTOPPI/REINISCH/SINCLAIR): "The ICSID Convention: A Commentary", 2nd ed., 2009 p. 147.
[187] Each of the French, Spanish and English version of the ICSID AF Rules are of equal force: Art. 34(1) and (2) ICSID Administrative and Financial Regulations in relation to Art. 5 AF Rules.

"[…] el Secretario General dará su aprobación solamente (a) si a su juicio se han cumplido los requisitos de esa disposición […]"

267. The tribunal in *Venoklim*, adjudicating a dispute under the ICSID Convention (not under the AF Rules), came to an analogous conclusion. In that case, the Request had been filed on 23 July 2012, but the Secretary-General only registered that request on 15 August 2012, i.e. once the denunciation of the ICSID Convention by Venezuela had become effective. Venezuela contended that there was no consent to ICSID arbitration, because it was not a party to the ICSID Convention when proceedings were instituted on 15 August 2012[188]. The tribunal rejected this argument on the ground that it would make no sense if a claimant could be prejudiced by the lapse of an indefinite period between the filing of its request and the registration by ICSID's Secretary-General[189].

268. (ii) The Secretary-General also came to the conclusion that the requirement under Art. 4(2)(b) of the AF Rules had been met – a conclusion confirmed by Art. XII.4 of the Treaty, which foresees that if Canada and Venezuela both become parties to the ICSID Convention, any investment dispute will be submitted to ICSID arbitration (and not to AF arbitration).

### No possibility of accessing UNCITRAL arbitration

269. The Secretary-General's decision not only made AF arbitration available for adjudicating the present dispute, but it also provoked a second consequence: it precluded the possibility of resorting to an UNCITRAL arbitration, because Art. XII.4 of the Treaty only permits that an investor submit a dispute to UNCITRAL arbitration "in case neither [ICSID or AF arbitration] is available". If, as happened in this case, authorization has been granted to access AF arbitration, UNCITRAL arbitration becomes unavailable.

270. Venezuela's averment that in the present case Claimant should have accessed UNCITRAL arbitration is a legal impossibility: once the decision of the Secretary-General has made AF arbitration available, Art. XII.4 of the Treaty precludes the possibility of resorting to the UNCITRAL procedure.

271. This line of reasoning was forcefully and successfully argued by Venezuela in *Nova Scotia*, a case where the positions were reversed: the Canadian investor had filed an arbitration against Venezuela under the UNCITRAL rules, not under the AF, in the wrong understanding that AF arbitration was not available. The Bolivarian Republic successfully challenged the jurisdiction of the UNCITRAL tribunal, with the reasoning that the investor should have requested authorization to access AF arbitration, and that, if the investor had done so, AF arbitration would have been available. In that case, Venezuela accepted that the relevant date for assessing the availability of the AF was that of submission of the request[190].

272. If Rusoro had started an UNCITRAL arbitration (as Respondent now avers that Claimant should have done), and not proceedings under the AF, the Bolivarian

---

[188] *Venoklim* at 69-70.
[189] *Venoklim* at 78.
[190] *Nova Scotia* at 57 *in fine*.

Republic could have challenged the jurisdiction of the UNCITRAL tribunal, arguing that as of the Date of Request Venezuela was still a party to the Convention, and that consequently AF arbitration was available. If the new UNCITRAL tribunal adopted the *Nova Scotia* doctrine, the Bolivarian Republic would have prevailed.

273. The position which Venezuela now adopts in this arbitration is contrary to that assumed in *Nova Scotia*, and represents an unacceptable *volte-face*.

## VI.3.   THE THIRD JURISDICTIONAL OBJECTION: ILLEGALITY IN THE OWNERSHIP OF MINING ASSETS

274. The Bolivarian Republic alleges that Rusoro intentionally disregarded Venezuelan law in the establishment and throughout the life of the alleged investment, and therefore, in accordance with Art. I (f) of the Treaty, Claimant's assets do not constitute protected investments and Claimant is not a protected investor under the Treaty.

### 1.   THE RESPONDENT'S POSITION

275. In its Counter-Memorial, Respondent avers that Claimant's assets were neither owned nor controlled in accordance with Venezuelan law for three reasons:

- First, because Claimant had acquired all of its Mining Rights in violation of Art. 29 of the Mining Law[191];

- Second, because Claimant conducted all of its currency transactions on the grey market, the so-called Swap Market, in order to evade Venezuela's foreign exchange controls[192]; and

- Third, because Claimant contravened Venezuela's gold marketing regime by refusing to sell to the Central Bank or to export its gold through legal channels; instead Claimant was supplying the illegal export market in Venezuela.

276. In its Rejoinder, Venezuela added two further alleged violations of Venezuelan law[193]:

- Fourth, Rusoro misrepresented its identity to claim it was a Russian-owned company before the Venezuelan people and the Venezuelan government; and

- Fifth, Claimant decided to mine the softer saprolite material in violation of the mine plans and in order to claim higher levels of production.

---

[191] R I at 314; Doc. RLA-49 – Mining Law.
[192] R I at 315.
[193] R II at 197.

277. In its Post Hearing Submission, Venezuela limited its jurisdictional argument to two alleged breaches committed by Rusoro:

- Claimant allegedly acquired Mining Rights without prior authorization from the Ministry of Mines as required by Mining Law Art. 29[194]; and

- Claimant also failed to report and account for its purported domestic sales or the final destination of the gold it produced, thus feeding an illegal export market[195].

278. The Tribunal will review in this section the two jurisdictional arguments invoked in the PHB. A number of illegality claims, which in the initial submissions were viewed as jurisdictional objections, have in the PHB become grounds for inadmissibility[196] (e.g. the misrepresentation of its Russian identity), and will be analysed in the Merits section of this Award[197].

_The alleged violation of Art. 29 Mining Law_

279. Rusoro purchased shares in companies that indirectly controlled mining rights in Venezuela through Venezuelan subsidiaries. The Bolivarian Republic contends that these acquisitions breached Art. 29 of the Mining Law, which provides that a party must obtain prior authorization from the Ministry of Mines before acquiring mining exploration or exploitation rights[198].

280. Venezuela says that Rusoro acquired all but Bloque B-Isidora in violation of the prior authorization requirement for the transfer of mining rights under Art. 29 of the Mining Law[199]. This provision establishes that the exploration and exploitation rights deriving from the concession are rights _in rem_. All of Rusoro's alleged exploration and exploitation rights were rights _in rem_ derived

- from concessions granted directly by the Ministry of Mines to the Venezuelan subsidiaries controlled by Rusoro, and from

- concessions granted to the CVG, which later contracted with Rusoro subsidiaries the exploration and exploitation rights deriving from these concessions through leases and operation agreements[200].

281. Art. 29 Mining Law expressly refers to contracts signed by Regional Development Corporations like CVG[201].

282. The correct reading of Art. 29 requires that it also apply to indirect transfers through change of control. Any other reading defeats the object and purpose of the norm[202].

---

[194] R PHB at 70.
[195] R PHB at 92.
[196] HT at 276:5; R PHB at 96.
[197] See section VII.1 _infra_.
[198] HT at 237.
[199] R PHB at 70.
[200] R PHB at 72.
[201] R PHB at 74.
[202] R PHB at 77.

Art. 107 of the *Ley de Bosques*[203], Art. 53 of the *Ley Orgánica para la Prestación de Servicios de Agua Potable y de Saneamiento*[204] and Art. 10 of the *Ley Orgánica que reserva al Estado las Actividades de Exploración y Explotación del Oro, así como las Conexas y Auxiliares*[205] all require prior Government authorization for the indirect transfer of rights granted by the State[206].

283. Moreover, Venezuela's reading of Art. 29 in this arbitration has been consistently espoused by government officials at least since 2007[207].

284. Summing up, Rusoro violated Art. 29 by failing to seek and obtain Ministry of Mines' authorization before acquiring 57 of the 58 mining rights upon which it bases its claims. Therefore Rusoro did not own and control these 57 mining titles in accordance with Venezuelan law, and there is no subject-matter with respect to them[208].

### Creation of an illegal export market

285. Finally, Venezuela alleges that Rusoro violated the Mining Law regulations by failing to report and account for its purported domestic sales or the final destination of the gold produced, thus feeding an illegal export market[209].

## 2. THE CLAIMANT'S POSITION

286. Claimant disagrees.

287. None of Rusoro's acquisitions involved a change in the identity of the Venezuelan company which held the mining rights. Nor was there any transfer of mining rights themselves. Art. 29 of the Mining Law applies to the situation where a concessionaire transfers its mining exploration and exploitation rights to another entity – not to a situation like this one[210]. Venezuela's construction of this provision is inconsistent with the plain meaning of Art. 29, which the legislature directed at the concessionaire, not its shareholders[211].

288. Rusoro adds that there is nothing in the text of Art. 29 to suggest that the legislature intended this requirement to be extended to a change of control of the concessionaire. The contrary interpretation is inconsistent with basic principles governing statutory interpretation under Venezuelan law. The *favor libertatis* principle requires that provisions which limit economic and contractual freedom be interpreted restrictively. The principle of legality requires an express enabling provision authorizing the Ministry of Mines to subject transactions to prior

---

[203] Doc. JMB-95 – *Ley de Bosques*. See Muci at 74.
[204] Muci at 102.
[205] Doc. CLA-157 – *Ley Orgánica que reserva al Estado las Actividades de Exploración y Explotación del Oro, así como las Conexas y Auxiliares*.
[206] R PHB at 78.
[207] R PHB at 79.
[208] R PHB at 80.
[209] HT at 237; R PHB at 92.
[210] C PHB at 72.
[211] C PHB at 73.

authorization[212]. Venezuela's proposed construction is also inconsistent with legislative practice. When the Venezuelan legislature has intended to subject a change of control to prior governmental authorization, it has done so expressly[213].

### 3.   THE TRIBUNAL'S DECISION

289.   Art. I (f) of the Treaty defines "investment" as

> "[…] any kind of asset owned or controlled by an investor of one Contracting Party […] in the territory of the other Contracting Party <u>in accordance with the latter's laws</u>". [Emphasis added].

290.   Venezuela argues that Rusoro acquired its mining assets in contravention of Venezuela's mining regulations and specifically of Art. 29 of the Mining Law, and that consequently the investment does not constitute a protected investment under the Treaty, which in turn implies that Claimant has no standing in this arbitration and that the Tribunal lacks jurisdiction.

291.   Rusoro for its part denies that the acquisition of the assets held in Venezuela lead to any violation of Venezuelan mining legislation, and contends that the Venezuelan government was perfectly aware of Rusoro's acquisitions and never raised any concern, and that the Republic even entered into a joint-venture – called Venrus – with Rusoro.

292.   Art. 29 of the Mining Law reads as follows[214]:

> "**Artículo 29**: El derecho de exploración y de explotación que se deriva de la concesión es un derecho real inmueble. El concesionario podrá enajenar dicho derecho, gravarlo, arrendarlo, sub-arrendarlo, traspasarlo o celebrar sobre el mismo sub-contrataciones para la explotación, mediante permiso previo otorgado por el Ministerio de Energía y Minas, siempre y cuando demuestre efectivamente que la negociación cuya autorización se solicita, se hará exclusivamente para el eficiente desarrollo del proyecto de explotación, previamente aprobado por este Ministerio y dentro de los lapsos autorizados para la ejecución del mismo.
>
> Parágrafo Primero: En caso de arrendamiento de una concesión cuyos titulares sean Corporaciones Regionales de Desarrollo, exentas del pago de impuestos, los arrendatarios tendrán la obligación de pagar los impuestos establecidos en esta Ley; salvo que el arrendamiento se lleve a cabo con otros entes de carácter público, también exentos del pago de impuestos.
>
> Parágrafo Segundo: Los traspasos deberán ser presentados para su protocolización por ante la Oficina Subalterna de Registro de la Circunscripción de ubicación de la concesión."

---

[212] C PHB at 74.
[213] C PHB at 75.
[214] Doc. RLA-49 – Mining Law, Art. 29.

Rusoro's Mining Rights

293. The starting point of the analysis is that Rusoro is not the direct holder of any mining titles in Venezuela. What Claimant did was to acquire (direct or indirect) control of Venezuelan companies that in their turn were titleholders of Venezuelan mining rights. These Mining Rights belong to two distinct categories:

- Some Rights take the form of administrative concessions ("concesiones administrativas"), i.e. *iura in rem* granted by the Venezuelan State; eight concessions had been directly granted to Venezuelan companies, while six concessions had been acquired by Venezuelan companies from the original concessionaires – and these six acquisitions had been duly authorized by the Government; Rusoro in its turn had acquired the ownership or control of these Venezuelan companies;

- Other mining rights have the legal nature of administrative contracts ("contratos administrativos") entered into between the Venezuelan publicly owned companies CVG and CVG Minerva (which had been incorporated to further the development of the Guyana region) and Venezuelan companies which eventually became affiliates of Rusoro; these administrative contracts include at least 10 lease contracts and 29 operation contracts.

294. The relevant question thus is whether Claimant, when it indirectly acquired control over the Venezuelan companies holders of mining rights, without obtaining authorization from the Venezuelan Government, incurred in a violation of Venezuelan mining legislation – as Respondent affirms and Claimant denies. To adjudicate this issue the Tribunal will first establish the applicable provisions of Venezuelan law (**A.**); it will then summarize the facts (**B.**), and in a final section it will analyse whether Rusoro has violated these provisions (**C.**).

## A.   Provisions of Venezuelan law

295. Mining activities under Venezuelan Law are regulated in the Mining Law[215]. The basic principle of the Law – established in Art. 2, which reiterates Art. 12 of the Constitution – is that mines or mineral deposits of any type existing in the national territory belong to the Republic, are public property and therefore inalienable and imprescriptible[216].

Mining concessions

296. Art. 7 of the Mining Law establishes that exploration and exploitation of mineral resources may be carried out through administrative concession, and in the case of small-scale mining also by administrative authorization[217]. In Art. 24 the Mining Law then defines that an administrative concession is

> "el acto del Ejecutivo Nacional, mediante el cual se otorgan derechos e imponen obligaciones a los particulares para el aprovechamiento de los recursos minerales existentes en el territorio nacional. La concesión minera

---

[215] Doc. RLA-49 – Mining Law.
[216] Muci at 32.
[217] Doc. RLA-49 – Mining Law.

> "confiere a su titular el derecho exclusivo a la exploración y explotación de las sustancias minerales otorgadas que se encuentren dentro del ámbito espacial concedido".

297. This article does not consider the concession as a contract, and even less so as an *intuitu personae* relationship, but rather as a unilateral State act which creates a *ius in rem*. Art. 29 of the Law explicitly declares that

> "El derecho de exploración y de explotación que se deriva de la concesión es un derecho real inmueble".

298. This conclusion is reinforced by Art. 67, which regulates small scale mining, and expressly states that the rights conferred to small scale miners are *intuitu personae* and do not constitute *iura in rem*[218]:

> "**Artículo 67**: El derecho de explotación que se deriva del ejercicio de la actividad de la pequeña minería es a título precario, se otorga *intuitu personae*, y en consecuencia, no confiere derechos reales inmuebles, por lo que no podrá ser enajenado, gravado, arrendado, traspasado ni cedido; […]"

<u>Mining contracts granted by CVG</u>

299. The basic instrument created by the Mining Law for the exploration and exploitation of mineral deposits is the concession, granted by the State in favour of the concessionaire. What the Law fails to regulate, however, is the pre-existing situation of CVG[219], which had been entrusted with certain mining rights in the Guyana region by the 1945 Mining Law and by Decree No. 1409 of 1991[220].

300. Before the enactment of the 1999 Mining Law, CVG had signed a number of lease agreements with private third parties, which granted the private party the right to explore and exploit certain mineral deposits[221]. Such contracts, which do not constitute a *ius in rem*[222], continue to be valid and binding after the enactment of the present Mining Law and are regulated by the general provisions on contracts provided for by Venezuelan law. Art. 132 of the present Mining Law creates a special transitory regime: these contracts can be transformed into concessions – a possibility which in the case of Rusoro was not applied[223].

<u>Transfer of concessions</u>

301. Art. 29 of the Mining Law regulates the transfer of concessions. In its first sentence the rule clarifies the legal nature of mining concessions: they are "derechos reales inmuebles". The article then provides as follows[224]:

> "El concesionario podrá enajenar dicho derecho, gravarlo, arrendarlo, sub-arrendarlo, traspasarlo o celebrar sobre el mismo sub-contrataciones para la

---

[218] Muci at 34. See Doc. RLA-49 – Mining Law.
[219] Including CVG-Minerven; the situation is similar for other regional development corporations.
[220] Muci at 88-89.
[221] Muci at 36.
[222] Muci at 87.
[223] None of the contracts signed with affiliates of Rusoro have actually been transformed into concessions.
[224] Doc. RLA-49 – Mining Law, Art. 29.

> explotación, mediante permiso previo otorgado por el Ministerio de Energía y
> Minas, siempre y cuando demuestre efectivamente que la negociación cuya
> autorización se solicita, se hará exclusivamente para el eficiente desarrollo del
> proyecto de explotación, previamente aprobado por este Ministerio y dentro
> de los lapsos autorizados para la ejecución del mismo."

Concessions are *iura in rem*, and as such can be transferred, leased or encumbered, subject only to the previous authorization from the Minister of Mines.

302. The addressee of the requirement established in Art. 29 is the concessionaire, the person or company holder of the *ius in rem*. The object whose transfer requires administrative authorization is the concession itself. This conclusion is confirmed by Art. 29 Parágrafo Segundo, which provides that the transfer must be registered in the land registry[225]:

> "los traspasos deberán ser presentados para su protocolización por ante la
> Oficina Subalterna de Registro de la Circunscripción".

Since only concessions, being *iura in rem*, can be registered at the land registry, it is clear that the scope of the authorization required by Art. 29 can only refer to concessions – not to administrative contracts, which cannot be registered in the land registry.

303. A second aspect is relevant: the law only applies to the requirement of administrative authorization to the transfer or encumbrance of the concession itself. In accordance with the literal reading of the rule, such requirement of prior approval under Art. 29 does not extend to the transfer (or encumbrance) of a controlling interest over a company which holds concessions. The sale of the shares of a company which has separate legal personality does not affect the concession, which is not transferred and remains as an asset of the concessionaire company. Since the concession is not transferred, the registration at the land registry is not affected, and the administrative authorization requirement is not triggered[226].

Transfer of mining contracts granted by CVG

304. The transfer of mining contracts granted by CVG (and by CVG-Minerven) is not subject to Art. 29 of the Mining Law, because this provision is only concerned with the transfer of mining concessions, and the mining contracts do not have the legal status of concessions. The CVG transfers are governed by the general rules on transfer of contracts under Venezuelan law and by the contractual arrangements agreed upon by the parties.

305. CVG did give thought to the possibility that its counterparty might decide to assign the contract, or that ownership of the counterparty might change. For this reason, the contracts signed between CVG and the Venezuelan companies eventually acquired by Rusoro included specific clauses, requiring CVG's authorization for the assignment to a third party. In at least one case the contractual language required

---

[225] Doc. RLA-49 – Mining Law, Art. 29.
[226] Muci at 70.

CVG's approval for the change of control of the Venezuelan counterparty with whom CVG had signed the lease agreement[227].

## B.  **Relevant facts**

306. It is undisputed that Rusoro never directly acquired mining rights in Venezuela and that, when Rusoro acquired control of the Venezuelan companies holding such mining rights, it never asked or obtained any authorization from the Venezuelan State.

307. There is no evidence however that Rusoro took any action to hide its acquisitions from the Venezuelan authorities. To the contrary, there is ample evidence that Rusoro, as a company controlled (at least initially) by Russian shareholders and managed by Russian citizens, enjoyed excellent relationships with the Venezuelan authorities[228]. All of the investments made by Rusoro were publicly announced, were published in the press, information was disclosed on the Canadian stock market and reported in Rusoro's published annual accounts. Venezuelan Ministers visited Rusoro's sites and Mr. Agapov, Rusoro's chief executive, met a number of times with high representatives of the Venezuelan Government, including President Chávez.

308. There is express evidence in the file that in one case, the acquisition of Gold Fields, Rusoro actually wrote to the Minister of Mines to inform him of the transaction[229]. It is telling that the letter starts with the following phrase:

> "A pesar de que el acuerdo se ha celebrado entre empresas no domiciliadas en Venezuela, consideramos de suma importancia hacer partícipe del mismo al Ministerio que usted dirige y, en general, al Gobierno Nacional".

The phrase indicates that Rusoro's understanding at the time was that no authorization was required, because the transaction had been effected between two foreign corporations, and that it was informing the Government as a sign of goodwill.

309. Venezuela has not filed any letter or communication from the Minister of Mines either rejecting Rusoro's interpretation of the law or requesting a formal application for authorization. It must thus be assumed that no such reaction took place. To the contrary, in July 2008 the Venezuelan Government, rather than raising concerns, entered into a formal partnership with Rusoro, known as Venrus, and signed a Commitment Agreement.

Examination of Sr. Marcano

310. Venezuela's former Director of Mining Concessions at the Ministry of Mines, Sr. Reinaldo Marcano, provided testimony as a witness in these proceedings. He

---

[227] See para. 316 *et seq infra*.

[228] See Vladimir Agapov II with an extensive discussion of his meetings with Ministers and with President Chávez; see HT at 353:19 where Mr. Agapov represents that he met President Chávez at least 20 times and received his support each time.

[229] Doc. C-352 – Letter from Rusoro to MIBAM, p 1.

confirmed that the Ministry was aware of Rusoro's indirect acquisitions[230], he averred that he himself was of the opinion that indirect acquisition of mining rights required authorization under Art. 29 of the Mining Law, but that he never put his advice in writing, and that his personal view was not shared by the Ministry's Legal Department[231].

311. Sr. Marcano's testimony appears to give a good summary of the Bolivarian Republic's attitude throughout this period: the official position of the Legal Department of the Ministry of Mines supported a literal interpretation of Art. 29 of the Mining Law, implying that indirect acquisitions of mining rights were excluded from the need of obtaining an administrative authorization. That official position was compatible with the personal opinion of certain civil servants, according to which from a policy point of view the Republic should also supervise indirect acquisitions – but that this was a *de lege ferenda* objective, which for its implementation would have required an amendment of the Mining Law.

Administrative practice

312. Venezuela's administrative practice with regard to the granting of mining authorizations reinforces this conclusion.

313. The Republic has not presented any evidence showing that in a case of indirect transfers of mining rights it ever requested a foreign investor to petition an authorization under Art. 29[232]. Neither has the Republic presented any evidence that it actually granted an authorization for an indirect transfer (although many indirect transfers in the mining sector must have taken place). Finally, Venezuela has not adduced any evidence of the imposition of fines or sanctions to foreign investors who made indirect acquisitions of mining rights in Venezuela without obtaining Government approval.

314. This practice chimes with Venezuela's attitude vis-à-vis Rusoro. Before this arbitration, Venezuela at no time made any representation that Rusoro was acting illegally when it acquired mining rights in Venezuela through the indirect taking of control of foreign holding companies, without requesting or obtaining administrative authorization. To the contrary: in June 2007 the Government extended Rusoro's mining rights over the El Placer mine through 2017 and in

---

[230] HT at 1067:21.

[231] HT at 1143:10.

[232] In its PHB at 79 Venezuela refers to Doc. R-68, a memorandum of a meeting between officials of the Ministry of Mines and Gold Fields, the South-African Company, from whom Rusoro afterwards bought mining assets. In that meeting a Ministry official is quoted as making the statement that Gold Fields had bought without obtaining administrative authorisation ("GF no solicitó autorización del MIBAM para la compra de BGC"). The official does not state that this behaviour was illegal or contrary to the Mining Law. The memorandum reinforces the Tribunal's position: Venezuelan officials accepted that under Art. 29 of the Mining Law an authorization was not required (even if, from a policy point of view, the requirement of such authorization would have been welcomed). It is worth noting that when Rusoro eventually acquired Gold Field's mining interests, it informed the Ministry (without requesting authorization). In R II at 207, the Respondent also referred to a letter from CVG to Inversiones Goldwana (Doc. R-54), in which CVG asked for information regarding an indirect transfer of ownership. This letter does not refer to Art. 29, and once again reinforces the conclusion that the continuing administrative practice was not to require consent under Art. 29.

September 2009 granted exploitation rights over the Increíble 6 mine for a period of 20 years[233].

315. Summing up, there is no evidence in the file suggesting that Rusoro acted with fraud, bad faith or *mens rea* when it purchased mining rights in Venezuela indirectly by taking control of foreign companies which held those rights. To the contrary, the evidence shows that Rusoro adhered to the interpretation of Art. 29 of the Mining Law then favoured by the Venezuelan authorities and to the administrative practice applied at that time by the Venezuelan Ministry of Mines.

Bloque B

316. There is however one exception to the general rule that Rusoro never asked nor obtained administrative authorization. That exception is the acquisition of El Callao, the Hecla subsidiary which held mining rights for the so-called Bloque B. In this case an authorization does indeed exist. But the cause for and the justification of this authorization has been the object of intense discussion between the parties.

317. Hecla Mining Company and CVG-Minerven, a State-owned mining company, had in 2002 signed a lease agreement for the exploitation of gold in an area known as Bloque B. In 2008 Hecla agreed the sale of Hecla's assets in Venezuela to Rusoro, the transaction to be executed through a transfer of shares in non-Venezuelan companies. On 15 May 2008[234] Hecla and Rusoro sent a joint letter to CVG-Minerven giving details of the intended transaction and asking for CVG-Minerven's consent to the indirect assignment of the lease agreement[235]

> "de conformidad con lo previsto en la cláusula 20.1 del Contrato de Arrendamiento".

318. It is important to note that the letter was addressed to CVG-Minerven, not to the Minister, and that the basis for requesting the authorization was clause 20.1 of the lease agreement, which required CVG-Minerven's consent for any indirect change of ownership affecting Hecla.

319. The answer to that letter came not from CVG-Minerven but from the "Ministro del Poder Popular para las Industrias Básicas y Minería". The Minister's letter, dated 3 July 2008, is undoubtedly a reply to the 15 May 2008 joint letter from Hecla and Rusoro, because in its introductory paragraph there is an express statement to that effect. The Minister then authorizes the "cesión indirecta del contrato de arrendamiento", and invokes Art. 29 of the Mining Law as the basis for his decision[236].

320. There is no clear explanation why the Minister invoked Art. 29 of the Mining Law - a provision which had not been mentioned in Rusoro's request for authorization.

---

[234] Doc. C-357 – Letter from El Callao Gold Mining Co. and Rusoro to CVG Minerven, p. 1. The letter is dated 12 May 2008, but it has a stamp from CVG-Minerven that it was received on 15 May 2008.
[235] Doc. C-357 – Letter from El Callao Gold Mining Co. and Rusoro to CVG Minerven, p. 2.
[236] Doc. C-171 – Authorization from MIBAM of assignment of Bloque B to Rusoro.

321.   Sr. Marcano suggested in cross-examination that there might have been a second request from Rusoro, asking for authorization under Art. 29, and that such letter had been lost in the Ministry's files and could not be produced[237]. This seems an unlikely explanation, because the Minister's letter explicitly replies to the existing 15 May 2008 joint letter from Rusoro and Hecla. Two letters on the same date to ask for the same authorization seems an unlikely practice.

322.   The more convincing explanation is that the civil servant who prepared the Minister's letter adhered to the template normally used when granting mining authorizations under Art. 29 of the Mining Law and simply applied that template to a different situation, in which the authorization was not required under that rule, but rather under the terms and conditions of the lease agreement.

323.   Whatever the explanation, the authorization granted for Bloque B does not change the Tribunal's finding that Venezuela's practice throughout the relevant period was neither to request nor to grant authorizations for indirect transfers of mining rights under Art. 29 of the Mining Law.

### C.   Rusoro did not violate Art. 29

324.   Venezuela argues that Art. 29 does apply to indirect transfers of all types of mining rights, even if such transfers are effected through the change of control of entities holding mining rights. In Venezuela's opinion the contrary reading of the rule defeats the object and purpose of Art. 29. If indirect transfers could be permitted without prior consent, the requirement of Art. 29 could be easily circumvented, thus rendering the provision meaningless[238].

325.   The Tribunal disagrees.

326.   The proper interpretation of Art. 29 of the Mining Law proves that the Venezuelan legislator only had the intention to submit to administrative authorization the transfer or encumbrance of concessions – not the indirect transfer of control of companies holding concessions (or other mining rights like CVG Contracts).

327.   Art. 4 of the Civil Code provides the basic rule for the interpretation of laws in the Venezuelan legal system[239]:

> "A la ley debe atribuírsele el sentido que aparece evidente del significado propio de las palabras, según la conexión de ellas entre sí y la intención del legislador".

### Indirect transfer of concessions

328.   Art. 29 of the Mining Law is inserted in Chapter IV of the Law, titled "De las Concesiones". The literal wording of the rule limits its scope of application to mining concessions, it declares that such concessions are *iura in rem,* that the

---

[237] HT at 1120:4-1122:9.
[238] R PHB at 116; R II at 205.
[239] Doc. RLA-15 – Venezuelan Civil Code.

81

transfer and encumbrance of such concessions requires administrative authorization and in its final paragraph adds that transfers must be registered at the land registry.

329. The intention of the legislator can be clearly derived from the words used: the aim of the provision is to regulate the legal nature of mining concessions, their registration at the land registry and their transfer and encumbrance. There is no indication that the legislator wanted to regulate other activities, like the transfer of control over companies holding mining concessions. And the words used to convey the legislator's intent also do not give rise to any ambiguity: the rule reiteratively refers to "mining concessions", not to the shareholding of companies owning mining concessions.

330. Venezuela's proposed construction is inconsistent with basic principles governing statutory interpretation under Venezuelan law. The *favor libertatis* principle requires that provisions which limit a private party's economic and contractual freedom – such as Art. 29 – be interpreted restrictively[240]. The principle of legality recognized under the Venezuelan Constitution[241] further requires an express enabling provision authorizing the Ministry to subject transactions between private parties to its prior permission[242].

331. A comparative analysis of other administrative laws adopted by Venezuela shows that the Venezuelan legislator was perfectly aware that the transfer of an administrative concession can be distinguished from the change of control of a company holding a concession. When the Venezuelan legislature intended to subject a change of control to prior governmental approval, it has done so expressly. In the *Ley de Bosques* the legislator has chosen to submit to administrative authorization not only the transfer of forest rights, but also indirect changes of control[243]. The same applies to the Gold Nationalization Law[244]. The fact that the Mining Law lacks any language extending the requirement of administrative authorization to transfers of controlling companies holding mining concessions, is a powerful indicator that the intent of the Venezuelan legislator was to exclude such transfers from the scope of the required administrative consent.

<u>Mining contracts under Art. 29, paragraph 1</u>

332. Venezuela has also drawn the Tribunal's attention to Art. 29, paragraph 1 of the Mining Law, which refers to "arrendamiento de una concesión cuyos titulares sean Corporaciones Regionales de Desarrollo"[245]. In Venezuela's opinion, this would show that Art. 29 also covers mining contracts, and not only concessions.

333. Art. 29 paragraph 1 reads as follows[246]:

---

[240] Muci at 47.
[241] Doc. RLA-105 – 1999 Venezuelan Constitution, Art. 141; See also Doc. C-176 – Organic Law of the Public Administration, Article 4.
[242] Muci at 45.
[243] Doc. JMB-95 – *Ley de Bosques*, Art. 107; Muci at 74.
[244] Doc. CLA-157 – *Ley Orgánica que reserva al Estado las Actividades de Exploración y Explotación del Oro, así como las Conexas y Auxiliares*, Art. 10.
[245] R PHB at 74.
[246] Doc. RLA-49 – Mining Law, Art. 29.

> "En caso de arrendamiento de una concesión cuyos titulares sean Corporaciones Regionales de Desarrollo, exentas del pago de impuestos, los arrendatarios tendrán la obligación de pagar los impuestos establecidos en esta Ley; salvo que el arrendamiento se lleve a cabo con otros entes de carácter público, también exentos del pago de impuestos".

334. Venezuela's argument is without merit.

335. The question is not whether Art. 29, in its paragraph 1, includes a reference to the tax status of mining contracts signed by *Corporaciones Regionales de Desarrollo* like CGV (it does). The question is whether the requirement of administrative authorization, which Art. 29 in its initial paragraph establishes for transfers or encumbrances of concessions, can be extended to changes in the control of companies holding such concessions. Art. 29, paragraph 1 does not affect the conclusion. The plain language of the rule is that such extension is not provided for.

<u>Decisions of the Venezuelan Courts</u>

336. The parties have not drawn the Tribunal's attention to any ruling from the Venezuelan Courts addressing the issue whether transfers of shares in companies which hold mining concessions fall under the authorization requirement of Art. 29 of the Mining Law.

337. Prof. Mouriño, Venezuela's legal expert, however, offered one authority in support of Venezuela's interpretation of the law: the 2011 *Minca* case[247], where the Venezuelan Supreme Court characterized as *intuitu personae* a joint venture relationship between a private company and CVG, formed to develop the Las Cristinas reserve[248].

338. In fact, the *Minca* case is inapposite, since it does not address the issue under discussion.

339. Minca was a mixed enterprise, incorporated by CVG together with a private partner, Placer Dome de Venezuela CA, which had been selected through a competitive bidding procedure. Both shareholders signed a shareholders agreement, which included a specific clause prohibiting assignments to third parties, except with the authorization of the other party. Placer Dome de Venezuela CA then transferred its shares to another company, Vanessa de Venezuela CA, and the Supreme Court declared the nullity of such transfer, because the authorization from CVG, required under the shareholders agreement, had not been provided[249]. The *Minca* decision does not contain a single reference to Art. 29 of the Mining Law. It does not address whether the authorization under that rule extends to indirect transfers of shares. It simply comes to the rather unobjectionable conclusion that transfers of shares which violate an authorization requirement embedded in a shareholders agreement signed between a State party and a private party selected through a bidding procedure, are null and void.

---

[247] Doc. JMB-89 – Sala Político-Administrativa, Sentencia N° 1.690 of 6 December 2011.
[248] Mouriño I at 141; HT at 1546:2-10.
[249] Mouriño I at 141; Doc. JMB-89 – Sala Político-Administrativa, Sentencia N° 1.690 of 6 December 2011.

**D.** **Conclusion**

340. The Tribunal thus dismisses Venezuela's jurisdictional objection

  - that Rusoro acquired its mining assets in contravention of Venezuela's mining regulations,

  - that the investment does not constitute a protected investment under the Treaty,

  - that Claimant has no standing in this arbitration and

  - that the Tribunal lacks jurisdiction.

341. Rusoro formalized its investment in Venezuela through the acquisition or control of non-Venezuelan corporations, an activity which did not require administrative authorization from the Venezuelan authorities. The fact that these non-Venezuelan corporations in their turn controlled Venezuelan companies holding mining concessions and contracts did not trigger the requirement of administrative consent set forth in Art. 29 of the Mining Law. The Venezuelan government was aware of Rusoro's acquisitions and at the relevant time never raised any concern.

Creation of an illegal export market

342. Venezuela devotes two and a half lines of its PHB to the argument that in the course of its mining activities Rusoro violated "the Mining Law Regulations" by failing to report and account for its purported domestic sales or the final destination of the gold produced, thus feeding an illegal export market.

343. Venezuela's argument is doomed to fail:

  - First, because Venezuela only identifies two rules, contained in the Reglamento General de Minas of 2001[250], which allegedly had been breached by Rusoro:

  - Art. 33, which creates an obligation for concessionaires to periodically send statistical information to the Ministry of Mines[251], and

  - Art. 74, which refers to the "Guías de Circulación" which must be issued to formalize deliveries of any mineral from the mine[252];

  - Second, because Venezuela fails to marshal any evidence that in the period of 2007-2008 Rusoro actually failed to properly report the requisite statistical information or moved gold without the correct "Guía de Circulación". If these violations of the Reglamento General de Minas had actually happened, the Ministry of Mines and its inspectorate must for sure have become aware, and

---

[250] Doc. C-256 – Decree 1.234 published in the *Gaceta Oficial* No. 37.155 on 9 March 2001.
[251] R II at 73.
[252] R I at 110.

there would be written requirements demanding compliance. No such evidence has been adduced.

* * *

344. <u>In summary</u>, Venezuela has failed to prove that Rusoro did not own and exploit its investments in Venezuela "in accordance with [Venezuela's] law", as required by Art. I (f) of the Treaty.

# VII.  RUSORO'S CLAIMS

345.  Having rejected Venezuela's three jurisdictional objections, the Tribunal must now address Rusoro's merits claims, namely that the Bolivarian Republic, in violation of the BIT, expropriated Claimant's investment (**VII.2.**), that it failed to accord Fair and Equitable Treatment, Full Protection and Security, national treatment and free transfer to such investment (**VII.3.**)

346.  Before doing so, however, the Tribunal must briefly address two preliminary issues (**VII.1**): the applicable legal framework and the Republic's defence that the merits claims are inadmissible because Rusoro incurred in bad faith conduct[253].

# VII.1.  PRELIMINARY ISSUES

## 1.  LEGAL FRAMEWORK

347.  Article 54(1) of the Arbitration AF Rules provides as follows:

> "The Tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute"

348.  Canada and Venezuela have done so in Article XII(7) of the BIT:

> "A tribunal established under this Article[254] shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal".

349.  The Tribunal must consequently adjudicate the present dispute applying the BIT and the rules of international law. Neither Claimant nor Respondent have drawn the Tribunal's attention to the existence of any common interpretation of the BIT made by the Bolivarian Republic and Canada.

## 2.  CLAIMANT'S GOOD FAITH

350.  The Bolivarian Republic says that Rusoro's claims are inadmissible, because it did not pursue its investments in good faith

- By taking control of Venezuelan mining rights through offshore corporate transactions without the Government's authorization[255] and

- By misrepresenting its identity as a Russian-owned company[256].

---

[253] R PHB at 96.
[254] Article XII – Settlement of Disputes between an Investor and the Host Contracting Party.
[255] R PHB at 97.
[256] R PHB at 101.

351. The Republic's first argument can be swiftly rejected: the Tribunal has already found that Rusoro did not incur in a violation of Art. 29 of the Mining Law when it indirectly acquired control of its Mining Rights, and that Rusoro, enjoyed excellent relationships with the Venezuelan authorities[257]. All of the investments made by Rusoro were publicly announced, were published in the press, information was disclosed on the Canadian stock market and reported in Rusoro's published annual accounts. Venezuelan Ministers visited Rusoro's sites and Mr. Agapov, Rusoro's chief executive, met a number of times with President Chávez. These facts are incompatible with Venezuela's *ex post* argument that Rusoro did not pursue its investments in good faith.

<u>Misrepresentation of Rusoro's identity</u>

352. The second argument is also untenable.

353. Since its incorporation, Rusoro was a Canadian corporation, publicly traded on the Canadian stock exchange, whose shareholding was a matter of public record[258]. It is true that its initial shareholders and its management were of Russian nationality, and that later on, as a consequence of successive corporate acquisitions and mergers, Russian control was diluted. There is no evidence, however, that Rusoro acted in bad faith and tried to mislead the Venezuelan officials. The Bolivarian Republic's only evidence is a letter dated October 29, 2007 sent by Mr. Vladimir Agapov, the Chairman of Rusoro, to Minister José S. Khan[259].

354. In that letter Mr. Agapov defines "Rusoro Mining Ltd" as "poseída mayoritariamente por ciudadanos rusos" and then goes on to explain that Rusoro has acquired the Venezuelan gold mining activities from the South African company Gold Fields, that Gold Fields will become a "socia minoritaria" at Rusoro, that he and his son Andre will continue holding "el control accionario y directivo", that he will continue to be "Presidente" and his son "Director Ejecutivo" and that the "Consejo Consultivo" will be constituted by three Russian citizens.

355. During his examination, Mr. Agapov acknowledged that before the Gold Fields transaction his personal participation in Rusoro amounted to 38%[260] and that after the transaction his participation was diluted to 18.2%[261]. It is also undisputed that throughout the relevant period Mr. Agapov senior was the Chairman of Rusoro, his son its CEO, and that both together controlled the company *de facto* (through their minority holding and in agreement with other shareholders). There is no allegation that Mr. Agapov breached his promise that Rusoro's "Consejo Consultivo" would consist of Russian individuals.

356. Given these facts, the Tribunal does not see any bad faith or intention to mislead in Rusoro's decision to send the October 29, 2007 letter to Minister Khan. To the contrary: under Venezuelan law, the acquisition of Gold Fields, through a merger

---

[257] See Vladimir Agapov II with an extensive discussion of his meetings with Ministers and with President Chávez; see HT at 353:19 where Mr. Agapov represents that he met President Chávez at least 20 times and received his support each time.
[258] C PHB at 68.
[259] R PHB at 101; Doc. C-352 – Letter from Rusoro to MIBAM.
[260] HT at 440:l-9.
[261] HT at 441:l-2.

with Rusoro, did not require administrative authorization, and did not even have to be communicated to the Venezuelan government. Rusoro voluntarily informed the authorities, and gave a reasonably precise overview of the forthcoming transactions and the impact on Rusoro's shareholders.

# VII.2. <u>EXPROPRIATION</u>

357. Rusoro's fundamental claim is that Venezuela expropriated Rusoro's investments for Venezuela's own economic benefit in violation of Article VII(1) of the BIT, which provides as follows:

> "Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subject to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable".

358. Both Parties agree that the BIT does not prohibit nationalization, and the Bolivarian Republic does not contest that as a consequence of the Nationalization Decree it actually nationalized Rusoro's Mining Rights in Venezuela. There is thus ample coincidence between both Parties that expropriation has indeed happened. The real issue to be discussed is the amount of compensation, and certain ancillary issues (whether the expropriation is lawful or unlawful, and whether it was accomplished in one single act or by a chain of successive events).

## 1. <u>CLAIMANT'S POSITION</u>

359. Claimant alleges that it has suffered both a direct expropriation and a creeping expropriation[262].

360. Claimant avers that when on 16 September 2011 the Bolivarian Republic passed the Nationalization Decree it expropriated Rusoro's Mining Rights, transferred all assets to the State, destroyed the value of Rusoro's subsidiaries, and deprived the investment of all economic value[263]. This direct expropriation was unlawful, not only because Venezuela has never paid any compensation for Rusoro's Mining Rights or the shares in the subsidiaries[264], but also because it was not carried out

---

[262] C II at 206.
[263] C I at 212.
[264] C I at 218; C II at 211.

under due process of law[265], because it was discriminatory[266] and not for a public purpose[267].

361. Rusoro avers that it also suffered a creeping expropriation: the Bolivarian Republic adopted a premeditated plan to obtain State control of the gold sector[268]. Starting in April 2009, Venezuela allegedly enacted a series of interconnected measures targeting Rusoro's gold mining business and culminating in the outright nationalization of Rusoro's investment through the Nationalization Decree. Claimant submits that taken together, Venezuela's chain of actions resulted in the expropriation of Rusoro's investment[269] and that this creeping expropriation implies a composite breach of the BIT. Rusoro is entitled to compensation for the fair market value of its investment, excluding the effect of all measures comprising Venezuela's premeditated plan to extract greater economic benefits from the gold sector[270].

## 2. RESPONDENT'S POSITION

362. The Bolivarian Republic takes the stand that the right to nationalize or expropriate is a sovereign right of States, affirmed by international scholars and investment tribunals[271].

363. Respondent adds that the BIT permits nationalization and that it complied with the BIT's requirements when it expropriated Claimant's Mining Rights:

- Due process was respected[272],

- The Nationalization Decree was non-discriminatory[273],

- The expropriation was effected for a public purpose[274].

364. The only BIT requirement not complied with is that no compensation has been paid, the reasons being that after six months of negotiations, Claimant failed to reach an agreement with Venezuela on the amount of compensation (or the conditions for forming a joint venture)[275]. The Parties' failure to agree on the amount of compensation does not render nationalization unlawful *per se*[276].

365. Venezuela offered book value for the expropriated assets, and book value can represent the genuine value of the investment[277]. Furthermore, the Nationalization

---

[265] C II at 219.
[266] C II at 220.
[267] C II at 222.
[268] C II at 204; C PHB at 106.
[269] C II at 210.
[270] C PHB at 112.
[271] R II at 411.
[272] R II at 439.
[273] R II at 443.
[274] R II at 447.
[275] R I at 503.
[276] R I at 505; R II at 414.
[277] R I at 507; R II at 416.

Decree offered another alternative: the possibility of negotiating a joint venture agreement[278]. Thus Venezuela engaged in good faith negotiations regarding a joint venture regime and appropriate compensation for Claimant, despite the fact that Claimant did not have proper title to the investment[279]. Rusoro did not like the offer made by the Bolivarian Republic, because that offer did not match Rusoro's own inflated valuation. But a disagreement over valuation between a State and an investor is not a breach of international law by the State. It simply makes immediate payment of compensation impossible because the private party is unwilling to accept the compensation offered by the State[280].

366. As regards Venezuela's regulatory actions before 2011, these did not imply an indirect expropriation of Claimant's investment, because they were not part of a plan to expropriate Rusoro's assets. There is no evidence that these regulatory actions before 2011 were interconnected. Venezuela sustains that all of them were distinct policy decisions taken by various government entities and based upon different and legitimate reasons[281]. These actions represented a legitimate exercise of government regulation in the public interest – not expropriation.

367. Claimant knew about the strict monetary controls in place before acquiring its interests in Venezuela. It was aware that since 2003 exporters of gold were required to sell 90% of the foreign currency obtained from exports to the BCV at the Official Exchange Rate. Any reasonable investor would have expected a prudent government to increase exchange control in order to stop illegal and law-evading conduct, as Venezuela did[282].

368. In the gold market, sales to the BCV and authorized exports had halted, and at the same time gold production overall was increasing, or at least holding steady. Venezuela rationally took action to address the discrepancy[283].

369. Venezuela engaged in lawful and appropriate State action to regulate the gold mining industry and enforce financial and monetary policies in the public interest. These measures were not expropriatory[284].

**3.   THE TRIBUNAL'S DECISION**

370. There are three questions, which the Tribunal must address: whether a direct expropriation of Rusoro's investment has occurred (**3.1.**), whether such expropriation meets the requirements set forth in the BIT (**3.2.**) and finally, whether the Bolivarian Republic also incurred in a creeping expropriation of Claimant's assets (**3.3.**).

---

[278] R I at 514.
[279] R I at 516; R II at 428.
[280] R II at 436.
[281] R II at 460.
[282] R I at 521.
[283] R I at 522.
[284] R I at 524.

**3.1  DIRECT EXPROPRIATION**

371. In accordance with Art. VII.1 of the Treaty,

> "Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subject to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation".

372. The Tribunal will first summarize the proven facts (**A.**) and then establish whether such facts give rise to a nationalization (**B.**).

**A.   Proven facts**

373. On 17 August 2011 President Chávez publicly announced the immediate nationalization of the gold mining industry in Venezuela. Shortly after, on 16 September 2011, Venezuela adopted the Nationalization Decree with "rango, valor y fuerza de Ley Orgánica", which

   - declared all assets and operations associated with the mining and exploitation of gold in Venezuela of "utilidad pública e interés social",

   - provided for State control of the property and mining rights of all gold producing companies,

   - ordered the transfer of all existing concessions or contracts to Mixed Companies, controlled by the State,

   - decreed the automatic extinction of all existing concessions or contracts if holders did not agree within 90 days to their transfer to Mixed Companies,

   - ordered that compensation to investors be equal to the book value of the investment.

374. Venezuela then issued Resolutions 88 and 89, dated 7 October 2011, which created a single Negotiation Commission for the whole gold industry, with the task of transferring all gold concessions, contracts and leases to new Mixed Companies, and an OTC entrusted with the authority of taking control over and managing all gold assets to be nationalized, with mandates expiring on 15 December 2011.

375. Negotiations between Rusoro and the Negotiation Commission started in September 2011 and continued through December. On 15 December 2011, the last day of negotiations, Venezuela adopted an Amendment Decree, extending the deadline for reaching agreement for another 90 days.

376. On 13 March 2012 a final meeting between Rusoro and PDVSA (the State-owned oil company which was acting on behalf of the State) took place. It became clear that no agreement on compensation could be reached, and negotiations were suspended. The next day, 14 March 2012, the negotiation period expired with no agreement between Rusoro and the Government having been reached.

377. Accordingly, all Mining Rights held by Rusoro through its subsidiaries were automatically extinguished by law as of 15 March 2012. After Rusoro's formal withdrawal from the mining areas on 31 March 2012, all of Rusoro's Mining Rights and other assets located in Venezuela were taken over by the Bolivarian Republic.

378. No compensation has been paid by the Bolivarian Republic for the nationalization of Rusoro's Mining Rights and other assets located in Venezuela.

### B.    Nationalization

379. It is undisputed that the Bolivarian Republic expropriated all the Mining Rights and other assets, indirectly held by Rusoro in Venezuela through local subsidiaries. The legal basis for such nationalization was the Nationalization Decree, issued by the President of the Bolivarian Republic and countersigned by the cabinet, which had "rango, valor y fuerza de Ley Orgánica". The Nationalization Decree effected

- the nationalization of the gold sector (i.e. the expropriation of a natural resource or of an industrial sector for the direct benefit of the State or of its agencies and enterprises)[285], as well as

- the appropriation by the Bolivarian Republic of Rusoro's interest in the Mining Rights and other assets held through its Venezuelan subsidiaries.

### 3.2   REQUIREMENTS ESTABLISHED IN ART. VII.1

380. The BIT does not forbid States to expropriate assets owned or controlled by investors, nor to nationalize natural resources or economic sectors. But the BIT establishes four requirements which the State must comply with in order for the expropriation or nationalization to be lawful: the measure

- must be adopted for a public purpose,

- under due process of law,

- in a non-discriminatory manner and

- ensure prompt, adequate and effective compensation.

### A.    Public purpose

381. According to Venezuela, sovereigns enjoy wide latitude in determining whether an action is taken for a public purpose. The sovereign determination of a public purpose should not be second-guessed[286]. Venezuela's actions directly responded to troublesome developments in the gold mining sector: environmental harm and

---

[285] BROWNLIE: "Principles of Public International Law", Oxford University Press (2008), 7th edition, p. 532.
[286] R II at 447.

violation of rights of the workers[287] and their purpose was to ensure sustainable and socially responsible exploitation of natural resources[288].

382.  Rusoro disagrees. Venezuela's assertion that the "capitalist mining model" has caused serious detriment and that nationalization was an appropriate means to mitigate is unsupported. There is no evidence linking Rusoro's operations with alleged negative effects claimed to have inspired the nationalization[289]. The real motivation for the expropriation was the desire to boost Venezuela's gold reserves. The nationalization of Rusoro's assets was designed to achieve political advantage for the State by seizing massive value at the expense of a foreign company[290].

The Tribunal's position

383.  The purpose of the Nationalization Decree is stated in its Preamble and its Art. 1:

> "Con el supremo compromiso y voluntad de lograr la mayor eficacia política y calidad revolucionaria en la construcción del socialismo y el engrandecimiento del país, basado en los principios humanistas y en las condiciones éticas Bolivarianas…"

> "Artículo 1: El presente Decreto Ley tiene por objeto regular lo relativo al régimen de las minas y yacimientos de oro, la reserva al Estado de las actividades primarias, conexas y accesorias al aprovechamiento de dicho mineral, y la creación de empresas para su ejercicio, con el propósito de revertir los graves efectos del modelo minero capitalista, caracterizado por la degradación del medio ambiente, el irrespeto de la ordenación territorial, el atentado a la dignidad y la salud de las mineras y mineros y pobladoras [y] pobladores de las comunidades aledañas a las áreas mineras, a través de la auténtica vinculación de la actividad de explotación del oro con la ejecución de políticas públicas que se traduzcan en el vivir bien del pueblo, la protección ambiental y el desarrollo nacional".

384.  The stated purpose of the Nationalization Decree is consequently

-    The construction of socialism, "basado en los principios humanistas y en las condiciones éticas Bolivarianas",

-    To undo the capitalist mining model, and substitute it by a new model, and

-    The execution of public policies "que se traduzcan en el vivir bien del pueblo, la protección ambiental y el desarrollo nacional".

385.  States enjoy extensive discretion in establishing their public policy. It is not the role of investment tribunals to second-guess the appropriateness of the political or economic model adopted by the legitimate organs of a sovereign State. The Nationalization Decree clearly states its purpose, and such purpose is a legitimate

---

[287] R II at 451.
[288] R II at 454.
[289] C II at 224.
[290] C II at 226.

93

aim of economic policy. On its face, the Nationalization Decree complies with the public purpose requirement of Art. VII.1 of the BIT.

### B.   Due process

386.   Venezuela says that the requirement of due process was complied with, because Rusoro had the option to pursue judicial or administrative remedies in Venezuela. For example, Rusoro could have challenged the constitutionality of the Nationalization Decree – but it failed to do so[291].

387.   Rusoro disagrees[292]. In its opinion, Rusoro had no opportunity to claim its legitimate rights, because the Decree stipulated *ab initio* that compensation could only be paid according to book value. Rusoro could not challenge this requirement before the Venezuelan courts. Indeed the Nationalization Decree provided that[293]

> "las disposiciones del presente Decreto Ley son de orden público y se aplicarán con preferencia a cualquier otra del mismo rango legal".

### The Tribunal's position

388.   The Tribunal sides with Venezuela.

389.   The Treaty requires that the nationalization be effected "under due process of law". The requirement does not specifically refer to the municipal expropriation law of Venezuela, but to due process in general, a generic concept to be construed in accordance with international law. In essence, due process requires

-      (i) that the decision to nationalize be properly adopted, and that

-      (ii) the expropriated investor have an opportunity to challenge such decision before an independent and impartial body[294].

390.   (i) In the present case, the Nationalization Decree was adopted as a decree with the rank of a Ley Orgánica – an organic law holding the highest authority (after the Constitution) in the Venezuelan legal hierarchy. After deliberation at the *Consejo de Ministros*, the Decree was issued by President Chávez, who had been empowered by a formal authorization granted by Parliament[295]. Claimant does not allege that President Chávez was not duly authorized to pass the Nationalization Decree, or that the proper formalities of law have not been followed.

391.   (ii) Respondent submits that the Claimant had two avenues open to challenge the decision to nationalize its gold mining operations:

---

[291] R II at 441.
[292] C II at 219.
[293] Doc. C-214 – Nationalization Decree, Art. 36.
[294] *OI European* at 387; *Feldman* at 140; see also R. DOLZER AND C. SCHREUER: "Principles of International Investment Law", Oxford University Press (2008), 2nd edition, p. 91.
[295] Doc. C-214 – Nationalization Decree, Preamble.

- First, it could have challenged the constitutionality of the Nationalization Decree, alleging that this *Decreto* is incompatible with the Venezuelan Constitution[296],

- Second, additionally or alternatively, Rusoro could have challenged the *actos de ejecución* adopted by the Venezuelan Government in furtherance of the Nationalization Decree before the *Jurisdicción Contencioso-Administrativa*[297].

392.   Rusoro never pursued any of these options – arguing that any attempt to obtain justice locally would have been futile[298]. Be that as it may, the Republic's averment that two judicial recourses were available remains unchallenged, and is sufficient for "due process of law" to have been complied with.

393.   The Tribunal concludes that Claimant has failed to prove that the Bolivarian Republic violated due process of law when it decided to nationalize the gold sector in Venezuela by issuing the Nationalization Decree, which adopted the form of a "Decreto con rango, valor y fuerza de Ley Orgánica".

## C.   Non-discrimination

394.   The Bolivarian Republic says that the Nationalization Decree applied to all mining operators in Venezuela, foreign or domestic without regard to nationality. There is no evidence that the reasons for nationalizing Rusoro's assets were related to its nationality[299].

395.   Rusoro disagrees: the Nationalization Decree restricted gold exploration and exploitation to State-owned companies and thus discriminated against Rusoro by excluding it from the gold sector[300].

396.   The Tribunal again sides with Venezuela.

397.   Venezuelan and foreign investors in the gold sector were equally affected by the Nationalization Decree. It is true, as Claimant avers, that Venezuela's State-owned companies were not negatively affected by the Nationalization Decree[301]. But this is a necessary consequence of the nationalization of a productive sector in which privately owned and State-owned companies coexisted. In situations like this, privately owned enterprises are expropriated, while State-enterprises remain unaffected. But this difference of treatment cannot be considered to amount to discrimination.

---

[296] C II at 441.
[297] Mouriño II at 199, invoking Art. 259 of the Venezuelan Constitution.
[298] C II fn. 545.
[299] R II at 446.
[300] C II at 221.
[301] C II at 221.

**D.**    **Prompt, adequate and effective compensation**

398. Claimant emphasizes that this requirement has never been complied with. Venezuela never paid any compensation and the negotiation was a mere window dressing: the Nationalization Decree limited compensation to the book value of the investment and Venezuela never offered the "genuine value" of the investment, as required by the BIT[302].

399. Venezuela sees things differently: it avers that it negotiated in good faith with Claimant for six months, and that the outcome was that Rusoro did not like the offer made by the Bolivarian Republic. A disagreement over valuation between a State and an expropriated private party is not a breach of international law by the State[303].

The Tribunal's position

400. It is a fact that from October 2011 through March 2012 the Bolivarian Republic and Rusoro unsuccessfully negotiated a settlement for the expropriation of Rusoro's Mining Rights and assets. It is also undisputed that in accordance with the Nationalization Decree, the maximum amount of compensation which could be offered by Venezuela was capped at the "valor en libros" of the investment[304]. Finally, it is also undisputed that in the four years which have lapsed since the negotiations broke off, the Bolivarian Republic has not made any payment of compensation in favour of Rusoro.

401. The standard required by the BIT is that compensation be "prompt, adequate and effective". However, the mere fact that an investor has not received compensation does not in itself render an expropriation unlawful. An offer of compensation may have been made to the investor and, in such case, the legality of the expropriation will depend on the terms of that offer[305].

402. The precise amount of compensation offered by Venezuela has not been disclosed, since it is covered by a confidentiality undertaking.

403. However, Ing. Rubén Figuera, the leader of the Venezuelan negotiation team, has submitted two witness statements, and was then examined in the course of the Hearing. Ing. Figuera has explained in some detail the reasoning underlying Venezuela's offer:

-    Venezuela's preferred solution had been the creation of a Mixed Company, compensation being a subsidiary alternative offered to the investor[306];

-    Venezuela's initial intention had been to base its offer for compensation on the consolidated net worth of Rusoro's Venezuelan subsidiaries[307];

---

[302] C II at 217.
[303] R II at 436.
[304] Doc. C-214 – Nationalization Decree, Art. 16.
[305] *Exxon Mobil* at 301.
[306] HT at 1407:6-13.
[307] HT at 1403:11-15.

- In the course of the due diligence procedure, the legal advisors to the State concluded that Rusoro had illegally acquired title to the Mining Rights, since it had bought controlling shareholdings in the Venezuelan companies holding such rights, without obtaining authorization from the Venezuelan authorities[308];

- Consequently, it was decided that Venezuela should only offer a reduced compensation to Rusoro: (i) there should be no compensation for un-mined gold deposits, since the investor lacked valid title to such gold[309]; and (ii) compensation should be limited to the non-depreciated value of fixed assets plus investments in explorations that had yielded positive results[310] (provided that such explorations had been carried out in areas where Rusoro held valid exploration rights[311]);

- In any case, the Nationalization Decree made it legally impossible for Venezuela to offer a compensation which exceeded the book value of the expropriated investment, even if fair market value were to exceed book value[312].

<u>Standards of compensation</u>

404. The standard for compensation under Art. VII.1 of the BIT requires that the amount paid must represent the "genuine value of the investment or returns"; and this "genuine value" equates with fair market value[313]. An analogous standard is also required by Venezuela's domestic law on expropriation ("valor equivalente que corresponda al bien expropiado")[314].

405. The Nationalization Decree however established a different standard – "valor en libros", which, in the interpretation given by Ing. Figuera, equates with the net worth of the expropriated companies. Ing. Figueras also confirmed that even if the fair market value of the investment were to exceed the "valor en libros", the Nationalization Decree precluded an offer beyond that threshold.

<u>Venezuela's offer</u>

406. In reality, however, Venezuela's offer did not even reach the cap provided for in the Nationalization Decree. As Ing. Figueras deposed, the offer was reduced to the non-depreciated value of the fixed assets plus the investment in certain explorations, based on the argument that Rusoro had illegally acquired its Mining Rights by failing to obtain requisite administrative authorizations. The Tribunal has already analysed this argument, and has concluded that Rusoro's acquisitions of Venezuelan companies holding mining rights did not require administrative authorization under Art. 29 of the Mining Law and that the Venezuelan government

---

[308] Figuera II at 18; HT at 1403:16-18.
[309] Figuera II at 18.
[310] Figuera II at 18; HT at 1403:20-22.
[311] Figuera II at 19.
[312] HT at 1404:19-22.
[313] See para. 647 *infra* when discussing compensation.
[314] Art. 36 LECUPS.

at the relevant time was perfectly aware of the acquisitions and never raised any concern[315].

407. The legality of an expropriation where the State has taken the investment but has failed to make any compensation payment, depends on whether a good faith offer for a reasonable amount of compensation was actually made.

408. In the present case, the Nationalization Decree provided for the payment of compensation to investors in the gold sector, but established a cap, which was not foreseen either in the BIT or in domestic Venezuelan law. The Bolivarian Republic then submitted an offer, for an amount which was significantly below the cap established by the Decree. The reason for this reduction was the alleged illegality of Rusoro's investment – an argument which has been analysed and dismissed by the Tribunal[316]. Furthermore, the amount offered was never actually paid to, nor deposited in escrow in favour of Claimant.

409. Given these circumstances the Tribunal concludes that the Bolivarian Republic has not met the requirement established in Art. VII.1. of the BIT, to the effect that expropriations or nationalizations may only be decreed "against prompt, adequate and effective compensation".

* * *

410. Summing up, the Tribunal concludes that the Bolivarian Republic has complied with three of the four requirements established in Art. VII.1 of the Treaty, but that it has failed to comply with the fourth, "prompt, adequate and effective compensation": although it is undisputed that Venezuela made an offer to compensate Rusoro, such offer was insufficient and the minimum amount offered was never paid or deposited.

### 3.3  CREEPING EXPROPRIATION

411. Claimant submits that it suffered not only a direct expropriation of its assets, but that it was also the subject of a creeping expropriation.  Starting in April 2009, Venezuela allegedly enacted a series of interconnected measures targeting Rusoro's gold mining business, which culminated in the outright nationalization of Rusoro's investment through the Nationalization Decree.

412. The Bolivarian Republic denies that, before the enactment of the Nationalization Decree, it had developed or was following any plan with the aim of taking Claimant's investments. All pre-2011 actions were unconnected, did not form part of a wider plan to nationalize Rusoro's assets and represented distinct policy decisions, based upon different and legitimate reasons, taken by various government entities in the exercise of their legitimate right to issue regulation in the public interest.

413. To adjudicate this issue, the Tribunal will establish the proven facts (**A.**), and then will decide whether there is evidence that in 2009 Venezuela had developed the

---

[315] See para. 341 *et seq supra*.
[316] See para. 341 *et seq supra*.

plan to nationalize Claimant's gold assets and whether the 2009 Measures formed part of that plan (**B.**).

## A.   Proven facts

414.  Venezuela submits[317] that since 2005 its approved and publicly announced government policy was to replicate in the gold sector the policy adopted in the oil sector: to convert all private mining activities to mixed enterprises, and of expropriating holders of substantial mining rights who resisted the change.

415.  There is some evidence showing that that since 2005/6 the Venezuelan government was at least envisioning the possibility that in a medium to long term time horizon it would nationalize the gold and diamond mining sectors:

-    in 2005 President Chávez approved an internal policy paper, which implied that in a time horizon of between five and 10 years the State would assume control of the gold (and diamond) mining activities, and

-    in 2006 the then "Ministro de Industrias Básicas", Sr. Víctor Álvarez, published an article in the Internet[318] in which he set forth the "Principios rectores de la nueva política minera venezolana", the first principle being the suppression of all mining concessions granted to private persons, and the incorporation of mixed enterprises to carry out mining activities and the second principle the abolition of "mining latifundia", including those owned by "private groups from Russia".

416.  Grupo Agapov had started its acquisitions of mining assets in Venezuela in 2002, and continued doing so through 2005. In 2006 Grupo Agapov merged into Rusoro, and Rusoro purchased additional assets in the period 2006-2008. There is no evidence that the approval of the 2005 policy paper by President Chávez was made publicly known, nor that Rusoro became aware of the article published by the Minister in 2006 in Aporrea (which defines itself as a "portal alternativo de noticias a favor del gobierno de Hugo Chávez").

Regulation of the gold market

417.  At the time when Grupo Agapov/Rusoro made their investments, the BCV was already entrusted with the regulation of the Venezuelan gold sector. It had issued a specific Resolution – the 1996 BCV Resolution – limiting the export of gold: at least 15% of the total production could not be exported and had to be sold in the private domestic market.

418.  That Resolution was in force when Rusoro bought its assets and continued in force until April 2009, when a new Resolution – the April 2009 BCV Resolution - was approved, which introduced further limitations:

-    sales in the domestic market were limited to 10% of production,

---

[317] R I at 497.
[318] Doc. R-6 – Aporrea, 18 May 2006.

- exports to 30% and

- 60% of the production had to be sold to the BCV, at a price in VEF calculated by converting the international gold price at the Official Exchange Rate.

419. In June 2009 a new Resolution was enacted – the <u>June 2009 BCV Resolution</u> – which reaffirmed the regime created by the April 2009 BCV Resolution for the private sector, but relaxed the rules for the public gold producing sector: in companies controlled by the State

- Sales in the domestic market were raised to up to 25%,

- The percentage which could be exported was raised to 50%,

- And the share which had to be offered to the BCV was reduced to 25%.

420. The June 2009 BCV and its striking differentiation between public and private gold producers remained in force for approximately one year and was then replaced by the <u>July 2010 BCV Resolution</u>, which again created a unified regime for public and private producers:

- 50% of production had to be sold to the BCV, at a price expressed in VEF and converted at the Official Exchange Rate,

- the remaining 50% could be exported.

421. The July 2010 BCV Resolution was still in force when the Nationalization Decree was issued on 23 August 2011.

<u>General exchange control rules</u>

422. In 2003 – before the incorporation of Rusoro in 2006 – the Government of Venezuela and the BCV issued <u>Convenio Cambiario No. 1</u>, a rule which created a strict exchange control regime, with a public agency, CADIVI, to supervise and manage the system and to grant the requisite authorizations.

423. In accordance with Convenio Cambiario No. 1, a private company operating in Venezuela was obliged to sell its foreign currency to the BCV at the Official Exchange Rate (except for a 10% tranche, which could be used to pay related expenses in foreign currency), and could only purchase the foreign currency required for its import and other activities with prior authorization of CADIVI.

424. The impact of this severe exchange control regime was softened due to the existence of the Swap Market, a parallel currency market where Venezuelan individuals and corporations could exchange VEF against USD (and vice-versa), at a market rate (which was consistently higher than the Official Exchange Rate), by buying and selling securities. In May 2010 the Government passed the Ley de Reforma Cambiaria making the use of the Swap Market illegal[319].

---

[319] See para. 154 *supra*.

100

<u>Specific exchange control rules for the gold sector</u>

425.   After the enactment of Convenio Cambiario No. 1, gold producing companies were subject to the normal statutory exchange control regime. That situation however changed in June 2009, when <u>Convenio Cambiario No. 12</u> was published, a specific exchange control rule for the gold sector. Private companies were now obliged to repatriate all foreign currency earning obtained from gold exports and sell the foreign currency to the BCV at the Official Exchange Rate. This rule, however, did not apply to state-owned companies, which were exempted from the repatriation rule and authorized to maintain foreign currency in bank accounts located abroad, and to freely use such funds[320].

426.   This rule, which favored State-controlled gold producing companies, was repealed in July 2010, when Convenio Cambiario No. 12 was amended. Thereafter the regulation applicable to private and to public gold producers was unified: all gold producers were now required to sell to the BCV at the Official Exchange Rate 50% of their foreign currency income from export operations, while the other 50% was exempted from repatriation and could be held in foreign accounts and used outside Venezuela[321].

### B.   **No evidence of creeping expropriation**

427.   Rusoro's contention regarding creeping expropriation is two-pronged: (i) since 2005/2006 Venezuela had a plan to nationalize the gold mining sector, and (ii) this plan was then carried out in three interconnected steps:

-   in 2009, when Venezuela adopted the 2009 Measures (i.e. the April 2009 BCV Resolution, the June 2009 BCV Resolution and the Convenio Cambiario No. 12),

-   in 2010, when the <u>Ley de Reforma Cambiaria</u> and the **2010 Measures** were issued (i.e. the July 2010 BCV Resolution and the Amendment to the Convenio Cambiario No. 12), and finally

-   in 2011 when the Nationalization Decree was approved.

<u>Time bar</u>

428.   The Tribunal has already found[322] that in accordance with Art. XII.3 (d) of the BIT any breach allegedly committed by Venezuela when it adopted the 2009 Measures has become time barred and cannot result in an enforceable claim. This decision implies that the 2009 Measures cannot be taken into consideration in order to decide whether a creeping expropriation has occurred.

429.   As noted in the jurisdictional findings, however, this conclusion does not imply that the 2009 Measures have become totally irrelevant for the Tribunal's decision,

---

[320] Doc. C-188 – Convenio Cambiario No. 12, Arts. 1 and 2.
[321] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No. 12.
[322] See para. 232 *et seq supra*.

providing background and context for the Tribunal's adjudication, even if by themselves they cannot amount to a breach of the Treaty.

The Tribunal's position

430. Rusoro's argument that it suffered a creeping expropriation is premised on two factual assumptions:

- (i) that Venezuela had developed a plan to nationalize the gold sector, and

- (ii) that such plan was implemented through three interconnected steps.

431. (i) There is some evidence in the file which supports the first assumption. There are indications that since 2005/2006 the Bolivarian Republic may have been envisioning a high level policy for the gold and diamond mining sector, which in a five to 10 years horizon would lead to a reform similar to that accomplished in the oil and gas sector: all existing mining concessions and contracts held by "mining latifundia" would be converted into mixed enterprises, controlled by the State, while private investors unwilling to accept the change would be expropriated.

432. (ii) The problem with Rusoro's allegation is that the second factual assumption is unproven. There is no convincing evidence that before the adoption of the 2011 Nationalization Decree Venezuela had decided to implement the high level policy of nationalization of the gold sector envisioned since 2005/6, in spite of the political inspiration of both sets of measures.

Analysis of the available evidence

433. The 2009 Measures is the first set of measures which, in Rusoro's submission, resulted in a creeping expropriation. The 2009 Measures mandated private gold producers to sell 60% of their production to the BCV at a reduced price, limited exports to 30% and ordered repatriation of all proceeds; the result was that Venezuela's reserves were bolstered and that the BCV could replenish its holdings of gold at a favourable price – as admitted in a public interview by the President of the BCV, who explained that the BCV was able to buy gold at 900 USD/oz. using the Official Exchange rate and then resell it in the international market for 1,700 USD/oz.[323].

434. These measures were adopted by the BCV – not by the Ministry of Mining – and their primary purpose clearly was to increase the BCV's currency and gold reserves, depleted due to the international financial crisis and the reduction of the oil exports – not to take control of the gold sector.

435. There is a further argument: the 2009 Measures were only in force for approximately one year, and were repealed by the 2010 Measures, which implied a partial re-liberalization of the gold market: the 60% obligatory sale percentage to

---

[323] The interview in "El Universal" was published in 2012, but the conclusions also apply to the situation in 2010.

the BCV was reduced to 50%, the export quota was raised from 30% to 50% and the obligation to repatriate funds was lowered from 100% to 50%.

436. The adoption of the 2010 Measures, an attempt to undo some of the most stringent effects of the 2009 Measures, is incompatible with Claimant's allegation that Venezuela was following a well-defined plan to nationalize the gold sector by successive, interconnected actions. If such plan had existed, the 2010 Measures should have increased, not decreased, the burden on private gold producers. The fact that the 2010 Measures in fact <u>relaxed the regime</u>, proves that Venezuela was not following a hidden agenda to nationalize the private gold sector.

437. There is a final argument: if the Venezuelan State had had the intention of nationalizing the gold sector in 2009 or in 2010, there was no need at all to use the powers of the BCV as an instrument to advance the policy. In 2011 President Chávez and his Consejo de Ministros nationalized the gold sector using the powers vested by Parliament, by simply issuing a Decree with "rango, valor y fuerza de Ley Orgánica". If the government had wanted to nationalize the gold sector in 2009 or 2010, it could easily have followed the same path, without involving the BCV.

438. <u>In conclusion</u> the contention that Venezuela incurred in a creeping expropriation of the gold sector beginning with the 2009 Measures, in breach of Art. VII.1 of the Treaty, must be dismissed.

# VII.3.  <u>ANCILLARY CLAIMS</u>

439. Rusoro has also filed several Ancillary Claims, submitting that

- Venezuela failed to accord Rusoro's investment fair and equitable treatment ["**FET**"] and

- full protection and security ["**FPS**"],

- that Venezuela discriminated against Rusoro and its investments,

- that Venezuela impeded the free transfer of Rusoro's funds and

- that Venezuela imposed an illegal export ban on gold.

440. The Tribunal will summarize Claimant's and Respondent's position with regard to the Ancillary Claims (**1.** and **2.**) and will then reach its own opinion (**3.**).

## 1.  <u>CLAIMANT'S POSITION</u>

441. Claimant says that the Bolivarian Republic breached the FET standard, failed to provide FPS, incurred in discrimination, impeded the free transfer of funds and imposed an illegal export ban on gold.

### A.   FET

442. Claimant submits that Art. II.2 of the Treaty does not require a heightened threshold corresponding to an alleged customary international minimum standard for the treatment of aliens for a violation of the FET standard to occur[324]. Alternatively, Rusoro pleads application of the most favoured nation ["**MFN**"] clause contained in Art. III of the BIT, and the application of Belarus-Venezuela Treaty, which provides for an FET standard without any restriction[325].

443. Rusoro submits that Venezuela breached the FET standard by imposing a series of conflicting, unpredictable and ever-changing regulations between 2009 and 2011[326].

444. The FET standard specifically requires states to maintain a stable investment environment in accordance with the investor's legitimate expectations. If an investor makes important capital contributions and takes on significant financial obligations in reliance on the legal and regulatory environment in place at the time of the investment, it is fair and equitable that those key rules are respected and that they are not unilaterally abrogated by the State[327]. Investors are entitled to expect that they will enjoy a stable and predictable legal framework for their investments, and the FET standard protects that expectation[328]. In this case, there were government actions which created a legitimate expectation that the investment environment would not be fundamentally altered[329].

445. When Rusoro invested in Venezuela, it was possible to sell gold freely and foreign currency was available without significant limitations through the Swap Market[330].

446. The 2009 Measures fundamentally altered the economic foundation of Rusoro's business. From April 2009 it was forced to sell more than half of its production to the BCV at a greatly reduced price. From July 2010 the private domestic market was totally closed. In June 2009 Rusoro's ability to obtain foreign currency derived from gold exports was eliminated[331]. Venezuela also implemented more favourable conditions for its own gold producers, while it continued to extract a heavy toll from private companies like Rusoro's subsidiaries. The restrictions were designed to shift gold and hard currency from private to public hands, so that applying them to State-owned companies would have been counterproductive[332].

447. The elimination of the Swap Market in 2010 was also unfair and inequitable, because it denied Rusoro the foreign currency needed for its business[333]. Between 2003 and 2010 the Swap Market was the only lawful and effective way for Rusoro

---

[324] C II at 228; C PHB at 120.
[325] C II fn 467.
[326] C PHB at 126.
[327] C I at 233.
[328] C II at 232.
[329] C II at 235.
[330] C PHB at 122.
[331] C I at 235; C II at 238.
[332] C I at 241.
[333] C I at 242.

to obtain foreign currency[334]. SITME, the system that replaced it, was non-transparent, incompetent and wholly inadequate[335]. As a result Rusoro's cash flow was crippled[336].

448. Venezuela also failed to treat Rusoro's investment with transparency and under due process, because each of the 2009 and 2010 Measures was executed without warning[337] and Rusoro never had a realistic opportunity to review the measures or their application or have them reviewed by an impartial person[338].

449. Venezuela's measures were also arbitrary, because the 2009 and 2010 Measures were allegedly designed to combat illegal gold trade, but in fact Rusoro had no opportunity to illegally sell gold[339]. There is no evidence of illegal and law-evading activity in the gold sector, and Venezuela's explanation is a *post hoc* pretext[340].

**B.   FPS**

450. The FPS imposes an obligation of due diligence and vigilance on the host State[341], which is not limited to physical protection[342]. Venezuela failed to ensure FPS to Rusoro's investment by adopting the 2009 and 2010 Measures, by shutting-down the Swap Market in 2010 and by denying Rusoro access to foreign currency in the post-nationalization phase[343].

451. Even if the Treaty were found to guarantee only physical security, Rusoro would still benefit from FPS (pursuant to the Treaty's MFN clause, because Venezuela guaranteed "full protection and legal security" to third-State nationals under the Uruguay-Venezuela BIT[344].

**C.   Discrimination**

452. Beginning with the 2009 Measures[345] Venezuela discriminated against Claimant's investments by creating more favourable rules for Venezuelan State-owned producers operating in the gold sector than those it applied to foreign producers[346] and by promoting small-scale private producers against Rusoro, the only large scale private producer[347].

---

[334] C II at 241.
[335] C I at 243.
[336] C II at 243.
[337] C II at 248.
[338] C II at 249.
[339] C II at 2520.
[340] C PHB at 127.
[341] C I at 250.
[342] C II at 257.
[343] C I at 256-258; C II at 261-263.
[344] C PHB at 335.
[345] C I at 264.
[346] C I at 262.
[347] C II at 267.

### D.   Free transfer of funds

453.   Rusoro says that Art. VIII of the BIT is an objective and absolute guarantee of the free transfer of investments and returns, irrespective of whether exchange restrictions were already in place when the investment was made[348]. Convenio Cambiario No. 1 expressly stated that Venezuela's international commitments would prevail.

454.   The 2009 Measures effectively imprisoned Rusoro's returns in Venezuela, forcing Rusoro to repatriate to Venezuela the totality of the proceeds from each export sale, for conversion at the BCV, at an exchange rate that artificially boosted the value of the VEF[349].

455.   Furthermore, the 2009 and 2010 Measures compelled Rusoro to sell most of its gold to the BCV in Venezuela. Since gold falls within the definition of "returns", Rusoro argues that this also represented a breach of the BIT[350].

456.   Further breaches of the Treaty were the abolition of the Swap Market in 2010, and the obligation to sell the foreign currency obtained from the gold exports at the distorted Official Exchange Rate[351]. The BIT guarantees a market-based exchange rate. If necessary, Art. 7 of the Denmark-Venezuela BIT, which refers to the "prevailing market rate at the date of transfer" could be applied pursuant to the Treaty's most-favoured nation treatment clause (Art. III.1)[352].

457.   Finally, the abolition of the Swap Market and the deficiencies of the SITME scheme cut off Rusoro's access to foreign currency and the export restrictions on gold also violated paragraph 6 of the Annex of the Treaty[353].

### 2.   RESPONDENT'S POSITION

458.   The Bolivarian Republic rejects Rusoro's Ancillary Claims (**B.** through **E.**). But before doing so, it submits two preliminary defences (**A.**)

### A.   Preliminary defences

459.   The Bolivarian Republic submits two preliminary defences: that Rusoro had no legal standing because its hands are dirty (i) and that the general exemption established in Art. X of the BIT, carving out prudential regulation, is applicable to the Ancillary Claims.

460.   (i) The Republic argues that Rusoro may not seek relief for regulations adopted by Venezuela that prevented Rusoro's illegal conduct[354]. The 2009 Measures were a justified response to the growth of illegal exports of gold. Rusoro's hands are dirty

---

[348] C PHB at 132.
[349] C I at 270.
[350] C I at 272; C PHB at 131.
[351] C I at 273.
[352] C I at 275.
[353] C II at 277; C PHB at 137-138.
[354] R II at 271.

because it engaged in illegal conduct and in some instances its illegal conduct contributed substantially and directly to the conditions that led Venezuela to adopt the regulations about which Rusoro complains[355].

461. Since Venezuela's domestic market was too small to absorb Venezuela's production, it is clear that Rusoro's alleged buyers were exporting illegally. By adopting the 2009 Measures the BCV intended to put an end to illegal exports and exert more control over the mining industry[356].

Art. X of the Treaty

462. (ii) As a general defence Venezuela argues that Art. X of the BIT governs the 2009 and 2010 Measures and carves out regulatory space for governments to enact policies for prudential reasons[357]. Regulation of the gold market is an essential control instrument of a country's monetary and financial policy. The 2009 and 2010 Measures and the closure of the Swap Market were adopted to prevent threats to the "integrity and stability" of Venezuela's "financial system"[358].

**B.   FET**

463. Respondent says that the language of Art. II.2 of the Treaty explicitly qualifies the FET standard by reference to "the principles of international law"[359], which is practically identical to the language of Art. 1105(1) of NAFTA[360] and equates with the customary international minimum standard. The parties to the BIT have specifically interpreted the relevant FET language as incorporating the minimum standard, and Art. XII.7 of the BIT states that an interpretation to which both parties have agreed shall be binding upon the Tribunal[361]. And this standard is only violated in cases of extreme government conduct like gross denial of justice, manifest arbitrariness, blatant unfairness or complete lack of due process[362].

464. Venezuela adds that Claimant's attempt to incorporate the FET clause contained in the Venezuela-Belarus bilateral treaty, by way of the MFN clause contained in the Canada-Venezuela BIT, should be rejected, because the requirements established in Art. III of the BIT have not been met[363].

465. There can be no legitimate expectations of legal stability where Claimant had failed to obtain a stabilization agreement required under Venezuelan law and Venezuela had made no specific promises or commitments[364]. In these cases there is no

---

[355] R II at 274.
[356] R II at 275.
[357] R II at 285.
[358] R II at 294; R PHB at 104.
[359] R I at 376.
[360] R II at 298.
[361] R II at 304.
[362] R I at 386, R II at 295.
[363] R II at 308.
[364] R I at 420-426.

legitimate expectation that the legal regime affecting the investment is immutable[365].

466. Venezuela says that the modification of its regulatory regime for gold marketing was a legitimate regulatory action in response to significant changes in the market, including an increase in illegal activity. Gold producers were selling gold to small domestic purchasers in an abusive manner[366]. The 2009 Measures simply eliminated this avenue of abuse[367]. Venezuela does not need to prove that Rusoro was participating in an illegal market. What matters is that the new regulation reacted to evidence of illegal activity and was a legitimate exercise of regulatory authority[368].

467. Respondent explains that the abolition of the Swap Market was a legitimate exercise of Venezuela's authority to enforce its laws. The Swap Market was an unregulated grey market created by private traders based on a loophole in the law and was used to evade clearly established exchange control laws. Although the Swap Market was tolerated by the Government from 2003 through 2010, its legality was always dubious[369]. The closure of the Swap Market was a legitimate step to combat massive evasion of laws[370]. A foreign investor has no inherent right to require that a government tolerate an informal practice based on a loophole in a legal regime[371]. Moreover, investors had access to three different mechanisms for acquiring foreign currency: CADIVI, SITME and after the 2010 Measures exports of gold[372].

468. The Bolivarian Republic says that the modification of its regulatory regime of gold marketing and the abolition of the Swap Market were consistent with Venezuelan Law, well reasoned and based on the need to address an increase in illegal activities[373]. Even if an autonomous FET standard were to be applied, Venezuela has not breached the BIT, because there has been no failure to protect legitimate expectations, no failure to adhere to transparency and due process and no arbitrary or bad faith behaviour[374].

## C. **FPS**

469. Respondent avers that Claimant is not alleging that its property or personnel were in any way subject to or threatened with harm. Under the applicable legal standard of FPS, Rusoro's claim for a violation of the BIT is frivolous[375]. Furthermore Art. II.2 of the BIT prescribes the minimum standard of FPS under customary

---

[365] R PHB at 108.
[366] R PHB at 112.
[367] R I at 388, 414; R PHB at 110.
[368] R PHB at 113.
[369] R PHB at 116.
[370] R I at 391.
[371] R I at 399; R PHB at 119.
[372] R I at 400-404.
[373] R II at 320.
[374] R II at 322-360.
[375] R I at 429.

international law[376], and this standard only protects persons and property from physical harm – and no physical harm is being alleged by Claimant[377].

470.   The Bolivarian Republic adds that Claimant's effort to import the FPS standard contained in Art. 4 of the Uruguay-Venezuela BIT through the Treaty's most favoured nation clause should be disregarded, because Claimant has failed to prove the conditions required by Art. III of the BIT for the application of the MFN clause: that Venezuela accorded Claimant's investments "treatment" that "in like circumstances" was "less favourable" than the treatment accorded to Uruguayan investments[378]. Furthermore, the mere invocation of the MFN clause cannot override specifically-negotiated provisions that the parties envisaged as fundamental conditions for their acceptance of the BIT. This includes any specifically negotiated limitations on the content of the FPS standard, like the adherence to the minimum standard of treatment[379].

471.   In any case, the Bolivarian Republic argues that it did not fail to provide FPS under any standard[380]. Even if FPS is extended beyond physical harm, there was nothing unlawful in the manner in which Venezuela amended its regulation[381]. Rusoro has failed to establish any wrongful conduct by Venezuela. Its vague allegations of regulatory delays are not sufficient to meet its burden of proof[382].

   **D.   <u>Discrimination</u>**

472.   Venezuela denies having discriminated against Rusoro and its investments, since Claimant, as a foreign investor, was afforded the same treatment and was subject to the same benefits and exemptions as Venezuela's national investors[383]. There was nothing discriminatory in the 2009 Measures, and the special benefits granted to State-controlled companies should have been no surprise to Rusoro, since Rusoro knew that the mining policy was to encourage the creation of mixed companies. Venezuela had a sovereign right to foster the implementation of these widely-announced mining policies[384]. Furthermore, Rusoro cannot legitimately argue discriminatory treatment based on a provision aimed at setting rules for small mining activity that are not applicable to the large scale miners, whether public or private[385]. In any case, the alleged discrimination against Rusoro – which Venezuela denies – certainly ceased with the adoption of the 2010 Measures[386].

---

[376] R I at 430, R II at 362.
[377] R I at 433; R II at 371.
[378] R I at 444.
[379] R I at 446.
[380] R II at 370.
[381] R II at 372.
[382] R I at 454.
[383] R I at 473.
[384] R I at 482.
[385] R II at 403.
[386] R II at 399.

### E.    Free transfer of funds

473. The Bolivarian Republic says that Art. VIII of the Treaty does not prohibit a Party from establishing exchange control measures[387]. A restriction on the transfer of funds is not a violation of the Treaty, since customary international law recognizes the concept of "monetary sovereignty", according to which a State has the exclusive right to determine its monetary unit, to fix and to regulate the exchange rate and to regulate, prohibit or restrict the conversion and transfer of foreign exchange[388]. Art. X of the Treaty expressly incorporates the principle that the exercise of monetary sovereignty is legitimate and takes precedence over any provision of the Treaty

474. In fact Venezuela's exchange control regime was established in 1996, before Claimant acquired any assets in Venezuela. The laws were modified in 2003 creating an integrally controlled exchange market[389]. Among the risks disclosed by Rusoro in 2006 to its investors was the risk of exchange control restrictions in Venezuela[390]. Claimant cannot now complain about alleged breaches based on laws and regulations already in place when it invested[391].

475. While the 2009 Measures were in place, Claimant could obtain foreign currency through the CADIVI mechanism[392]. Upon enactment of the 2010 Measures, Claimant was allowed to keep accounts overseas, directly export 25% of its gold and keep the foreign currency proceeds in such accounts. There was no "imprisonment"[393]. The regime which resulted from the 2009 and 2010 Measures was consistent with the Treaty: Rusoro had at all times available mechanisms to obtain dollars for repatriation of capital[394].

476. Venezuela denies that the gold produced by Rusoro can be considered for purposes of the BIT as "returns". Claimant's gold is no more a return than is a car produced by a foreign investor in its car factory in Venezuela. Gold is a commodity, not a currency. It can only become a currency if it is minted and becomes legal tender by government[395]. Therefore Venezuela did not breach its obligation to guarantee the unrestricted transfer of investments and returns by requiring gold producers to allocate part of their production to the domestic market[396].

477. The Bolivarian Republic adds that it has not manipulated its exchange rate: the applicable exchange rate is the Official Exchange Rate established by the BCV, as it is in all countries around the world with exchange controls[397]. The BIT does not guarantee the transfer at a market rate of exchange. Claimant's attempt to import

---

[387] R PHB at 127.
[388] R II at 378.
[389] R II at 379; R PHB at 129.
[390] R I at 457.
[391] R PHB at 129.
[392] R I at 462; R PHB at 131.
[393] R I at 461.
[394] R PHB at 130.
[395] R I at 467.
[396] R I at 468; R II at 382.
[397] R I at 469.

the transfer of funds provision contained in the Denmark-Venezuela BIT must be disregarded for the same reasons submitted when dealing with the FPS standard[398].

478.  As regards Claimant's argument based on para. 6 of the Annex of the Treaty, the regime for gold marketing in place in 2003 required repatriation of 90% of all foreign currency from exports of gold. This is equivalent to the requirement established by the 2009 and 2010 Measures to sell to the BCV. These Measures did not change Rusoro's financial situation and did not cause any harm[399].

### 3.  THE TRIBUNAL'S DECISION

479.  The Tribunal must now decide whether there is merit in any of the Ancillary Claims submitted by Rusoro. In order to do so, the Tribunal will summarize the proven facts (**3.1.**), and will then establish whether the Bolivarian Republic breached the principles of FET (**3.3.**), FPS (**3.4.**) or free transfer of funds (**3.6.**), or subjected Rusoro's investment to a discriminatory treatment (**3.5.**).

480.  Before doing so, it is necessary to briefly address two preliminary arguments submitted by the Bolivarian Republic (**3.2.**).

### 3.1  PROVEN FACTS

481.  The Tribunal has already found that in accordance with Art. XII.3 (d) of the BIT any breach allegedly committed by Venezuela when it adopted the 2009 Measures has become time barred (although the 2009 Measures may still provide background and context for the Tribunal's decision)[400].

482.  This implies that only two sets of facts remain which allegedly could have resulted in ancillary breaches of the BIT: the closure of the Swap Market (**A.**) and the 2010 Measures, i.e. the July 2010 BCV Resolution and the Amendment to the Convenio Cambiario No. 12 (**B.**).

### A.  Closure of the Swap Market

483.  In 2003 Convenio Cambiario No. 1 was enacted; it created an exchange control system, forcing private companies operating in Venezuela to sell foreign currency to the BCV at the Official Exchange Rate, and to purchase foreign currency through CADIVI and subject to CADIVI's discretionary authorization.

484.  Apart from this official market, a parallel market, not expressly provided for in the exchange control legislation, but tolerated by the authorities, existed[401]. Through this Swap Market private companies had the possibility of buying and selling

---

[398] R I at 471; R II at 390.

[399] R II at 393.

[400] See paras. 232 *et seq supra*.

[401] As additions to their PHB's, both Parties submitted Briefs on the Swap Market [C PHB/SM and R PHB/SM]; in its R PHB/SM the Republic acknowledges that the swap market was unregulated and of dubious legality – but not that before 2010 it was illegal (at 4). In Venezuela's submission, the only illegal behaviour was that of certain stock-brokers, who used the same government securities repeatedly to carry out successive swap transactions (at 8).

foreign currency against VEF, at a market exchange rate which was consistently higher than the Official Exchange Rate.

485. This dual system came to a halt on 17 May 2010, when the Ley Cambiaria was amended, making the use of the Swap Market illegal[402].

### B.   The 2010 Measures

486. In July 2010 the BCV[403] amended the 2009 Measures, liberalized the gold sale regime and reduced the distinction between publicly and privately owned gold producers.

487. The purpose of the July 2010 BCV Resolution[404] was to regulate the sale of gold by public and private producers operating in Venezuela. It created a unified regime for public and private producers:

- 50% of production had to be sold to the BCV, at a price expressed in VEF and converted at the Official Exchange Rate; and

- the remaining 50% could be exported, subject to authorization from the BCV.

488. Simultaneously the Convenio Cambiario No. 12 (originally issued in 2009) was amended, partially liberalizing the exchange control regime of gold producers, and unifying the different regimes applicable to private and to public gold producers (except small scale producers). All gold producers were now required to sell 50% of their foreign currency income from export operations to the BCV at the Official Exchange Rate, and were authorized to keep the other 50% in foreign accounts and to use the funds for payments in foreign currency outside the Bolivarian Republic[405].

### 3.2   PRELIMINARY DEFENCES

489. Venezuela has filed two preliminary defences: that Rusoro's hands are dirty (**A.**) and that the exception benefitting prudential regulation, provided for in Art. X of the BIT, is to be applied (**B.**).

490. Both defences are without merit.

### A.   Dirty hands

491. The Republic argues that Rusoro may not seek relief for regulations adopted by Venezuela to prevent Rusoro's illegal sales to domestic buyers, in order to permit buyers to illegally export gold from Venezuela (i), and that the purpose of the 2009 and 2010 Measures was to curb such illicit transactions (ii).

---

[402] Doc. C-200 – Ley de Reforma Cambiaria.
[403] See para. 157 *supra*.
[404] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No.12.
[405] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No.12.

492. (i) The problem with Venezuela's first contention is not the principle (it is undisputed that claimants with "dirty hands" have no standing in investment arbitration[406]), but the total lack of evidence.

493. Venezuela submits that Rusoro knowingly furthered the illegal export of gold

- By selling to domestic clients, certified by the Ministry of Mines, but not included in the BCV's list of registered gold exporters[407],

- And by incorrectly making out waybills in favour of a security transport company (and not the final buyer of the gold)[408].

494. In accordance with Art. 88 Mining Law the Ministry of Mines is entrusted with the following duties with regard to mining activities and companies:

"El Ejecutivo Nacional, por órgano del Ministerio de Energía y Minas, vigilará, fiscalizará y controlará las actividades de toda persona natural o jurídica, pública o privada, en las materias sometidas a las disposiciones de esta Ley […]".

The Ministry is also empowered to impose sanctions on persons who breach the mining regulations[409].

495. Using the powers conferred by law, the Ministry of Mines supervised (or should have supervised) the activities carried out by Rusoro, Venezuela's largest private gold producer. There is no evidence in the file that, as a consequence of such supervisory activities, the Ministry ever challenged the legality of Rusoro's conduct, filed a complaint against Rusoro or imposed any sanction. The Bolivarian Republic is now raising, for the first time and *ex post facto*, previously unidentified violations of its own laws to challenge Rusoro's claim.

496. To prove this allegation, the Republic is not marshalling any direct evidence, but only what Respondent itself defines as "indirect evidence"[410]. The Republic avers that this evidence "demonstrates that Rusoro systematically evaded mining regulations that required it to document with specificity each and every gold transaction"[411].

497. The Tribunal is unconvinced.

498. If Rusoro's conduct had indeed been as egregiously illicit as now claimed, the Ministry of Mines must have been aware of the situation and must have adopted the corresponding measures. However, there is no evidence that this actually took place. In the Tribunal's opinion, the "indirect evidence" marshalled by the

---

[406] *Flughafen Zürich* at 132; *Phoenix* at 101; *Saur* at 308.
[407] R II at 71.
[408] R II at 77.
[409] See Doc. RLA-49 – Mining Law, Art. 109 *et seq*.
[410] R II at 82.
[411] R II at 81.

Bolivarian Republic is blatantly insufficient to prove Venezuela's allegation, that Rusoro knowingly colluded with domestic purchasers to foster illicit gold exports.

499. (ii) The second leg of Rusoro's contention is that the 2009 and 2010 Measures were adopted to combat illegal exports.

500. Again, the evidentiary underpinning of this allegation is inexistent: the Measures themselves fail to state (in their preambles or otherwise) that their purpose was to combat illegal gold exports; and the Republic has not drawn the Tribunal's attention to any contemporary memorandum, report or public statement confirming the Republic's averment.

501. The very content of the 2009 and 2010 Measures disproves the Republic's contention: If Venezuela's true aim had been to limit illegal exports, the natural course of action would have been to reinforce the supervisory capacity of the Ministry of Mines and of the BCV, to intensify reporting requirements and to increase sanctions for improper behaviour. None of these measures was adopted. The fundamental innovation introduced by the 2009 and 2010 Measures was to put producers under a compulsory obligation to sell a percentage of their production to the BCV, at a price in VEF converted at the Official Exchange Rate – a measure which permitted the BCV to increase its holdings of gold paying a price which was lower than the price which would have accrued if the market exchange rate had been applied.

## B. **Art. X of the BIT**

502. Art. X of the BIT provides as follows:

> "Investment in Financial Services
>
> Nothing in this Agreement shall be construed to prevent a Contracting Party from adopting or maintaining reasonable measures for prudential reasons, such as:
>
> (a) The protection of investors, depositors, financial market participants, policy-holders, policy-claimants, or persons to whom a fiduciary duty is owed by a financial institution;
>
> (b) The maintenance of the safety, soundness, integrity or financial responsibility of financial institutions; and
>
> (c) Ensuring the integrity and stability of a Contracting Party's financial system".

503. Art. XII(13) adds the following possibility:

> "Where and investor submits a claim to arbitration and the disputing Contracting Party alleges as a defense that the measure in question is
>
> a reasonable measure for prudential reasons of the kind referred to in Article X, or

> a measure to limit or prevent transfers by a financial institution under paragraph 6 of Article VIII.
>
> the tribunal, at the request of such Contracting Party, shall request both Contracting Parties to submit a joint report in writing as to whether the defense is a valid one in that particular case. The Contracting Parties shall consult through their financial services authorities on the matter".

504. The Tribunal notes that the Bolivarian Republic, although it is alleging a defense based on Art. X, has not requested that both Contracting Parties submit the joint report provided for in Art. XII.13 of the BIT. Absent such request, the Tribunal may proceed to decide the matter.

505. Venezuela argues that Art. X of the BIT affords governments regulatory space to enact policies for prudential reasons[412], and that, when it issued the 2009 and 2010 Measures regulating the gold market and tightened the exchange control regime by closing the Swap Market, such measures were part of its monetary and financial policy and prevented threats to the "integrity and stability" of its "financial system"[413].

506. The Bolivarian Republic's allegation is incompatible with the plain text of Art. X of the BIT.

507. Art. X permits Canada and Venezuela to "[adopt] or [maintain] reasonable measures for prudential reasons" and then provides an open list of examples, including the solvency of financial institutions, the protection of financial clients and the integrity of the financial system.

508. The very language of the rule shows that its scope is limited to prudential measures adopted in order to protect the financial sector and its institutions, i.e. banking, insurance and securities. The regulation of the gold mining sector and the general exchange control regime fall outside the carve out permitted by Art. X. This conclusion, which derives from a literal interpretation of the rule, is confirmed by its title ("Investment in Financial Services"), which reinforces the conclusion that the provision is directed exclusively at investments in the financial sector.

509. Rusoro was a gold mining company, that owned and exploited its Mining Rights in Venezuela, produced gold and sold it to industrial clients (and – when forced by the regulation – to the BCV). Rusoro has never been a bank, an insurance company, a broker or any other type of financial institution. And Venezuela has failed to establish that the offending measures were necessary to reinforce Rusoro's solvency, to protect the purchasers of gold or to safeguard Venezuela's financial system. There is no indication that the purpose of the 2009 or 2010 Measures and of the closure of the Swap Market was in any way related to the adoption of "reasonable measures for prudential reasons" in the Venezuelan financial system, as required by Art. X of the BIT.

---

[412] R II at 285.
[413] R II at 294; R PHB at 104.

### 3.3   FET

510.   Art. II.2 of the BIT reads as follows:

> "Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party fair and equitable treatment and full protection and security".

511.   Rusoro says that Venezuela breached the FET standard guaranteed in the BIT, by adopting the 2009 and 2010 Measures and eliminating the Swap Market. These Measures were adopted without regard to due process, were arbitrary and destroyed Rusoro's legitimate expectations of a stable investment environment, limited its right to freely sell gold and to acquire foreign currency and finally discriminated Rusoro against privately owned gold producers.

512.   The Republic disagrees. It says that the measures against which Rusoro rallies were legitimate regulatory actions taken in the public interest to combat illegal activities, that Rusoro had no legitimate expectation that the legal regime would remain immutable and that the abolition of the Swap Market was a legitimate exercise of Venezuela's authority to enforce its laws.

513.   Before adjudicating this issue (**B.** and **C.**), it is necessary to settle a preliminary question: the relevance of the so called "customary international minimum standard" ["**CIM Standard**"] (**A.**).

### A.   <u>Customary International Minimum Standard</u>

514.   Respondent says that the language of Art. II.2 of the Treaty explicitly qualifies the FET standard by reference to "the principles of international law"[414], which equate with the CIM Standard.

515.   Claimant disagrees: in its submission Art. II.2 of the Treaty does not require a heightened threshold corresponding to an alleged CIM Standard[415].

516.   The starting point of this debate is the historic definition of the CIM Standard – a question which is fraught with difficulties.

517.   For claims arising from administrative or legislative acts of Governments (as is the case in these Ancillary Claims) the historic leading case seems to be *Roberts*[416], issued by the United States – Mexico General Claims Commission in 1926, which defined the minimum treatment as that required "in accordance with ordinary standards of civilization".

518.   *Roberts* is understood to stand for the propositions that a certain treatment may give rise to international responsibility notwithstanding that it affects citizens and aliens alike, and that administrative and legislative actions may amount to a violation of

---

[414] R I at 376.
[415] C II at 228; C PHB at 120.
[416] *Roberts* at 71.

the customary minimum treatment even if the State did not act in bad faith or with wilful neglect of duty[417].

519. But the CIM Standard has not stood still, and in the century since it was first defined, it has continuously developed. The tribunal in *OI European* has thus summarized the impact of this development[418]:

> "El estándar mínimo consuetudinario no ha permanecido congelado, y desde sus primeras formulaciones hace 100 años se ha beneficiado de un desarrollo importante, impulsado por el asentamiento de los Derechos Humanos y la implantación del Estado de Derecho. Bien entrado el siglo XXI *Roberts* es de dudosa relevancia para la protección de inversores extranjeros frente a actos administrativos, legislativos o judiciales que interfieran con el uso y disfrute de su inversión. Lo relevante no es el estándar, tal como se definió en el siglo XX, sino el estándar tal como existe y se acepta hoy – pues tanto el Derecho internacional consuetudinario como el propio estándar se hallan en constante evolución. Y es bien posible que en la actualidad el estándar mínimo consuetudinario y el TJE previsto en los tratados hayan convergido, llegando a otorgar al inversor niveles de protección sustancialmente equivalentes".

520. The Tribunal shares Respondent's interpretation that when Art. II.2 of the BIT qualifies Venezuela's commitment to accord FET (and FPS) treatment "in accordance with the principles of international law", the rule is referring to the CIM Standard[419]. But the incorporation of the CIM Standard into the definition of the FET does not provoke a major disruption in the level of protection: the CIS Standard has developed and today is indistinguishable from the FET standard and grants investors an equivalent level of protection as the latter. The whole discussion of whether Art. II.2 of the BIT incorporates or fails to incorporate the CIS Standard when defining FET has become dogmatic: there is no substantive difference in the level of protection afforded by both standards.

521. Since CIS Standard and FET Standard have converged, Rusoro's subsidiary pleading, that the Tribunal apply (via the MFN clause contained in Art. III of the BIT) the definition of the FET standard established in the Belarus-Venezuela Treaty, which lacks a reference to "international law", has become moot[420].

---

[417] While for claims based on denial of justice, aggravating circumstances like outrage, bad faith, willful neglect of duty or other egregious behaviour are required; see *Neer* at 60; *Lemire (Jurisdiction)* at 249.

[418] *OI European* at 489 (footnote omitted). "The minimum customary standard has not remained frozen. It has developed significantly since its early formulations 100 years ago, driven by the establishment of Human Rights and the implementation of the Rule of Law. Well into the 21st century, *Roberts* is of dubious relevance for the protection of foreign investors against administrative, legislative or judicial actions that interfere with the use and enjoyment of their investment. What is relevant is no the standard as it was defined in the 20th century, but rather the standard as it exists and is accepted today – since both Customary International Law and the standard itself are constantly evolving. And it is quite possible that currently the minimum customary standard and the FET envisaged in the treaties have converged, according the investor with substantially equivalent levels of protection".

[419] *Flughafen Zürich* at 573.

[420] C II fn 467.

### B.   The FET standard

522. Art. II.2 of the BIT simply states that each Contracting Party shall accord protected investments or returns "fair and equitable treatment".

523. Although the Treaty does not provide further guidance, it is generally accepted that this undefined legal concept requires States to adopt a minimum standard of conduct vis-à-vis aliens. A State breaches such minimum standard if actions (or in certain circumstances omissions) occur, for which the State must assume responsibility, and which violate certain thresholds of propriety or contravene basic requirements of the rule of law, causing harm to the investor[421]. The obligation to provide FET binds all branches of government, and can be disavowed

- by administrative acts, adopted by the government or its agencies, targeting the investor or its investment directly,

- by judicial decisions, approved by the State's judicial system, which are directed directly against the investor or the investment personally and which amount to a denial of justice,

- or finally by legislation, approved by the legislative power, or regulation, adopted by government (or by another authority with regulatory powers), affecting citizens in general, and the protected investor and investment in particular.

524. The required threshold of propriety must be defined by the tribunal after a careful analysis of facts and circumstances, and taking into consideration a number of factors, including among others the following[422]:

- whether there has been harassment, coercion, abuse of power or other bad faith conduct by the host State;

- whether the State had made specific representations to the investor, prior to the investment;

- whether the State's actions or omissions can be labelled as arbitrary, discriminatory or inconsistent;

- whether the State has respected the principles of due process and transparency when adopting the offending measures;

- whether the State has failed to offer a stable and predictable legal framework, breaching the investor's legitimate expectations.

525. In evaluating the State's conduct, the Tribunal must balance the investor's right to be protected against improper State conduct, with other legally relevant interests and countervailing factors. First among these factors is the principle that legislation and regulation are dynamic, and that States enjoy a sovereign right to amend legislation and to adopt new regulation in the furtherance of public interest. The

---

[421] *Glamis* at 616; *OI European* at 491.
[422] *Lemire (Jurisdiction)* at 284.

right to regulate, however, does not authorize States to act in an arbitrary or discriminatory manner, or to disguise measures targeted against a protected investor under the cloak of general legislation. Other countervailing factors affect the investor: it is the investor's duty to perform an appropriate pre-investment due diligence review and to show a proper conduct both before and during the investment[423].

526. Having defined the scope and meaning of the FET standard in the abstract, the Tribunal must now analyse whether the proven facts contravene such standard.

### C.   **Respondent's conduct**

527. Rusoro claims that the Bolivarian Republic breached the FET standard guaranteed in the BIT, not by adopting administrative or judicial acts targeted directly against Rusoro or its investment, but rather by two pieces of general legislation and regulation:

- the 2010 Ley de Reforma Cambiaria approved by the Venezuelan Parliament and

- the 2010 Measures approved by the BCV, using the powers vested by Venezuelan law.

528. The Tribunal disagrees. Rusoro has failed to prove a breach of Art. II.2 of the Treaty.

General exchange control regime

529. When Rusoro took the decision to invest in Venezuela, the 2003 exchange control regime, regulated by the Convenio Cambiario No. 1, was already in place. This regime forced exporters to sell (at least) 90% of the foreign currency revenues earned by the export of goods to the BCV, at the Official Exchange Rate. It is true that from 2003 through 2010, Venezuela tolerated the existence of a parallel Swap Market, which permitted the acquisition and sale of USD against VEF at market prices. But the Swap Market was completely unregulated, and its users simply exploited a loophole in the exchange control legislation (which did not cover securities transactions).

530. On 17 May 2010 the *Asamblea Nacional* adopted the Ley de Reforma Cambiaria, a law which made the use of the Swap Market illegal[424]. The sale and purchase of foreign currency became the exclusive purview of the BCV, through CADIVI, and significant monetary and jail penalties were imposed for circumvention of the law.

531. States have the sovereign right to establish and amend, in furtherance of their economic policy, exchange control regulations, which define the relationship between the State's own currency and that of other sovereigns. Exchange control rules typically regulate

---

[423] *Lemire (Jurisdiction)* at 285.
[424] Doc. C-200 – Ley de Reforma Cambiaria.

- the repatriation by residents of foreign currency earned abroad,

- the requirements and authorizations needed for the purchase by residents of foreign currency and

- the system to establish the appropriate exchange rate between local and foreign currency.

532. Claimant took the decision to invest in Venezuela when the Bolivarian Republic already had an exchange control regime in place, which imposed compulsory repatriation of (at least) 90% of foreign currency earned, required authorization from CADIVI for purchases of foreign currency and defined the Official Exchange Rate. The Bolivarian Republic never made any representation vis-à-vis Rusoro, either before or after the investment, that Rusoro would somehow be exempted from the application of the general exchange control regime. Claimant never developed a legitimate expectation that in due course Venezuela would not adopt more restrictive legislation, and that tolerance of the Swap Market would continue *sine die*. Finally, there is no evidence that the 2010 Ley de Reforma Cambiaria was improperly adopted, that its content is arbitrary or that its specific purpose was to discriminate against Claimant.

533. In these circumstances, Rusoro's allegation that the closing of the Swap Market implied a breach of the FET standard must fail.

Gold marketing

534. The powers of the BCV to regulate the gold market already existed when Rusoro invested in Venezuela. The 1996 BCV Resolution imposed certain restrictions on all Venezuelan gold miners: 15% of production had to be sold in the domestic market, while the rest could be exported under supervision of the BCV. Additionally, in 2003 the Convenio Cambiario No. 1 came in force, and this general exchange control rule required that exporters sell to the BCV at the Official Exchange rate 90% of the foreign currency earned[425].

535. The July 2010 BCV Resolution significantly modified the system: 50% of Rusoro's production had now to be sold to the BCV, at a price expressed in VEF and converted at the Official Exchange Rate, while the remaining 50% could be exported, subject to authorization from the BCV. Simultaneously the Convenio Cambiario No. 12 was amended, and gold producers were now required to sell 50% of their foreign currency income from export operations to the BCV at the Official Exchange Rate, but were authorized to use the other 50% (i.e. 25% of the total production) for payments in foreign currency outside the Bolivarian Republic.

536. When Rusoro invested in Venezuela, it was (or should have been) aware that the BCV had the power to impose restrictions on the free sale of gold by Venezuelan mining companies and that under the relevant Convenios Cambiarios the BCV

---

[425] The Tribunal is aware that in practice the rule could be circumvented by using the unregulated Swap Market. But for present purposes, the relevant fact is that the provision formed part of the Venezuelan exchange control rule book, and that investors could and should be aware that in the future the Republic could decide to effectively enforce the rule.

could force exporters to sell up to 90% of the foreign currency earned at the Official Exchange Rate. Rusoro never benefitted from any specific representation that legislation would not be amended and that the gold marketing regime would not become more restrictive. The 2010 Measures were adopted by BCV in accordance with its statutory powers and in compliance with the appropriate administrative procedures. Finally there is no evidence that the content of the 2010 Measures is discriminatory: while the 2009 Measures provided for a distinct treatment of publicly and privately owned mining companies, the 2010 Measures unified the regime.

537. It is true that the 2010 Measures forced gold producers to sell 50% of their production to the BCV (i) and that the price to be paid was to be calculated at the Official Exchange Rate, set by the BCV (ii). But in the Tribunal's opinion, there are countervailing factors which justify the Measures:

538. (i) Gold is not an ordinary mineral; it is intimately connected with the monetary sovereignty of nations, because central banks use gold as reserve assets to back the national currency. The BCV, Venezuela's central bank, has been entrusted, at least since 1996, with the regulation of the Venezuelan gold market, and it has consistently imposed restrictions on the sale and purchase of gold. An experienced gold producer as Rusoro could have foreseen, when it invested, that the BCV could use its regulatory powers to impose a compulsory sale of production to the central bank.

539. (ii) Rusoro complains not only because of the compulsory nature of its sales to the BCV, but also because of the price applied: the BCV was paying international gold prices, expressed in USD, converted into VEF at the Official Exchange Rate; by applying the Official Exchange Rate the BCV was allegedly depriving the investor of a significant portion of its value.

540. Rusoro's argument might have been true, while the Swap Market was in operation, because at that time there were two exchange rates, the Official Exchange Rate and the market exchange rate applied in the Swap Market, which consistently was lower than the Official Exchange Rate. But the situation changed when in 2010 Venezuela decided to close the parallel market, and only permitted one single exchange rate, i.e. the Official Exchange Rate. From that time on, all exporters – including gold exporters – were forced to sell (a very high percentage of[426]) the foreign currency earned to the BCV at the Official Exchange Rate, and the Official Exchange Rate became the only legally relevant measure to establish the value in VEF of amounts in foreign currency.

* * *

541. The Tribunal concludes that neither the July 2010 BCV Resolution, nor the Amendment to the Convenio Cambiario No. 12 (which together form the 2010 Measures), nor the 2010 Ley de Reforma Cambiaria eliminating the Swap Market, breached Venezuela's commitment to provide FET to Rusoro's investment.

---

[426] 90% for general exporters, 75% for gold producers.

### 3.4   FPS

542. Art. II.2 of the BIT provides as follows:

> "Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investors of the other Contracting Party fair and equitable treatment and full protection and security".

543. Claimant says that the FPS standard imposes an obligation of due diligence and vigilance on the host State, which is not limited to physical protection, and that Venezuela breached that principle by adopting the 2009 and 2010 Measures, by shutting-down the Swap Market in 2010 and by denying Rusoro access to foreign currency in the post-nationalization phase[427].

544. Even if the Treaty were found to guarantee only physical security, Rusoro would still benefit from FPS (via the Treaty's MFN clause), because Venezuela guaranteed "full protection and legal security" under the Uruguay-Venezuela BIT[428].

545. Respondent says that Art. II.2 of the BIT prescribes the minimum standard of FPS under customary international law[429], and this standard only protects persons and property from physical harm – and no physical harm is being alleged by Claimant[430]. Even if FPS is extended beyond physical harm, the manner in which Venezuela amended its regulation was lawful[431].

546. The Tribunal has already concluded that any claim based on the adoption of the 2009 Measures is time barred[432]. Consequently Claimant's allegation that the Bolivarian Republic breached the FPS standard enshrined in Art. II.2 of the Treaty is premised on the adoption of three measures:

-   (i) The issuance of the 2010 Measures,

-   (ii) The promulgation of the 2010 Ley de Reforma Cambiaria eliminating the Swap Market and

-   (iii) The denial of foreign currency to Rusoro's subsidiaries in the post-nationalization phase.

547. The Parties discuss whether the FPS guarantee offered to investors in accordance with Art. II.2 of the BIT only covers physical harm (as Respondent says), or whether it should be extended (directly or via the MFN clause) to also cover legal certainty (as is Claimant's contention). The Tribunal does not have to delve into this debated issue, because even assuming *arguendo* the widest possible

---

[427] C I at 256-258; C II at 261-263.
[428] C PHB at 335.
[429] R I at 430, R II at 362.
[430] R I at 433, R II at 371.
[431] R II at 372.
[432] See paras. 232 *et seq supra*.

construction of the FPS standard, there can be no doubt that Venezuela never incurred in a breach:

548. (i) and (ii): The Tribunal has already concluded that the 2010 Measures and the abolition of the Swap Market were formalized in laws and regulations adopted by Venezuela and did not amount to a breach of the FET standard; consequently, such measures can never imply a breach of the FPS standard, however widely interpreted.

549. (iii) Claimant also refers to a third measure, which allegedly occurred in the post-nationalization phase, while Rusoro still transitorily managed the nationalized mines. Rusoro says that during that period its Venezuelan subsidiaries were illicitly denied the foreign currency required for their day-to-day operations.

550. The problem with this allegation is that it is unsupported in evidence.

551. Following the Nationalization Decree, and while the negotiations were taking place, the BCV issued a special rule, Convenio Cambiario No. 19[433] which authorized nationalized gold producers to acquire foreign currency, subject to administrative authorization. Rusoro complains that such authorization was never granted and that it never had access to the required foreign currency[434].

552. The only piece of evidence to which Rusoro refers is the witness statement of its employee Sr. Matías Herrero[435]. A careful review of the WS shows that Sr. Herrero does not say that Rusoro's subsidiaries were systematically denied access to foreign currency; his statement is much more nuanced: the government did grant the requisite authorization, but then "the BCV would often decline our requests for payment". Sr. Herrero does not explain the meaning of "often", and does not provide any further information regarding the percentage of rejections by the BCV. Even assuming the veracity of Sr. Herrero's statement at face value, the only point which is proven is that the BCV sometimes granted the requests for foreign currency, and sometimes denied them.

553. The evidence marshalled by Rusoro is manifestly insufficient to prove its allegation that Venezuela illicitly denied access to the foreign currency required for the day-to-day operations of its subsidiaries.

\* \* \*

554. The Tribunal therefore concludes that neither the 2010 Measures, nor the elimination of the Swap Market, nor the BCV's conduct after the Nationalization Decree regarding the issuance of authorization to Rusoro to acquire foreign currency amount to a violation of the FPS standard.

## 3.5   DISCRIMINATION

555. Art. IV.1 of the BIT provides as follows:

---

[433] Doc C-223 – Convenio Cambiario No. 19.
[434] C II at 263.
[435] Matías Herrero I at 53.

> "Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns of its own investors".

556. Rusoro says that with the enactment of the 2009 Measures[436] Venezuela discriminated against Claimant's investments, by creating more favourable rules for Venezuelan State-owned producers than those it applied to foreign producers[437]; and by promoting small-scale private producers against Rusoro, the only large scale private producer[438].

557. Venezuela denies having discriminated against Rusoro and that the alleged discrimination in any case ceased with the adoption of the 2010 Measures[439].

558. The Tribunal sides with the Bolivarian Republic.

559. The 2009 Measures gave different treatment to publicly and to privately owned gold mining companies, and such difference in treatment, if not properly justified, could indeed have given rise to a breach of the equal treatment principle established in Art. IV.1 of the BIT. But any claim based on the 2009 Measures has become time barred[440]. And in any case, the 2010 Measures unified the regime applicable to privately and publicly owned miners. Any alleged discrimination between public and private gold miners is a thing of the past.

560. Rusoro also argues that, through the 2010 Measures, it was discriminated vis-à-vis small-scale private producers.

561. The 2010 Measures contain two specific rules for small scale producers of gold:

- the July 2010 BCV Resolution requires small-scale producers to offer 15% of their production to the BCV or to sell it in the domestic market[441], and

- the Amendment to the Convenio Cambiario No. 12 requires that small producers sell 70% of the foreign currency income obtained from gold exports to the BCV[442].

562. The comparable figures for full scale producers like Rusoro (and for all public owned mining companies) are 50% obligatory offer to the BCV, with a 50% percentage of repatriation of foreign currency. The treatment given to small scale producers is thus on one side more lenient, and on the other side more stringent than that offered to large producers.

563. Art. IV.1 of the BIT only requires that Venezuela grant treatment no less favourable to Rusoro than that which, "in like circumstances", grants to its own investors. The Bolivarian Republic has adopted an official policy, differentiating between small

---

[436] C I at 264.
[437] C I at 262.
[438] C II at 267.
[439] R II at 399.
[440] See paras. 232 *et seq supra*.
[441] Doc. C-203 – July 2010 BCV Resolution, Art. 2.
[442] Doc. C-203 – July 2010 BCV Resolution, Art. 2.

scale, traditional miners and large mining companies and offering additional support and less stringent requirements to small miners. Thus Rusoro (and other large miners) and small scale miners are not "in like circumstances", and the difference in treatment is justified by valid policy reasons.

564. The Tribunal finds that the distinct treatment given to small scale miners in the 2010 Measures does not result in a breach of Art. IV.1 of the BIT. Rusoro's claim for discrimination cannot succeed.

**3.6   FREE TRANSFER OF FUNDS**

565. Claimant argues that the Bolivarian Republic breached two distinct provisions of the BIT, which refer to or are related with the free transfer of funds: Art. VIII.1 and para. 6 (d) of the Annex to the Treaty.

### A.   Art. VIII

566. Art. VIII.1 and 2 of the BIT provide as follows:

> "1. Each Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns. Without limiting the generality of the foregoing, each Contracting Party shall also guarantee to the investor the unrestricted transfer of:
>
> (a) funds in repayment of loans related to an investment;
>
> (b) the proceeds of the total or partial liquidation of any investment;
>
> (c) wages and other remuneration accruing to a citizen of the other Contracting Party who was permitted to work in a capacity that is managerial, executive or involves specialized knowledge in connection with an investment in the territory of the other Contracting Party;
>
> (d) any compensation owed to an investor by virtue of Articles VI or VII of the Agreement.
>
> 2. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer".

Is gold a "return"?

567. Rusoro's starting point is that gold falls within the definition of "returns" and that exports of gold are protected by the rule contained in Art. VIII.1 of the BIT: that investors are entitled to the "unrestricted transfer" of "investments and returns"[443].

---

[443] C I at 272; C PHB at 131.

568. Venezuela denies that the gold produced by Rusoro can be considered for purposes of the BIT as "returns". Gold is a commodity, not a currency. It can only become a currency if it is minted and becomes legal tender by government[444].

569. The Tribunal again considers Respondent's arguments to be right.

570. Art. VIII.1 of the BIT establishes the principle that protected Canadian investors can make "unrestricted transfer[s]" of their "investments and returns" in Venezuela and, after defining this general principle, provides an open list of examples:

-   Repayment of loans related to an investment,

-   proceeds from liquidation,

-   certain wages paid to executives, and

-   compensation for expropriation or other losses.

571. "Investment" and "return" are terms defined in the BIT:

-   in accordance with Art I. (f) "investment" is

    "any kind of asset owned or controlled by an investor […] in the territory of the other Contracting Party, [including] shares [or] stocks […]";

-   while "return" is defined in Art. I. (i) as

    "all amounts yielded by an investment and in particular, though not exclusively, […] profits, interest, dividends, royalties, fees, other current income or capital gains".

572. It is undisputed that Rusoro's "investment" in Venezuela consisted in "shares and stocks" of certain Venezuelan companies holding Mining Rights. Having made the investment, Art. VIII.1 (in connection with the definitions of Art I.) guarantees Rusoro the right to an "unrestricted transfer" of funds outside Venezuela in relation with three categories of monetary flows:

-   All "returns" which Rusoro may generate as a consequence of its status as investor, including dividends and profits,

-   The price which Rusoro may collect in an eventual disposition of its investment, including capital gains, or alternatively,

-   Any compensation payable by the Bolivarian Republic in an eventual expropriation of Rusoro's investment.

573. The BIT's guarantee that "returns" arising from the investment may be freely transferred does not cover, however, the entrepreneurial activities of Rusoro's subsidiaries in Venezuela. If these subsidiaries perform an export activity, the price received from the third party who imports the product, is simply a price received

---

[444] R I at 467.

by a Venezuelan corporation in exchange for a commodity, not a "return" earned by Rusoro as a consequence of the holding of an investment in Venezuela.

574. The fact that the product exported by Rusoro's subsidiaries is gold does not change this conclusion. Gold is a commodity, not a currency: it only becomes a currency if a sovereign state decides to mint it and to make it legal tender (which did not happen in this case). Rusoro's subsidiaries mine the gold to sell it as a commodity to unrelated third parties – not to distribute it to their shareholder *in lieu* of dividends. As Respondent rightly says, Claimant's gold is no more a return than is a car produced by a foreign investor in its car factory in Venezuela.

Implications for Claimant's claim

575. The finding that gold is not a return, and that its sales are not protected by Art. VIII, plus the decision, already adopted by the Tribunal, that the 2009 Measures are affected by the statute of limitations[445], does away with the majority of Rusoro's claims under this heading. The only claims left are those based on the 2010 Measures, the 2010 Ley de Reforma Cambiaria which abolished the Swap Market and the alleged denial to Rusoro of required foreign currency in the post-nationalization phase.

576. Art. VIII.1 and 2 of the BIT guarantee investors that they will be able to transfer funds related to their investments and returns without delay, in a convertible currency and at the rate of exchange prevailing at the date of transfer.

577. Provided that this triple guarantee is complied with, the BIT does not impose restrictions on the manner in which Contracting States decide to regulate their exchange control regime. States have the choice of abolishing all exchange control restrictions, of establishing certain limits or of submitting all foreign currency transactions to administrative control.

578. After 2010 the Bolivarian Republic has chosen to impose a stringent exchange control mechanism, in which residents in Venezuela must acquire foreign currency via an administrative authorization, must sell a high percentage of foreign currency earned to the BCV, and in which the Official Exchange rate is established by fiat of the BCV. Each of these choices is a policy decision, which the Bolivarian Republic is empowered to adopt exercising its monetary sovereignty, and which is compatible with the guarantees offered to protected investors in the BIT. Art. VIII simply requires that if a protected investor requests foreign currency in relation to its investment or returns, the application must be approved without delay, the funds delivered in convertible currency and at the Official Exchange Rate prevailing at the date of transfer.

The 2010 Measures and the 2010 Ley de Reforma Cambiaria

579. Neither the 2010 Measures nor the 2010 Ley de Reforma Cambiaria, which abolished the Swap Market, breached the prohibition established in Art. VIII of the BIT:

---

[445] See paras. 232 *et seq supra.*

580.   (i) The scope of the 2010 Measures was limited to regulating the sale and export of gold mined in Venezuela, and the repatriation of the purchase price, not the transfer of investments and returns in the gold sector; these 2010 Measures can never give rise to a breach of the guarantee offered in Art. VIII.

581.   (ii) And the 2010 reform of the Swap Market was a policy decision adopted by the Bolivarian Republic in order to prohibit a parallel foreign currency market, which up to then had been tolerated[446]; after the reform all foreign currency transactions were to be cleared through a centralized exchange control system, controlled by the BCV and based on the Official Exchange Rate.

582.   This reform could only give rise to a breach of Art. VIII if Rusoro could prove that it had requested foreign currency in connection with an investment or a return, and that the authorization had not been granted as required by the BIT (without delay, in a convertible currency and at the rate of exchange prevailing at the date of transfer) – which Rusoro has not alleged.

<u>Post-nationalization denial of currency</u>

583.   Rusoro's only allegation in this regard is that during the post-nationalization phase its subsidiaries were illicitly denied foreign currency[447]. But the Tribunal has already found that Claimant has failed to marshal evidence supporting this submission[448]. Consequently, there is no substantiation that the 2010 prohibition of the Swap Market, and the ensuing centralization of the exchange control regime, restrained Rusoro's rights to unrestricted transfer of investments and returns guaranteed by Art. VIII of the BIT.

**B.   <u>Paragraph 6 (d)</u>**

584.   Paragraph 6 (d) of Part II of the Annex to the BIT ["**Paragraph 6 (d)**"] provides as follows:

> "6. Neither Contracting Party may impose any of the following requirements in connection with permitting the establishment or acquisition of an investment or enforce any of the following requirements in connection with the subsequent regulation of that investment:
>
> [...]
>
> (d) restrictions on exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products, or in terms of a proportion of volume of its local production".

585.   And Art. XVI.2 clarifies that

---

[446] C PHB/SM at 17; R PHB/SM at 13.
[447] C II at 263.
[448] See para. 550 *et seq supra*. Furthermore, Claimant has also failed to prove that the foreign currency denials related to investments and returns, as required by Art. VIII; Claimant's allegation seem to refer to denials of foreign currency requests made by the Venezuelan subsidiaries in their export/import activities; such requests in any case fall outside the scope of protection of Art. VIII.

"the Annex hereto shall for all purposes constitute an integral part of this Agreement".

The Parties' positions

586. Claimant says that in the BIT Venezuela guaranteed not to enforce any regulation restricting the export of gold produced by Rusoro. The 2010 Measures imposed a variety of restrictions, both direct and indirect, on Rusoro's ability to export gold, and consequently contravened Paragraph 6 (d)[449].

587. Respondent's only defence is that the regime for gold marketing in place in 2003 required repatriation of 90% of all foreign currency from exports of gold. This is equivalent to the requirement established by the 2010 Measures to sell gold to the BCV[450].

The Tribunal's decision

588. The Tribunal sides with Claimant: The 2010 BCV Resolution is incompatible with, and represents a breach of Paragraph 6 (d) of the Annex to the BIT.

589. Paragraph 6 (d), which is an integral part of the BIT, prohibits Contracting Parties to

"enforce any of the following requirements in connection with the subsequent [i.e. post-establishment] regulation of that investment:"

Among the prohibited requirements are

"restrictions on exportation or sale for export by an enterprise of products, whether specified in terms of particular products, in terms of volume or value of products […]".

590. At the time when Rusoro made its investments, the export of gold was regulated by the 1996 BCV Resolution[451], which mandated that each gold producer sell at least 15% of its total production in the private domestic market. This restriction, which implied that only 85% of total production could be exported, was accepted by Rusoro, and its legality has not been challenged and falls outside the Tribunal's remit.

591. In July 2010 the BCV decided to issue the July 2010 BCV Resolution[452] (which is one of the two 2010 Measures). This new Resolution limited the amount of gold which any private Venezuelan gold producer could export, and it did so by volume: 50% of the production in each quarter had to be compulsorily sold to the BCV, and export was restricted to the remaining 50%, subject to authorization from the BCV.

592. The July 2010 BCV Resolution is clearly incompatible with the plain wording of Paragraph 6 (d): the Resolution creates a "requirement", to be enforced by the BCV

---

[449] C II at 277; C PHB at 137-138; in para. 137 Claimant argues that Venezuela also breached para. 6 (c) of the Annex to the BIT. This is not so: Venezuela never restricted Rusoro's "access to foreign exchange to an amount related to the foreign exchange inflows attributable to the enterprise".
[450] R II at 393.
[451] Doc. C-101 – Resolution of the BCV No. 96-12-02.
[452] Doc. C-203 – July 2010 BCV Resolution and Amendment to Convenio Cambiario No.12.

in the post-establishment phase of the investment, restricting the "exportation by an enterprise" [i.e. Rusoro's Venezuelan subsidiaries] of its products "in terms of volume" – precisely what Paragraph 6 (d) prohibits.

593. A precision: The 1996 BCV Resolution had already created a legal regime limiting the export of gold to 85% of production. The July 2010 BCV Resolution increased the export restriction to 50% of production, and it is this increase which is incompatible with Paragraph 6 (d) of the Treaty[453].

Respondent's defence

594. Respondent's only defence is that the regime for gold exports in place in 2003 required repatriation of 90% of all foreign currency earned. The defence has no bearing. The purpose of Paragraph 6 (d) is to guarantee that protected investors, who have taken the risk of investing in a Contracting State, will not be burdened with restraints on their capacity to export the products manufactured by their local enterprise. The rule does not address the (separate) issue of repatriation of proceeds earned as a consequence of an export activity.

595. Respondent avers that in 2003 Venezuela had a compulsory repatriation regime for export earnings at the Official Exchange Rate. The statement may be true or false (Convenio Cambiario No. 1 required the repatriation of earnings, but the principle was subverted by the tolerance of the Swap Market). In any case that argument is irrelevant for deciding whether the July 2010 BCV Resolution imposed quantitative export restrictions on gold produced by Rusoro's Venezuelan subsidiaries and whether such restriction ran afoul of the prohibition imposed by Paragraph 6 (d).

## 3.7   CONCLUSION

596. Summing up, the Tribunal dismisses Claimant's claims that the Bolivarian Republic

- breached the principles of FET and FPS, provided for in Art. II.2 of the BIT,

- subjected Rusoro's investment to a discriminatory treatment in breach of Art. IV.1 of the BIT, and

- restricted Rusoro's right to transfer investments and returns in breach of Art. VIII.1 of the BIT.

597. The Tribunal, however, finds that by issuing the 2010 BCV Resolution the Bolivarian Republic imposed an increased restriction in terms of volume on the exportation of gold, and that such increase was in breach of Paragraph 6 (d) of the Annex to the BIT.

# VII.4.  VENEZUELA'S COUNTER-CLAIM

598. Should the Tribunal reject all of Venezuela's jurisdictional objections, and find that it has jurisdiction to decide the present dispute, Venezuela asserts a counter-claim

---

[453] This precision has impact on the calculation of damages – see section VIII.2 *infra*.

against Claimant, based on Rusoro's alleged improper mining practices of the Choco 10 deposit. In Venezuela's opinion, Rusoro's mining strategy had a detrimental impact on the future viability of the mine.

599. Rusoro's first defence against the counter-claim is that the BIT establishes no jurisdictional basis for this Tribunal to adjudicate counter-claims submitted by a respondent State. Additionally, Claimant says that Respondent has not identified any legal obligation allegedly breached by Rusoro, and has failed to marshal any factual evidence in support of its averment and to quantify the damage allegedly suffered.

## 1. RESPONDENT'S COUNTER-CLAIM

600. Venezuela says that this Tribunal has jurisdiction to adjudicate its counter-claim, pursuant to Article 47 of the Arbitration AF Rules, which provides that:

> "(1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim, provided that such ancillary claim is within the scope of the arbitration agreement of the parties".

601. Venezuela submits that Article XII.1 of the BIT defines the scope of arbitrable disputes to

> "[a]ny dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor"[454]

602. In Venezuela's view, its counter-claim based on Rusoro's inadequate mining practices falls within the scope of the arbitration agreement between the Parties, since it is directly related to Rusoro's claims in this arbitration[455].

603. Respondent additionally submits that the Tribunal's adjudication of Venezuela's counter-claim serves the interest of procedural efficiency and economy, because all issues related to this dispute would be resolved in the same *forum*. The opposite solution would require Venezuela to file its claim before Venezuelan courts. This option would entail additional (yet unnecessary) time and resources for both Parties, and could result in inconsistent rulings, which in turn would originate further unnecessary litigation costs[456].

### Merits

604. Venezuela avers that Rusoro implemented a "short term production gains" mining strategy, which had an impact on the future profitability of the Choco 10 mine[457].

605. In 2007, in the context of the Gold Fields transaction by which Rusoro acquired the Choco 10 mine, Rusoro commissioned the mineral consulting firm Micon to prepare a NI 43-101 Technical Report on the Choco 10 mine ["**Micon 2007**

---

[454] Emphasis added by Respondent.
[455] R I at 532-534.
[456] R I at 535.
[457] R I at 527-530.

Technical Report"][458]. This report gathered relevant information on the mine property, geological and mineral data, current exploration and exploitation results, and also an analysis of the prospective development and future production of the mine. One of the conclusions arrived at by the consulting firm was that Rusoro was required to strip between 9 million and 16 million tonnes of waste rock[459].

606. It is Venezuela's contention that since 2008[460] Rusoro deviated from the mining plan envisaged in the Micon 2007 Technical Report, and centred its activities on the mining of soft rock material located at the surface of the deposits[461] (easier to mine and at a lesser cost). This mining practice implied delaying costs into the future, by leaving the mining of deeper and harder ore to forthcoming years. The effects of Rusoro's improper mining practices have jeopardized the original production targets of the mine and have had a negative impact on future mining costs[462].

607. Venezuela also submits a witness statement by Mr. Fernando Barrios, former engineer in the Ministry of Mines, and currently serving as General Manager of Operations at CVG – which now operates the Choco 10 deposit[463]. Mr. Barrios concurs with Respondent's expert, and avers that the current accumulation of waste material caused by Rusoro's "irresponsible" mining practices has jeopardized the original production targets of the Choco 10 mine[464].

608. According to Mr. Barrios and Mr. Grandillo of BBA Inc. ["BBA"], Rusoro's sole purpose when implementing its mining strategy was to achieve higher gold production rates in the early years which would secure the desired short term profits[465].

Quantum

609. Respondent avers that, in order to quantify the damage caused by Rusoro's conduct when operating the Choco 10 mine, it required access to certain information which was in possession of Rusoro[466]. However, given that Rusoro did not provide such information to its own expert, it was not obliged (under the Tribunal's directions) to facilitate that information to Venezuela's expert either. As a result, Mr. Grandillo, Venezuela's expert, was unable to quantify Venezuela's loss caused by Claimant's improper mining of the Choco 10 deposit[467].

---

[458] Doc. C-273 – Micon 2007 Technical Report.
[459] BBA I at 108.
[460] BBA II at 48, third bullet point; BBA II, Appendix 23; Also Rusoro's securities filing, Doc. R-21, p. 4. Doc. R-27, p. 6. Doc. C-307, p. 8.
[461] Respondent refers to Rusoro's securities filings, specifically to Management's Discussion and Analysis of the years 2008 to 2010: Doc. R-21, Doc. R-27 and Doc. C-307; and to the testimony of Gregory Smith (Rusoro's former Vice-President) in the Hearing: HT at 778-782.
[462] BBA I at 108; BBA II at 48
[463] Barrios at 3.
[464] Barrios at 17-19.
[465] Barrios at 18; BBA I at 109.
[466] R I fn. 779.
[467] R II at 465-467.

610. Therefore, Venezuela requests that the Tribunal find that Rusoro is liable for its improper mining practices when operating the Choco 10 mine, and declare that there is insufficient information to determine an award on damages to either party[468].

## 2. CLAIMANT'S POSITION

611. Claimant's first defence is that the BIT does not offer a basis for the Tribunal to hear a counter-claim advanced by Venezuela[469]. The fact that the counter-claim is related to Rusoro's claims in this arbitration, as averred by Venezuela, is irrelevant for the purpose of jurisdiction[470].

612. The Contracting States to the BIT only consented to resolve through arbitration the disputes submitted by investors of the Contracting States[471]. The language of the BIT in Art. XII is clear[472].

Merits

613. Even if the Tribunal should find that it has jurisdiction to adjudicate Venezuela's counter-claim, Respondent has not provided any legal or factual basis for its allegations: Venezuela has not been able to single out a law which prohibits Rusoro to operate the Choco 10 mine as it did, nor that a breach of such law took place[473].

614. Claimant's mining expert – Mr. Tim Swendseid, from the firm Runge Pincock Minarco ["**RPM**"] – declares that the deviations from the Micon 2007 Technical Report were routine modifications to the mining plan, something that is common in the mining industry[474]. Mr. Gregory Smith – former Vice President of Rusoro – endorses Mr. Swendseid's opinion, stating that he had

> "never seen a mining company carry out a mining plan over an extended period of time exactly as it was first written"[475].

615. According to Mr. Smith, one of the reasons which explain the deviations from the Micon 2007 Technical Report was Rusoro's restriction of access to foreign currency. The Micon 2007 Technical Report required a capital expenditure for a new crusher, necessary to grind the hard rock.  As a consequence of the 2009 and 2010 Measures, Rusoro was deprived from access to foreign currency, which prevented the purchase of the new crusher[476]. Under these circumstances, Rusoro was forced to continue stripping the saprolite from the surface[477].

---

[468] R PHB at 154.
[469] C II at 383.
[470] C II at 386.
[471] C II at 386.
[472] C II at 386.
[473] C II at 387.
[474] RPM I at 28.
[475] Smith II at 37.
[476] Smith II at 44.
[477] HT at 783.

616. Claimant submits that before this arbitration Venezuela never complained or criticised Rusoro's operation of the Choco 10 mine[478].

<u>Quantum</u>

617. Lastly, Rusoro argues that the counter-claim should be rejected in any case, because Respondent has been unable to quantify the alleged loss suffered[479].

**3.   THE TRIBUNAL'S DECISION**

618. Venezuela submits a counter-claim against Rusoro arguing that Claimant caused damage to the natural resources of the Bolivarian Republic by adopting improper mining practices in the Choco 10 mine, contrary to its own mining plans[480]. Respondent clarifies that the counter-claim is purely declaratory, because it has been unable to quantify its claim: despite repeated requests, Rusoro refused to provide the information necessary for Venezuela's experts to do so[481]. Venezuela therefore asks the Tribunal to find that Rusoro is liable for the harm caused and to declare that there is insufficient information in the record to award damages[482].

<u>The Tribunal's jurisdiction</u>

619. The first issue which the Tribunal must address is whether it has jurisdiction to adjudicate Venezuela's counter-claim against Rusoro.

620. Article 47 of the Arbitration AF Rules provides that[483]:

> "(1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim, <u>provided that such ancillary claim is within the scope of the arbitration agreement of the parties</u>.
>
> (2) An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the counter-memorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding".

621. The AF Rules permit the submission of counter-claims, but subject to the condition that the counter-claim fall within the scope of the arbitration agreement. In the present case, the arbitration agreement is to be found in Art. XII of the Treaty – it is from this provision from where the Tribunal derives its jurisdiction.

622. Article XII of the BIT reads as follows[484]:

---

[478] C II at 388.
[479] C II at 387.
[480] R II at 463.
[481] R PHB at 153.
[482] R PHB at 154.
[483] Emphasis added by the Tribunal.
[484] Emphasis added by the Tribunal.

**"ARTICLE XII – Settlement of Disputes between an Investor and the Host Contracting Party**

1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a <u>claim by the investor</u> that a <u>measure taken or not taken by the former Contracting Party is in breach of this Agreement</u>, and that the investor or an enterprise owned or controlled directly or indirectly by <u>the investor has incurred loss or damage</u> by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, <u>it may be submitted by the investor to arbitration</u> in accordance with paragraph (4). For the purpose of this paragraph, <u>a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement</u>, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach.

3. <u>An investor may submit a dispute as referred to in paragraph (1)</u> to arbitration in accordance with paragraph (4) only if:

(a) the <u>investor has consented</u> in writing thereto;

(b) the <u>investor has waived</u> its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;

(c) […]

(d) not more than three years have elapsed from the date on which <u>the investor first acquired</u>, or should have first acquired, <u>knowledge of the alleged breach</u> and <u>knowledge that the investor has incurred loss or damage</u>".

4. The dispute may, <u>by the investor concerned</u>, be submitted to arbitration under […];

7. A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law […]".

<u>Interpretation of Art. XII of the Treaty</u>

623. <u>Art. XII.1</u> restricts the scope of arbitrable disputes, to those based on a

"claim by the investor that a measure taken or not taken by the [host State] is in breach of this Agreement".

624. If an investor holds a claim for breach of the BIT against the host State, <u>Art. XII.2</u> permits the investor to define such claim, to notify it to the host state and to determine the scope of the future arbitration:

135

> "For the purpose of this paragraph, <u>a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party</u> alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement".

625. Absent amicable settlement within a six-month period, the investor and only the investor has the right to file an arbitration:

> "If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, <u>it may be submitted by the investor to arbitration</u> in accordance with paragraph (4) [...]".

626. <u>Art. XII.3 and Art. XII.4</u> each reiterate again *expressis verbis* that the standing to file an arbitration corresponds exclusively to the investor.

627. The literal wording of Art. XII does not leave room for doubt: the Treaty affords investors, and only investors, standing to file arbitrations against host States; and the purpose of the arbitrations is for arbitrators to adjudicate disputes relating "to a claim by the investor that a measure taken or not taken by [the host State] is in breach of this Agreement", by applying the Treaty and applicable rules of international law.

628. In its counter-claim, the Republic submits that Rusoro intentionally failed to adhere to the mine plan, in breach of its obligations vis-à-vis the Republic and thereby caused damage to Venezuela. There are three reasons why the Tribunal has no jurisdiction to adjudicate this dispute:

- <u>First</u>, the Tribunal's power is limited to adjudicating disputes which arise from the BIT, and the obligations allegedly breached by Rusoro do not derive from and have no connection with the Treaty;

- <u>Second</u>, the Tribunal must decide the dispute in accordance with the Treaty and the principles of international law, and the dispute underlying the counter-claim – that Rusoro breached the mine plan –  and cannot be adjudicated by applying the Treaty or principles of international law;

- <u>Third</u>, the Treaty does not afford host States a cause of action against an investor of the other Contracting Party, be it by way of claim or of counter-claim.

629. <u>Summing up</u>, the Tribunal finds that it lacks jurisdiction to adjudicate the counter-claim submitted by the Bolivarian Republic against Rusoro.

<u>Case law</u>

630. The Parties have drawn the Tribunal's attention to two previous decisions, adopted by tribunals with regard to counter-claims.

631. The first decision is *Roussalis*, an ICSID arbitration in which the respondent State filed several counter-claims. The tribunal concluded that the consent to arbitration under the BIT does not *per se* imply a consent to arbitrate counter-claims. In that case the applicable BIT limited jurisdiction to claims brought by investors referring

to obligations of the host State. The tribunal concluded that the BIT did not permit host States to introduce counter-claims relating to obligations of the investor arising from instruments other than the applicable treaty[485].

632. The second decision is *Hamester,* a case where the Respondent State – Ghana – submitted a counter-claim, requesting the tribunal to indemnify the State for the damages caused for the investor's irregular conduct[486]. Respondent did not develop this argument, and the tribunal dismissed the counter-claim for lack of substantiation[487] and also for lack of jurisdiction (since the harm allegedly caused was not suffered by the State, but by a third party)[488]. In an *obiter dictum* the tribunal mentioned that the treaty language, which permitted "the aggrieved party" to refer a dispute to arbitration, might in other circumstances permit the host State to submit a claim[489]. The *dictum* of *Hamester* is inapposite to the present case, because the treaty language is radically different (the Canada-Venezuela BIT clearly and repeatedly limits the right to introduce arbitrations to the investor and lacks any reference to the "aggrieved party").

<u>Venezuela's complaint that Rusoro did not provide information</u>

633. Although the Tribunal lacks jurisdiction to decide the counter-claim, a short comment must be devoted to Venezuela's argument that Claimant's refusal to deliver documents made it impossible to quantify the harm caused by Rusoro's failure to adhere to the mining plan[490]. The argument is difficult to follow. The Bolivarian Republic has expropriated Rusoro's mines, together with all supporting staff, records and documentation. It must have at its disposal (and much readier than Claimant) all the relevant documentation and evidence to prove that Rusoro, while it managed the mine, did not adhere to the mine plan.

---

[485] *Roussalis* at 869 – 871.
[486] *Hamester* at 351.
[487] *Hamester* at 357.
[488] *Hamester* at 356.
[489] *Hamester* at 354.
[490] R PHB at 153.

# VIII. QUANTUM

634. Having come to the conclusion that the Bolivarian Republic unlawfully expropriated Claimant's enterprise in Venezuela and that it also imposed an unlawful restriction on the exportation of the gold produced by the Claimant, the Tribunal must now address the issue of *quantum*.

The Parties' positions

635. Rusoro is claiming three different types of compensation:

- The fair market value of Rusoro's investment in Venezuela as of 16 September 2011, estimated by Navigant at USD 2.23 billion[491];

- The cash flows allegedly lost between 30 April 2009 and 16 September 2011 as a result of the 2009, the 2010 Measures and the closure of the Swap Market adopted by the Bolivarian Republic ["**Lost Cash Flows**"], in an amount of USD 85.4 million[492];

- Pre- and post-award interest on the amounts awarded at Venezuela's borrowing rate[493].

636. Venezuela submits that Rusoro has failed to meet its burden to prove the quantum of its damages, or, if the Tribunal were to find otherwise, that damages be limited to a compensation of USD 1.5 million, reduced by 50% for contributory fault and detrimental reliance[494].

Treaty provisions

637. Article XII.9 provides as follows:

"A tribunal may award, separately or in combination, only:

(a)  monetary damages and any applicable interest;

(b)  restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.

A tribunal may also award costs in accordance with the applicable arbitration rules.

Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls any award shall be made to the affected enterprise".

---

[491] C PHB at 151.
[492] C PHB at 209.
[493] C PHB at 211.
[494] R PHB at 268, in relation to Table 6 Joint Tables.

638. This rule authorizes the Tribunal to award "monetary damages" plus "applicable interest", and Article XII.7 specifies that it must decide "in accordance with this Agreement and applicable rules of international law".

639. The Treaty only contains one specific rule regarding damages: Article VII says that expropriation must be made "against prompt, adequate and effective compensation". The rule then provides the following additional criteria:

> "Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable."

640. The compensation provided for in Article VII only covers cases of expropriation. In all other breaches, absent any specific Treaty language, damages must be calculated in accordance with the rules of international law. The relevant principle was originally formulated in the seminal judgement of the Permanent Court of International Justice in the *Chorzów* case: reparation must wipe-out the consequences of the breach and re-establish the situation as it is likely to have been absent the breach. This well-established principle complements those found in the ILC Articles, and particularly in Article 31, to make full reparation for injury caused as a consequence of a violation of international law[495].

641. Additional principles of international law mandate that Claimant bear the burden of proof, and that damages be certain, in the sense that speculative or hypothetical harm be excluded, not in that of scientific certainty[496].

642. Any assessment of damages in a complex factual situation, involving revenue-generating enterprises, includes some degree of estimation – the same degree which is also applied by (private and government) actors in the real world when valuing enterprises. Because of this difficulty, tribunals retain a certain margin of appreciation. This should not be confused with acting *ex aequo et bono*, because the Tribunal's margin of appreciation can only be exercised in a reasoned manner and with full respect of the principles of international law for the calculation of damages[497].

Evidence

643. The Parties have submitted extensive evidence to support their cases:

- Rusoro has produced two financial expert reports prepared by Mr. Brent C. Kaczmarek, from Navigant Consulting Inc. ["**Navigant**"]: **NAV I**, dated 20 March 2013 and **NAV II**, dated 12 June 2014. Additionally, Rusoro retained the services of Mr. Tim J. Swendseid, from Runge Pincock Minarco, to

---

[495] *Gold Reserve* at 679; *Ioannis Kardassopoulos* at 503-505; *Rumeli* at 792.
[496] *Amoco* at 238; *Lemire (Award)* at 246; *Gold Reserve* at 685-686.
[497] *Gold Reserve* at 686.

produce a technical report on Rusoro's mining projects in Venezuela: **RPM I**, dated 11 June 2014.

-   Venezuela's financial experts were Dr. James C. Burrows from Charles River Associates ["**CRA**"], who prepared two expert reports: **CRA I**, dated 30 January 2014, and **CRA II**, dated 13 October 2014; and Mr. John G. Brim, who prepared another report: **Brim**, dated 13 October 2014. Additionally Venezuela produced two technical reports on Rusoro's mines prepared by Mr. Angelo Grandillo from BBA Inc.: **BBA I**, dated 30 January 2014, and **BBA II**, dated 10 October 2014.

644.   On the last day of the Hearing, and with the consent of the Parties, the Tribunal requested the financial experts, Navigant and CRA, to jointly prepare tables of discounted cash flow valuations under alternative sets of assumptions[498]. On 27 February 2015 the experts presented the tables ["**Joint-Tables**"], and their respective comments. The Tribunal thanks the experts for their additional effort.

645.   The Tribunal will analyse in a first section Rusoro's request for compensation resulting from the expropriation of its Venezuelan assets (**VIII.1.**), and in subsequent sections the claims for additional damages due to the Lost Cash Flows (**VIII.2.**), the interest accruing on the amounts awarded (**VIII.3.**), and Rusoro's claim that the award be net of Venezuelan taxes (**VIII.4.**).

## VIII.1. COMPENSATION FOR EXPROPRIATION

646.   The Bolivarian Republic has committed a fundamental breach of the Treaty: the unlawful expropriation of Rusoro's Venezuelan enterprise. Art. VII of the BIT mandates that Venezuela pay to the investor "adequate" compensation, "based on the genuine value of the investment" expropriated. The devil is the quantification: while Rusoro, supported by its expert, comes up with a "genuine value" of USD 2.23 billion, the Bolivarian Republic and its own advisors reduce the amount to a mere USD 1.5 million.

647.   Although in quantitative terms the difference between the Parties is colossal, there are two important issues on which both parties agree, and which the Tribunal consequently will apply without further discussion:

-   The first is that the proper valuation date is 16 September 2011, the day when the Nationalization Decree was adopted (an agreement which makes it unnecessary for the Tribunal to address the thorny issue of the appropriate date for calculation in unlawful expropriations);

-   The second that the "genuine value", to which Art. VII refers, equates with the traditional concept of "fair market value", defined as the[499]

---

[498] HT at 3026 *et seq.*
[499] *Starret Housing* at 18.

"price that a willing buyer would buy given goods at and the price at which a willing seller would sell it at on the condition that none of the two parties [is] under any kind of duress and that both parties have good information about all relevant circumstances involved in the purchase".

648. In order to establish the fair market value of Rusoro's investment, the Tribunal will proceed as follows: it will first make a short introduction to the international gold market and the value of gold producing companies (**1.**), and then it will establish

- the amount actually invested by Rusoro in Venezuela, at historic prices (**2.**), and revalued in accordance with the evolution of gold producing companies (**3.**)

- the book value of such investment (**4.**),

- Rusoro's market capitalization (**5.**), and

- the valuation made by Claimant's expert (**6.**).

649. Having made this analysis, the Tribunal will be in a position to present its own valuation of the fair market value of Rusoro's Venezuelan enterprise as of 16 September 2011, taking into consideration Venezuela's arguments that there was contributory fault and that Rusoro overpaid for worthless investments (**7.**).

\* \* \*

650. Before doing so, it is important to underline two characteristics which are specific to Rusoro, and which have a significant impact on its enterprise value:

651. The <u>first</u> is that Rusoro is a corporation listed on the TSX Toronto Stock Exchange – a respected and well regulated market specializing in the listing and trading of mining companies. The fact that Rusoro is listed implies not only that it has an open number of shareholders (there being no single person who exercises control), but also that it is subject to reinforced rules regarding accounting and disclosure:

- its accounts, prepared in accordance with International Financial Reporting Standards, are audited (by Grant Thornton, a respected auditing company),

- it must provide relevant information to the market on a regular (at least quarterly) basis,

- and any disclosure of a mineral project must conform to the official standards set forth in National Instrument 43-101 ["**NI 43-101**"], a demanding standard which requires an extensive prospectus, with very detailed information, prepared by a "Qualified Person", who must accept responsibility for its content[500].

652. The <u>second</u> is that Rusoro's enterprise was limited to the exploration, mining and production of gold in one single country, Venezuela: at the time of the

---

[500] BBA I at 85; NAV I at fn 140 and Exhibit 33.

expropriation, Rusoro's only assets were three gold producing projects in Venezuela, with over five million ounces gold reserves[501], and more than ten million ounces of additional gold resources[502].

653. And gold is indeed a very special commodity (to the extent that President Chávez personally wrote "¡Oro, oro, oro!" beneath his signature on the Nationalization Decree). Since times immemorial gold not only serves as a currency, it is also an investment asset, appreciated by investors especially in times of uncertainty. Gold is also an industrial commodity, used as a fundamental input not only in the jewellery industry but also in other sectors. The backside is that gold prices are highly volatile, with huge swings in value.

## 1. THE PRICE OF GOLD AND THE VALUE OF GOLD MINING COMPANIES

654. The valuation of any enterprise presents the challenge of estimating its capacity to generate future cash flows. In most enterprises, the sales price of its products or services can be predicted with a minimum of certainty; in the case of gold producing enterprises, however, an additional layer of unpredictability, an "unknown unknown" is added: the volatility of sales prices and the uncertainty about the level of revenue which the enterprise will be able to generate.

655. The most significant sources of demand for gold are jewellery and industry, which make up 61% of total demand, while retail investors represent 28%; the supply is satisfied for 2/3 by mine production and for the rest by recycling[503]. As the following figure shows, since 1970's gold prices (measured in constant 2012 USD) ranged between USD 200 to USD 600 per oz., with two exceptional spikes:

- The first occurred in 1979-1980, when prices reached USD 1700/oz., but then dropped quickly;

- The second happened in 2011, when prices peaked on August 22, 2011 (*pro memoria*: less than one month before the expropriation) at USD 1,838/oz.[504]

---

[501] "Mineral Reserves are those parts of Mineral Resources which, after the application of all mining factors, result in an estimated tonnage and grade which, in the opinion of the Qualified Person(s) making the estimates, is the basis of an economically viable project after taking account of all relevant processing, metallurgical, economic, marketing, legal, environment, socio-economic and government factor". See CIM Standards on Mineral Resources and Reserves – Definition and Guidelines, 20 August 2000, p. 7. (Doc. NAV-34)

[502] "Mineral Resource is a concentration or occurrence of natural, solid, inorganic or fossilized organic material in or on the Earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction. The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge".– CIM Standards on Mineral Resources and Reserves – Definition and Guidelines, 20 August 2000, p. 8. (Doc. NAV-34).

[503] Data for 2010; NAV I at 23.

[504] CRA I at 95, Figure 5.

Figure 5: Real Gold Price 1833 - 2011 (London fix price, annual average 2012 dollars per ounce)



Note: Gold prices adjusted by U.S. CPI; Source: Measuring Worth and World Gold Council.

656. After the 2011 peak, gold prices remained very high (above USD 1,500/oz.) for the next 18 months, and thereafter have ranged above USD 1,200/oz.[505]

Gold prices and the value of gold companies

657. The value of gold mining companies and projects is closely correlated with the price of gold: the higher the price of the commodity, the higher the value of gold producing enterprises (and *vice versa*). The increased valuation of companies, however, lags the rises in gold prices, because taxes on profits and royalties levied by host States increase more than proportionally. The relationship and the lag can be seen in this figure, which shows the evolution of the price of gold vis-à-vis the valuation of gold companies (measured by the S&P-TSX Global Gold Index)[506]:

---

[505] This is hindsight information, which cannot be taken into account to establish Rusoro's fair market value as of the date of expropriation; it has been provided by Respondent's expert: CRA I at 97.
[506] See also Doc. H-8 at 18.

143



Figure 3: Gold Spot Price (London fix) and S&P/TSX Global Gold Index, Cumulative Return from 12/31/06 to 09/16/11

658. Venezuela decided to expropriate Rusoro's investments in Venezuela on 16 September 2011, less than one month after gold reached its all-time peak of USD 1,838/oz. The value of gold companies is, as the above figure shows, closely related to the price of gold. This implies that (*ceteris paribus*) on the date of expropriation the value of Rusoro must have been at (or very close to) its historic maximum.

## 2. **RUSORO'S INVESTMENTS IN VENEZUELA**

659. Mr. Kaczmarek, Claimant's expert, has performed a precise valuation of the amounts actually invested by Rusoro in Venezuela[507]:

---

[507] NAV II at 19.

Table 3 – Summary of Rusoro's Investments in the Projects (2006 to 2008)[1]

| Acquisition | Acquisition Date | Significant Mine/Projects | Consideration Paid (US$ millions) |
|---|---|---|---|
| Grupo Agapov | 7-Nov-06 | SREP, Valle Hondo (76%), Increible 6 (76%), Emilia, Days, Ceiba | 23.0 |
| Cradock | 19-Dec-06 | Yuruan | 5.0 |
| Mena | 5-Mar-07 | Valle Hondo (24%), Increible 6 (24%), Trinidad | 39.1 |
| Gold Fields | 30-Nov-07 | Choco 10 | 526.5 |
| Hecla | 8-Jul-08 | Isidora, Twin Shear | 35.7 |
| Total Acquisitions | | | 629.3 |
| Other Investments (PP&E, Mineral Property Costs, Funding for Operating Losses) | | | 163.9 |
| TOTAL INVESTMENT | | | 793.1 |

660. In accordance with Mr. Kaczmarek's analysis, the total acquisition costs incurred by Rusoro from 2006 – 2008 amount to USD 629.3 million. Additionally, Rusoro spent USD 163.9 million in plant and equipment, mineral property and funding for operating losses, making a total of USD 793.1 million.

Dr. Burrows' objections

661. Dr. Burrows, Respondent's expert, disagrees with this valuation; his numbers are significantly different[508]:

| Investment Component (US$s Millions) | Dr. Burrows Net Cash Investment |
|---|---|
| *Acquisitions* | |
| Grupo Agapov | 0.0 |
| Cradock | 5.0 |
| Mena Resources | (57.6) |
| Gold Fields | 205.5 |
| Hecla | 27.0 |
| **Total Acquisitions** | **179.9** |
| *Other Investments* | |
| Property, Plant & Equipment Total | 159.4 |
| Losses (Proceeds) from Operations | (26.7) |
| **Total Other Investments** | **132.7** |
| **TOTAL** | **312.6** |

662. There are fundamentally three reasons for Dr. Burrows' differing opinion[509]:

---

[508] CRA II, Exhibit 22.
[509] CRA I at 45-49.

-     <u>First</u>, he does not account for the value of the shares that Rusoro issued to pay for some of its investments (Agapov, Mena, Gold Fields and Hecla); for example, Dr. Burrows concludes that Rusoro invested USD 206 million in the Gold Fields acquisition, disregarding the USD 321 million in Rusoro stock that additionally formed part of the consideration;

-     <u>Second</u>, he puts a negative value to the investment in Mena, because the acquired company had a positive net cash position;

-     <u>Third</u>, he excludes operating losses incurred from the computation of investment.

663. The Tribunal

-     agrees with Dr. Burrows' third objection (losses as such cannot be considered investments, only the capital contributions to cover losses can be considered investments); Navigant erroneously considered the mere funding of operating losses as an investment; if these losses are excluded, the additional investment in Mr. Kaczmarek's table is reduced from USD 163.9 million to USD 145 million[510], bringing the total investment to <u>USD 774.3 million</u>[511];

-     rejects Dr. Burrows' second objection (the proposition that the acquisition of Mena, in which Rusoro delivered shares in an amount of USD 111 million, in fact implies a "negative investment" of almost USD 60 million is difficult to accept);

-     and does not share, but has a certain understanding for the first objection.

664. This first objection in fact requires a more careful evaluation.

<u>Was there overvaluation?</u>

665. Dr. Burrows' main argument to support his first objection is that the Rusoro shares, delivered as consideration for the acquisitions, were overvalued, and that the total consideration agreed upon between Rusoro and the sellers (which included cash and shares) significantly exceeded the real value of the acquired assets.

666. Venezuela has expressed the same idea in more forceful term[512]:

> "The consideration for the Mena transaction was 100% Rusoro stock and warrants. The cash for the Gold Fields transaction was extracted from Mena and additional sale of Rusoro stock. Thus the Agapovs themselves invested nothing in these acquisitions. They simply issued more Rusoro stock"

667. As evidence of this alleged overvaluation, Dr. Burrows explains that the share price of Rusoro dropped between the announcement date and the closing date of the Gold

---

[510] Doc. H-9, second table excluding line "Operating losses", totaling USD 18.9 million.
[511] Doc. H-9: USD 629.3 million for the acquisitions plus USD 145 million for plant and equipment and mineral property costs.
[512] R PHB at 250.

Fields transaction by 33%, and that after the closing date, the share price continued to decline, suggesting that investors considered that there was an overpayment, and that the stock market valued the acquisition at USD 160 to 230 million – which equates with the cash portion of the transaction[513].

668.  There are a number of inconsistencies with Dr. Burrows' and Venezuela's argument:

669.  (i) The <u>first</u> is that the facts do not quite fit Dr. Burrows' account: when the Gold Fields transaction was announced on 11 October 2007, Rusoro's share price was USD 2.5; after an initial fall, the price recovered, and towards the end of the month reached a peak in excess of USD 2.5; thereafter a decline set in and by December the price had dropped below USD 1.5[514].

Figure 2: Rusoro Stock Price at Gold Fields Acquisition



Source: Exhibit [4A]

670.  There is no evidence in the file that this decline was caused by an overvaluation of the Gold Fields acquisition – other reasons (e.g. increase in the Venezuelan country risk) could also have been at play; Dr. Burrows himself has provided the following figure[515], which shows that, shortly after the Gold Fields acquisition, Venezuela's sovereign bond spread started to rise (caused by the fall in oil prices).

---

[513] CRA I at 47.
[514] CRA I, Figure 2 at 47.
[515] CRA II, Figure 5.



Figure 5: Venezuela Sovereign Bond Spread, 1999-2013[4]

Based on CS Sovereign Bond Spread over Benchmark.   Source: Bloomberg

671. Rusoro was a single country gold producing company: any increase in the Venezuela country risk must have produced a significant reduction in its share price.

672. Furthermore, there is no evidence that the decline in Rusoro's share price, which occurred between announcement and execution of the Gold Fields deal, was definitive. To the contrary, the evidence shows that the share price of Rusoro recovered, and as Dr. Burrows himself shows[516], Rusoro reached its all-time highest market capitalization one year later in September 2008 (at approximately USD 750 million).

673. (ii) The second problem is that Dr. Burrows totally disregards the fact that Rusoro is a listed company and that its board of directors has a fiduciary duty towards its existing shareholders. If a board decides to issue new stock, against undervalued consideration, existing shareholders are diluted and suffer a loss in the value of their investment. There is no evidence in the file that any of the historic shareholders of Rusoro ever voiced any protest or submitted any claim for this reason.

674. (iii) Third, the Tribunal does not concur with Venezuela's argument that the Agapovs "invested nothing" and "simply issued more Rusoro stock".

675. An initial point of disagreement is that the investor was of course Rusoro, a listed company with many shareholders, not the Agapovs.

676. But more importantly, Venezuela's argument is untenable from a legal and financial point of view: it totally disregards a basic principle of company law and corporate finance, the fact that the issuance of new shares does affect existing shareholders' rights and values. If the new shareholders do not pay in the appropriate consideration, the value of the shares in the hands of the existing shareholders will be diluted, and wealth will pass – for free – from old shareholders to new

---

[516] Doc. H-10 at 79.

shareholders. The Agapovs and the other shareholders could not "simply issue more Rusoro stock": had they issued stock against insufficient consideration, they would have been cutting themselves in their own (financial) finger.

A *caveat* by the Tribunal

677. That said, the Tribunal concurs with Dr. Burrows' underlying assumption that in corporate acquisitions there are differences in the quality of the consideration, depending on whether payment is made in cash or in shares. In share transactions a seller wishing to monetize the proceeds has to dispose of the securities received – a procedure which implies risks (which increase if there is a lock-in period) and costs; while in a cash transaction these risks and costs of course disappear. This would justify a small adjustment downwards of the portion of the consideration expressed in shares – but never its total exclusion, as advocated by Dr. Burrows.

678. <u>Summing up</u>, the Tribunal concludes that Rusoro effectively made substantial investments in Venezuela of <u>USD 774.3 million</u>:

- it made five corporate acquisitions, for a total consideration of USD 629.3 million, of which a portion was paid for in cash (which Dr. Burrows calculates at approximately USD 237 million[517]) and the rest (of approximately USD 400 million) in its own shares; and

- additionally it made further investments in property plant and equipment of approximately USD 145 million[518].

## 3.   RUSORO'S INVESTMENT ADJUSTED

679. The Tribunal has already explained[519] that the value of gold mining companies (expressed through the S&P/TSX Global Index [the "**Index**"]) is closely related, albeit with a lag, to the price of gold. This implies that if gold prices rise, the value of a gold producer will also increase – assuming that all other factors which influence value remain unchanged.

680. Rusoro made its five acquisitions in Venezuela at a time when gold prices and consequently also the overall valuation of gold mining companies were (relatively) low, but had already started to rise. In fact, the Index, which represents the value of gold mining companies, stood at 284 at the time of the Agapov acquisition, and reached 347 by the time of the Hecla purchase[520]. When Rusoro suffered expropriation in September 2011, the Index had risen to 473.5[521] (and the gold price had risen in an even higher proportion – see figures in paras. 654 and 657 above).

681. Claimant's expert has performed a calculation[522], increasing the consideration paid in the five acquisitions (including cash and shares) in the same proportion as the

---

[517] CRA I at 49.
[518] In this item, CRA provides a higher figure (USD 159.4 million) than Navigant (USD 145 million).
[519] See para. 657 *supra*.
[520] Doc. NAV-6.
[521] Doc. NAV-6.
[522] Doc. H-9.

rise of the Index between the date of each transaction and the date of expropriation. This drives the amount invested from USD 774.3 million (Mr. Kaczmarek's calculation, corrected by the Tribunal to exclude operating losses) to USD 1,128.7 million[523].

| Investment (US$ millions) | Investment Date | Amount Invested[1] (US$ millions) [A] | S&P-TSX Gold Index Value as of Investment Date[2] [B] | S&P-TSX Gold Index Value as of 16 September 2011[2] [C] | Percentage Increase in Gold Index [D] = C/B - 1 | 16 September 2011 Value (US$ millions) [E] = A x (1+D) |
|---|---|---|---|---|---|---|
| Grupo Agapov | 07/11/2006 | 23,0 | 284,0 | 473,5 | 67% | 38,3 |
| Cradock | 19/12/2006 | 5,0 | 293,1 | 473,5 | 62% | 8,1 |
| Mena | 05/03/2007 | 39,1 | 267,7 | 473,5 | 77% | 69,2 |
| Gold Fields | 30/11/2007 | 526,5 | 326,8 | 473,5 | 45% | 762,8 |
| Hecla | 08/07/2008 | 35,7 | 346,7 | 473,5 | 37% | 48,7 |
| **Total Acquisitions** | | **629,3** | | | | **927,1** |
| 2006 PP&E, Mineral Property Costs and Operating Losses | 30/06/2006 | 6,26 | 277,7 | 473,5 | 71% | 10,7 |
| 2007 PP&E, Mineral Property Costs and Operating Losses | 30/06/2007 | 23,61 | 265,5 | 473,5 | 78% | 42,1 |
| 2008 PP&E, Mineral Property Costs and Operating Losses | 30/06/2008 | 41,92 | 368,3 | 473,5 | 29% | 53,9 |
| 2009 PP&E, Mineral Property Costs and Operating Losses | 30/06/2009 | 18,18 | 289,6 | 473,5 | 63% | 29,7 |
| 2010 PP&E, Mineral Property Costs and Operating Losses | 30/06/2010 | 22,39 | 386,6 | 473,5 | 22% | 27,4 |
| 2011 PP&E, Mineral Property Costs and Operating Losses | 30/06/2011 | 32,64 | 409,0 | 473,5 | 16% | 37,8 |
| **Total Other Investments** | | **145,0** | | | | **201,6** |
| **Total Investment** | | **774,3** | | | | **1.128,7** |

[1] For investment amounts, see Navigant Second Report, Table 3. See below for the detailed calculation of "Other Investments." Property, Plant & Equipment, Mineral Property Costs, and Operating Losses figures are from Navigant First Report, Appendix 5 - Operating Income Tab

| Component | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|
| Property Plant & Equipment | 0,1 | 12,2 | 22,6 | 7,0 | 5,8 | 12,4 | 60,1 |
| Mineral Property Costs | 6,1 | 11,5 | 19,3 | 11,2 | 16,6 | 20,2 | 84,9 |
| Operating Losses | 15,6 | 21,2 | 31,5 | 12,7 | -42,7 | -19,5 | 18,9 |
| Total (corrected by the Tribunal excluding Operating Losses) | 6,3 | 23,6 | 41,9 | 18,2 | 22,4 | 32,6 | 145,0 |

[2] For S&P-TSX Gold Index Values, see JB-6 (Total Return Column).

682. In other words: Rusoro initially invested some USD 774.3 million in its Venezuelan enterprise; it did so at a time of low (but rising) gold prices and gold company valuations. Hindsight shows that the timing of Rusoro's investment was excellent. Gold prices and consequently also gold company valuations rose while it held its investment. Venezuela chose to expropriate at the time when gold prices and gold company values had reached their peak. *Ceteris paribus*, i.e. assuming no change whatsoever in micro- or macro-economic conditions, the mere evolution of the gold price, which significantly increased during the time between investment and expropriation, would have led the value of the investment to increase to more than USD 1,128.7 million.

## 4.   THE BOOK VALUE OF RUSORO'S INVESTMENT

683. In the quarterly accounts as of 30 September 2011, Rusoro was carrying its Venezuelan enterprise at a gross book value of USD 959 million, comprised of[524]

- USD 674 million property, plant and equipment, and

- USD 285 million for mineral properties.

---

[523] Doc. H-9, modified by the Tribunal to exclude Operating Losses. Rounded figures.
[524] Doc. NAV-23 – Rusoro Q 3 2011 Quarterly Report, p. 13-14.

The corresponding depreciation was USD 51 million, leading to a net book value of USD 908 million. Book value of assets is higher than amounts invested, because the acquisitions included assets and liabilities.

684. Rusoro reported the gross and net book values of its investments not only in its quarterly reports but also in its audited annual financial statements. The annual reports were prepared in accordance with International Financial Reporting Standards ["IFRS"], were audited by Grant Thornton, Rusoro's auditor, and were publicly disclosed and filed with the Canadian securities regulator. The 2010 annual report (the one preceding the Q 3 2011 quarterly report) had been approved by the auditors with a clean opinion[525].

685. IFRS required Rusoro to impair its assets, reducing the book value, if it believed that their "fair value"[526] was lower than book value. In fact, in 2010 Rusoro had made an impairment of USD 11 million to the value of its mineral properties[527]. Rusoro's auditor was required to verify this periodic "fair value" analysis. In its 2010 opinion Grant Thornton does not mention any disagreement with the impairment policy and practice adopted by the company.

The relevance of book value

686. Claimant says that the book value of the expropriated assets, in addition to being a useful benchmark, should act as a floor for the assessment of damage in this case[528], especially, because the Nationalization Decree specifically provided for book value to be paid as compensation[529].

687. Respondent disagrees[530].

688. It first requests that the Tribunal ignore any reference to Rusoro's book value, because "Venezuela had no opportunity to brief or provide expert analysis"[531], Claimant having brought up the issue for the first time in the Hearing[532].

689. The argument is misguided, because in the valuation of any expropriated enterprise its book value is by nature one of the relevant elements. The Nationalization Decree itself provides that the compensation paid should equate with the book value of the expropriated assets. Furthermore, the data on which the calculation of book value relies are the accounts of Rusoro, and these were available to the Bolivarian

---

[525] Doc. NAV-137 – Rusoro Annual Financial Statements Years Ending 31 December 2010 and 2011. Grant Thornton gave a clean opinion, only including an emphasis paragraph regarding the repayment of a loan agreement due in June 2011.
[526] International Financial Reporting Standards – IFRS 13 – Fair Value Measurement defines "fair value" as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date". Available at http://www.ifrs.org/IFRSs/IFRS-technical-summaries/Documents/English%20Web%20Summaries%202013/IFRS%2013.pdf.
[527] Doc. NAV-136 – Rusoro Annual Financial Statements Years Ending 31 December 2009 and 2010, Note 7.
[528] C PHB at 207.
[529] Doc. C-214 – Nationalization Decree, Art. 16.
[530] R PHB at 247.
[531] R PHB at 247.
[532] HT at 1778.

Republic at all times (and additionally were submitted into the file by Navigant). Venezuela and its experts had every opportunity to argue the relevance of book value. And in fact they did: Respondent devotes three pages of its PHB to this matter[533].

690. Second, the Republic submits that Rusoro's book value was created by allocating "inflated paper purchase consideration" over assets that in fact had little value[534]. It adds that[535]

> "as of the end of 2007, only US$ 115 million of PP&E was actual machinery, facilities, vehicles or other tangible assets; the remainder was Rusoro's allocation of its purchase price to mining properties".

691. The Tribunal does not share the argument. It is a second rendering of the reasoning that consideration expressed in own shares is worthless. The Tribunal has already rejected this proposition[536].

692. (The Tribunal takes objection to Respondent's reference to "USD 115 million of PP&E". What Venezuela is quoting is the 2007 figure; what is being discussed here are 2011 values, because it is in 2011 when Rusoro was expropriated. The reference to 2007 is misleading. The correct figure for 2011 is USD 674 million[537]).

693. Third, Respondent says that the difference between the USD 900 million book value and Rusoro's market capitalization dramatically increased, the market value falling to USD 106.8 million just before the announcement of the expropriation[538].

694. The Tribunal does not share this reasoning.

695. From a methodological standpoint, the Republic's comparison of book value and market capitalization is inapposite. It compares apples with oranges, because book value is unaffected by corporate leverage, while market capitalization is.

696. Further to this, the price of a Rusoro share in the Toronto stock market (and consequently Rusoro's market capitalization) was affected by the 2009 and 2010 Measures, and by the general increase in the perceived political risk affecting the Bolivarian Republic (as shown by the fact that Venezuela's sovereign bond spread increased six fold, from approximately 2% to 12%, between 2007 and 2011[539]). The fact that, because of these exogenous reasons, the market price of Rusoro's share collapsed, did not impact the book value of Rusoro's assets. The share price of listed companies is subject to the volatility of the stock market; swings in share prices, however, do not result in an obligation to impair the book value of their assets.

---

[533] R PHB at 247-254.
[534] R PHB at 248.
[535] R PHB at 249.
[536] See paras. 668 *et seq supra.*
[537] Doc. NAV-23 – Rusoro Q 3 2011 Quarterly Report, p. 13-14.
[538] R PHB at 263.
[539] CRA II, Figure 5; see para. 670 *supra.*

697. The record shows that in 2010 Rusoro decided to make an impairment of USD 11 million to the value of its mineral properties[540]. There is no evidence that the auditor disagreed with this determination; neither has evidence been marshalled to prove that the applicable IFRS standards required additional impairments.

698. Fifth, the Bolivarian Republic argues that Gold Fields wrote down the value of its Rusoro stock almost immediately – and that this should have led to an impairment of Rusoro's book value.

699. The precise figures of the write down are somewhat in doubt. The Republic's expert, Mr. Brim, refers to a write down to USD 168 million in seven months[541], while in the R-PHB the figure quoted is USD 165.7 million (presumably at the end of Q 3 2008)[542].

700. Be that as it may, the argument is unconvincing.

701. One thing is the price in the Toronto Stock Exchange of the Rusoro share, and another the book value of Rusoro's assets in the annual accounts. As has already been explained, stock prices are influenced by exogenous factors, which have no impact on the accounting valuations of the listed company. The price of a Rusoro share in the Toronto stock market fell sharply – and when that happened, Gold Fields, also a listed company, was forced by the applicable accounting standards to impair the value attributed to the Rusoro shares it held. But there was no impact on Rusoro's book value, which is accounted for applying different standards.

702. Sixth, the Bolivarian Republic finally alleges that Rusoro "wrongly ignores USD 267.8 million in future tax liabilities" in arriving at its book value[543]. Respondent does not provide any further explanation or support for this argument, which seems to have been submitted for the first time in its PHB.

703. Respondent does not explain where the USD 267.8 million figure comes from. The Tribunal has reviewed Rusoro's accounts trying to find an explanation. The figure does not arise from the Q 3 2011 accounts (which are the relevant ones). because there the number for future tax liabilities is USD 198.7 million[544]. The figure seems to come from the 2008 accounts (which are irrelevant for the determination of the book value on the date of expropriation – September 2011)[545].

704. In the 2010 annual accounts there is a specific note [17 (b)] which relates to this issue – but the amount again is different. The relevant part of the Note reads as follows[546]:

---

[540] Doc. NAV-136 – Rusoro Annual Financial Statements Years Ending 31 December 2009 and 2010, Note 7.
[541] HT at 2906.
[542] R PHB fn 498.
[543] R PHB at 253.
[544] Doc. NAV-23 – Rusoro Q 3 2011 Quarterly Report, p. 3.
[545] Doc. C-301 – Rusoro Annual Financial Statements Years Ending 31 December 2007 and 2008, p. 11.
[546] Doc. NAV-136 – Rusoro Annual Financial Statements Years Ending 31 December 2009 and 2010, Note 17(b).

"The future income tax liability of \$338,973 (December 31, 2009: \$264,405) substantially relates to the excess of the fair value of the assets acquired in previous acquisitions over their tax costs which have been substantially allocated to property, plant and equipment and mineral properties. As the future amortization of these assets for accounting purposes will exceed the equivalent tax deduction, the Company recorded the future income tax liability relating to these temporary differences at the time of the acquisitions. As the related assets are amortized the future income tax liability will decrease with an offsetting recovery of future income taxes in the consolidated statement of operations." [Amounts in thousands of USD]

705. The Note explains that the future income tax liability arises because Rusoro has bought assets at fair value, which exceeded the amortizable tax costs of such assets. Future accounting amortizations will be higher than the tax deductible amortizations, and this may give rise to an income tax liability. Whether this future tax liability will or not arise is uncertain. Its real effect is also unclear, since it may also give rise to an offsetting recovery in the statement of operations.

706. The Republic's request, that USD 267.8 million in future tax liabilities be deducted from Rusoro's book value, cannot succeed,

- because the figure seems to relate to 2008, and is irrelevant for the calculation of book value in 2011, and

- because Respondent has not provided any reason or support justifying why this deduction should be performed.

707. Summing up, the Tribunal concludes that the net book value of Rusoro's assets, as of 30 September 2011 (the last day of the quarter in which the expropriation took place), amounted to USD 908 million.

## 5.  RUSORO'S MARKET CAPITALIZATION

708. The market capitalization of a listed company (calculated by multiplying the market price per share by the number of outstanding shares) represents the valuation given by the market to the company's equity. Rusoro's market capitalization from November 2006 through November 2011 is shown in this figure:

Figure 19 – Historical Market Capitalization of Rusoro[203]



709. The figure indicates that Rusoro's market capitalization increased following the Gold Fields acquisition at the end of November 2007, reaching a peak of USD 752.4 million 28 February 2008[547].

710. It is important to underline that in 2008, before Venezuela adopted the 2009 and 2010 Measures and its political risk escalated, the stock market valued the equity of Rusoro at USD 750 million.

711. From a financial point of view market capitalization of a listed company does not equate with its enterprise value. To calculate the enterprise value it is necessary to add (or detract) the outstanding net debt to this figure. Navigant has provided the daily calculation of Rusoro's enterprise value, performed by Bloomberg[548]. For 28 February 2008, the enterprise value was USD 700.6 million (indicating that net debt was a negative amount, due to Rusoro's positive cash position).

712. This implies that in the year 2008 the market at one point valued Rusoro's Venezuelan enterprise at some USD 700 million.

713. Then the value started to decline rapidly, and the trend continued until market capitalization plummeted to USD 106.8 million on 5 August 2011, the day before President Chávez announced that Venezuela would nationalize the gold mining industry[549] (which corresponded to an enterprise value of USD 125.6 million – by then Rusoro's net debt was positive[550]).

---

[547] Doc. NAV-64 – Bloomberg-Rusoro Historical Share Price.
[548] Doc. NAV-63 – Bloomberg-Rusoro Historical Enterprise Value.
[549] R PHB at 263.
[550] Doc. NAV-63 – Bloomberg-Rusoro Historical Enterprise Value.

714. This protracted decline came during a period of rising gold prices and a significant increase in the S&P/TSX Global Gold Index (which represents the global value of gold mining companies). Rusoro's reduced market capitalization does not reflect the fundamental economics and value of gold mines, but rather the political uncertainty created by the 2009 and 2010 Measures and the increase of the political country risk associated with the Bolivarian Republic (whose sovereign bond spread jumped from 2% to 12% between 2007 and 2011[551]).

**6. THE VALUATION OF RUSORO PROPOSED BY CLAIMANT'S EXPERT**

715. Navigant, Claimant's expert, values Rusoro's Venezuelan enterprise using a weighted average of three different methods[552]:

- Comparable publicly traded companies: USD 2.49 billion [the "**CPTC Valuation**"]

- Comparable transactions: USD 2.59 billion [the "**CT Valuation**"];

- Discounted Cash Flow: USD 2.03 billion [the "**DCF Valuation**"].

716. Mr. Kaczmarek weighted these results in accordance with an assessment of the robustness of the available data (50% CPCT Valuation, 30% DCF Valuation, 20% CT Valuation) and initially arrived at a figure of USD 2.37 billion. It later adjusted this figure to USD 2.23 billion, which in his opinion reflects the fair market value of the expropriated assets[553].

717. The Tribunal will first provide some additional detail of Navigant's valuation (**A.**), and it will then summarize Respondent's objections (**B.**).

**A. Navigant's valuation**

718. Navigant in fact performs three different valuations of Rusoro's enterprise, using three different methods.

**CPCT Valuation**

719. The CPTC Valuation is based on 211 potentially comparable gold mining companies that were publicly traded on the valuation date. Navigant subsequently reduces this list to six companies, chosen for their similarity to Rusoro in certain key respects such as total resources, proportion of resources identified as reserves, annual production and average costs. Each company is then assigned a weight based upon how comparable it is with Rusoro, and for each company Navigant calculates the ratio between its enterprise value and its total amount in oz. of resources and reserves. The result is shown in the following table[554]:

---

[551] CRA II, Figure 5; see para 670 *supra*.
[552] C PHB at 151.
[553] Doc. H-8 at 25; the amount claimed by Rusoro in its PHB is USD 2.23 billion, because of a reduction in the updated resource estimate for the Increible 6 project – see C PHB at fn. 390.
[554] NAV I at 110.

**Table 14 – Weighted Average EV/Total Resource Calculation (US\$ per oz.)**

| Company | Weighting | EV/Total Resource |
|---|---|---|
| Allied Gold Mining Plc | 20% | 75 |
| Aurizon Mines Ltd. | 20% | 137 |
| Jaguar Mining Inc. | 10% | 80 |
| Osisko Mining Corporation | 10% | 234 |
| Perseus Mining Ltd. | 20% | 204 |
| CGA Mining Ltd. | 20% | 180 |
| **Weighted Average** | | **151** |

720.   The table shows that each oz. of gold in reserves and resources held by the six comparable companies had a weighted average value of 151 USD/oz.

721.   Then Navigant resorts to the total gold reserves and resources held by Rusoro:[555]:

**Table 7 – Summary of Rusoro's Major Projects Reported as of 16 September 2011[17]**

| | Property | Date of Acquisition | Region | Ownership Percentage | Gold Reserves & Resources ('000 oz) |
|---|---|---|---|---|---|
| 1 | Ceiba | 07-Nov-06 | El Dorado District | 100% | 459 |
| 2 | Days | 07-Nov-06 | El Dorado District | 100% | 37 |
| 3 | Emilia | 07-Nov-06 | El Dorado District | 100% | - |
| 4 | Increíble 6 | 07-Nov-06 05-Mar-07 | El Callao Region | 100% | 2,690 |
| 5 | SREP | 07-Nov-06 | El Dorado District | 100% | 923 |
| 6 | Valle Hondo | 07-Nov-06 05-Mar-07 | Cuyuni Region | 100% | 1,451 |
| 7 | Yuruan | 19-Dec-06 | Cuyuni Region | 100% | - |
| 8 | Trinidad | 05-Mar-07 | El Dorado District | 100% | - |
| 9 | Choco 10 | 30-Nov-07 | El Callao Region | 95% | 10,571 |
| 10 | Isidora | 08-Jul-08 | El Callao Region | 50% | 154 |
| 11 | Twin Shear | 08-Jul-08 | El Callao Region | 50% | 241 |
| | Total | | | | 16,526 |

722.   Since Rusoro has 16,525,550 oz. of gold reserves and resources, Navigant multiplies this figure by 151, resulting in Rusoro's implied enterprise value: USD 2,49 billion.

---

[555] NAV I, Table 7.

CT Valuation

723. For the CT Valuation Navigant first divides Rusoro's properties in production[556] and pre-production projects[557].

724. Thereafter Navigant identifies 108 transactions that were comparable to Rusoro's production and pre-production gold mine projects. The expert then narrows the list to the four production projects and four pre-production projects most comparable to Rusoro's projects, using similar criteria to those used in the CPCT Valuation. For each transaction Navigant calculates the ratio between enterprise value and total resources and then it obtains a weighted average, applying the weightings it finds most appropriate after a qualitative and quantitative review. The results for production projects and pre-production projects are shown in these tables:

**Table 17 – Weighted Average Multiples of Comparable Transactions with Production Projects[127]**

| Target Company / Project | Weighting | EV/Total Resources (US$/oz.) |
|---|---|---|
| Adamus Resources | 30% | 161.50 |
| Mt Rawdon and Cracow | 30% | 229.26 |
| Crew Gold Corp | 20% | 112.37 |
| Capital Gold | 20% | 154.64 |
| | Weighted Average: | 170.63 |

**Table 21 – Weighted Average Multiples of Comparable Transactions with Pre-Producing Projects[138]**

| Target Company / Project | Weighting | EV/Total Resources (USD/oz.) |
|---|---|---|
| Underworld Resources | 30% | 63.74 |
| Kutyn | 30% | 53.68 |
| Richfield Ventures Corp. | 20% | 103.39 |
| Brazauro Resources Corp. | 10% | 47.70 |
| Pediment Gold Corp. | 10% | 43.60 |
| | Weighted Average: | 65.03 |

725. The calculation of Rusoro's value again is very straightforward: since Rusoro's three production projects contain 14.34 million oz. of reserves and resources[558], multiplying this figure by USD 170.63/oz. results in an enterprise value of USD 2.45 billion[559]. The equivalent calculation for the pre-production projects is 2.19

---

[556] NAV I, Appendix 3. Rusoro's production projects were Choco 10, Increible 6, Isidora and SREP, totalling 14.34 million oz of reserves and resources.

[557] NAV I, Appendix 3. Rusoro's pre-producing projects were Twin Shear, Ceiba, Days, Emilia,Valle Hondo, Yuruan and Trinidad, totalling 2.19 million oz of reserves and resources.

[558] NAV I, Appendix 3. Rusoro's production projects were Choco 10, Increible 6, Isidora and SREP.

[559] NAV I at 130.

million oz. of reserves and resources[560], multiplied by USD 65.03/oz., resulting in an enterprise value of USD 142.3 million.

726. The sum of the enterprise value for Rusoro's production and the pre-production projects (USD 2.45 billion plus USD 142.3 million) results in a total CT Valuation of USD 2.59 billion.

The so-called DCF Valuation

727. The so-called DCF Valuation in fact does not value the totality of the assets using a DCF approach: only the three mining projects with defined reserves[561] (Choco 10/Increible 6, SREP and Isidora) are actually valued calculating the future cash flows they will generate[562]. The remaining additional resources[563] (contained in producing and pre-producing projects) are valued applying the CT approach; and for the two exploration projects Navigant resorts to the cost approach. The aggregate of the three valuations results in Rusoro's enterprise value.

(i) The DCF leg

728. The fundamental component of the cash flow projections used in the DCF leg of the total valuation are

-   The amount of gold that Rusoro would have produced and sold,

-   The price at which Rusoro would have sold its gold and

-   The discount rate to be applied.

729. Navigant relies on the mining plans contained in the NI 43-101 Report prepared by Micon International Limited, an independent expert, for the "Expansion of gold production at Choco 10 and Increible 6"[564] [the "**Micon Report I**"]; on Micon's Technical Report for Isidora[565] [the "**Micon Report II**"] and on Whillans' NI 43-101 pre-feasibility study for SREP [the "**Whillans Report**"][566]. Navigant's assumptions regarding production are based on these reports[567].

730. One of the difficulties in the modelling of gold mines is to project how gold prices will evolve. Navigant bases its model on gold futures contracts. Such contracts were available through 2016, and Navigant uses the prices which result from these

---

[560] NAV I, Appendix 3. Rusoro's pre-producing projects were Twin Shear, Ceiba, Days, Emilia,Valle Hondo, Yuruan and Trinidad.
[561] Only mineral reserves as defined in fn. 500 supra, which can be categorized as Probable Reserves" and "Proven Reserves" in order of increasing confidence. See Doc. NAV-34 – CIM Standards on Mineral Resources and Reserves – Definition and Guidelines, 20 August 2000, pp. 9-10.
[562] NAV I at 195.
[563] Only mineral resources as defined in fn. 501 *supra*, which can be "sub-divided, in order of increasing geological confidence, into Inferred, Indicated and Measured categories". See Doc. NAV-34 – CIM Standards on Mineral Resources and Reserves – Definition and Guidelines, 20 August 2000, p. 7.
[564] Doc. C-326 – Micon Report I.
[565] Doc. C-283 – Micon Report II.
[566] Doc. C-309 – Whillans Report.
[567] C PHB at 156.

agreements. From 2017 Navigant assumes a steady gold price in nominal terms[568]. Navigant does not include any discount on gold prices to reflect obligatory sales in the domestic market[569].

731. The appropriate weighted average cost of capital ["**WACC**"] rate, in accordance with Navigant's opinion, is 11.53%, incorporating a country risk premium of 1.50%[570].

(ii) The CT leg

732. The DCF method is only applied to the three producing projects with reserves. For the remaining resources contained in producing and pre-producing projects, the valuation is not based on DCF, but rather on the CT methodology. As already seen, Navigant concludes that Rusoro's additional pre-producing resources should be valued at USD 65.03/oz. Applying this figure to Rusoro's oz. of resources – 11.282 million[571] – results in an additional value of USD 733.6 million[572].

Table 31 – Value for Rusoro's Additional Resources[199]

| | Property | Additional Resources ('000 oz) | Non-Producing Assets Multiple (US$/oz.) | Value for Additional Resources (US$ thousands) |
|---|---|---|---|---|
| 1 | Ceiba | 459 | | 29,849 |
| 2 | Days | 37 | | 2,406 |
| 3 | Emilia | - | | - |
| 4 | Increible 6 | 2,130 | | 138,514 |
| 5 | SREP | 547 | | 35,571 |
| 6 | Valle Hondo | 1,451 | 65.03 | 94,359 |
| 7 | Yuruan | - | | - |
| 8 | Trinidad | - | | - |
| 9 | Choco 10 | 6,331 | | 411,692 |
| 10 | Isidora | 86 | | 5,580 |
| 11 | Twin Shear | 241 | | 15,672 |
| | **Total** | **11,282** | | **733,642** |

---

[568] C PHB at 182.
[569] C PHB at 186.
[570] NAV I at 189-193.
[571] NAV I, Appendix 3. Total additional resources contained in Rusoro's properties, i.e. measured, indicated and inferred resources.
[572] NAV I at 199.

(iii) The cost leg

733. Finally, for two exploration projects, where reserves or resources have not yet been defined, Navigant uses historical cost (USD 7.2 million)[573].

\* \* \*

734. The addition of

- the valuation of the three producing projects, actually made with DCF approach, which amounts to USD 1.29 billion plus

- the valuation of Rusoro's additional resources, made with CT Valuation approach, which amounts to USD 733.6 million plus

- the cost value of two exploration projects, which amounts to USD 7.2 million

all together result in the total so-called DCF Valuation of USD 2.03 billion.

\* \* \*

735. Summing up, Navigant weighs these results (50% CPCT Valuation, 20% DCF Valuation, 30% CT Valuation) to arrive at a figure of USD 2.23 billion, which reflects the fair market value of the expropriated assets.

## B.   Venezuela's rejection of the Navigant valuation

736. The Bolivarian Republic and its expert are in total disagreement with Mr. Kaczmarek's valuation of the expropriated assets.

737. First, Respondent says that in its DCF analysis Navigant only relied on the Micon and Whillans Reports, and complains that Rusoro failed to provide the actual studies and block models upon which these NI 43-101 Reports were based. Venezuela adds that the Micon Report I in fact is a litigation document and that the Whillans Report is at the less reliable pre-feasibility level[574].

738. Second, Venezuela argues that there are no historical data on operations to verify Navigant's valuation.

739. More than 80% of the value that Navigant attributes to the Choco 10 expansion comes from the completely unexploited VBK and Increíble 6 deposits. The pits and aging plant Rusoro inherited from Gold Fields make up less than 20% of the value attributed by Navigant[575]. The expansion project requires new financing in an amount of USD 310.8 million, to quadruple processing capacity, to mine seven

---

[573] C PHB at 154; NAV I at 14.
[574] R PHB at 181-194.
[575] R PHB at 195-197.

times more material and it required an upgrade of the mill from a 2,000 to a 11,000 kilowatt motor[576].

740. <u>Third</u>, Respondent underlines that only 63% of Navigant's DCF Valuation actually involves discounted cash flows from the three production projects. The remainder is comprised of valuations based on CT methodology and cost approach. The Tribunal should ignore 37% - USD 720 million – of Navigant's DCF Valuation[577].

741. <u>Fourth</u>, the Republic says that Rusoro never sold gold at international spot prices in its operational history. The NI 43-101 Reports relied upon by Rusoro contain a discount to the international gold price – including the Micon Report with a 20.31% discount[578]. Additionally, Respondent disagrees with Navigant's approach for calculating gold prices on the basis of futures, instead supporting CRA's methodology of using a survey of the prevailing views of industry participants on the valuation date[579].

742. (In its PHB, Rusoro submits counter-arguments: CRA's "consensus view" is biased and flawed, and Dr. Burrows has accepted the use of futures in other reports[580].)

743. <u>Fifth</u>, Venezuela notes that only El Placer was held by Rusoro as a concession; the rest of the Mining Rights for which compensation is being sought are based on CVG Contracts. Rusoro had no right to the renewal of the concession or of the CVG Contracts. Navigant inappropriately attributes value to reserves and resources that could only be mined after the concession or leases will have ended, by simply assuming the renewal of the Mining Rights. The possibility of a renewal of the Mining Rights must be excluded, because Minister Álvarez had announced in 2006 a policy of no more concessions[581].

744. (In its PHB, Claimant counters Venezuela's argument that Mining Rights will not be renewed, saying that Rusoro was always in good standing, that in a counter-factual scenario Venezuela's Bolivarian policies must be excluded and that as a matter of law the government did not have unfettered discretion to reject renewal[582].)

745. <u>Sixth</u>, Venezuela makes a number of specific objections to Navigant's DCF calculations (including that a high country risk of 16.46% is justified[583] and that the adjustments to the mine plan favoured by Venezuela's expert BBA should be included in the calculations[584]).

746. <u>Seventh</u>, the Republic says that the *OI European* tribunal rejected using CPCT or CT valuations as a primary method of valuation and relegated them to a secondary

---

[576] R PHB at 198-199.
[577] R PHB at 201.
[578] R PHB at 205.
[579] R PHB at 208.
[580] C PHB at 182-185.
[581] R PHB at 217.
[582] C PHB at 176-179.
[583] R PHB at 212.
[584] R PHB at 222-228.

"sanity check" role[585]. Furthermore, Navigant's selection of public traded companies and transactions are not comparable to Rusoro, because they differ substantially with respect to location, cost of capital, price realization, operating costs, stage of production and quality of resource base, among other factors[586].

747. The filters applied by Navigant resulted in comparables that were not even reasonably and justifiably similar to each other[587]. Navigant's selected filters produce comparables that are clearly more valuable than Rusoro.

748. It is undisputed that resources are less valuable than reserves. 66% of the mineralization for which Rusoro claims value falls into the category of resources, as shown in the figure below[588]:

**Figure 18: Resources and Reserves by Property[483]**

| Property | | Ownership Percentage | Reserves ('000 oz) Total (P&P) | Resources ('000 oz) Total (M&I) | Inferred | Total Gold ('000 oz) | Percentage of Reserves (%) | Percentage of Resources (%) |
|---|---|---|---|---|---|---|---|---|
| Rusoro's "Producing" Projects | | | Adjusted for Rusoro's Ownership | | | | | |
| 1 | Choco 10 | 95% | 4,240 | 3,655 | 2,676 | 10,571 | 40% | 60% |
| 2 | Increible 6 | 100% | 560 | 812 | 458 | 1,830 | 31% | 69% |
| 3 | Isidora | 50% | 14.4 | 63 | 23 | 100 | 14% | 86% |
| 4 | SREP | 100% | 376 | 23 | 524 | 923 | 41% | 59% |
| | **Subtotal** | | 5,190 | 4,553 | 3,680 | 13,424 | 39% | 61% |
| Rusoro's Non-producing Projects | | | Adjusted for Rusoro's Ownership | | | | | |
| 5 | Twin Shear | 50% | - | - | 241 | 241 | 0% | 100% |
| 6 | Ceiba | 65% | - | - | 298 | 298 | 0% | 100% |
| 7 | Days | 100% | - | - | 37 | 37 | 0% | 100% |
| 8 | Emilia | 100% | - | - | - | - | 0% | 0% |
| 9 | Valle Hondo | 100% | - | 103 | 1,348 | 1,451 | 0% | 100% |
| 10 | Yuruan | 100% | - | - | - | - | 0% | 0% |
| 11 | Trinidad | 100% | - | - | - | - | 0% | 0% |
| | **Subtotal** | | 0 | 103 | 1,924 | 2,027 | 0% | 100% |
| | **Total** | | 5,190 | 4,656 | 5,605 | 15,451 | 34% | 66% |

749. Navigant's comparables analysis effectively attributes inferred resources a value equal to reserves, by basing valuation on total ounces present in a deposit, regardless of geological classification, which is fundamentally wrong[589]. Yet Navigant made no adjustments to reflect Rusoro's much lower reserves and higher resources in comparison to its comparables[590].

---

[585] R PHB at 230; *OI European* at 656-657.
[586] R PHB at 232.
[587] R PHB at 233.
[588] R PHB at 243.
[589] R PHB at 238-239.
[590] R PHB at 234-235.

750. (In its PHB, Claimant submits that the use of market approaches is very common, and that the CIMVal Guidelines, which provide the market standard for valuing mineral assets in Canada affirm the widespread application of market approaches in mining valuations. Market approaches are of particular utility in the valuation of gold resources which are less amenable to DCF analysis but undisputedly have value[591].Complete similarity between Rusoro and its comparables is unnecessary and impractical – the valuation exercise involves finding adequately similar projects, and those identified by Navigant effectively are so[592].)

## 7.  THE TRIBUNAL'S DECISION

751. The Tribunal is tasked with establishing the "genuine value" (in the terminology of Article VII of the BIT) of Rusoro's expropriated investment. Both parties agree, and the Tribunal accepts, that the genuine value is equivalent to the fair market value of the enterprise, i.e. the price at which a willing buyer would buy, and a willing seller would sell, no party being under any type of duress and both parties having good information about all relevant circumstances involved in the purchase[593].

Assessment of fair market value

752. The calculation which the Tribunal must perform is a hypothetical exercise: in real life, in September 2011 no buyer having good information about the gold sector in Venezuela would have been prepared to buy a gold producing enterprise in that country for a fair price.

753. Gold is a very special commodity, intimately linked to the financial sovereignty of nations, and the value of gold companies is affected by the intensity of the regulatory measures adopted by host states.

754. At the time of expropriation, the regulatory intensity in Venezuela was significant indeed: the Bolivarian authorities had already issued the 2009 and then the 2010 Measures, signalling their readiness to impose severe restrictions on the export of gold produced in Venezuela and subjecting gold to a strict exchange control regime. These measures, plus the increasing political risk associated with investments in Venezuela (evidenced by a dramatic increase in Venezuela's bond spread[594]) would have a chilling effect on any prospective purchaser.

755. The Tribunal must thus calculate the fair market value of an enterprise which no well-informed purchaser would buy, at a fair price.

756. The BIT provides the Tribunal with some guidance on how to solve this apparently inextricable riddle: it foresees that the value of the expropriated asset should be established at the time "immediately before the expropriation or at the time the proposed expropriation became public knowledge". The purpose of this rule is to avoid that the price of the asset becomes contaminated by the information

---

[591] C PHB at 198-199.
[592] C PHB at 200.
[593] Agreed by Respondent in R PHB at 155.
[594] See para. 670 *supra*.

originating from the host State. The fair market value which the State must pay is that which an innocent, uninformed third party would pay, having no knowledge of the State's pre-expropriation (but post-investment) policy towards the expropriated company and its sector.

757.   There is a second argument, specific to this case: the Tribunal has already concluded that the intensification of the gold export restrictions contained in the 2010 Measures are incompatible with the Treaty. Consequently, the effect of the increased export restrictions must be excluded from the valuation of Rusoro's enterprise – otherwise the State would be deriving advantage from its own wrong[595].

Use of DCF valuations

758.   Valuations based on the DCF method have become usual in investment arbitrations, whenever the fair market value of an enterprise must be established. The Tribunal agrees that, where the circumstances for its use are appropriate, forward looking DCF has advantages over other, more backwards looking valuation methods.

759.   DCF, however, cannot be applied to all types of circumstances, and while in certain enterprises it returns meaningful valuations, in other cases it is inappropriate. DCF works properly if all, or at least a significant part, of the following criteria are met[596]:

-   The enterprise has an established historical record of financial performance;

-   There are reliable projections of its future cash flow, ideally in the form of a detailed business plan adopted *in tempore insuspecto*, prepared by the company's officers and verified by an impartial expert;

-   The price at which the enterprise will be able to sell its products or services can be determined with reasonable certainty;

-   The business plan can be financed with self-generated cash, or, if additional cash is required, there must be no uncertainty regarding the availability of financing;

-   It is possible to calculate a meaningful WACC, including a reasonable country risk premium, which fairly represents the political risk in the host country;

-   The enterprise is active in a sector with low regulatory pressure, or, if the regulatory pressure is high, its scope and effects must be predictable: it should be possible to establish the impact of regulation on future cash flows with a minimum of certainty.

760.   DCF is not a friars' balm which cures all ailments. It is simply a financial technique, in which an expert is able to estimate with reasonable certainty a number of future parameters (income, expenses, investments), and then discount the net income at an

---

[595] *Chorzów* at 45.
[596] See *OI European* at 658-660.

appropriate rate. If the estimation of those parameters is incorrect, the results will not represent the actual fair market value of the enterprise. Small adjustments in the estimation can yield significant divergences in the results. For this reason, valuations made through a DCF analysis must in any case be subjected to a "sanity check" against other valuation methodologies[597].

* * *

761. Having established these general principles, the Tribunal must now address the precise quantification of the "genuine value" of Rusoro's Venezuelan enterprise. In order to do so, the Tribunal will first summarize the various alternative valuations which are in the record (**A.**), will then exclude the application of certain valuations (**B.**) and will use the remaining valuations to establish the "genuine value" of the expropriated assets (**C.**). Finally the Tribunal will assess Respondent's additional defences (**D.**)

### A.     Valuations in the record

762. The Tribunal has at its disposal the following six valuations:

763. <u>First</u>, Rusoro made five corporate acquisitions, for a total consideration of USD 630 million, of which a portion was paid for in cash and the rest in its own shares, and it made further investments in property plant and equipment of approximately USD 145 million. Rusoro consequently made an investment in Venezuela of <u>USD 774.3 million</u> – a sum which may be slightly inflated by the use of own shares as a portion of the consideration [the "**Investment Valuation**"][598].

764. <u>Second</u>, when Rusoro initially invested some USD 774.3 million in its Venezuelan enterprise, it did so at a time of low (but rising) gold prices and gold company valuations. The timing of Rusoro's investment was prescient: gold prices and consequently also gold company valuations rose while Claimant held its investment. Venezuela chose to expropriate at the time when gold prices and gold company values had reached their peak. *Ceteris paribus*, i.e. assuming no change whatsoever in micro- or macro-economic conditions, the mere evolution of the gold price, which significantly increased during the time between investment and expropriation, would have led the value of the investment to increase to more than <u>USD 1,128.7 million</u> [the "**Adjusted Investment Valuation**"][599].

765. This sum derives from the USD 774.3 million amount invested, and may also be slightly inflated by the use of own shares as consideration.

766. <u>Third</u>, the net book value of Rusoro's assets, as of 30 September 2011 (the last day of the quarter in which the expropriation took place), amounted to <u>USD 908 million</u> [the "**Book Valuation**"][600].

---

[597] *OI European* at 662-663.
[598] See para. 678 *supra*.
[599] See para. 682 *supra*.
[600] See para. 707 *supra*.

767. <u>Fourth and fifth</u>, Rusoro's market capitalization can also be used to establish its enterprise value.

768. In mid-2008, before Venezuela adopted the 2009 and 2010 Measures and its political risk escalated, the stock market valued the equity of Rusoro at USD 752.4 million, which after exclusion of debt net resulted in an enterprise value of approximately <u>USD 700.6 million</u> [the "**Maximum Market Valuation**"][601].

769. The market capitalization started to declined rapidly, and plummeted to USD 97.5 million on 5 August 2011, the day before President Chávez announced that Venezuela would nationalize the gold mining industry. To this amount the net debt should be added, resulting in a "**Final Market Valuation**" of approximately <u>USD 125.6 million</u>[602].

770. <u>Sixth</u>, Mr. Kaczmarek, Claimant's expert, performed a valuation of Rusoro's enterprise, based fundamentally on a comparables method (and only to a limited extend on DCF). He arrived at a figure of <u>USD 2.23 billion</u>, which in his opinion reflects the fair market value of the expropriated assets [the "**Navigant Valuation**"][603].

### B. Exclusion of certain valuations

771. The Tribunal finds that, for different reasons, three of the six valuations on record should not be taken into consideration for establishing the "genuine value" of the expropriated assets:

#### a. The Investment Valuation.

772. Under certain conditions, the historic amounts invested by an investor may be a relevant yardstick to establish the correct fair market value of the investment at the time of expropriation. If

- the investment consisted in the arms' length acquisition from non-related third parties of existing enterprises,

- the time period between investment and expropriation is not unreasonably long,

- no major micro- or macroeconomic disruptions have occurred between investment and expropriation, and

- the fundamental parameters of the enterprise have not been subverted (e.g. in an investment in the natural resources sector, no significant new findings have been made),

the actual amount invested may bear a relationship with the fair market value at the time of expropriation and, with the appropriate adaptations for the passage of time

---

[601] See para. 712 *supra*.
[602] See para. 713 *supra*.
[603] See para. 735 *supra*.

and the change in market conditions, may yield a relevant yardstick for the valuation.

773. In the present case the requirement of a short time frame is probably met: Rusoro's first (Agapov) and second (Cradock) acquisitions were carried out in 2006, while the third (Mena) and fourth (Gold Fields) took place in 2007. The last transaction (Hecla) occurred in 2007, and it led to the joint venture with the State, executed in July 2008. Only three years thereafter, the Bolivarian Republic expropriated all of Rusoro's Mining Rights. The average life span of each investment, between execution and expropriation, is little more than four years.

774. However, the other requirements are not complied with. Two important changes occurred while Rusoro held its investment:

- Rusoro significantly increased the available gold mineralization; between the acquisition of Choco 10 on November 2007 and the Valuation Date, Rusoro increased the reserves from 1.83 million oz.[604] to 4.46 million oz.[605] and the total resources from 7.69 million oz.[606] to 11.13 million oz.[607]; and the price of gold escalated from USD 784/oz.[608] to USD 1,812/oz.[609];

- the Index representing the value of gold mining companies rose from approximately 327[610] at the time when Rusoro made its acquisitions to 474[611] when it suffered expropriation.

775. Rusoro invested at times when the price of gold and gold producing companies was (relatively) low. Venezuela chose to unlawfully expropriate Rusoro's investment at a time when gold and the value of gold producers had reached their peaks. Having made the investment, Rusoro ran the risk of movements in the gold prices. In this case, prices moved upwards. Benefit must follow risk: it would be deeply inequitable to permit the State to expropriate Rusoro's investment for the amount invested, and to reap the benefits of Rusoro's decision to invest in the Venezuelan gold sector at the appropriate time. Otherwise States would be encouraged to expropriate investors in the natural resources sectors when commodity prices climb, while investors would have to bear the losses if prices plummet.

776. For these reasons, the Tribunal finds that the Investment Valuation does not represent the "genuine value" of Rusoro's expropriated investment.

---

[604] Doc. JB-1 – Filing Statement of Rusoro's acquisiton of the Choco 10 Mine form Gold Fields, p. 76.
[605] Doc. C-326 – Micon Report I, p. 6.
[606] Doc. JB-1 – Filing Statement of Rusoro's acquisiton of the Choco 10 Mine form Gold Fields, p. 70.
[607] Doc. C-326 – Micon Report I, p. 5.
[608] Doc. JB-41 – Bloomberg - Gold Spot Price, p. 206.
[609] Doc. JB-41 – Bloomberg - Gold Spot Price, p. 229.
[610] Doc. JB-6 – Bloomberg - S&P/TSX Global Gold Index, p. 30.
[611] Doc. JB-6 – Bloomberg - S&P/TSX Global Gold Index, p. 49.

**b.   The Final Market Valuation.**

777.  The Final Market Valuation is based on the value given by the stock market to Rusoro's enterprise on the day before President Chávez announced the expropriation.

778.  The Tribunal has already found[612] that the legally relevant fair market value of an investment equates with the price which an innocent, uninformed third party would pay, ignorant of the State's pre-expropriation policy towards the expropriated company and its sector.

779.  The Final Market Valuation is deeply contaminated by the Bolivarian Republic's policy decisions affecting the gold sector, adopted after Rusoro had made its investments, and by the increased export restrictions imposed by way of the 2010 Measures.

780.  These reasons advocate that the Final Market Valuation be excluded from the determination of the "genuine value" of Rusoro's investment.

**c.   The Navigant Valuation.**

781.  Both parties advocate that a DCF would be an appropriate methodology to value Rusoro's Venezuelan enterprise[613]. The unsurmountable obstacle is that there is only one valuation in the file which includes the DCF method, the Navigant Valuation, and this valuation is only in a small portion a DCF valuation:

-    70% of Navigant's calculation is based on CT and CPCT methods,

-    And the remaining 30% is based on a mixed method, in which only the three production projects in Rusoro's portfolio are valued using a DCF model, while the remaining projects are valued on a CT/cost basis.

In fact, as Dr. Burrows has shown, only 19% of Navigant's value is directly attributable to a DCF analysis – while 50% is based on a CPCT method and 31% on a CT approach[614].

782.  Although the Tribunal understands the methodology and logic of the CP and CPCIT "market multiples" technique, it considers that in the present case this comparative approach is not appropriate. The situation of Venezuela in general, of the Venezuelan gold sector in particular, and the very special characteristics surrounding Rusoro (a Russian managed company operating in a Bolivarian political environment) make a valuation based on comparable companies or transactions, located or performed in other countries and political environments, inappropriate.

---

[612] See para. 751 *supra*.
[613] C PHB at 151; R PHB at 179-180.
[614] Doc. H-10 at 6.

Rusoro requires a "stand alone" valuation

783. Only a "stand alone" valuation (confirmed by the appropriate sanity checks) is capable of reflecting the "genuine value" of Rusoro[615] .

784. Although both Parties and their experts seem to support the proposal that this "stand alone" valuation should be performed using DCF methodology, the Navigant Valuation in fact cannot be labelled as a real DCF valuation, because it relies on other techniques for most of its results.

785. The inexistence of a proper DCF valuation is – in the Tribunal's opinion – not an oversight, but rather the result of the very special characteristics surrounding Rusoro, which make the use of DCF approach inappropriate, and which have led Mr. Kaczmarek to predominantly rely on comparables methodologies:

- Rusoro lacks a proven record of financial performance: approximately 75% of the cash flows to be valued derive not from existing facilities, but rather from the yet to be built expansion of the existing Choco 10/Increíble mines[616];

- The price of gold is highly volatile, and Venezuela decided to expropriate Rusoro when gold was at one of its two historic peaks; it is difficult to recreate the market expectations on the date of expropriation regarding the future development of gold prices;

- The business plan for Choco 10/Increíble mines required additional funding in an amount of USD 310 million[617]; there is no certainty that Rusoro would have been able to secure the financing for this new investment;

- The country risk advocated by Navigant (1.5%) is clearly too low, and does not reflect the actual situation of Venezuela; the tribunal in *OI European* accepted that the equivalent margin should be 6%[618]; simply adding a 4.5% differential to the WACC used by Navigant reduces the valuation from USD 1,266 million[619] to USD 910 million[620]; and accepting CRA's proposed WACC of 26.38%, the resulting valuation would be just USD 457 million[621];

- The Venezuelan gold sector has suffered increasing regulatory pressure, and this makes it impossible to predict, with any certainty, how future cash flows will be affected; an alternative solution, to design a "but for" scenario excluding all regulatory impact, would not be appropriate, because the gold sector was already regulated when Rusoro decided to enter the market.

---

[615] The tribunal in *OI European* (at 601) came to the same conclusion in the (much less idiosyncratic) valuation of a glass manufacturer in Venezuela.

[616] CRA I at 78, 104 and 194.

[617] Doc. C-326 – Micon Report I, p. 11.

[618] *OI European* at 782.

[619] Joint-Tables, Table 1.

[620] Joint-Tables, Table 1.

[621] Joint-Tables, Table 1.

- Rusoro's Mining Rights have a finite duration, and the DCF model assumes renewal; given the political uncertainty surrounding Venezuela, there are significant doubts whether a government supporting Bolivarian ideology would agree to a renewal; non-renewal, although non-fatal, would reduce the DCF value of the three projects (from USD 1,266 million to USD 1,196 million[622]).

786. <u>Summing up</u>, the Navigant Valuation consists of three legs, two of them representing more than 80% of the total value, based on CT and CPCT "market multiples" technique, and the third one based on DCF[623]; the Tribunal finds that this Valuation is not an appropriate basis for calculating the "genuine value" of Rusoro's assets:

- <u>First</u>, because the CT and CPCT "market multiple" technique, which Navigant predominantly uses, does not provide a "stand alone" valuation of Rusoro, responsive to the unique characteristics of this Russian managed gold mining company operating in the gold sector of the Bolivarian Republic, and

- <u>Second</u>, as regards the DCF minority part of Navigant's valuation, the Tribunal has doubts whether in the specific case of Rusoro a DCF valuation really is an appropriate technique to establish its fair market value.

## C.   The "genuine value" of the expropriated investment

787. The Tribunal is left with three different Valuations:

- the Maximum Market Valuation in an amount of USD 700.6 million[624];

- the Book Valuation of USD 908 million[625] and

- the Adjusted Investment Valuation of USD 1,128.7 million[626].

788. How to use these Valuations in order to establish the "genuine value" of the expropriate enterprise?

789. The Tribunal finds that the best approach is a weighted combination of the three Valuations, taking into consideration that each Valuation has its own strengths and shortcomings:

- An advantage of the Maximum Market Valuation is that there is no subjectivity in its calculation: it is simply the sum of Rusoro's peak market capitalization plus (negative) net debt; the shortcoming is that this valuation was only reached for a very short period, in mid 2008, three years before the date of expropriation; taking into consideration the advantages and shortcomings, the Tribunal awards it a weighting of 25%;

---

[622] Joint Tables Table 1 and Table 2, assuming Navigant's inputs.
[623] See para. 735 *supra*.
[624] See para. 712 *supra*.
[625] See para. 707 *supra*.
[626] See para. 682 *supra*.

- The Book Valuation is a number which derives directly from Rusoro's audited balance sheet; it represents a conservative criterion, frequently found in the valuation of enterprises, including in the Nationalization Decree; the shortcoming is that it does not reflect the increase in the price of gold and gold mining companies between investment and expropriation, nor the development of the mining properties carried out under Rusoro's watch; setting off pros and cons the Tribunal gives it a weighting of 25%;

- The Adjusted Investment Valuation reflects the value the investment would have reached on the date of expropriation, simply as a direct consequence of the increase in the price of gold and of gold producing companies, between the dates of investment and the date of expropriation; it represents the minimum which fairness requires an expropriating state to compensate for the expropriation of a gold producing enterprise; in the present case, the USD 1,128.7 million figure derives from the original investment consideration, which was partially made in shares and which, in the Tribunal's opinion, might justify a small adjustment downwards; for this reason, the Tribunal reduces the weighting to 50%.

790. Applying the weightings to the three Valuations, the result is USD 966.5 million[627]. This is the Tribunal's determination of the "genuine value" of Rusoro's investment as of 16 September 2011.

### D.   Respondent's additional defences

791. The Bolivarian Republic raises a number of additional defences, based predominantly on issues of law:

792. First, Respondent says that any compensation for rights claimed by way of *venire contra factum proprium*, *confianza legítima* or estoppel are limited to the extent of injury caused by detrimental reliance[628].

793. Since none of Rusoro's successful claims is based on any such doctrines, the defence is inapposite.

794. Second, Venezuela argues that Rusoro withheld the underlying data to the Micon and Whillans Reports and that such information is needed to assess Rusoro's compensation[629].

795. Since such Reports are only relevant for the Navigant Valuation (but not for any other Valuation), and the Tribunal has decided to exclude the Navigant Valuation from its calculations, Venezuela's objection has become moot.

796. Third, the Bolivarian Republic says that Rusoro invested in Venezuela's mining sector at a time when all international companies were exiting. No other company purchased assets in Venezuela's natural resources sector. Rusoro acquired assets

---

[627] Genuine value (in USD million) = (700.6 x 0.25) + (908 x 0.25) + (1,128.7 x 0.5).
[628] R PHB at 157.
[629] R PHB at 162.

for which there was effectively no market. In such circumstances a hypothetical buyer would only be willing to pay a minimal price for these assets[630].

797. Rusoro may well have been, at the beginning of this century, the only foreign company buying natural resources assets in Venezuela. But then Rusoro was not an ordinary company. As its name implies, and the nationality of its main officers evidences, it had a strong Russian connection, and – through that connection – a privileged access to the leading authorities of the Bolivarian Republic[631]. Relying on these relationships, Rusoro made five acquisitions in the Venezuelan gold sector, paying to unrelated third parties an arms' length price for the assets it purchased.

798. These assets have now been unlawfully expropriated by the Bolivarian Republic, and, in accordance with the Treaty, Rusoro is entitled to be compensated with their "genuine value". Such value must be established – for the very reasons that Venezuela refers to – on a "stand alone" basis. This is precisely the determination which the Tribunal has made.

799. Fourth, the Republic complains that Rusoro was a deficient operator of its mining properties, lacked experience in processing hard rock, and was ill-equipped to profitably implement the substantially larger and more complicated Choco 10/Increíble 6 expansion project[632].

800. Venezuela's present position is difficult to reconcile with the fact that in 2008 it was prepared to create a 50/50 joint venture with Rusoro. Gold Fields' readiness to sell its gold producing Venezuelan operations to Rusoro, and to receive a significant part of the consideration in Rusoro shares, also undermines Venezuela's current averment.

801. Be that as it may, even if it is accepted *ad arguendum* that Rusoro was indeed an inefficient gold mine operator, such situation would never justify an unlawful expropriation and would not impact on the "genuine value" of the investment (because the hypothetical buyer must be assumed to be a reasonable and diligent gold mine operator).

802. Fifth, the Republic says that any award of damages must be reduced by at least 50% because of Rusoro's contributory fault: the investor disregarded Article 29 of the Mining Law and the applicable gold sales reporting requirements and refused to sell to the BCV in 2007 and 2008[633].

803. The Tribunal does not see any contributory fault on the side of Rusoro. It has already concluded that Rusoro's acquisitions fell outside the scope of Article 29 of the Mining Law[634] and that there is no evidence that Rusoro incurred in any other violation of the Mining Law or regulations[635].

---

[630] R PHB at 170.
[631] Vladimir Agapov I at 11 and 12; HT at 353.
[632] R PHB at 171-176.
[633] R PHB at 160.
[634] See paras. 324 *et seq supra*.
[635] See para. 342 *et seq supra*.

# VIII.2. DAMAGES FOR BREACH OF TREATY

804. Rusoro is claiming not only the fair market value of Rusoro's investment in Venezuela, but also the damages caused by the 2009 and 2010 Measures, and the closure of the Swap Market, which represent its **Lost Cash Flows** between 30 April 2009 and 16 September 2011.

805. Claimant says that the Lost Cash Flows amount to USD 90.5 million, as per the calculation made by its expert, Mr. Kaczmarek, in his second report[636]. Rusoro additionally accepts that the Lost Cash Flows originating from sales during May and June 2009 should be excluded from the calculation, because the Measures did not take actual effect until July 2009. This exclusion brings the calculation down to USD 85.4 million[637], which is the amount which Rusoro claims[638].

## 1. THE EXPERTS' CALCULATION

806. Navigant and CRA have devoted considerable attention to the proper calculation of the Lost Cash Flows – the reduction in Rusoro's income caused by the application of the 2009 and 2010 Measures and the closure of the Swap Market in the pre-expropriation period.

### Navigant I

807. To calculate lost profits from April 2009 to September 2011, in its first report Navigant creates two scenarios. The "Actual Scenario" reflects the historical revenues that Rusoro achieved, which were affected by the 2009 and 2010 Measures and the closure of the Swap Market. The "But-for Scenario" shows the revenues that Rusoro would have achieved, absent the 2009 and 2010 Measures and the closure of the Swap Market[639]. In the But-For Scenario, Navigant assumes that Rusoro would have been able to sell all its gold at international gold spot prices[640]. By subtracting the revenue in the Actual Scenario from the revenue in the But-For Scenario yields the pre-tax Lost Cash Flows. As Rusoro would have paid taxes on these cash flows, Navigant applies the 34% marginal corporate tax rate[641]. In the first Navigant report the resulting net Lost Cash Flows amount to USD 106.4 million[642].

---

[636] NAV II at 48.
[637] NAV II, Appendix 4 A) p. 1.
[638] C PHB at 209.
[639] NAV I at 89.
[640] NAV I at 90.
[641] NAV I at 92.
[642] NAV I at 92.

<u>CRA I</u>

808. CRA in its first report criticizes Navigant's Lost Cash Flow calculation, agreeing on the methodology, but saying that the calculation is unreliable for a number of reasons[643]:

- CRA says that Navigant does not take into consideration that before the 2009 and 2010 Measures Rusoro was already selling its gold at a discount to international spot gold prices. The discount averaged 20.2% during the period from Q 4 2007 through Q 1 2009, with the discount for Q 1 2009 (the last quarter before the 2009 Measures) being 16.7%[644]. CRA says that the appropriate discount should be 18.3%, based on the most recent price discount received by Rusoro during Q 1 2009, inclusive of the discount of ore[645].

- Navigant calculates Lost Cash Flows based on the timing of gold sales, not on the timing of gold production, which is inconsistent with Rusoro's own publicly-disclosed statements[646].

- Navigant's analysis does not adjust for the fact that Rusoro altered the timing of its gold sales in response to the Measures. For example, during Q 3 2009, Rusoro did not sell any gold produced during that quarter[647].

- Navigant's estimate of Lost Cash Flows includes sales of gold made prior to the regulations[648].

809. CRA makes the appropriate corrections to Navigant's calculation, and comes to the conclusion that the proper determination of the Lost Cash Flows is USD 57.3 million[649].

<u>Navigant II</u>

810. Navigant reviews CRA's objection in its second report:

- Navigant agrees that cash flows from sales prior to 30 April 2009 should be excluded from the calculation – and accepts that it mistakenly included the month of April 2009 in its assessment[650];

- Navigant also agrees with CRA's proposal to create a hypothetical sales schedule that distributes the volumes sold during this period based on the

---

[643] CRA I at 67.
[644] CRA I at 67.
[645] CRA I at 74.
[646] CRA I at 70.
[647] CRA I at 72.
[648] CRA I at 73.
[649] CRA I at 75.
[650] NAV II at 47.

timing of production, not on the timing of sales, which during this period were notoriously intermittent[651];

- Navigant disagrees with CRA's proposal to use in the But-For Scenario a gold price discounted from the international spot price of gold; in the absence of the 2009 and 2010 Measures, Claimant could be expected to have sold its gold at the highest price available to it[652].

811. As a consequence of this review, Navigant reduces its calculation of Lost Cash Flows from USD 106.4 million to USD 90.5 million[653].

CRA II

812. In its second report, CRA still disagrees with Navigant's calculation of Lost Cash Flows:

- CRA says that Navigant's revised analysis is still incorrect in that it applies the altered timing of gold sales to both the But-For and the Actual Scenarios, though this altered timing should apply only to the But-For Scenario; this error results in an underestimate by Navigant of Lost Cash Flows by approximately USD 5.1 million on an after-tax basis[654];

- The regulatory regime before the 2009 Measures attracted Rusoro's investment, and a damage estimate should assume continuation of that same regulatory regime and assume continuation of Rusoro's practice under that regime of selling gold at a discount. For this reason, CRA sees no reason to alter its analysis that an 18.3% discount to the gold price should be inserted in the But-For Scenario[655].

813. In Exhibit 2 to CRA's second report Dr. Burrows presents a revised version of his calculation of Lost Cash Flows, with monthly breakdown, and two corrections to Navigant's updated analysis (correct timing in the Actual Scenario plus 18.3% gold price discount in the But-For Scenario)[656]. The net impact of both corrections results in a net Lost Cash Flow calculation of USD 58.4 million.

2. **THE TRIBUNAL'S DECISION**

814. The Tribunal has already found that by issuing the July 2010 BCV Resolution the Bolivarian Republic increased the volume restrictions on the export of gold, and that such increase was in breach of Paragraph 6 (d) of the Annex to the BIT[657]. The Tribunal has also concluded that any alleged breach committed by Venezuela and

---

[651] NAV II at 48.
[652] NAV II at 49.
[653] NAV II, Appendix 4 A.
[654] CRA II at 73.
[655] CRA II at 75.
[656] CRA II, Exhibit 2.
[657] See para. 592 *supra*.

based on the 2009 Measures is time-barred[658]; and that the 2010 Ley de Reforma Cambiaria which closed the Swap Market did not amount to a violation of the BIT.

815. The task at hand is to calculate the damage suffered by Rusoro as a consequence of Respondent's breach of the Treaty by issuing the July 2010 BCV Resolution and increasing the gold export restrictions. This damage is equal to the cash flows, net of corporate tax, which Rusoro has lost, by being forced to sell a portion of its gold at a price which is lower than the international gold prices.

816. The precise portion is 35% of production: under the historic 1996 BCV Resolution, which was in place when Rusoro decided to invest, obligatory domestic sales were restricted to 15% of production[659], while the corresponding figure under the July 2010 BCV Resolution was raised to 50%, in breach of the Treaty[660].

817. To establish the damage caused, the Tribunal cannot rely on the calculations made by the experts, because both Navigant and CRA assume that the 2009 and the 2010 Measures, as well as the closure of the Swap Market amounted to a breach of the BIT – a conclusion which the Tribunal has rejected. But from the data supplied by Navigant it is possible to extract the precise cash flows, net of corporate tax, lost by Rusoro as a consequence of the increase in the gold export restrictions.

818. Navigant provides the appropriate figures in its Appendix 4.A of its second report[661]

| Sources & Notes | Calc. Logic | Component | Unit | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [A] | Sales Quantity Allocated by Production | oz. | 9,507 | 8,689 | 8,689 | 8,689 | 7,968 | 7,968 | 7,968 | 8,208 | 8,208 |
| 2 | [B] | Gold Price (But-For Scenario) | US$/oz. | 1,135 | 1,154 | 1,188 | 1,223 | 1,211 | 1,224 | 1,267 | 1,341 | 1,349 |
| 3 | [C] | Gold Price (Actual Scenario) | US$/oz. | 745 | 688 | 625 | 962 | 1,190 | 1,203 | 1,244 | 1,317 | 1,336 |
| Calc. | [D] = A × B | Isidora and Choco But-for Revenue (But-for Scenario) | US$ | 10,786,252 | 10,024,090 | 10,296,355 | 10,625,184 | 9,647,268 | 9,755,110 | 10,092,304 | 11,004,462 | 11,069,840 |
| Calc. | [E] = A × C | Isidora and Choco Realized Revenue (Actual Scenario) | US$ | 7,082,129 | 5,978,121 | 5,428,627 | 8,360,343 | 9,478,913 | 9,584,723 | 9,916,164 | 10,812,430 | 10,964,300 |
| 4 | [F] | Official Venezuela Exchange Rate | Bs/USD | | | | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 |
| 4 | [G] | US Monthly Inflation | % | | | | -0.10% | 0.02% | 0.14% | 0.06% | 0.12% | 0.04% |
| 4 | [H] | Venezuela Monthly Inflation | % | | | | 1.60% | 1.60% | 1.60% | 1.10% | 1.50% | 1.50% |
| 4 | [I] | Calculated Parallel Rate | Bs/USD | | | | 8.28 | 8.44 | 8.55 | 8.68 | 8.77 | 8.89 | 9.02 |
| 4 | [J] | Post-May 2010 Estimated Parallel/Official Rate | | N/A | N/A | N/A | 1.96 | 1.99 | 2.02 | 2.04 | 2.07 | 2.10 |
| Calc. | [K] = E × J | Actual Scenario After Adjusting for Exchange Rate Loss | US$ | 7,082,129 | 5,978,121 | 5,428,627 | 4,261,387 | 4,765,837 | 4,749,694 | 4,863,302 | 5,231,006 | 5,228,289 |
| Calc. | [L] = D - K | Lost Profits | US$ | 3,704,122 | 4,045,968 | 4,867,727 | 6,363,796 | 4,881,431 | 5,005,415 | 5,229,002 | 5,773,456 | 5,841,552 |
| Calc. | [M] = L × 34% | Taxes | 34% | 1,259,402 | 1,375,629 | 1,655,027 | 2,163,691 | 1,659,687 | 1,701,841 | 1,777,861 | 1,962,975 | 1,986,128 |
| Calc. | [N] = L - M | After-Tax Profits | US$ | 2,444,721 | 2,670,339 | 3,212,700 | 4,200,106 | 3,221,745 | 3,303,574 | 3,451,141 | 3,810,481 | 3,855,425 |

819. Line [A] reflects Rusoro's gold production in oz.; line [B] the gold price which would be applied assuming that gold could be sold at international prices; line [C] the gold price actually received by Rusoro; line [D] the revenue Rusoro would have earned, if it had been able to sell all of its gold at international prices; line [E] the actual revenue generated by Rusoro selling gold; lines [F] through [N] show the impact of the changes in the exchange control rules and of the abolition of the swap market, and are consequently irrelevant for the Tribunal's calculation; the only other relevant input is line [M] which shows that the corporate tax rate is 34%.

---

[658] See paras. 232 *et seq supra*.

[659] See para. 139 *supra*.

[660] See paras. 158 and 592 *supra*.

[661] NAV II, Appendix 4.A; CRA's equivalent table, which is Exhibit 2 to CRA's second report, does not provide the necessary breakdown to perform the calculation; but CRA's disagreement with Navigant's report does not seem to affect the lines used by the Tribunal (lines [A] through [E]) but rather the lines [F] through [N], which are irrelevant for the Tribunal's calculation.

820.  The proper way to calculate Rusoro's damage requires the following steps:

-   To subtract line [E] from line [D], and thus calculate the difference [the "**Additional Revenue**"] between (i) the monthly revenue Rusoro would have been able to generate if – absent the July 2010 BCV Resolution –it had been able to sell the entirety of its production at international prices[662], and (ii) the revenue actually generated by Rusoro (excluding the impact of Venezuela's exchange control);

-   To multiply the Additional Revenue by 35/50, because the July 2010 BCV Resolution increased the export prohibition from 15% (which had been established in the 1996 BCV Resolution) to 50%;

-   To do so for the months August 2010 (the month in which the July 2010 BCV Resolution came into force[663]) through September 2011;

-   to deduct the 34% corporate tax rate.

| Sources & Notes | Calc. Logic | Component | Unit | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [A] | Sales Quantity Allocated by Production | oz. | 9,507 | 8,689 | 8,689 | 8,689 | 7,968 | 7,968 | 7,968 | 8,200 | 8,205 |
| 2 | [B] | Gold Price (But-for Scenario) | US$/oz. | 1,135 | 1,154 | 1,188 | 1,223 | 1,211 | 1,224 | 1,267 | 1,341 | 1,349 |
| 3 | [C] | Gold Price (Actual Scenario) | US$/oz. | 745 | 688 | 625 | 962 | 1,190 | 1,203 | 1,244 | 1,317 | 1,336 |
| Calc. | [D] = A x B | Indova and Choco But-for Revenue (But-for Scenario) | US$ | 10,786,252 | 10,024,090 | 10,296,355 | 10,625,184 | 9,647,268 | 9,755,110 | 10,092,304 | 11,004,462 | 11,069,940 |
| Calc. | [E] = A x C | Indova and Choco Realized Revenue (Actual Scenario) | US$ | 7,082,129 | 5,978,121 | 5,428,627 | 8,360,363 | 9,478,913 | 9,584,723 | 9,916,164 | 10,812,430 | 10,964,300 |
| 4 | [F] | Official Venezuela Exchange Rate | Bs/US$ | | | | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 |
| 4 | [G] | US Monthly Inflation | % | | | | -0.10% | 0.02% | 0.14% | 0.06% | 0.12% | 0.04% |
| 4 | [H] | Venezuela Monthly Inflation | % | | | | 1.86% | 1.40% | 1.60% | 1.10% | 1.50% | 1.50% |
| 4 | [I] | Calculated Parallel Rate | Bs/US$ | | | | 8.44 | 8.55 | 8.68 | 8.77 | 8.89 | 9.02 |
| 4 | [J] | Post-May 2010 Estimated Parallel/Official Rate | Bs/US$ | N/A | N/A | N/A | 8.26 | 1.96 | 1.99 | 2.02 | 2.04 | 2.07 | 2.10 |
| Calc. | [K] = E x J | Actual Scenario After Adjusting for Exchange Rate Loss | US$ | 7,082,129 | 5,978,121 | 5,428,627 | 4,261,367 | 4,765,537 | 4,749,694 | 4,863,302 | 5,231,006 | 5,228,288 |
| Calc. | [L] = D - K | Lost Profits | US$ | 3,704,122 | 4,045,968 | 4,867,727 | 6,363,796 | 4,881,431 | 5,005,415 | 5,229,002 | 5,773,456 | 5,841,552 |
| Calc. | [M] = L x 34% Taxes | | 34% | 1,259,402 | 1,375,629 | 1,655,027 | 2,163,691 | 1,659,687 | 1,701,841 | 1,777,861 | 1,962,975 | 1,986,128 |
| Calc. | [N] = L - M | After-Tax Lost Profits | US$ | 2,444,721 | 2,670,339 | 3,212,700 | 4,200,106 | 3,221,745 | 3,303,574 | 3,451,141 | 3,810,481 | 3,855,425 |

| Sources & Notes | Calc. Logic | Component | Unit | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [A] | Sales Quantity Allocated by Production | oz. | 8,208 | 6,027 | 6,027 | 6,027 | 5,427 | 5,427 | 5,427 | 7,567 | 7,567 | 7,567 |
| 2 | [B] | Gold Price (But-for Scenario) | US$/oz. | 1,396 | 1,368 | 1,387 | 1,371 | 1,446 | 1,509 | 1,529 | 1,542 | 1,736 | 1,810 |
| 3 | [C] | Gold Price (Actual Scenario) | US$/oz. | 1,375 | 1,336 | 1,297 | 1,366 | 1,402 | 1,480 | 1,479 | 1,498 | 1,700 | 1,790 |
| Calc. | [D] = A x B | Indova and Choco But-for Revenue (But-for Scenario) | US$ | 11,460,724 | 8,186,382 | 7,874,642 | 8,260,649 | 7,846,435 | 8,187,252 | 8,297,601 | 11,671,260 | 13,125,196 | 13,695,537 |
| Calc. | [E] = A x C | Indova and Choco Realized Revenue (Actual Scenario) | US$ | 11,283,184 | 8,051,950 | 7,814,253 | 8,233,930 | 7,605,997 | 8,031,943 | 8,025,608 | 11,333,573 | 12,865,249 | 13,542,539 |
| 4 | [F] | Official Venezuela Exchange Rate | Bs/US$ | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 | 4.30 |
| 4 | [G] | US Monthly Inflation | % | 0.17% | 0.48% | 0.47% | 0.98% | 0.64% | 0.47% | -0.11% | 0.09% | 0.32% | 0.15% |
| 4 | [H] | Venezuela Monthly Inflation | % | 1.80% | 2.70% | 1.70% | 1.40% | 1.40% | 2.50% | 2.50% | 2.70% | 2.20% | 1.60% |
| 4 | [I] | Calculated Parallel Rate | Bs/US$ | 9.16 | 9.37 | 9.48 | 9.52 | 9.59 | 9.78 | 10.04 | 10.30 | 10.50 | 10.65 |
| 4 | [J] | Post-May 2010 Estimated Parallel/Official Rate | Bs/US$ | 2.13 | 2.18 | 2.20 | 2.21 | 2.23 | 2.28 | 2.33 | 2.40 | 2.44 | 2.48 |
| Calc. | [K] = E x J | Actual Scenario After Adjusting for Exchange Rate Loss | US$ | 5,294,295 | 3,096,331 | 3,544,644 | 3,718,461 | 3,410,102 | 3,529,636 | 3,437,190 | 4,730,613 | 5,268,825 | 5,346,038 |
| Calc. | [L] = D - K | Lost Profits | US$ | 6,166,429 | 4,490,051 | 4,330,018 | 4,542,188 | 4,436,333 | 4,657,616 | 4,860,411 | 6,940,647 | 7,856,371 | 8,349,499 |
| Calc. | [M] = L x 34% Taxes | | 34% | 2,096,586 | 1,526,617 | 1,472,206 | 1,544,344 | 1,508,353 | 1,583,589 | 1,652,540 | 2,359,820 | 2,671,166 | 2,838,830 |
| Calc. | [N] = L - M | After-Tax Lost Profits | US$ | 4,069,843 | 2,963,434 | 2,857,812 | 2,997,844 | 2,927,980 | 3,074,027 | 3,207,871 | 4,580,827 | 5,185,205 | 5,510,669 |

821.  Rusoro's lost profits from August 2010 through September 2011, multiplied by 35/50 and net of 34% corporate tax in Venezuela, are shown in this table (in USD):

---

[662] The Tribunal is aware that in accordance with the 1996 BCV Resolution in force at the time when Rusoro made its investment, 15% of the production had to be sold in the domestic market.
[663] Doc. C-203 – July 2010 BCV Resolution, Art. 13.

178

| | But-for Scenario | Actual Scenario | Pre-tax Lost Profits | 1996 BCV Resolution Adjustment | After-tax Lost Profits |
|---|---|---|---|---|---|
| Aug-10 | 9.755.110 | 9.584.723 | 170.387 | 119.271 | 78.719 |
| Sep-10 | 10.092.304 | 9.916.164 | 176.140 | 123.298 | 81.377 |
| Oct-10 | 11.004.462 | 10.812.430 | 192.032 | 134.422 | 88.719 |
| Nov-10 | 11.069.840 | 10.964.300 | 105.540 | 73.878 | 48.759 |
| Dec-10 | 11.460.724 | 11.283.184 | 177.540 | 124.278 | 82.023 |
| Jan-11 | 8.186.382 | 8.051.950 | 134.432 | 94.102 | 62.107 |
| Feb-11 | 7.874.662 | 7.814.253 | 60.409 | 42.287 | 27.909 |
| Mar-11 | 8.260.649 | 8.231.930 | 28.719 | 20.103 | 13.268 |
| Apr-11 | 7.846.435 | 7.605.997 | 240.438 | 168.307 | 111.082 |
| May-11 | 8.187.252 | 8.031.643 | 155.609 | 108.927 | 71.892 |
| Jun-11 | 8.297.601 | 8.025.408 | 272.193 | 190.535 | 125.753 |
| Jul-11 | 11.671.260 | 11.333.573 | 337.687 | 236.381 | 156.012 |
| Aug-11 | 13.125.196 | 12.865.248 | 259.948 | 181.963 | 120.096 |
| Sep-11 | 13.695.537 | 13.242.537 | 453.000 | 317.100 | 209.286 |
| | | | | Total LP | 1.277.002 |

822. The Tribunal concludes that the net of tax cash flows lost by Rusoro as a consequence of the enactment of the July 2010 BCV Resolution amount to USD 1,277,002 and orders the Bolivarian Republic to pay to Claimant such amount as damage for the Republic's breach of Paragraph 6 (d) of the Annex to the BIT.

# VIII.3. INTEREST

823. Rusoro claims pre-and post-award interest on the amounts awarded.

## 1. CLAIMANT'S POSITION

824. In Rusoro's submission, interest should accrue at Venezuela's borrowing rate, because Venezuela has effectively forced Rusoro to lend to it for free by not paying compensation promptly as required by the Treaty[664]. If Rusoro prevails in this arbitration it faces precisely the same default risk as any other state creditor – and consequently it should receive the same remuneration[665]. Any interest rate lower than Venezuela's sovereign bond rate eliminates any incentive for Venezuela to pay compensation voluntarily. Venezuela would be incentivized to prioritize the payment of other creditors instead of satisfying any award in Rusoro's favour[666].

825. Interest is not an award in addition to reparation, it is rather a component of full reparation which gives effect to that principle[667]. This full reparation would not be

---

[664] C PHB at 212; C II at 362.
[665] C II at 364.
[666] C II at 366.
[667] C I at 319.

achieved if the award were to deprive Claimant of compound interest. For this reason, Claimant submits that any interest awarded should be subject to reasonable compounding[668].

## 2.   RESPONDENT'S POSITION

826. Respondent says that Art. VII.1 of the Treaty mandates that compensation "shall be payable from the date of expropriation with interest at a normal commercial rate", which in Respondent's opinion corresponds to short-term US Treasury bill rates. Any higher rate would effectively grant Rusoro an increased benefit for riskier investments, without actually having run the risk of losses. Since there is little to no risk of not collecting a valid damages award against Venezuela, Rusoro is not entitled to a rate that compensates it for the time value of money plus default risk, which is what Venezuelan sovereign bonds offer its holders[669].

827. As regards compounding, although Venezuela readily admits that some arbitral tribunals have recently awarded compound interest, other recent decisions that grant simple interest are more relevant to the circumstances of this case, like *RosInvest*[670] where the Tribunal refused to award compound interest because claimant's investment was speculative.

## 3.   THE TRIBUNAL'S DECISION

828. The BIT foresees the accrual and payment of interest both on the compensation for expropriation and on damages for breach:

- Art. VII.1 mandates that the compensation "shall be payable from the date of expropriation with interest at a normal commercial rate"; and

- Art. XII.9 authorizes the Tribunal to award "monetary damages and any applicable interest".

829. The Tribunal must decide the *dies a quo*, the *dies ad quem*, the appropriate interest rate, the principal amount and calculation methodology.

### *Dies a quo*

830. Art. VII.1 provides that interest on the compensation for expropriation should start to accrue on the date of expropriation, in the present case 16 September 2011. Since the damages for breach of the Treaty occurred slightly before the date of expropriation, the Tribunal finds that the same *dies a quo* should apply for such damages.

### *Dies ad quem*

831. Interest shall continue to accrue until the date of effective payment.

---

[668] C I at 321.
[669] R II at 632.
[670] *RosInvest* at 689.

Interest rate

832. The Treaty does not impose any specific interest rate – it simply refers to "a normal commercial rate", affording the Tribunal discretion to select any rate which complies with the double requirement of being normal and commercial.

833. Claimant's proposal is for the Tribunal to select Venezuela's borrowing rate, with the argument that Venezuela has effectively forced Rusoro to become an involuntary lender. Navigant has made the appropriate calculations, has selected certain Venezuelan bonds maturing in 2014-2016, and has come up with an average interest rate of almost 13%[671].

834. Respondent's proposal is that the appropriate rate should be short-term U.S. Treasury bills[672], which practically offer no return[673].

835. The Tribunal disagrees with both proposals. Neither represents a "normal commercial rate". The rate proposed by Claimant is the yield of Venezuela's sovereign bonds on the date of expropriation, and the rate proposed by Venezuela that of short-term debt of the US Treasury. Neither party has shown that any of these rates is used in a "normal" "commercial" environment.

836. In the Tribunal's opinion, the best approach for establishing "a normal commercial rate" is to select LIBOR plus an appropriate margin.

837. LIBOR is an international commercial benchmark: the interest rate at which banks can borrow funds from other banks in the London interbank market. LIBOR is published daily for different maturities and currencies and is universally accepted as a valid reference for the calculation of variable interest rates[674]. Since the compensation is expressed in USD, the appropriate rate of reference for the calculation of interest should be the LIBOR rates for one year deposits denominated in USD, calculated as of the date of expropriation. The rate shall be adjusted every year thereafter, to reflect changing conditions.

838. LIBOR reflects the interest rate at which banks lend to each other money. Loans to customers invariably include a surcharge, and this surcharge must be inserted in the calculation of interest to reflect the financial loss caused to Claimant by the temporary withholding of money. In the present market situation of ultra-low interest rates, the Tribunal finds that a margin of 4% is appropriate, and that (whatever the LIBOR rate for one year deposits) a minimum of 4% p.a. interest should in any case be payable.

Principal amount

839. Interest shall accrue on the amounts awarded in favour of Rusoro in this Award: USD 966,500,000 as compensation for the expropriation plus USD 1,277,002 as damages for Venezuela's breach of the Treaty.

---

[671] CRA II at 344.
[672] CRA II at 342.
[673] The cumulative return calculated by CRA through September 2014 is 0,30% - CRA II Exhibit 23 A.
[674] *Lemire (Award)* at 352.

Simple or compounded

840. Claimant has requested that interest should be compounded, while Respondent proposes that simple interest be applied. The question to be decided by the Tribunal is whether unpaid LIBOR interest, calculated as simple interest and accruing at the end of each six month period, should be added to the principal, and as such accrue interest in the succeeding interest periods.

841. The question whether interest should be accumulated periodically to the principal has been the subject of diverging decisions. While older case law tended to repudiate this possibility, recent case law tends to accept annual or semi-annual capitalisation of unpaid interest[675].

842. The Tribunal sides with the more modern decisions. Loan agreements in which interest is calculated on the basis of LIBOR plus a margin usually include a provision that unpaid interest must be capitalised at the end of the interest period, and will thereafter be considered as capital and accrue interest. The financial reason for this provision is that an unpaid lender has to resort to the LIBOR market, in order to fund the amounts due but defaulted, and the lender's additional funding costs have to be covered by the defaulting borrower.

843. This principle implies in our case that, if Claimant were to take out a LIBOR loan to anticipate the amounts to which it is entitled under the Award, the bank would insist that unpaid interest be capitalised at the end of each interest period. Consequently, if Claimant is to be kept fully indemnified for the harm suffered, interest owed under the Award should be capitalised at the end of each annual interest period. The Tribunal, thus, decides that due and unpaid interest shall be capitalized annually, from the *dies a quo*.

# VIII.4. <u>TAXES</u>

844. Rusoro submits that it is entitled to a tax indemnification. Venezuela rejects Rusoro's contention and submits that the Tribunal should deny this request.

845. The Tribunal will now advance the Parties' position with respect to Rusoro's claim for tax indemnification (**1.**) and adopt a decision (**2.**).

**1.   <u>THE PARTIES' POSITION</u>**

846. In its Post Hearing Brief Rusoro requests the Tribunal to declare[676]:

- that any award of compensation granted to Rusoro is net of all applicable Venezuelan taxes;

- order Venezuela to indemnify Rusoro for any Venezuelan taxes imposed on the compensation awarded.

---

[675] *Lemire (Award)* at 360; *Flughafen Zürich* at 968; *OI European* at 949.
[676] C PHB at 219(k).

847. (Initially Rusoro also requested the Tribunal to (i) declare that Venezuela may not tax or attempt to tax the Award; (ii) and to order Venezuela to indemnify Claimant for any double taxation liability that might arise in Canada or elsewhere[677]. These claims, however, were abandoned in Rusoro's Post Hearing Brief).

848. Rusoro argues that Navigant's report on damages (both the estimate of Rusoro's lost profits and the assessment of Rusoro's enterprise value) has been prepared net of Venezuelan taxes[678]. Therefore, if Venezuela imposes any taxation on the eventual award, Claimant will have been taxed twice for the same income. Only an award ensuring Claimant's indemnity for any taxation would place Rusoro in the financial position but for Venezuela's breach of the Treaty[679].

849. Venezuela says that Rusoro's request that the Tribunal declare that the award be net of Venezuelan taxes has become moot, since the valuation prepared by Claimant's expert is already net of Venezuelan taxes[680]; and that Rusoro's request for indemnification for any taxes that Venezuela may impose on the Award is speculative and premature, because Rusoro has failed to identify which Venezuelan taxes, if any, would be applicable.

## 2. THE TRIBUNAL'S DECISION

850. Rusoro makes two distinct requests:

- that the Tribunal declare that the amounts awarded to Rusoro be net of taxes;

- to order Venezuela to indemnify Claimant with respect to any Venezuelan taxes imposed on the compensation awarded.

851. The Tribunal sides with Rusoro.

852. The BIT specifies that the compensation for expropriation must be "prompt, adequate and _effective_"[681] and "shall be paid without delay and shall be effectively realizable and freely transferable"[682].

853. These rules support Rusoro's position. The Bolivarian Republic is a sovereign State that can tax any assets or payments located in or originating from its territory. If the Bolivarian Republic were to impose a tax on Rusoro's award, Venezuela could _reduce the compensation_ "effectively" received by Rusoro. A _reductio ad absurdum_ proves the point: Venezuela could practically avoid the obligation to pay Rusoro the compensation awarded by fixing a 99% tax rate on income derived from compensations issued by international tribunals, thereby ensuring that Rusoro would only effectively receive a compensation of 1% of the amount granted.

---

[677] C I at 324 and 325.
[678] C I at 323 and fn 554.
[679] C I at 323.
[680] R I at 746; R II at 635.
[681] Art. VII.1 of the BIT. Emphasis by the Tribunal.
[682] Art. VII.1 of the BIT.

854. In its Memorial and Reply, Rusoro sought indemnity in respect of any double taxation of the Award that may rise in Canada (or elsewhere), to the extent this liability would not have arisen had Venezuela observed its international commitments under the Treaty[683]. This claim seems to have been abandoned in Rusoro's Post Hearing Brief. In any case, the claim lacks merit. Any tax liability arising under Canadian tax laws (or from any other fiscal regime, other than the Venezuelan), does not qualify as consequential loss arising from Venezuela's breach of the Treaty and does not engage Venezuela's liability.

855. <u>In conclusion</u>, the Tribunal declares that the compensation, damages and interest granted in this Award are net of any taxes imposed by the Bolivarian Republic and orders the Bolivarian Republic to indemnify Rusoro with respect to any Venezuelan taxes imposed on such amounts.

---

[683] C I at 325; C II at 381.

# IX. COSTS

856. Article 52(1)(j) of the AF Rules provides that

> "[t]he award shall be made in writing and shall contain [...] any decision of the Tribunal regarding the cost of the proceeding".

857. On the last day of the Hearing the Tribunal requested the Parties to submit a statement of costs[684]. The Parties did so on 1 July 2015. None of the Parties challenged the items or the amounts claimed by the counterparty.

## 1. CLAIMANT'S POSITION

858. Claimant sustains that when allocating costs, the starting point for the Tribunal should be the principle of "costs follow the event". This criterion is consistent with the principle of full reparation, insofar as it is necessary to wipe out the consequences of Venezuela's wrongful conduct[685]. Accordingly, Claimant requests the Tribunal to order Venezuela to pay all of the costs and expenses of this arbitration[686].

859. Additionally, the Tribunal should take into account Venezuela's conduct throughout the arbitration, which has unnecessarily delayed the proceeding, such as, its refusal to pay its share of costs, the unmeritorious challenge of a co-arbitrator, extensive document production requests and submission of evidence in advanced stages of the proceeding[687].

860. Specifically, Claimant requests the reimbursement of the following costs and expenses[688]:

- Fees and expenses of the Tribunal and ICSID

    o Lodging fee for the Request for Arbitration: USD 25,000;

    o Advances on costs[689]: USD 1,145,000;

- Travel costs and expenses of witnesses and representatives: USD 75,910.66;

- Legal fees: USD 6,957,528.42;

- Expert fees: USD 1,713,386.01[690].

---

[684] HT at 2978.
[685] C PHB at 215 and 216.
[686] C PHB at 218.
[687] C PHB at 217.
[688] C SC; See C PHB at 214-219. Claimant requests no interests on the costs claimed.
[689] USD 635,000 corresponding to Rusoro's share of the advance on costs, and USD 510,000 corresponding to Venezuela's share of the advance on costs paid by Rusoro.
[690] Claimant's statement of costs has a typo indicating subtotal fees for Rusoro's experts of USD 1,723,386. However, the addition of all the fees of the Rusoro's experts is 1,713,386.01.

2.   **RESPONDENT'S POSITION**

861.   Venezuela submits that the Tribunal should award costs against the party which generated unnecessary expenses to its counterparty. In the present case Rusoro initiated a time-barred claim before a wrong forum and opposed the bifurcation of the jurisdictional issues. The result was that Venezuela incurred in unnecessary costs related to the merits and damages of the case[691]. Therefore the Tribunal should order Rusoro to bear Venezuela's costs associated to this proceeding since the date of Rusoro's opposition to Venezuela's request for bifurcation (15 May 2013), plus interest[692].

862.   Specifically, Venezuela requests the reimbursement of the following costs and expenses[693]:

-   Legal fees: USD 9,142,809.63;

-   Expert fees: USD 5,920,749.63;

-   Administrative expenses: USD 1,255,787.78;

3.   **THE TRIBUNAL'S DECISION**

863.   Article XII(9) of the BIT sets forth that the Tribunal "may also award costs in accordance with the applicable arbitration rules". And Article 58(1) of the AF Rules establishes that:

> "Unless the parties otherwise agree, the Tribunal shall decide how and by whom the fees and expenses of the members of the Tribunal, the expenses and charges of the Secretariat and the expenses incurred by the parties in connection with the proceeding shall be borne".

864.   Neither the Arbitration AF Rules nor the BIT contain any guidelines for the apportionment of costs. Therefore, the Tribunal has ample discretion to decide on how the costs of this proceeding will be apportioned.

865.   The Tribunal looks favourably upon the criterion, often used in investment arbitration, that the losing party should make a significant contribution to the payment of the arbitration fees and the costs and expenses incurred by the prevailing party.

866.   In the present case both Parties request that the Tribunal order their counter-party to bear the full amount (or a great portion, in the case of Venezuela) of the costs arising from this arbitration. Venezuela bases its petition on the argument that this Tribunal has no jurisdiction over Rusoro's claims and that Rusoro's substantiation of the proceeding generated unnecessary expenses to the Republic.

867.   The Tribunal concluded that only the portion of Rusoro's claim based on the 2009 Measures was time-barred; but the Tribunal asserted its jurisdiction over Rusoro's

---

[691] R PHB at 267.
[692] R PHB at 268.
[693] R SC.

claims based on the 2010 Measures and the Nationalization Decree. Furthermore, the Tribunal concluded that Venezuela unlawfully expropriated Rusoro's Mining Rights and breached Paragraph 6 (d) of the Annex to the BIT by issuing the 2010 BCV Resolution. Finally, the Tribunal has determined that Venezuela must indemnify Claimant in the amount of USD 967,777,002[694], as a consequence of the Republic's violations of the BIT.

868. Taking into account that Rusoro has prevailed in a significant portion of its relief, the Tribunal decides that Respondent shall bear part of Claimant's costs.

869. In allocating arbitration costs, the Tribunal will consider two main categories of costs:

-   the lodging fee and advance on costs paid to ICSID [the "**Costs of the Proceeding**"];

-   the expenses incurred by the Parties to further their position in the arbitration [the "**Defense Expenses**"].

### A.    Costs of the Proceeding

870. The Tribunal finds that Claimant has prevailed, not entirely, but to a great extent, in this proceeding: the Tribunal confirmed its jurisdiction over claims based on the 2010 Measures onwards and held that Venezuela unlawfully expropriated Rusoro's investment and restricted the export of gold. Finally it awarded approximately 1/3 of Rusoro's requested damages.

871. For this reason, the Tribunal finds that Respondent must bear 75% of the Cost of the Proceeding. Since Claimant has paid a disproportionate part of the Cost of the Proceedings, Respondent shall reimburse Claimant in an amount of USD 877,500[695].

### B.    Defense Expenses

872. Rusoro requests the reimbursement of a wide variety of Defense Expenses related to attorneys' and experts' fees and travel costs and expenses of witnesses and representatives. The Tribunal is of the opinion that Respondent should not bear all the expenses incurred by Claimant without limitation. Venezuela shall only bear the Defense Expenses actually incurred by Claimant that are indispensable to adequately defend its position [the "**Reasonable Defense Expenses**"]. Taking into account the complexity of this case, the amount in dispute and the work performed by the attorneys and experts, the Tribunal determines that the amount of Reasonable Expenses is USD 3,000,000 for attorneys and USD 1,000,000 for experts.

Venezuela's contribution to the Reasonable Defense Expenses

873. The Tribunal will now determine the portion of Rusoro's Reasonable Defense Expenses based on Rusoro's rate of success.

---

[694] USD 966,500,000 as compensation for expropriation plus USD 1,277,002 for Lost Cash Flows.
[695] 75% * USD 1,170,000.

874. This arbitration was divided in three main stages: jurisdiction, liability and damages. In order to determine the apportionment of costs, the Tribunal will assume that Claimant's Reasonable Defense Expenses have been divided as follows:

- One third of the attorneys' fees and expenses to each stage of the arbitration;

- USD 250.000 of the fees for Prof. Muci's legal expert opinion to the jurisdiction stage[696];

- USD 750,000 of the remaining experts' fees and expenses to the damages stage.

875. Therefore, the apportionment of Reasonable Defense Expenses to each phase of the proceeding is:

- Jurisdiction: USD 1,250,000;

- Liability: USD 1,000,000;

- Damages: USD 1,750,000.

876. Accordingly:

- In the jurisdiction stage, the Tribunal only partially accepted one (of a total of three) of Venezuela's jurisdictional objections. The Tribunal decides that Venezuela shall pay 60% of Claimant's Reasonable Defense Expenses incurred in the jurisdiction stage: USD 750,000.[697].

- In the liability stage, the Tribunal rejected Rusoro's claim that Venezuela carried out a creeping expropriation and that the Republic breached the FET, FPS, discrimination and free transfer of funds provisions of the BIT. However the Tribunal did find that Respondent unlawfully expropriated Rusoro's investment in Venezuela, and that it breach Paragraph 6 (d) of the Annex to the BIT. Therefore the Tribunal decides that Venezuela shall pay 80% of Claimant's Reasonable Defense Expenses incurred in the liability stage: USD 800,000[698].

- In the damages phase, Rusoro claimed USD 2.4 billion in damages. The Tribunal concluded that the damages owed to Claimant as a consequence of Venezuela's breach of the BIT is USD 967,777,002[699]. The Tribunal holds that Venezuela must pay 50% of Claimant's Reasonable Defense Expenses incurred in the damages stage: USD 875,000[700].

---

[696] See C SC at 11.
[697] 60% * USD 1,250,000.
[698] 80% * USD 1,000,000.
[699] USD 966,500,000 as compensation for expropriation plus USD 1,277,002 for Lost Cash Flows.
[700] 50% * USD 1,750,000.

877. The total amount owed to Rusoro by Venezuela for Reasonable Defense Expenses amount USD 2,425,000.

878. <u>In conclusion</u>, Venezuela shall pay Rusoro USD 3,302,500[701] for the costs involved in this arbitration.

---

[701] USD 877,500 of Cost of the Proceeding + USD 2,425,000 of Reasonable Defense Expenses.

# X.  SUMMARY

879.  In its Post Hearing Brief, Claimant requested the Tribunal to[702]:

"219. […]

(a) DISMISS all Venezuela's objections to the jurisdiction of the Tribunal;

(b) DECLARE that Venezuela violated Article VII(1) of the Treaty by expropriating the Claimant's investment without payment of compensation;

(c) DECLARE that Venezuela violated Article II(2) of the Treaty by failing to accord the Claimant's investments fair and equitable treatment;

(d) DECLARE that Venezuela violated Article II(2) of the Treaty by failing to accord the Claimant's investments full protection and security; and

(e) DECLARE that Venezuela violated Article IV of the Treaty by failing to accord the Claimant treatment no less favorable than the treatment it grants to its own investors;

(f) DECLARE that Venezuela violated Article VIII of the Treaty by failing to guarantee to the Claimant the unrestricted transfer of its investments and returns; and

(g) DECLARE that Venezuela violated paragraph 6 of the Annex to the Treaty by imposing restrictions on the exportation of gold.

(h) DISMISS Venezuela's Counter-claim;

(i) ORDER Venezuela to pay compensation to the Claimant of no less than US $2,318,898,825 and, to the extent applicable, DECLARE that the sum awarded has been calculated net of Venezuelan taxes;

(j) ORDER Venezuela to pay pre- and post-award interest at Venezuela's sovereign borrowing rate (as updated), compounded annually, accruing until payment is made in full or such other rate as the Tribunal deems appropriate;

(k) ORDER Venezuela to indemnify the Claimant in full with respect to any Venezuelan taxes imposed on the compensation awarded to the extent that such compensation has been calculated net of Venezuelan taxes;

(l) ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimant's reasonable legal and expert fees, and the fees and expenses of the Tribunal; and

(m) AWARD such other relief to the Claimant as the Tribunal considers appropriate.

220. To the extent this Tribunal finds that Venezuela's Measures constituted a creeping expropriation in violation of Article VII of the Treaty (paragraph 219(b) above) and that the compensation to be awarded to Rusoro includes the

---

[702] C PHB at 219.

effects of each of those measures calculated by reference to Fair Market Value, Rusoro would be content for the Tribunal to make those findings without proceeding to consider the additional violations of the Treaty (paragraph 219 (c)-(g) above)".

880. And Venezuela requested the Tribunal to[703]:

"Issue an Award stating it lacks jurisdiction to hear Rusoro's claims under the Treaty and the Additional Facility, and order Rusoro to pay all the fees, expenses, and costs associated with defending against these proceedings since the date of its opposition to Venezuela's request for bifurcation (15 May 2013), with interest;

Should the Tribunal find that it has jurisdiction to hear Rusoro's dispute,

- only consider claims for compensation for alleged breaches and harm after 17 July 2009,

- issue an Award dismissing all of Rusoro's claims in their entirety for lack of factual and legal merit, and

- find that Venezuela is entitled to compensation for injury suffered based on the counter-claim specified in Part IV;

Should the Tribunal find Venezuela has breached any provision of the Treaty or is otherwise legally responsible,

- issue an Award indicating that Rusoro has failed to meet its burden to prove the quantum of its damages and finding that Venezuela is not required to pay Rusoro any compensation;

Should the Tribunal award damages,

- find that damages are limited to compensation for alleged reserves based on DCF values included in the final column of Table 6 of the Experts' Joint Matrix;

- reduce damages by at least 50% for contributory fault; and

- for any liability based on *venire contra factum proprium*, *confianza legítima*, or estoppel, limit damages to injury caused by detrimental reliance; and

Grant Venezuela any other remedy that the Tribunal considers appropriate".

881. The Tribunal will now make a brief summary of the decisions taken with respect to the Parties request for relief.

## 1. JURISDICTION

882. Venezuela submitted three jurisdictional objections:

---

[703] R PHB at 268.

<u>First Jurisdictional Objection: the time bar</u>

883.   Venezuela argues that Rusoro's claims are time barred by the statute of limitations in Art. XII.3 (d) of the BIT, which requires the investor to submit a dispute to arbitration within three years from the date when the investor obtained actual knowledge of the breach and of the damage caused by such breach.

884.   Respondent submits that the entire dispute is time-barred, Rusoro's main claim for expropriation being based on several measures which Venezuela adopted before the Cut-Off Date, i.e. 17 July 2009[704].

885.   The Tribunal concluded that the 2009 Measures occurred before the Cut-Off date and that Claimant was aware of their existence and of their potentially detrimental effect on the investment. Therefore, the Tribunal held that any claim based on any of the 2009 Measures was time-barred[705]. The Tribunal, however, rejected Venezuela's submission that the entire dispute be time-barred. The Tribunal asserted its jurisdiction over Rusoro's claims supported by other breaches which occurred after the Cut-Off date[706].

<u>Second Jurisdictional Objection: AF Rules</u>

886.   Venezuela's second jurisdictional objection is that the Tribunal lacks jurisdiction under the AF Rules, because neither Canada nor Venezuela were parties to the ICSID Convention by the time the Secretary-General of ICSID registered Rusoro's Request for Arbitration.

887.   The Tribunal concluded that the relevant date for the requirement that at least one State be a party to the ICSID Convention is not the date of registration by the Secretary General – as averred by Venezuela – but the date when the investor files a request for approval to institute a proceeding under the AF Rules[707]. It is undisputed that Rusoro submitted its Request for Arbitration, including its application for approval to access ICSID AF, before Venezuela's denunciation of the ICSID Convention came into effect – and therefore, Venezuela was a party to the ICSID Convention at that time. Consequently, the Tribunal dismissed Respondent's second jurisdictional objection.

<u>Third Jurisdictional Objection: Illegality</u>

888.   Finally, Venezuela argues that Rusoro breached Venezuelan law, and that consequently Rusoro's investment forfeited any protection under the BIT for two reasons:

-      first, Rusoro breached Art. 29 of the Mining Law by failing to obtain the necessary authorization from the Ministry of Mines to acquire its Mining Rights in Venezuela, and

---

[704] See paras. 195 and 197 *supra*.
[705] See para. 232 *et seq supra*.
[706] See paras. 231 - 232 and 236 *supra*.
[707] See para. 266 *supra*.

192

- second, Rusoro breached the mining regulation by failing to report and account for its purported domestic sales or the final destination of the gold produced, thus feeding an illegal export market.

889. Regarding the first argument, the Tribunal concluded that Rusoro complied at all times with the Mining Law. Rusoro acquired its Mining Rights through the acquisition or control of non-Venezuelan corporations which in turn controlled Venezuelan companies, which held Mining Rights in Venezuela. The Tribunal concluded that Rusoro was not required to apply for authorization under Art. 29 of the Mining Law, which is only applicable to the transfer of concessions[708]. With regards to the argument based on the creation of an illegal export market, the Tribunal dismissed Venezuela's submission for lack of supportive evidence[709].

## 2. LIABILITY

890. Venezuela raises an additional objection arguing that Claimant's claims are inadmissible because Rusoro did not pursue its investment in good faith. The Tribunal rejected Venezuela's contention, because Rusoro's acquisitions were in conformity with Venezuelan law and Rusoro never misrepresented its identity as a Russian owned company[710].

### Expropriation

891. Rusoro's central claim in this arbitration is that Venezuela expropriated Rusoro's investment in violation of Article VII of the Treaty. Claimant alleges that it suffered a direct expropriation through the Nationalization Decree; and additionally, that it suffered a creeping expropriation through a series of interconnected measures consisting of the 2009 and 2010 Measures, the closure of the Swap Market and finalized with the Nationalization Decree of September 2011.

892. The Tribunal concluded that Venezuela unlawfully expropriated Rusoro's Mining Rights by failing to pay the prompt, adequate and effective compensation required in Art. VII.1 of the BIT[711]. Regarding the allegation for creeping expropriation, the Tribunal found that:

- the 2009 Measures have to be excluded from the analysis as a consequence of the statute of limitations of Art. XII.3 (d)[712];

- Rusoro failed to produce convincing evidence that the 2010 Measures or the 2010 Ley de Reforma Cambiaria which closed the Swap Market were part of a premeditated plan of the Venezuelan authorities to nationalize the gold sector.

---

[708] See paras. 324 - 339 *supra*.
[709] See paras. 342 *et seq supra*.
[710] See para. 356 *supra*.
[711] See para. 409 *supra*.
[712] See para. 428 *supra*.

In fact, the 2010 Measures re-liberalized the gold regime and diminished the adverse impact of the 2009 Measures. In light of these findings, the Tribunal rejected Rusoro's claim for creeping expropriation[713].

<u>Ancillary Claims</u>

893.  Rusoro also submits that, by adopting the 2009 and 2010 Measures, Venezuela

-  breached the FET and FPS standards;

-  treated Rusoro and its investment in a discriminatory manner;

-  impeded Rusoro from freely transferring its funds; and

-  imposed an export ban on gold in breach of the BIT.

894.  The Tribunal rejected two preliminary defences submitted by Venezuela:

-  that Rusoro was favouring the illegal export of gold; and

-  that the Measures where adopted to guarantee the "integrity and stability" of its "financial system", and were excluded from the scope of protection afforded by the BIT pursuant to Art. X of the Treaty.

895.  Regarding Rusoro's claims, the Tribunal held that any Ancillary Claim based on the 2009 Measures was time-barred. As for the 2010 Measures and the Ley de Reforma Cambiaria, the Tribunal concluded that:

-  The Ley de Reforma Cambiaria which closed the Swap Market and the Amendment of the Convenio Cambiario No. 12, were legitimate sovereign measures, adopted according to the established procedure, within the framework of the general exchange control regime already in force when Rusoro entered the Venezuelan gold market.

-  Therefore, the Tribunal rejected Rusoro's claims for breach of the FET[714] and the FPS standards[715]. Furthermore, the Tribunal dismissed Rusoro's claim for breach of Art. VIII of the BIT, which guarantees investors free transfer of funds. The closure of the Swap Market was exclusively aimed at prohibiting a parallel foreign currency market; the market operators still had access to a centralized exchange control system managed by the BCV and based on the Official Exchange Rate[716].

-  The 2010 Measures regulating the sale and export of gold (the July 2010 BCV Resolution and the Amendment of the Convenio Cambiario No. 12) did not

---

[713] See paras. 435-438 *supra*.
[714] See para. 533 *supra*.
[715] See paras. 554 *supra*.
[716] See paras. 579-583 *supra*.

amount to a breach of the FET[717] or FPS standards[718]; neither did these measures amount to a breach of the free transfer of funds guaranteed in the BIT[719].

- Rusoro suffered no discrimination because the 2010 Measures unified the gold mining regime for public and privately owned miners (thereby correcting the 2009 Measures); Venezuela also did not discriminate against Rusoro by affording special treatment to small scale producers of gold in the 2010 Measures[720].

- However the Tribunal concluded that the adoption of the July 2010 BCV Resolution breached Paragraph 6 (d) of the Annex to the BIT, by imposing an increased restriction in terms of volume on the exportation of gold[721].

Venezuela's counter-claim

896. Venezuela filed a counter-claim averring that Rusoro applied an improper mining strategy in the Choco 10 mine, which had a detrimental impact on its future viability.

897. The Tribunal concluded that it had no jurisdiction to adjudicate Venezuela's counter-claim[722].

## 3.   QUANTUM

898. Rusoro claims an amount of USD 2.4 billion as compensation for Venezuela's expropriation of Rusoro's investment; plus USD 90 million for the Lost Cash Flows suffered as a consequence of the 2009 and 2010 Measures; and interest on these quantities.

899. The Tribunal concluded that

- the proper compensation due to Rusoro for the unlawful expropriation of its investment in Venezuela amounts to USD 966,500,000 and that

- the proper calculation of damages due to Rusoro for Venezuela's breach of Paragraph 6 (d) of the Annex to the BIT amounts to USD 1,277,002.

900. Additionally the Tribunal decided to grant Rusoro interest on the amounts of compensation and damages (i.e. USD 967,777,002[723]), accrued between 16 September 2011 and the date of actual payment, calculated at the interest rate p.a.

---

[717] See paras. 534 *et seq supra.*
[718] See para. 554 *supra.*
[719] See para. 579 *supra.*
[720] See para. 564 *supra.*
[721] See paras. 588 *et seq supra.*
[722] See para. 628 *supra.*
[723] USD 966,500,000 as compensation for expropriation plus USD 1,277,002 for Lost Cash Flows.

equal to USD LIBOR for one year deposits, plus a margin of 4%, with a minimum of 4% p.a, to be compounded annually[724].

901. The Tribunal dismissed Venezuela's defences that damages should be reduced for contributory fault or that in certain instances damages should be limited to injury caused by detrimental reliance[725].

902. Furthermore the Tribunal granted Rusoro's requests to declare the Award net of Venezuelan taxes and to order Venezuela to indemnify Claimant with respect to any Venezuelan tax imposed on the compensation awarded[726].

903. The Tribunal ordered the Bolivarian Republic to pay to Rusoro USD 3,302,500 as costs incurred in the present arbitration[727].

---

[724] See section VIII.3 *supra*.
[725] See para. 791 *et seq surpa*.
[726] See section VIII.4 *supra*.
[727] See para. 878 *supra*.

# XI. <u>DECISION</u>

904.  For the foregoing reasons, the Tribunal unanimously rules as follows:

1.  Declares that any alleged breach of the Treaty committed by Bolivarian Republic of Venezuela and based on the 2009 Measures is time-barred.

2.  Declares that the Tribunal lacks jurisdiction to adjudicate the counter-claim submitted by the Bolivarian Republic of Venezuela.

3.  Declares that the Bolivarian Republic of Venezuela breached Art. VII of the BIT by expropriating Rusoro's investment in Venezuela without payment of compensation.

4.  Declares that the Bolivarian Republic of Venezuela breached paragraph 6 of the Annex to the BIT by issuing the 2010 BCV Resolution and imposing additional restrictions on the export of gold.

5.  Orders the Bolivarian Republic of Venezuela to pay Rusoro USD 966,500,000 as compensation for the expropriation of its investment.

6.  Orders the Bolivarian Republic of Venezuela to pay Rusoro USD 1,277,002 as damages suffered as a consequence of the breach of paragraph 6 of the Annex to the BIT.

7.  Orders the Bolivarian Republic of Venezuela to pay Rusoro interest on the amounts of compensation and damages awarded in the two preceding paragraphs, accrued between 16 September 2011 and the date of actual payment, calculated at an interest rate p.a. equal to USD LIBOR for one year deposits, plus a margin of 4%, with a minimum of 4% p.a., to be compounded annually.

8.  Orders the Bolivarian Republic of Venezuela to pay Rusoro USD 3,302,500 as costs of this arbitration.

9.  Declares that the compensation, damages and interest granted in this Award are net of any taxes imposed by the Bolivarian Republic and orders the Bolivarian Republic to indemnify Rusoro with respect to any Venezuelan taxes imposed on such amounts.

10.  Dismisses all other claims or counter-claims.

Made at Paris, France

_____
Judge Bruno Simma
Arbitrator
Date:
July 22, 2016

_____
Prof. Francisco Orrego Vicuña
Arbitrator
Date: August 1, 2016

_____
Prof. Juan Fernández-Armesto
President of the Tribunal
Date:
July 18, 2016

Place of arbitration: Paris, France