# EXHIBIT 4

ARBITRATION UNDER THE RULES OF THE ADDITIONAL

FACILITY OF THE INTERNATIONAL CENTRE FOR

SETTLEMENT OF INVESTMENT DISPUTES


**RUSORO MINING LIMITED**

International Centre for Settlement
of Investment Disputes

JUL 17 2012

Received By:
ICSID

Claimant

-v-


**THE BOLIVARIAN REPUBLIC OF VENEZUELA**

Respondent

# REQUEST FOR ARBITRATION

# 17 JULY 2012

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
701 Pennsylvania Avenue NW
Suite 600
Washington, DC 20004
United States of America

**Figueiras & Fischbach**
Edificio Cavendes
Piso 8, Los Palos Grandes
Caracas, 1060
Venezuela

**Mezgravis & Asociados**
Torre Oxal
Piso 5, El Rosal
Caracas, 1060
Venezuela

INDEX

PAGE

I.    INTRODUCTION....................................................................................... 1

II.   THE FACTS RELEVANT TO THE DISPUTE ..................................... 3

      A. RUSORO'S INVESTMENTS IN VENEZUELA ............................................... 3
         1.    Rusoro's Mining Rights.................................................... 6
         2.    Rusoro's Investments in Social Projects ......................... 26

      B. STARTING IN 2009 VENEZUELA DISMANTLED THE LEGAL FRAMEWORK
         UNDER WHICH RUSORO HAD INVESTED AND SUBSEQUENTLY
         NATIONALISED ALL OF RUSORO'S INVESTMENTS WITHOUT PROMPT,
         ADEQUATE AND EFFECTIVE COMPENSATION ....................................... 28
         1.    Venezuela imposed restrictions on the marketing of gold and
         exchange control measures............................................... 29
         2.    Venezuela Nationalised Rusoro's investments ................. 35

III.  VENEZUELA'S BREACHES OF THE TREATY ......................... 48

      A. VENEZUELA HAS EXPROPRIATED RUSORO'S INVESTMENT WITHOUT
         PROMPT, ADEQUATE AND EFFECTIVE COMPENSATION CONTRARY TO THE
         TREATY AND INTERNATIONAL LAW ................................................... 48

      B. VENEZUELA HAS FAILED TO ACCORD RUSORO'S INVESTMENTS FAIR AND
         EQUITABLE TREATMENT AND FULL PROTECTION AND SECURITY ........... 49

      C. VENEZUELA HAS IMPEDED THE FREE TRANSFER OF PAYMENTS RELATED
         TO RUSORO'S INVESTMENTS................................................... 52

      D. VENEZUELA HAS IMPAIRED RUSORO'S INVESTMENTS THROUGH
         DISCRIMINATORY MEASURES ........................................................ 53

IV.   THE PARTIES' CONSENT TO ARBITRATION UNDER THE
      TREATY AND THE ADDITIONAL FACILITY RULES............. 54

      A. THE REQUIREMENTS FOR ACCESS TO THE ADDITIONAL FACILITY HAVE
         BEEN FULFILLED............................................................... 54
         1.    There is a Legal Dispute ............................................... 55
         2.    The Dispute is Between an ICSID Contracting State and the
         National of a State Which is Not a Contracting State ....................... 56
         3.    The Parties Agree that the Dispute is to Be Submitted to
         Arbitration Pursuant to the Additional Facility Rules.................... 56
         4.    There Are No Applicable Provisions from Which the Parties
         Cannot Derogate which Negate Access to the Additional Facility ............. 57

|   |   |   |   |
|---|---|---|---|
| | B. | THE ACCESS REQUIREMENTS UNDER THE TREATY HAVE BEEN FULFILLED | 57 |
| | C. | APPROVAL OF THE SECRETARY-GENERAL | 60 |
| V. | | CONSTITUTION OF THE ARBITRAL TRIBUNAL, APPLICABLE LAW, PLACE AND LANGUAGE OF THE ARBITRATION | 61 |
| VI. | | THE PARTIES | 62 |
| VII. | | THE CLAIMANT'S REQUEST FOR RELIEF | 64 |

## I.   INTRODUCTION

1.   Rusoro Mining Limited (***Rusoro*** or the ***Claimant***) hereby submits this Request for Arbitration (the ***Request***) in respect of its dispute with the Bolivarian Republic of Venezuela (***Venezuela*** or the ***Respondent***) pursuant to:

    (a)   Articles 2 and 3 of the Arbitration (Additional Facility) Rules of the International Centre for Settlement of Investment Disputes (the ***Arbitration Rules***); and

    (b)   The Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments, signed on 1 July 1996 and which entered into force on 28 January 1998 (the ***Treaty***).[1]

2.   Rusoro is a company existing under the laws of British Columbia, Canada with its head office in British Columbia[2]. Rusoro has taken all the necessary internal actions to authorize the submission of this request under the Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes (the ***Additional Facility Rules***) and has duly authorized Nigel Blackaby, Lluís Paradell and Jean-Paul Dechamps of Freshfields Bruckhaus Deringer US LLP, Alejandra Figueiras and Noemí Fischbach of Figueiras & Fischbach, and Andrés A. Mezgravis of

---

[1]   Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and the Protection of Investments, signed on 1 July 1996 and entered into force on 28 January 1998, together with a letter from the Deputy Director of the Criminal, Security and Treaty Law Division at the Canadian Department of Foreign Affairs and International Trade, 7 May 2009 (the ***Treaty***), **Exhibit C-102**.

[2]   Rusoro was incorporated under the laws of the Province of British Columbia on 1 March 2000 under the name "Hollingfield Capital Corporation". It changed its name to "PKI Innovations (Canada) Inc." on 20 August 2001. On 6 June 2005, it changed its name to "Newton Ventures Inc." On 6 November 2006, it changed its name to "Rusoro Mining Ltd." *See* Notarial Certificate of the Articles of Incorporation and Certificate of Change of Name of Rusoro Mining Ltd., 5 November 2009, **Exhibit C-196**.

Mezgravis & Asociados to institute and pursue arbitration proceedings on its behalf.[3]

3. As described in more detail in Section II below, this dispute arises out of certain measures adopted by Venezuela, starting in 2009. These measures interfered with Rusoro's investment in Venezuela by dismantling the basic principles of the legal framework applicable to its investment in an arbitrary and discriminatory manner in breach of the protections afforded to Rusoro by the Treaty and culminated in the outright nationalisation and control of Rusoro's investments in Venezuela without due process of law, nor prompt, adequate or effective compensation (the *Nationalisation*, and Venezuela's measures altogether, the *Measures*).

4. In this Request, Rusoro will show the jurisdictional and substantive bases upon which it is entitled to bring these proceedings. Specifically, Rusoro notes that:

    (a) The Measures have given rise to a dispute between Rusoro and Venezuela under the Treaty (Section II below);

    (b) The Measures have violated the protections afforded to Rusoro under the Treaty (Section III below);

    (c) Rusoro is a protected investor with qualifying investments in Venezuela which are protected by the Treaty (Section IV below); and

    (d) Rusoro is entitled to initiate arbitration proceedings pursuant to the Treaty (Section V below).

5. Rusoro reserves its right to supplement or amend the factual or legal claims and arguments contained herein, including (but not limited to) any Measures that

---

[3]    Resolution of the Board of Directors of Rusoro Mining Ltd., 28 June 2012, **Exhibit C-250** and Power of Attorney granted by Rusoro Mining Ltd., 11 July 2012, **Exhibit C-251**.

2

Venezuela has taken or may take in breach of its internal and international obligations.

## II.    THE FACTS RELEVANT TO THE DISPUTE

### A.    RUSORO'S INVESTMENTS IN VENEZUELA

6.    Rusoro first invested in the Venezuelan mining sector in November 2006 when it acquired the assets and subsidiaries of the Grupo Agapov Corp., a group of companies already active in the Venezuelan gold market where it had conducted over 175,000 metres of drilling from 2001 to 2006. From 2006 to 2008, Rusoro entered into a number of corporate transactions whereby it acquired additional companies with mining interests and operations in Bolívar State.[4] Through these acquisitions, by 2011 Rusoro had become the largest private gold production company in Venezuela.

7.    At all relevant times for this dispute, Rusoro had 24 Venezuelan subsidiaries holding a total of 58 mining concessions and contracts for the exploration, development and exploitation of alluvial and vein gold and other minerals in the Bolívar region (together, the *Mining Rights*). The Mining Rights were granted by:

   (a)    the Ministry of Energy and Mines (*MEM*), later replaced by the Ministry of People's Power for Basic Industries and Mining (*MIBAM*), currently, the Ministry of People's Power for Petroleum and Mining (*MPM*);

   (b)    Corporación Venezolana de Guayana (*CVG*), a state agency created by the Venezuelan Government in 1960 as an autonomous institute with the specific purpose of developing a special zone in the Guayana region.[5]

---

[4]    *See* paras. 13, 32, 39, 43 and 53.

[5]    The development zone of Guayana that is under the range of the CVG's competence covers the entire area of three states and part of the area of other four states in south-eastern Venezuela. Overall, the zone covers over 50% of the Venezuelan territory.

3

While CVG is subject to State control under Article 142 of the Venezuelan Constitution,[6] it holds its own legal personality and assets[7] and enjoys the same prerogatives as Venezuela;[8] and

(c)   CVG Compañía General de Minería de Venezuela C.A., "CVG MINERVEN" (*CVG Minerven*), a State owned mining company controlled by CVG. Founded in 1970, CVG Minerven is located in El Callao municipality, south of the Bolívar State, and holds mining concessions for a total area of 48,846.80 ha.[9]

8.   The Mining Rights were held by Rusoro's subsidiaries under four classes of legal titles granted under Venezuelan law, as follows:

(a)   <u>Concessions</u>: titles granted by MEM, giving an exclusive right to use the land for mining activities during a specified period of time, under the terms defined by the title granted and the law.[10]

---

[6]   Constitution of the Bolivarian Republic of Venezuela (including its Amendment No. 1), 15 February 2009, published in the *Gaceta Oficial* No. 5908, 19 February 2009, **Exhibit C-184**, Article 142.

[7]   Decree 430, 29 December 1960, published in the *Gaceta Oficial* No. 26.445, 30 December 1960, **Exhibit C-2**, Article 4. *See also* Decree 1531, 7 November 2001, published in the *Gaceta Oficial* Ext. No. 5.553, 12 November 2001, **Exhibit C-111**, Article 3.

[8]   Decree 6217 published in the *Gaceta Oficial* Ext. No. 5.890, 31 July 2008, **Exhibit C-176**, Article 98. *See also* Decree 1531, 7 November 2001, published in the *Gaceta Oficial* Ext. No. 5.553, 12 November 2001, **Exhibit C-111**, Article 24.

[9]   *See* http://www.cvg.gob.ve/espanol/cvgminerven.html.

[10]   1945 Mining Law published in the *Gaceta Oficial* Ext. No. 121 (excerpts), 18 January 1945, **Exhibit C-1**, Article 13; and Decree 295, 5 September 1999, published in the *Gaceta Oficial* No. 5.382, 28 September 1999, **Exhibit C-110**, Article 24, which reads: "The mining concession is the act of the National Executive, through which it confers rights and imposes obligations on individuals for exploitation of existing mineral resources in the national territory. The mining concession gives its holder the exclusive right to exploration and exploitation of mineral substances that are within the assigned spatial domain". English translation. The original text in Spanish reads: "La concesión minera es el acto del Ejecutivo Nacional, mediante el cual se otorgan derechos e imponen obligaciones a los particulares para el aprovechamiento de recursos minerales existentes en el territorio nacional. La concesión minera confiere a su titular el derecho exclusivo a la exploración y explotación de las sustancias minerales otorgadas que se encuentren dentro del ámbito espacial concedido".

4

(b)　　CVG contracts: contracts granted by CVG pursuant to a general assignment of mining rights from MEM to CVG.[11]

(c)　　Concession leases: concessions granted by MEM to CVG for exploration and exploitation, and then leased by CVG to Rusoro's subsidiaries.[12]

(d)　　Joint venture agreements: unincorporated joint venture agreements between Rusoro's subsidiaries and the legal holder of a CVG contract.

9.　　In addition to the rights conferred by the respective contracts and concessions, when Rusoro first invested in Venezuela, the legal regime for the marketing of gold permitted producers to sell their production freely either in the domestic or international markets, subject to a minimum quota of 15% of its quarterly production which had to be sold domestically in Venezuela.[13]

10.　　At the time of the investment, certain currency controls existed in Venezuela,[14] which nevertheless permitted Rusoro to exchange money earned in local currency through domestic sales, ie. Venezuelan Bolívares (**VEF**), into foreign currency. This could be done in two ways: (i) through requests to the *Comisión de Administración de Divisas* (**CADIVI**), a government agency which administers legal currency exchange in Venezuela, and, in limited circumstances,[15] authorizes

---

[11]　Resolution No. 2, 9 January 1991, published in the *Gaceta Oficial* No. 34.632, 10 January 1991, **Exhibit C-35**, Article 1; Decree 1409, 29 December 1990, published in the *Gaceta Oficial* No. 34.627, 3 January 1991, **Exhibit C-34**, Articles 2 and 5; Decree 3281, 9 December 1993, published in the *Gaceta Oficial* No. 35.366, 22 December 1993, **Exhibit C-91**, Articles 1 and 4.

[12]　1945 Mining Law published in the *Gaceta Oficial* Ext. No. 121 (excerpts), 18 January 1945, **Exhibit C-1**, Article 15.

[13]　Resolution of the BCV No. 96-12-06, 16 December 1996, published in the *Gaceta Oficial* No. 36.124, 13 January 1997, **Exhibit C-101**, Article 5, paragraph 1.

[14]　Indeed, since 2003 currency controls required that 90% of all foreign currency income obtained from exports be sold to the BCV at the official exchange rate. See *Convenio Cambiario* No. 1, 5 February 2003, published in the *Gaceta Oficial* No. 37.653, 19 March 2003, **Exhibit C-122**, Articles 18 and 27.

[15]　The acquisition of foreign currency through CADIVI has different rules and conditions depending on the purpose of the acquisition (i.e. imports of supplies that have to be sourced from outside Venezuela, payment of foreign private debt, payment of dividends, capital repatriation of registered foreign

5

access to foreign currency at the Government-controlled, artificially low, exchange rate (the *Official Exchange Rate*); or (ii) through a securities swap market, whereby certain securities denominated in VEF could be swapped for securities denominated in another currency (the *Swap Market*)[16]. The Swap Market was not subject to the Official Exchange Rate and effectively provided a market value for the VEF/US Dollar exchange rate in Venezuela (the *Parallel Exchange Rate*). Because it was a less bureaucratic and more straightforward system than CADIVI, Rusoro would often use the Swap Market in order to convert its VEF into foreign currency.

### 1. Rusoro's Mining Rights

11.   At the time of the Nationalisation, Rusoro's Mining Rights included two gold mines in production, the Choco mine (comprising Choco 4 and Choco 10) and the Bloque B, together with a processing plant at Choco 10. In addition, at the time of the Nationalisation, Rusoro also had over ten ongoing gold exploration projects ranging from early stage exploration to advanced/development stage.

12.   In reliance upon the terms governing its Mining Rights, the legal framework for the mining sector, and the representations of the Venezuelan Government, Rusoro

---

investments, etc.). *See Convenio Cambiario* No. 1, 5 February 2003, published in the *Gaceta Oficial* No. 37.653, 19 March 2003, **Exhibit C-122**, Articles 26, 29 and 33; *Providencia 108* of CADIVI, 20 September 2011, published in the *Gaceta Oficial* No. 39.764, 23 September 2011, **Exhibit C-216**; *Convenio Cambiario* No. 8, 2 September 2004, published in the *Gaceta Oficial* No. 38.015, 3 September 2004, **Exhibit C-132**, Article 1; *Providencia 45* of CADIVI, 24 September 2003, published in the *Gaceta Oficial* No. 37.788, 2 October 2003, **Exhibit C-124**; *Providencia 58* of CADIVI, 2 September 2004, published in the *Gaceta Oficial* No. 38.015, 3 September 2004, **Exhibit C-133**; and *Providencia 56* of CADIVI, 18 August 2004, published in the *Gaceta Oficial* No. 38.006, 23 August 2004, **Exhibit C-131**.

[16]   In a Swap Market transaction, a Venezuelan resident or a legal entity intending to acquire foreign currency purchases securities denominated in VEF (usually Venezuelan government bonds) (the *Venezuelan Security*) which it then exchanges at the Parallel Exchange Rate for securities denominated in foreign currency (the *Foreign Security*) held in custody abroad. The Venezuelan resident or the legal entity instructs the sale of the Foreign Security for a price in foreign currency payable into a foreign account. The "reverse swap" transaction is used to acquire VEF from a foreign currency position. These activities were authorized under the regulations and conducted between corresponding brokers in and outside of Venezuela. The Swap Market was eliminated without prior notice by the Government in 2010 (see para. 75 below).

6

invested in excess of US$ 1.25 billion during the period 2006-2012 in its operations in Venezuela. This included over VEF 90 million invested to comply with Rusoro's obligations to fund several social and construction projects in the local communities surrounding its operations (see section II.2 below).

### a.     First acquisition of mining rights: November 2006

13.   As mentioned above,[17] in November 2006, Newton Ventures (Panama) Inc., a wholly owned subsidiary of Rusoro[18] merged with Grupo Agapov Corp. to form a new corporation, Rusoro Mining (Panama) Inc.[19] The merger was structured as a reverse takeover, whereby the shareholders of Grupo Agapov Corp. became the owners of the majority of the issued and outstanding common shares of Rusoro, and, in turn, Rusoro Mining (Panama) Inc. became a wholly owned subsidiary of Rusoro.[20]

14.   Through Rusoro Mining (Panama) Inc., Rusoro became the owner of several subsidiaries in Venezuela which, in turn, were the direct holders of various Mining Rights in the Bolívar State in south-eastern Venezuela. The subsidiaries and the Mining Rights acquired through this transaction are described below:

### (i)     Corporación 80.000, C.A.

15.   Corporación 80.000, C.A.[21] held a concession granted by MEM for the exploration and exploitation of vein gold in the El Placer area, located in the Sifontes Municipality, which was to run until 22 August 2017.[22]

---

[17]  See para. 6 above.

[18]  Shareholders Register Newton Ventures (Panama) Inc., 24 August 2006, **Exhibit C-141.**

[19]  Agreement of Merger and Articles of Incorporation of Rusoro Mining (Panama) Inc., 7 November 2006, **Exhibit C-143.**

[20]  Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144.**

[21]  Articles of Incorporation of Corporación 80.000, C.A., 4 May 1987, **Exhibit C-11.** Corporación 80.000, C.A. is 100% owned by Dotly Financial Corp, *see* Shareholders Register of Corporación

7

16. At the time of the Nationalisation, Corporación 80.000, C.A. had carried out extensive exploration activities in both the El Placer and the adjacent San Rafael areas (see below at para 25), with a combined drilling of 177,000 metres in 717 drill holes that had successfully outlined a series of gold mineralized zones.

### (ii)   Corporación Cabello Gálvez, C.A.

17. Corporación Cabello Gálvez, C.A. is a 50% owned Venezuelan subsidiary of Rusoro.[23] This company held the concession for the exploration and subsequent exploitation of alluvial gold and diamonds in the Atlántida area, located in the Sifontes Municipality, which was granted by MEM on 16 August 1991 and was due to expire 20 years after the publication of the certificate of exploitation (which had not occurred at the time of the Nationalisation), with the possibility of extending the term for subsequent periods of ten years up to a maximum 40 years.[24]

---

80.000, C.A., 4 July 2005, **Exhibit C-136**. Dotly Financial Corp. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Dotly Financial Corp., 10 November 2006, **Exhibit C-145**; Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[22] Resolution DM 414/2007, 22 June 2007, published in the *Gaceta Oficial* No. 38.711, 22 June 2007, **Exhibit C-158**. The concession was originally granted to Pedro Rubén Vizcaya by MEM on 23 June 1972, *see* Mining Title of El Placer published in the *Gaceta Oficial* No. 29.882, 17 August 1972, **Exhibit C-4**. The title was transferred to Corporación 80.000 on 22 January 1991 and was approved by MEM in June 1992, *see* Transfer of Mining Title of El Placer published in the *Gaceta Oficial* No. 35.008, 17 July 1992, **Exhibit C-62**.

[23] Articles of Incorporation of Corporación Cabello Gálvez C.A., 20 January 1977, **Exhibit C-5**. Corporación Cabello Gálvez is 100% owned by Inversiones Mineras El Dorado, C.A., *see* Shareholders Register of Corporación Cabello Gálvez, C.A., 16 April 2002, **Exhibit C-112**. Inversiones Mineras El Dorado, S.A. is 50% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Inversiones Mineras El Dorado, S.A., 4 November 2008, **Exhibit C-180**; Rusoro Mining (Panama) Inc., is 100% owned by Rusoro Mining (Panama) Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[24] Mining Title of Atlántida published in the *Gaceta Oficial* Ext. No. 4.308, 3 September 1991, **Exhibit C-53**.

8

### (iii)   Corporación Minera 410879, C.A.

18.   Corporación Minera 410879, C.A.[25] held a CVG contract granted in June 1992 for the exploration and exploitation of gold and diamonds in the Anaconda area, located in the Sifontes Municipality, for a period of 20 years extendable for additional periods of ten years.[26] At the time of the Nationalisation, advanced exploration had been carried out at Anaconda, including a drilling of 3,800 metres in 34 drill holes.

### (iv)   General Mining de Guayana, C.A.

19.   General Mining de Guayana, C.A.[27] held a concession lease granted by CVG on 13 May 1991 for the exploration, development and exploitation of several minerals, including gold, silver, zinc and copper in the Increíble 6 area, located in the El

---

[25]   Articles of Incorporation of Corporación Minera 410879 C.A., 26 August 1991, **Exhibit C-52**. Rusoro acquired a 76% interest in this company in November 2006, with the remaining 24% being acquired by Rusoro in March 2007 (*see* below at para. 39). Corporación Minera 410879, C.A. is 100% owned by Balandria Ltd., *see* Shareholders Register of Corporación Minera 410879, C.A., 21 January 2004, **Exhibit C-130**. Balandria Ltd. is 76% owned by Rusoro Mining (Panama) Inc. and 24% owned by Tombstone Aruba A.V.V., *see* Shareholders Register of Balandria Ltd., 7 November 2006, **Exhibit C-142**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**. Tombstone Aruba A.V.V. is 100% owned by Mena Resources Inc., *see* Shareholders Register of Tombstone Aruba A.V.V., 29 May 1995, **Exhibit C-96** and Certificate of Change of Name of Tombstone Explorations Co. Ltd. to Mena Resources Inc., 17 April 2002, **Exhibit C-114**; Mena Resources Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

[26]   Exploitation Contract for Anaconda, 9 June 1992, **Exhibit C-61**.

[27]   Articles of Incorporation of General Mining de Guayana. C.A., 25 May 1988, **Exhibit C-18**. Rusoro acquired 76% interest of General Mining de Guayana, C.A. in November 2006, and would acquire the outstanding 24% interest in March 2007 (*see* footnote 65 below). General Mining de Guayana, C.A. is 100% owned by Balandria Ltd., *see* Shareholders Register of General Mining de Guayana C.A, 21 January 2004, **Exhibit C-128**. Balandria Ltd. is 76% owned by Rusoro Mining (Panama) Inc. and 24% owned by Tombstone Aruba A.V.V., *see* Shareholders Register of Balandria Ltd., 7 November 2006, **Exhibit C-142**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**. Tombstone Aruba A.V.V. is 100% owned by Mena Resources Inc., *see* Shareholders Register of Tombstone Aruba A.V.V., 29 May 1995, **Exhibit C-96** and Certificate of Change of Name of Tombstone Explorations Co. Ltd. to Mena Resources Inc, 17 April 2002, **Exhibit C-114**; Mena Resources Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

9

Callao Municipality.[28] The lease was to run for 20 years from the publication of the certificate of exploitation, which occurred in September 2009,[29] with the possibility of extending the term for subsequent periods of ten years.[30]

20.    After a successful exploration phase, which included 997 holes totalling a drilling of 188,000 meters, Increíble 6 was in the development stage at the time of the Nationalisation. Its feasibility study had been approved in December 2008,[31] and in September 2010 it had received from the Ministry of the People's Power for the Environment (*MinAmb*) the authorization to affect natural resources in the exploitation of the project.[32]

(v)    **Inversora Maryate, C.A.**

21.    Inversora Maryate, C.A.[33] had two concessions for the exploration and exploitation of (i) alluvial gold and diamonds over the Virginia I area and (ii) alluvial gold over the Virginia II area, both located in the Sifontes Municipality. These concessions

---

[28]    *See* Leasing Contract of Increíble 6, 13 May 1991, **Exhibit C-49**. The Increíble 6 area was originally granted by MEM to CVG on 7 December 1990, *see* Mining Title of Increíble 6 published in the *Gaceta Oficial* Ext. No. 4.251, 23 January 1991, **Exhibit C-36**.

[29]    Certificate of Exploitation of Increíble 6 published in the *Gaceta Oficial* No. 39.260, 9 September 2009, **Exhibit C-194**.

[30]    Leasing Contract of Increíble 6, 13 May 1991, **Exhibit C-49**.

[31]    Approval of the Feasibility Study for Increíble 6, 23 December 2008, published in the *Gaceta Oficial* No. 39.086, 23 December 2008, **Exhibit C-183**.

[32]    Authorization to affect Natural Resources for Increíble 6, 23 September 2010, **Exhibit C-204**.

[33]    Articles of Incorporation of Inversora Maryate, C.A., 30 May 1986, **Exhibit C-8**. Inversora Maryate, C.A. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Inversora Maryate, C.A., 17 October 2002, **Exhibit C-116**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

10

were granted in November 1988 for a period of 20 years from the publication of the certificate of exploitation, extendable for up to 40 years.[34]

### (vi)   Inversora Técnica de Minas, C.A. (INTEMIN)

22.   Inversora Técnica de Minas, C.A. (INTEMIN)[35] held a CVG contract granted in August 1991 for the exploration, development and exploitation of gold and diamonds in the Belkis I area, located in the Sifontes Municipality, for a period of 25 years.[36]

### (vii)   Krysos Mining, S.A.

23.   Krysos Mining, S.A.[37] held a concession for the exploration and exploitation of alluvial gold and diamonds in the Valle Hondo area, located in the Sifontes Municipality. The concession was granted by MEM in 1988 for a period of 20 years (extendable for up to 40 years) from the publication of the certificate of

---

[34]  Mining Title of Virginia I published in the *Gaceta Oficial* No. 34.087, 7 November 1988, **Exhibit C-24**; Mining Title of Virginia II, published in the *Gaceta Oficial* No. 34.087, 7 November 1988, **Exhibit C-25**.

[35]  Articles of Incorporation of Inversora Técnica de Minas, C.A. (INTEMIN), 14 May 1987, **Exhibit C-12**. Inversora Técnica de Minas Intemín, C.A. (INTEMIN) is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Inversora Técnica de Minas, C.A. (INTEMIN), 17 October 2002, **Exhibit C-117**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[36]  Exploration, Development and Exploitation contract for Belkis I, 5 August 1991, **Exhibit C-50**.

[37]  Articles of Incorporation of Krysos Mining, S.A., 30 June 1989, **Exhibit C-27**. In this acquisition only a 76% interest in the company was acquired. The remaining 24% was acquired in March 2007, *see* footnote 65 below. Krysos Mining, S.A. is 100% owned by Balandria Ltd., *see* Shareholders Register of Krysos Mining, S.A., 21 January 2004, **Exhibit C-129**. Balandria Ltd. is 76% owned by Rusoro Mining (Panama) Inc. and 24% owned by Tombstone Aruba A.V.V., *see* Shareholders Register of Balandria Ltd., 7 November 2006, **Exhibit C-142**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**. Tombstone Aruba A.V.V. is 100% owned by Mena Resources Inc., *see* Shareholders Register of Tombstone Aruba A.V.V., 29 May 1995, **Exhibit C-96** and Certificate of Change of Name of Tombstone Explorations Co. Ltd. to Mena Resources Inc., 17 April 2002, **Exhibit C-114**; Mena Resources Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

11

exploitation,[38] which took place in September 1995.[39] It also held five additional concessions granted in January 1999 to mine vein gold in the Valle Hondo I, II, III, IV and V areas for a period of 20 years (extendable for subsequent periods of ten years, for up to 40 years),[40] and two CVG contracts for the exploration, development and exploitation of gold and diamonds in the Valle Hondo 89 and 90 areas granted in May 1991, with a duration of 25 years.[41]

24.   The Valle Hondo project is located about 40 km southeast of the San Rafael and El Placer projects. At the time of the Nationalisation, Rusoro had already carried out advanced exploration activities at Valle Hondo, which included the aggregate drilling of 14,500 metres in 121 drill holes with successful results.

### (viii)   Lamin, Laboreos Mineros, C.A.

25.   Lamin, Laboreos Mineros, C.A.[42] had a CVG contract which authorized the exploitation of vein gold in the San Rafael area, located in the Sifontes Municipality, for a period of 25 years from April 1991.[43] At the time of the

---

[38]   The concession was originally granted by MEM to Francisco Zuloaga Pocaterra, *see* Mining Title of Valle Hondo published in the *Gaceta Oficial* No. 34.023, 5 August 1988, **Exhibit C-22**. Title to the concession was transferred to Krysos Mining, S.A. in 1993, *see* Transfer of Valle Hondo Mining Title to Krysos Mining, S.A. published in the *Gaceta Oficial* No. 35.370, 29 December 1993, **Exhibit C-92**.

[39]   Certificate of Exploitation of Valle Hondo published in the *Gaceta Oficial* No. 35.791, 7 September 1995, **Exhibit C-97**.

[40]   Mining Titles of Valle Hondo I, II, III, IV and V published in the *Gaceta Oficial* Ext. No. 5.287, 8 January 1999, **Exhibit C-107**.

[41]   The contracts were originally concluded between CVG and Invalmerca, C.A, *see* Exploration, Development and Exploitation Contract for Valle Hondo 89, 13 May 1991, **Exhibit C-47**; Exploration, Development and Exploitation Contract for Valle Hondo 90, 13 May 1991, **Exhibit C-48**. They were subsequently assigned to Krysos Mining, S.A. on 3 December 1993, *see* Assignment of Valle Hondo 89 to Krysos Mining, S.A., 10 December 1993, **Exhibit C-88**; Assignment of Valle Hondo 90 to Krysos Mining, S.A., 10 December 1993, **Exhibit C-89**.

[42]   Articles of Incorporation of Lamin, Laboreos Mineros, C.A., 17 October 1989, **Exhibit C-29**. Lamin, Laboreos Mineros, C.A. is 100% owned by Dotly Financial Corp., *see* Shareholders Register of Lamin Laboreos Mineros, C.A., 24 June 2008, **Exhibit C-170**. Dotly Financial Corp. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Dotly Financial Corp., 10 November 2006, **Exhibit C-145**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[43]   Exploitation Contract for San Rafael, 12 April 1991, **Exhibit C-46**.

12

Measures, Rusoro had carried out combined exploration activities in the San Rafael and El Placer areas (see above at para 15) with successful results, after drilling 177,000 metres in 717 holes.

### (ix)   Mineral Ecological Technology de Venezuela M.E.T. C.A.

26.   Mineral Ecological Technology de Venezuela M.E.T. C.A.[44] held a CVG contract for the exploration, development and exploitation of gold in the Guaicamacuare area, located in both the Roscio and Sifontes Municipalities, for a period of 20 years as of 5 September 1991, which was extendable for subsequent periods of ten years.[45]

### (x)   Minería MS, C.A.

27.   In March 1991, Minería M.S., C.A.[46] entered into two contracts with CVG to explore, develop and exploit gold and diamonds in the Emilia and Emilia II areas, located in the Sifontes Municipality, for a period of 25 years.[47]

28.   At the time of the Nationalisation, 52,500 metres of drilling for a total of 342 drill holes had been undertaken in the Emilia and Emilia II areas. The project was in the development phase, including one open pit mine and two zones which had been

---

[44]   Articles of Incorporation of Mineral Ecological Technology de Venezuela M.E.T. C.A., 27 April 1989, **Exhibit C-26**. Mineral Ecological Technology de Venezuela M.E.T. C.A. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Mineral Ecological Technology de Venezuela, 17 October 2003, **Exhibit C-125**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[45]   Exploration, Development and Exploitation Contract for Guaicamacuare, 5 September 1991, **Exhibit C-54**.

[46]   Articles of Incorporation of Minería MS. C.A., 10 November 1986, **Exhibit C-9**. Minería MS. C.A. is 100% owned by Dotly Financial Corp., *see* Shareholders Register of Minería MS, C.A., 29 June 2011, **Exhibit C-209**. Dotly Financial Corp. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Dotly Financial Corp, 10 November 2006, **Exhibit C-145**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[47]   Exploration, Development and Exploitation Contract for Emilia, 21 March 1991, **Exhibit C-44**; Exploration, Development and Exploitation Contract for Emilia II, 21 March 1991, **Exhibit C-45**.

13

worked by both open pit and underground methods. The existing infrastructure at the time of the Nationalisation included 1,893 metres of underground development accessed from two shafts.

29. Minería M.S., C.A. also entered into two unincorporated joint venture agreements with cooperatives holding CVG contracts. One of the agreements was entered into on 28 December 2004 to exploit alluvial and vein gold in an area called Ceiba II, located in the Sifontes Municipality for a period of 20 years, extendable for additional periods of ten years from March 1992.[48]

30. At the time of the Nationalisation, the Ceiba II deposits had been tested by diamond drilling to a depth of approximately 300 metres. 92 drill holes with an aggregate depth of 17,084 metres had been completed, outlining several gold mineralized zones.

31. The second joint venture agreement was executed on 15 July 2006 to explore, develop and exploit gold in an area called Urupagua, located in the Sifontes Municipality for a period of 25 years as of March 1991.[49]

**b.    Second acquisition of Mining Rights: December 2006**

32. On 19 December 2006, Rusoro Mining (Panama) Inc. acquired all of the issued and outstanding shares of Cradock United Inc., a company incorporated in Panama, which held several Mining Rights through its Venezuelan subsidiaries,[50] which became fully-owned subsidiaries of Rusoro, as described below:

---

[48] Joint Venture Agreement for the Exploitation of Ceiba II, 28 December 2004, **Exhibit C-134**; Exploration, Development and Exploitation Contract for Ceiba II, 18 March 1992, **Exhibit C-59**.

[49] Joint Venture Agreement for the Exploitation of Urupagua, 15 July 2006, **Exhibit C-139**; Exploration, Development and Exploitation Contract for Urupagua, 20 March 1991, **Exhibit C-43**.

[50] Articles of Incorporation of Cradock United Inc., 14 August 2006, **Exhibit C-140**; Purchase Agreement of Cradock United Inc., 19 December 2006, **Exhibit C-151**; Shareholders Register of Cradock United Inc., 19 December 2006, **Exhibit C-152**.

14

#### (i)      Corporación Minera Sor Teresita, C.A.

33.     Corporación Minera Sor Teresita, C.A.[51] had four contracts granted by CVG on 22 July 1992 for the exploration, development and exploitation of gold for a period of 20 years, extendable for additional periods of ten years, for the areas Sor Teresita 1, Sor Teresita 2, Sor Teresita 3 and Sor Teresita 4, located in the Sifontes Municipality.[52] It held an additional contract under the same terms for the exploration, development and exploitation of gold and diamonds in the area Bloque B y Sor Teresita 5 located in the Sifontes Municipality, dated 27 January 1993.[53]

#### (ii)     Inversiones Vipago, C.A.

34.     Inversiones Vipago, C.A.[54] held a concession for the exploration and subsequent exploitation of alluvial gold and diamonds in the Unin area, in the Sifontes Municipality, originally granted in 1988 for a period of 20 years (extendable for up to 40 years).[55] This term was to run from the date of publication of the certificate of

---

[51]   Articles of Incorporation of Corporación Minera Sor Teresita, C.A., 3 December 1986, **Exhibit C-10**. Corporación Minera Sor Teresita, C.A is 100% owned by Cradock United Inc., *see* Shareholders Register for Corporación Minera Sor Teresita. C.A, 18 December 2006, **Exhibit C-146.** Cradock United Inc. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Cradock United Inc., 19 December 2006. **Exhibit C-152.** Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining (Panama) Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006. **Exhibit C-144.**

[52]   Exploration, Development and Exploitation Contract for Sor Teresita 1, 22 July 1992, **Exhibit C-63**; Exploration, Development and Exploitation Contract for Sor Teresita 2, 22 July 1992, **Exhibit C-64**; Exploration, Development and Exploitation Contract for Sor Teresita 3, 22 July 1992, **Exhibit C-65**; Exploration, Development and Exploitation Contract for Sor Teresita 4, 22 July 1992, **Exhibit C-66**.

[53]   Exploration, Development and Exploitation Contract for Bloque B y Sor Teresita 5, 27 January 1993. **Exhibit C-72.**

[54]   Articles of Incorporation of Inversiones Vipago, C.A., 2 August 1988, **Exhibit C-20**. Inversiones Vipago. C.A. is 100% owned by Cradock United Inc., *see* Shareholders Register of Inversiones Vipago, C.A., 18 December 2006, **Exhibit C-149.** Cradock United Inc. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholder Register of Cradock United Inc., 19 December 2006, **Exhibit C-152.** Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining (Panama) Ltd., *see* Shareholder Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144.**

[55]   The concession was originally granted by MEM to Arapco Administración de Proyectos C.A., *see* Mining Title of Unin published in the *Gaceta Oficial* No. 33.967, 17 May 1988, **Exhibit C-16**. Title to the concession was transferred to Inversiones Vipago C.A. and such transfer was approved by MEM in 1992, *see* Transfer of Unin Mining Title to Inversiones Vipago, C.A. published in the *Gaceta Oficial* Ext. No. 4.492, 20 November 1992, **Exhibit C-67.**

15

exploitation, which had not happened at the time of Nationalisation by the Venezuelan Government.

### (iii)   Inversiones Yuruan, C.A.

35.   Inversiones Yuruan, C.A.[56] held a CVG contract executed in November 1993 for the exploration, development and exploitation of gold and diamonds in the Yuruan I area for a period of 20 years since its execution, extendable for additional periods of ten years.[57]

36.   The Yuruan mine is located in the Sifontes Municipality. At the time of the Nationalisation, 14,676.5 metres had been drilled in 93 drill holes at Yuruan.

### (iv)   Minera Tapaya, C.A.

37.   Minera Tapaya, C.A.[58] held two concessions granted in 1988 for the exploitation of alluvial gold and diamonds in the Tapaya N° 1 and Libertad N° 1 areas, located in the Sifontes Municipality. Both concessions were granted by MEM for 20 years, extendable for up to 40 years.[59]

---

[56]   Articles of Incorporation of Inversiones Yuruan, C.A., 3 August 1988, **Exhibit C-21**. Inversiones Yuruan, C.A. is 100% owned by Cradock United Inc., *see* Shareholders Register of Inversiones Yuruan, C.A., 18 December 2006, **Exhibit C-148**. Cradock United Inc, is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Cradock United Inc., 19 December 2006 **Exhibit C-152**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[57]   Exploration, Development and Exploitation Contract for Yuruan I, 16 November 1993, **Exhibit C-87**.

[58]   Articles of Incorporation of Minera Tapaya, C.A., 12 April 1988, **Exhibit C-14**. Minera Tapaya, C.A. is 100% owned by Cradock United Inc., *see* Shareholders Register of Minera Tapaya, C.A., 18 December 2006, **Exhibit C-150**. Cradock United Inc. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholders Register of Cradock United Inc., 19 December 2006, **Exhibit C-152**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[59]   The concession for the area Tapaya N° 1 was originally granted by the MEM to Camilo Bruno Nicoli in July 1988, *see* Mining Title of Tapaya N° 1, published in the *Gaceta Oficial* No. 34.002, 7 July 1988, **Exhibit C-19**. It was then transferred to Minera Tapaya, C.A. and such transfer was approved by the MEM in 1991, *see* Transfer of Tapaya N° 1 Mining Title to Minera Tapaya, C.A., published in the *Gaceta Oficial* Ext. No. 4.336, 13 November 1991, **Exhibit C-55**.

16

(v)     Representaciones Carson Gold Int., S.A.

38.  Representaciones Carson Gold Int., S.A.[60] held a CVG contract for the exploration, development and exploitation of gold and diamonds in the Bloque A and Bloque C area, located in the Sifontes Municipality granted in December 1992. The contract ran for a period of 20 years, extendable for additional periods of ten years.[61]

c.     Third acquisition of Mining Rights: March 2007

39.  In March 2007, Rusoro Acquisition Corp., a wholly owned subsidiary of Rusoro[62] incorporated in British Columbia, Canada, merged with Mena Resources Inc., a company also incorporated under the laws of British Columbia, by way of a Plan of Arrangement.[63] Pursuant to this merger, Rusoro acquired all of the issued and outstanding shares of Mena Resources Inc.[64] and became the owner of its Venezuelan subsidiaries, which held several Mining Rights, as described below.[65]

---

The concession for the area Libertad N° 1 was originally granted by the MEM to China Clay Guayana, C.A. in May 1988, *see* Mining Title of Libertad N° 1, published in the *Gaceta Oficial* No. 33.969, 19 May 1988 **Exhibit C-17**. It was then transferred to Minera Tapaya, C.A. and such transfer was approved by the MEM, in 1991, *see* Transfer of Libertad N° 1 Mining Title to Minera Tapaya C.A., 4 September 1991, published in the *Gaceta Oficial* Ext. No. 4.336, 13 November 1991, **Exhibit C-56**.

[60]  Articles of Incorporation of Representaciones Carson Gold Int.. S.A., 19 September 1990. **Exhibit C-33**. Representaciones Carson Gold Int., C.A. is 100% owned by Cradock United Inc., *see* Shareholders Register of Representaciones Carson Gold Int, S.A., 18 December 2006 **Exhibit C-147**. Cradock United Inc. is 100% owned by Rusoro Mining (Panama) Inc., *see* Shareholder Register of Cradock United Inc., 19 December 2006, **Exhibit C-152**. Rusoro Mining (Panama) Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholder Register of Rusoro Mining (Panama) Inc., 8 November 2006, **Exhibit C-144**.

[61]  Exploration, Development and Exploitation Contract for Bloque A and Bloque C, 21 December 1992. **Exhibit C-69**.

[62]  Shareholders Register of Rusoro Acquisition Corp., 15 January 2007, **Exhibit C-154**.

[63]  Arrangement Agreement between Rusoro Mining Ltd. and Mena Resources Inc., 22 January 2007, **Exhibit C-155**; Plan of Arrangement between Rusoro Mining Ltd. and Mena Resources Inc., 2 March 2007, **Exhibit C-156**.

[64]  Articles of Incorporation of Mena Resources Inc., 9 February 1990. **Exhibit C-30**; Certificate of Incorporation and Change of Name of Mena Resources Inc., 17 April 2002, **Exhibit C-113**; Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

[65]  Through this transaction, Rusoro also acquired the 24% interest that Mena Resources Inc. still had in Balandria Ltd., thus becoming the owner of 100% of its shares and thus owner of 100% of the shares of

17

### (i)   Corporación Minera 6560433, C.A.

40.   Corporación Minera 6560433[66] entered into a contract with CVG for the exploration, development and exploitation of gold in the Angelito area, located in the Sifontes Municipality, for a period of 20 years on 18 December 1993, extendable for additional periods of ten years.[67]

### (ii)   Inversiones Goldwana, C.A.

41.   Inversiones Goldwana, C.A.[68] had a contract with CVG concluded on 19 May 1993 for the exploration, development and exploitation of gold and diamonds in the La Trinidad area, located in the Sifontes Municipality, for a period of 20 years, extendable for additional periods of ten years.[69]

42.   The combined exploration activities in Angelito and La Trinidad included completing the drilling phase, which consisted of an aggregate drilling of 7729 metres and 75 holes, with successful results.

---

the Venezuelan subsidiaries General Mining de Guayana C.A., Krysos Mining S.A., and Corporación Minera 410879 C.A. *See* paras. 18, 19 and 23.

[66]   Articles of Incorporation of Corporación Minera 6560433, C.A., 24 February 1993, **Exhibit C-73**. Corporación Minera 6560433, C.A. is 100% owned by Tombstone Aruba A.V.V., *see* Shareholders Register of Corporación Minera 6560433, C.A., 16 October 1995, **Exhibit C-98**. Tombstone Aruba A.V.V. is 100% owned by Mena Resources Inc., *see* Shareholders Register of Tombstone Aruba A.V.V., 29 May 1995, **Exhibit C-96** and Certificate of Change of Name of Tombstone Explorations Co. Ltd. to Mena Resources Inc, 17 April 2002, **Exhibit C-114**; Mena Resources Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

[67]   Exploration, Development and Exploitation Contract for Angelito. 18 December 1993, **Exhibit C-90**.

[68]   Articles of Incorporation of Inversiones Goldwana, C.A., 9 April 1992, **Exhibit C-60**. Inversiones Goldwana, C.A. is 100% owned by Racal Investments A.V.V., *see* Shareholders Register of Inversiones Goldwana, C.A., 12 January 2004, **Exhibit C-127**. Racal Investments A.V.V. is 100% owned by Minplata Aruba A.V.V., *see* Shareholders Register of Racal Investments A.V.V., 16 June 1993, **Exhibit C-85**. Minplata Aruba A.V.V. is 100% owned by Tombstone Aruba A.V.V., *see* Shareholders Register of Minplata Aruba A.V.V., 27 January 1996, **Exhibit C-99**. Tombstone Aruba A.V.V. is 100% owned by Mena Resources Inc., *see* Shareholders Register of Tombstone Aruba A.V.V., 29 May 1995, **Exhibit C-96** and Certificate of Change of Name of Tombstone Explorations Co. Ltd. to Mena Resources Inc, 17 April 2002, **Exhibit C-114**; Mena Resources Inc. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Mena Resources Inc., 5 March 2007, **Exhibit C-157**.

[69]   Exploration, Development and Exploitation Contract for La Trinidad, 19 May 1993, **Exhibit C-84**.

18

**d.    Fourth acquisition of Mining Rights: October 2007**

43.    In October 2007, Rusoro acquired all of the Venezuelan mining assets of Gold Fields Netherlands Services B.V.,[70] which included a 95% interest in the Choco 10 mine, the largest gold mine in Venezuela in terms of production volume and mineral resource base. This agreement gave Rusoro ownership over several subsidiaries holding Mining Rights, as described below:

**(i)    Corporación Aurífera de El Callao, C.A.**

44.    Corporación Aurífera de El Callao, C.A.[71] had mining rights under three concession lease agreements to explore and exploit several minerals, including gold, copper, zinc and silver in the Choco 1, Choco 2 and Choco 12 areas located in the El Callao Municipality. The rights over these mines were initially granted by MEM to CVG for a period of 20 years from the publication of the certificate of exploitation (which had still not occurred at the time of the Nationalisation), extendable for periods of ten years and up to a total of 40 years.[72] These concessions were subsequently leased by CVG to Corporación Aurífera de El Callao, C.A. in 1998.[73]

---

[70]   Combination Agreement between Rusoro Mining Ltd. and Gold Fields Netherlands Services B.V., 11 October 2007, **Exhibit C-159**, as amended, *see* Joinder and Amending Agreement between Rusoro Mining (BVI) Ltd., Venezuela Holdings (BVI) Ltd., Rusoro Mining Ltd. and Gold Fields Netherlands Services B.V., 28 November 2007, **Exhibit C-162**.

[71]   Articles of Incorporation of Corporación Aurífera de El Callao, C.A., 25 October 1988, **Exhibit C-23**. Corporación Aurífera de El Callao, C.A., is 100% owned by Triway Corporation A.V.V., *see* Shareholders Register of Corporación Aurífera de El Callao, C.A., 10 June 2008, **Exhibit C-168**. Triway Corporation A.V.V. is 100% owned by El Callao Holdings A.V.V., *see* Shareholders Register of Triway Corporation A.V.V., 12 November 2003, **Exhibit C-126**. El Callao Holdings A.V.V. is 100% owned by Venezuela Holdings (BVI) Ltd., *see* Shareholders Register of El Callao Holding A.V.V., 23 October 2007, **Exhibit C-160**. Venezuela Holdings (BVI) is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Venezuela Holdings (BVI) Ltd., 30 November 2007, **Exhibit C-163**.

[72]   Mining Title of Choco 1 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-77**; Mining Title of Choco 2 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-78**; Mining Title of Choco 12 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-83**.

[73]   Leasing Contract for Choco 1, 3 December 1998, **Exhibit C-103**; Leasing Contract for Choco 2, 3 December 1998, **Exhibit C-104**; Leasing Contract for Choco 12, 3 December 1998, **Exhibit C-105**.

19

### (ii)     Corporación Minera Choco 9, C.A.

45.     Corporación Minera Choco 9, C.A.[74] had mining rights under a concession lease agreement over the Choco 9 area, located in the El Callao Municipality, to explore and exploit several minerals, including gold, copper, zinc and silver. The rights over this 5,000-hectare mine were initially granted by MEM to CVG in 1993 by means of a concession for a period of 20 years (extendable for up to 40 years) from the publication of the certificate of exploitation (which had still not happened at the time of the Nationalisation).[75] This concession was subsequently leased by CVG to Corporación Minera Choco 9 C.A on 18 December 1998.[76]

### (iii)    Promotora Minera de Guayana, P.M.G., S.A.

46.     Through the acquisition of Gold Fields Netherlands Services B.V., Rusoro became indirect owner of 95% of Promotora Minera de Guayana, P.M.G., S.A. (*PMG*).[77] CVG Ferrominera Orinoco C.A., a Venezuelan State-owned company, owns the remaining 5%.

---

[74]   Articles of Incorporation of Corporación Minera Choco 9, C.A., 18 July 1989, **Exhibit C-28**. Corporación Minera Choco 9 C.A. is 100% owned by Helvetia Corporation A.V.V., *see* Shareholders Register of Corporación Minera Choco 9, C.A., 10 December 1992, **Exhibit C-68**. Helvetia Corporation A.V.V. is 100% owned by El Callao Holdings A.V.V., *see* Shareholders Register of Helvetia Corporation A.V.V., 29 August 2003, **Exhibit C-123**. El Callao Holdings A.V.V. is 100% owned by Venezuela Holdings (BVI) Ltd., *see* Shareholders Register of El Callao Holding A.V.V., 23 October 2007, **Exhibit C-160**. Venezuela Holdings (BVI) is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Venezuela Holdings (BVI) Ltd, 30 November 2007, **Exhibit C-163**.

[75]   Mining Title of Choco 9 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-81**.

[76]   Leasing Contract for Choco 9, 18 December 1998, **Exhibit C-106**.

[77]   Articles of Incorporation of Promotora Minera de Guayana P.M.G., S.A., 10 May 1988, **Exhibit C-15**. PMG is 95% owned by Promotora Minera de Venezuela, S.A. (Promiven) and 5% owned by CVG Ferrominera Orinoco C.A., *see* Shareholders Register of Promotora Minera de Guayana P.M.G., S.A., 10 June 2008, **Exhibit C-166**. Promotora Minera de Venezuela, S.A. (Promiven) is 100% owned by Carisma Corporation A.V.V., *see* Shareholders Register of Promotora Minera de Venezuela, S.A (Promiven), 10 June 2008, **Exhibit C-167**. Carisma Corporation A.V.V. is 100% owned by Venezuela Holdings (BVI) Ltd., *see* Shareholders Register of Carisma Corporation A.V.V., 30 November 2007, **Exhibit C-164**. Venezuela Holdings (BVI) Ltd. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Venezuela Holdings (BVI) Ltd, 30 November 2007. **Exhibit C-163**.

20

47.   PMG held mining rights under two concession lease agreements over the Choco 4 and Choco 10 areas located in the El Callao Municipality. The Choco 10 area includes a mill facility for the processing of gold, the Choco 10 mill. The concessions were granted in 1993 by MEM to CVG for the exploration and production of several minerals, including gold, copper, zinc and silver for a period of 20 years, extendable for additional periods of ten years up to a maximum of 40 years from the publication of the certificate of exploitation,[78] which took place in December 2005.[79] The Choco 4 and Choco 10 concessions were leased by CVG to PMG in February 1994.[80]

48.   At the time of the Nationalisation, the Choco 4 and Choco 10 mines, together with the Choco 10 mill facility, were producing 8,000 to 10,000 gold ounces per month. Mining took place in established open pits which make up part of a significant gold reserve and resource base, developed through the drilling of 308,596 meters in 2811 drill holes.

49.   PMG was also the legal holder of a concession lease agreement over the Bochinche B1 and Bochinche B2 areas located in the Sifontes Municipality. Two concessions over these areas had been granted in 1990 by MEM to CVG for the exploration and subsequent exploitation of several minerals, including gold, copper, zinc and tin a for a period of 20 years, and extendable for up to 40 years, from the publication of the certificate of exploitation (which had still not happened at the time of the

---

[78]   Mining Title of Choco 4 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993; **Exhibit C-79**; Mining Title of Choco 10 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-82**.

[79]   Certificate of Exploitation of Choco 4 published in the *Gaceta Oficial* No. 38.328, 5 December 2005, . **Exhibit C-138**; Certificate of Exploitation of Choco 10 published in the *Gaceta Oficial* No. 38.328, 5 December 2005, **Exhibit C-137**.

[80]   Leasing Contract for Choco 4, 4 February 1994, **Exhibit C-93**; Leasing Contract for Choco 10, 4 February 1994, **Exhibit C-94**.

21

Nationalisation).[81] The Bochinche B1 and Bochinche B2 concessions were leased by CVG to PMG under a joint lease agreement of 18 March 1991.[82]

50. Additionally, in June 1993, PMG entered into a contract with CVG for the exclusive exploration, development and exploitation of gold in the Bochinche Zero area located in the Sifontes Municipality for a period of 20 years, extendable for additional periods of ten years.[83]

### (iv) Proyectos Mineros del Sur, PROMINSUR, C.A.

51. Proyectos Mineros del Sur, PROMINSUR, C.A. (*Prominsur*)[84] was the legal holder of a concession lease over the Choco 6 area located in the El Callao Municipality. The concession was granted in May 1993 by MEM to CVG for the exploration and subsequent exploitation of several minerals, including gold, copper, zinc and silver for a period of 20 years, and extendable for up to 40 years, from the publication of the certificate of exploitation (which had not happened at the time of the Nationalisation).[85] The Choco 6 lease agreement granted by CVG to Prominsur was executed on 25 May 1994.[86]

---

[81] Mining Title of El Bochinche B1 and El Bochinche B2, published in the *Gaceta Oficial* No. Ext. 4181, 10 May 1990, **Exhibit C-31**.

[82] Leasing Contract for Bochinche B1 and Bochinche B2, 18 March 1991, **Exhibit C-37**.

[83] Exploration, Development and Exploitation Contract for Bochinche Zero, 29 June 1993, **Exhibit C-86**.

[84] Articles of Incorporation of Proyectos Mineros del Sur, PROMINSUR, C.A., 29 March 1984, **Exhibit C-6**. Proyectos Mineros del Sur, PROMINSUR, C.A. is 100% owned by Valet Corporation A.V.V., *see* Shareholders Register of Proyectos Mineros del Sur, PROMINSUR, C.A., 23 December 2006, **Exhibit C-153**. Valet Corporation A.V.V. is 100% owned by El Callao Holdings A.V.V., *see* Shareholders Register of Valet Corporation A.V.V., 2 November 2007, **Exhibit C-161**. El Callao Holdings A.V.V. is 100% owned by Venezuela Holdings (BVI) Ltd., *see* Shareholders Register of El Callao Holding A.V.V., 23 October 2007, **Exhibit C-160**, Venezuela Holdings (BVI) Ltd. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Venezuela Holdings (BVI) Ltd, 30 November 2007, **Exhibit C-163**.

[85] Mining Title of Choco 6 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-80**.

[86] Leasing Contract for Choco 6, 25 May 1994, **Exhibit C-95**.

22

52. This company was also granted a contract by the CVG for the exploration, development and exploitation of gold and diamonds in the Increíble 16 area, located in the El Callao Municipality. The contract was dated 28 December 1992 and was expected to run for a period of 20 years, extendable for additional periods of ten years.[87]

### e.   Fifth acquisition of Mining Rights: June 2008

53. Pursuant to an agreement dated 19 June 2008 between Rusoro, Rusoro MH Acquisition Ltd. (a wholly owned subsidiary of Rusoro)[88] and Hecla Ltd. (*Hecla*, a wholly owned subsidiary of Hecla Mining Company), Rusoro MH Acquisition Ltd. acquired an indirect 100% interest in Hecla's assets in Venezuela, which were held through its subsidiaries Minera Hecla Venezolana C.A. (currently Minera Rusoro Venezolana C.A.) and El Callao Gold Mining Company de Venezuela S.C.S.[89]

54. Further, pursuant to an agreement of 4 July 2008, Rusoro and MIBAM agreed to form a Venezuelan corporation called Minera Venrus, C.A. (*Venrus*)[90] to carry out gold exploration and exploitation of the assets acquired in this fifth acquisition from Hecla,[91] which are described below:

---

[87]   Exploration, Development and Exploitation Contract for Increíble 16, 28 December 1992, **Exhibit C-70**.

[88]   Shareholders Register of Rusoro MH Acquisition Ltd., 16 May 2008, **Exhibit C-165**.

[89]   Stock Purchase Agreement between Rusoro Mining Ltd, Rusoro MH Acquisition Ltd and Hecla Limited, 19 June 2008, **Exhibit C-169**.

[90]   Venrus is 50% owned by Empresa de Producción Social Minera Nacional C.A., a company owned indirectly by MIBAM, and 50% owned by Rusoro Mining de Venezuela C.A. *See* Articles of Incorporation of Minera Venrus, C.A., 10 December 2008, **Exhibit C-182**. Rusoro Mining de Venezuela C.A. is 100% owned by Rusoro, *see* Shareholders Register of Rusoro Mining de Venezuela, C.A., 6 November 2008, **Exhibit C-181**.

[91]   Acuerdo Compromiso between Rusoro and MIBAM, 4 July 2008, **Exhibit C-173**.

23

(i)     **Minera Rusoro Venezolana C.A.**

55.    Minera Rusoro Venezolana, C.A.[92] was the holder of six contracts granted in 1991 by CVG for the exploration, development and exploitation of gold and diamonds in the areas Niña I, Niña II, Niña III, Niña IV, Niña VI and Niña VII, located in the Sifontes Municipality, for a period of 25 years from the date of execution.[93]

56.    This company also held 5 additional contracts granted between 1992 and 1993 by CVG for the exploration, development and exploitation of gold and diamonds in the areas named El Sudor, Yessica and La Medusa located in the Sifontes Municipality and in the areas El Puyero I and Choco 7 located in the El Callao Municipality for a period of 20 years, but extendable for subsequent periods of ten years.[94]

---

[92]    Minera Rusoro Venezolana, C.A. was initially incorporated in Venezuela with the name of Suramericana de Minería II, C.A. on 25 June 1987. On 19 January 1993, the company changed its name to Monarch Minera Suramericana, C.A. On 12 July 1999, Monarch Minera Suramericana, C.A. changed its name to Minera Hecla Venezolana, C.A. and on 13 August 2008 it changed its name to Minera Rusoro Venezolana, C.A. *See* Articles of Incorporation of Suramericana de Minería II, C.A., 15 May 1987, **Exhibit C-13**; Change of Name of Suramericana de Minería II, C.A. to Monarch Minera Suramericana, C.A., 25 January 1993, **Exhibit C-71**; Change of Name of Monarch Minera Suramericana, C.A. to Minera Hecla Venezolana, C.A., 25 June 1999, **Exhibit C-108**; Minutes of shareholders meeting for change of name from Minera Hecla Venezolana, C.A. to Minera Rusoro Venezolana, C.A., 13 August 2008, **Exhibit C-179**; Amendments to the Articles of Incorporation of Minera Hecla Venezolana, C.A., 18 August 1999, **Exhibit C-109**. Minera Rusoro Venezolana, C.A. is 100% owned by Drake-Bering Holdings B.V., Shareholders Register of Minera Rusoro Venezolana C.A., 31 May 2005, **Exhibit C-135**. Drake-Bering Holdings B.V. is 100% owned by Rusoro MH Acquisition, Ltd., *see* Shareholders Register of Drake-Bering Holdings B.V., 8 July 2008, **Exhibit C-174**. Rusoro MH Acquisition, Ltd. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register of Rusoro MH Acquisition, Ltd., 16 May 2008, **Exhibit C-165**.

[93]    The contracts were originally granted to Monarch Resources de Venezuela, C.A., which was absorbed by Monarch Minera Suramericana, C.A. (currently Minera Rusoro Venezolana, C.A.), *see* Merger between Monarch Resources de Venezuela, C.A., and Monarch Minera Suramericana, C.A., 25 September 1996 and 27 December 1996, **Exhibit C-100**. Exploration, Development and Exploitation Contract for Niña I, 18 March 1991, **Exhibit C-38**; Exploration, Development and Exploitation Contract for Niña II, 18 March 1991, **Exhibit C-39**; Exploration, Development and Exploitation Contract for Niña III, 18 March 1991, **Exhibit C-40**; Exploration, Development and Exploitation Contract for Niña IV, 5 August 1991, **Exhibit C-51**; Exploration, Development and Exploitation Contract for Niña VI, 18 March 1991, **Exhibit C-41**; Exploration, Development and Exploitation Contract for Niña VII, 18 March 1991, **Exhibit C-42**.

[94]    The contracts were originally granted to Monarch Resources de Venezuela, C.A., which was absorbed by Monarch Minera Suramericana, C.A. (currently Minera Rusoro Venezolana, C.A), *see* Merger between Monarch Resources de Venezuela, C.A. and Monarch Minera Suramericana, C.A., 25

24

57.    Additionally, Minera Rusoro Venezolana, C.A. held a concession granted by MEM
       to exploit vein gold in the Canaima area, located in the Roscio Municipality. The
       Canaima concession was initially granted for a period of 50 years,[95] due to expire
       in November 2013.[96]

               (ii)    **El Callao Gold Mining Company de**
                       **Venezuela S.C.S.**

58.    El Callao Gold Mining Company de Venezuela S.C.S.[97] held a lease agreement
       granted on 5 September 2002 by CVG Minerven for the exploration and
       exploitation of vein gold in the area named Bloque B, located in the El Callao
       Municipality, which ran until 4 March 2023, with the possibility of extending the

September 1996 and 27 December 1996, **Exhibit C-100**. Exploitation, Development and Exploration
Contract for Choco 7, 4 March 1992, **Exhibit C-58**; Exploration, Development and Exploitation
Contract for El Sudor, 16 April 1993, **Exhibit C-74**; Exploration, Development and Exploitation
Contract for El Puyero I, 28 January 1992, **Exhibit C-57**; Exploration, Development and Exploitation
Contract for Yessica, 16 April 1993, **Exhibit C-75**; Exploration, Development and Exploitation
Contract for La Medusa, 16 April 1993, **Exhibit C-76**.

[95]    Under the 1945 Mining Law, concessions related to vein gold were granted for periods of 50 years. *See*
       1945 Mining Law published in the *Gaceta Oficial* Ext. No. 121 (excerpts), 18 January 1945, **Exhibit
       C-1**, Article 41.

[96]    The Canaima concession was initially granted to Dolores Herrera de Rassi for a period of 50 years, due
       to expire in November 2013, *see* Mining Title of Canaima published in the *Gaceta Oficial* No. 27.313,
       5 December 1963, **Exhibit C-3**. The title was subsequently transferred to Suramericana de Minería,
       S.A., which in turn transferred it to Suramericana de Minería II, C.A. (currently Minera Rusoro
       Venezolana, C.A.) *see* Transfer of Mining Title of Canaima published in the *Gaceta Oficial* No.
       33.309, 17 September 1985, **Exhibit C-7**, and Transfer of Mining Title of Canaima published in the
       *Gaceta Oficial* No. 34.525, 7 August 1990, **Exhibit C-32**.

[97]    Articles of Incorporation of El Callao Gold Mining Company de Venezuela, S.C.S., 8 January 2003,
       **Exhibit C-118**. El Callao Gold Mining Company de Venezuela S.C.S. is 98% owned by El Callao
       Gold Mining Company and 2% owned by Minera Rusoro Venezolana C.A. (formerly Minera Hecla
       Venezolana C.A., *see* Shareholders Register of El Callao Gold Mining Company de Venezuela, S.C.S.,
       21 January 2003, **Exhibit C-119**. El Callao Gold Mining Company is 100% owned by Rusoro MH
       Acquisition Ltd., *see* Shareholders Register of El Callao Gold Mining Company, 8 July 2008; **Exhibit
       C-175**. Rusoro MH Acquisition Ltd. is 100% owned by Rusoro Mining Ltd., *see* Shareholders Register
       of Rusoro MH Acquisition Ltd., 16 May 2008, **Exhibit C-165**. Minera Rusoro Venezolana C.A. is
       100% owned by Drake-Bering Holdings B.V., *see* Shareholders Register of Minera Rusoro
       Venezolana C.A., 31 May 2005, **Exhibit C-135**. Drake-Bering Holdings B.V. is 100% owned by
       Rusoro MH Acquisition Ltd., *see* Shareholders Register of Drake-Bering Holdings B.V., 8 July 2008,
       **Exhibit C-174**. Rusoro MH Acquisition Ltd. is 100% owned by Rusoro Mining Ltd., *see* Shareholders
       Register of Rusoro MH Acquisition Ltd, 16 May 2008, **Exhibit C-165**.

25

term of the lease if the original Mining Title granted to the CVG Minerven was also extended.[98]

59.   Through Venrus, Rusoro carried out exploration, developing and production activities in Bloque B, including production in the Isidora mine, which since 2005 has produced a total of approximately 250,000 ounces of gold of very high grade ore. Bloque B also comprises the Twin Shear area, which was in the exploration phase at the time of the Nationalisation.

### 2.   Rusoro's Investments in Social Projects

60.   Under the different agreements reflecting the Mining Rights described in the preceding section, Rusoro assumed an obligation to carry out different social projects in the mining communities of each of the projects. These obligations were generally defined in very broad terms in the Mining Rights and normally included: (a) provision of supplies to schools and medical centres; (b) employment and contract preference to Venezuelans; (c) provision of training to employees; and (d) contributions to the social welfare of its employees (the *Social Obligations*).[99]

---

[98]   Leasing Contract for Bloque B, 5 September 2002, **Exhibit C-115**. The Bloque B lease agreement was entered into by CVG Minerven and Hecla Mining Company, and was then assigned by Hecla Mining Company to its Venezuelan subsidiary, El Callao Gold Mining Company de Venezuela S.C.S. in January 2003, *see* Assignment of the Leasing Contract for Bloque B, 24 January 2003; **Exhibit C-120**; Notification of the assignment of the Leasing Contract for Bloque B, 24 January 2003, **Exhibit C-121**.

The indirect assignment of the Bloque B lease to Rusoro was approved by MIBAM and by CVG Minerven in July 2008. *See* Authorization from MIBAM of the assignment of Bloque B to Rusoro, 3 July 2008, **Exhibit C-171**; Authorization from CVG Minerven of the assignment of Bloque B to Rusoro, 4 July 2008, **Exhibit C-172**. The Bloque B area was subsequently subleased to Minera Venrus C.A., for 1 year with the option to renew, which was exercised in 17 September 2010. *See* Sublease Agreement for Bloque B, 17 September 2009, **Exhibit C-195**; Addendum of the Sublease Agreement of Bloque B, 4 November 2010, **Exhibit C-205**.

[99]   For example, *see* Mining Title of Choco 1 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-77**, Articles 5 and 6; Mining Title of Choco 10 published in the *Gaceta Oficial* Ext. No. 4.578, 18 May 1993, **Exhibit C-82**, Articles 5 and 6; Exploration, Development and Exploitation Contract for Bloque B y Sor Teresita 5, 27 January 1993, **Exhibit C-72**, Article 14; Sublease Agreement for Bloque B, 17 September 2009, **Exhibit C-195**, Article 5.3, among others.

26

61.   Rusoro's compliance with the Social Obligations started as soon as it made its first acquisition of Mining Rights in 2006, and included the following areas:

(i)   **Generation of Employment**: Through its subsidiaries, by the time of the Nationalisation, Rusoro was employing over 1600 people, 95% of whom were Venezuelans.[100]

(ii)  **Improvement of Public Services**: Works undertaken included the construction and maintenance of primary and secondary access roads, water supply installations and public lighting.[101]

(iii) **Improvement of the Health System**: Including construction and maintenance of health facilities, provision of supplies to medical centres; and provision of ambulances.[102]

(iv)  **Improvement of education conditions**: Construction and expansion of several schools and school canteens, and launching of a literacy programme.[103]

(v)   **Support of social, cultural and sporting activities**: Diverse contributions to local communities, including sponsorship of extra-curricular activities.[104]

(vi)  **Support of sustainable development**: Launching several community projects and training courses on issues such as first aid assistance, environmental education and agricultural development. [105]

---

[100]  2011 Rusoro Annual Report, 31 December 2011, **Exhibit C-236**, page 3.

[101]  Informe de Gestión Social Rusoro, 31 January 2012, **Exhibit C-238**, page 5.

[102]  *Ibid*, page 7.

[103]  *Ibid*, page 9.

[104]  *Ibid*, page 12.

27

62. In compliance with the Social Obligations outlined above, Rusoro made disbursements for over VEF 75 million. In addition to these, and pursuant to its obligations under the agreement between Rusoro and MIBAM described in paragraph 54[106], Rusoro also contributed another VEF 15 million to the Villa Balazo community, in the proximities of the Choco 10 mine.[107] The positive impact of the above mentioned social projects in the local communities was widely reported in the Venezuelan press[108].

**B.    STARTING IN 2009 VENEZUELA DISMANTLED THE LEGAL FRAMEWORK UNDER WHICH RUSORO HAD INVESTED AND SUBSEQUENTLY NATIONALISED ALL OF RUSORO'S INVESTMENTS WITHOUT PROMPT, ADEQUATE AND EFFECTIVE COMPENSATION**

63. Rusoro made the core of its investments in the Venezuelan mining sector from 2006 to 2008, with its first gold sales taking place in 2007. Rusoro's investments were made under a regulation that allowed Rusoro to sell its production freely at market prices subject to a mandatory sale of 15% of such production to the domestic market. Further, the Swap Market allowed Rusoro to convert its VEF into foreign currency and vice versa.[109]

64. From 2009 onwards, Venezuela, through the Banco Central de Venezuela (the **BCV**) and the Ministry of People's Power for Economy and Finance (later renamed Ministry of People's Power for Planning and Finance, the **Ministry of Finance**)

---

[105]   *Ibid*, page 15.

[106]   Acuerdo Compromiso between Rusoro and MIBAM, 4 July 2008, **Exhibit C-173**, Clause 4.

[107]   Letter from MIBAM to Rusoro, 8 August 2008, **Exhibit C-177**. Payments were made to Misión Piar, an entity created by the Government with the aim of supporting small-scale miners. *See* Proof of payment of social contributions under MIBAM agreement, 12 and 18 August 2008, **Exhibit C-178**.

[108]   For example, *see* "Rusoro Mining asume compromiso de RSE por 20 años con escuela La Ramona" published in Tiempo Minero, 26 July 2011, **Exhibit C-210**; "Liceo José Manuel Agosto Méndez recibió nueva dotación" published in Diario El Progreso, 26 April 2009, **Exhibit C-185**; "Comunidad de San Rafael de la Camorra recibió operativo integral", published in La Revista Minera, 31 August 2009, **Exhibit C-193**.

[109]   *See* para. 10 above.

28

passed a series of measures that dismantled the existing legal regime for the marketing of gold in Venezuela (the ***Marketing Measures***) and strengthened exchange control restrictions (the ***Exchange Measures***). Venezuela's measures against Rusoro culminated in the outright nationalisation and control of Rusoro's investments without payment of prompt, adequate and effective compensation.

**1.  Venezuela imposed restrictions on the marketing of gold and exchange control measures**

65.   The Marketing Measures and the Exchange Measures passed by the BCV and the Ministry of Finance included:

> i.   the requirement that Rusoro and its subsidiaries sell a significant portion of their production to the BCV, which was to be paid for in local currency converted at the artificial Official Exchange Rate (which was approximately one half of the Parallel Exchange Rate applicable to non governmental transactions);

> ii.   the requirement that Rusoro and its subsidiaries sell to the BCV the foreign currency income obtained from gold exports at the artificial Official Exchange Rate;

66.   As the only large-scale gold producer in Venezuela, these measures were particularly damaging for Rusoro, as it was unable to convert the proceeds it received in VEF back into foreign currency at the same Official Exchange Rate. These measures had a severe effect on the financial viability of Rusoro's investments, restricting its cash flow,[110] impeding its ability to meet domestic and international contractual obligations, ultimately affecting its ability to finance the mining operations, as well as the exploration and development activities.[111]

---

[110]   Letter from Rusoro to MIBAM and PDVSA, 12 January 2012, **Exhibit C-237.**
[111]   *Ibid.*

29

a.   **The Marketing Measures**

67.   Restrictions on the marketing of gold were first introduced on 30 April 2009 by BCV Resolution 09-04-03.[112] This Resolution mandated that gold producers in Venezuela had to sell 70% of their quarterly production in the domestic market,[113] of which 60% had to be offered to the BCV, which would pay for it in VEF converting the US dollar quoted international price of gold into VEF at the Official Exchange Rate; and 10% of which had to be sold to the domestic processing sector.[114]

68.   Under Resolution 09-04-03, producers were allowed to export the remaining 30% of their quarterly production, but only after obtaining authorization from the BCV.[115] The Resolution provided that if an export request were denied by the BCV, that production had to be offered for sale to the BCV, under the same conditions and in addition to the 60% of production already sold to the BCV under the mandatory sale provisions.[116] In practice, export requests were often ignored or denied by the BCV.[117] This scheme, evidently aimed at limiting Rusoro's gold exports and forcing it to sell its production to the Government at approximately half of its market value, created severe cash flow problems for Rusoro.[118]

---

[112]   Resolution of the BCV No. 09-04-03, 30 April 2009, published in the *Gaceta Oficial* No. 39.169, 30 April 2009, **Exhibit C-186.**

[113]   *Ibid,* Article 1.

[114]   *Ibid.*

[115]   *Ibid,* Articles 1 and 2.

[116]   *Ibid,* Article 1, which reads: "[...] The remaining thirty percent (30%) may be exported in accordance with the provisions of Article 2 of this Resolution. However, in cases where the producer does not intend to make any export or the latter has been denied, this percentage shall be offered for sale in its entirety to the Central Bank of Venezuela". English translation. The original text in Spanish reads: "El treinta por ciento (30%) restante podrá ser exportado, de conformidad con lo previsto en el artículo 2° de la presente Resolución. No obstante, en los casos en que el productor no pretenda realizar exportación alguna o le haya sido negada la procedencia de la misma, dicho porcentaje deberá ser ofrecido en venta en su totalidad al Banco Central de Venezuela".

[117]   *See,* for example, letter from Rusoro to the President of the BCV, 30 September 2011, **Exhibit C-218.**

[118]   *Ibid.*

30

69.   The BCV replaced Resolution 09-04-03 with Resolution 09-06-03 on 11 June 2009.[119] The new Resolution maintained the regime for the marketing of gold established by its predecessor Resolution 09-04-03 for privately owned or controlled gold producers (of which Rusoro was the largest one in Venezuela), while establishing a more favourable regime for companies in which the State owned 50% of shares or more. Under the terms of Resolution 09-06-03, these companies were only required to offer 50% of their production to the domestic market (25% to the BCV and 25% to local processors), and could export the remaining 50% of their production.[120] This measure effectively meant that Rusoro's subsidiaries (with the exception of the joint venture Venrus) that were producing gold (or that would be producing gold in the future) were forced to sell their production on terms and in conditions that were significantly worse than the conditions applicable to mixed and State owned gold mining companies.

70.   The combined economic impact of Resolutions 09-04-03 and 09-06-03 was such that in November 2009, Rusoro informed the Government that it would be forced to suspend all activities in the Choco 10 mine, which it operated through PMG.[121] These measures had a broader impact, as they made it impossible to continue with certain exploration and development programmes Rusoro was carrying out.[122]

71.   Rusoro expressed its concerns regarding these regulations to the Venezuelan Government on several occasions, and asked to meet with members of the Government to discuss alternatives that would be less damaging to its investments.[123] On at least one occasion, in a letter to the BCV, the MIBAM

---

[119]   Resolution of the BCV No. 09-06-03, 11 June 2009, published in the *Gaceta Oficial* No 39.201, 16 June 2009, **Exhibit C-187**.

[120]   *Ibid*, Article 2.

[121]   Letter from Rusoro to the President of the BCV, 19 November 2009, **Exhibit C-197**.

[122]   As a result, Rusoro had to suspend over 2000 workers (including contractors, employees and indirect employees) for a period of at least 6 months.

[123]   Letter from Rusoro to the Vice-President of Venezuela, 3 July 2009, **Exhibit C-190**; Letter from Rusoro to the Vice-President of Venezuela, 23 July 2009, **Exhibit C-191**; Letter from Rusoro to the

31

acknowledged the damaging effects of Resolution 09-06-03 on the private mining sector.[124]

72.   Eventually, on 15 July 2010 the BCV passed Resolution 10-07-01, whereby it reduced the mandatory requirement for the domestic sale of gold for privately owned and controlled companies from 70% to 50% of their quarterly production.[125] The remaining 50% could be exported, subject to the authorization of the BCV.[126] While Resolution 10-07-01 formally improved the export capabilities of private gold producers, in practice, Rusoro continued to be plagued by problems when trying to obtain authorization from the BCV to export gold.[127] Rusoro was regularly subject to a number of unjustified bureaucratic requirements for authorization, which were not specified in the relevant rules, and that meant that often the BCV would delay issuing the export permits, causing Rusoro to lose the opportunity to fill its export quota for a given quarter.[128] In addition, the BCV often failed to purchase from Rusoro the gold that was allocated to it under Resolution 10-07-01,[129] further jeopardizing its cash flow.

---

President of the BCV, 19 November 2009, **Exhibit C-197**; Letter from Rusoro to the President of Venezuela, 19 November 2009, **Exhibit C-198**; Letter from Rusoro to the Vice-President of Venezuela, 26 November 2009, **Exhibit C-199**.

[124]   Letter from the MIBAM to the President of the BCV, 28 August 2009, **Exhibit C-192**.

[125]   Amendment to *Convenio Cambiario* No. 12 and Resolution of the BCV No. 10-07-01 of 15 July 2010, published in the *Gaceta Oficial* No. 39.485, 11 August 2010, **Exhibit C-203**.

[126]   *Ibid*, Article 1.

[127]   Rusoro unsuccessfully requested authorization from the BCV to export gold on several occasions. *See*, for example, Letter from Rusoro to the BCV, 30 November 2010, **Exhibit C-206**; Letter from Rusoro to the BCV, 7 December 2010, **Exhibit C-207**; Letter from Rusoro to the BCV, 6 January 2011, **Exhibit C-208**.

[128]   *Ibid*.

[129]   *Ibid*.

32

b.    **The Exchange Measures**

73.    In addition to the restrictions on the marketing of gold, the Government also strengthened its exchange control measures, severely limiting Rusoro's access to foreign currency.[130] The Exchange Agreement No. 12 of June 2009 (the *Exchange Agreement*)[131] issued jointly by the BCV and the Ministry of Finance, imposed an obligation on companies in which the Venezuelan State held less than 50% to sell all foreign currency obtained from gold export operations to the BCV at the Official Exchange Rate.[132]

74.    The practical effect of the Exchange Agreement was that even when Rusoro was able to successfully export gold, it was still required to repatriate 100% of its dollar export proceeds and exchange them for local VEF at the artificial Official Exchange Rate. This had the same economic effect as selling the gold directly to the BCV, with the added export expenses.[133] Rusoro, as the only large-scale private gold producer in Venezuela, was the only target of this regulation, which specifically excluded State-owned companies or mixed companies in which the Venezuelan State held 50% or more share ownership.[134]

---

[130]    Like any other mining ventures, Rusoro's activities were capital intensive. Most of the capital expenditure and operating costs followed tight purchasing schedules which needed to be maintained to achieve efficiency in the production cycle. Further, a large number of capital items and supplies for these operations had to be sourced from outside Venezuela using foreign currency exclusively.

[131]    *Convenio Cambiario* No. 12, 11 June 2009, published in the *Gaceta Oficial* No. 39.207, 25 June 2009, **Exhibit C-188**.

[132]    *Ibid*, Article 1.

[133]    On 11 August 2010 an amendment to the *Convenio Cambiario* No. 12 came into effect. Under this amendment, the requirement for private gold producers to sell income obtained in foreign currency from export operations to the BCV at the Official Exchange Rate was reduced from 100% to 50%. *See* Amendment to *Convenio Cambiario* No. 12 and Resolution of the BCV No. 10-07-01 of 15 July 2010, published in the *Gaceta Oficial* No. 39.485, 11 August 2010, **Exhibit C-203**, Article 1 of the Amendment to *Convenio Cambiario* No. 12.

[134]    *Convenio Cambiario* No. 12, 11 June 2009, published in the *Gaceta Oficial* No. 39.207, 25 June 2009, **Exhibit C-188**, Article 2.

33

75.   The situation worsened in May 2010, when the Government passed a law
      effectively terminating the Swap Market,[135] which had until then allowed Rusoro to
      transfer its foreign currency into and out of Venezuela at the Parallel Exchange
      Rate. The Government tried to alleviate the effect of this measure by introducing,
      on 9 June 2010, the *Sistema de Transacciones con Títulos en Moneda Extranjera*
      (*SITME*),[136] a new scheme controlled by the BCV whereby individuals or legal
      entities that met the SITME requirements could purchase foreign currency at a
      preferential rate and subject to a limit of $350,000 per month.[137] Only one of
      Rusoro's subsidiaries, PMG, was ever allowed to register with SITME, although
      the cumbersome bureaucratic procedures of the application process meant that even
      PMG was not able to access its $350,000 monthly allowance from SITME. The
      situation further worsened when, in August 2010, an amendment to the Exchange
      Agreement excluded gold producing companies such as Rusoro from accessing
      foreign currency through the official exchange system CADIVI to buy foreign
      supplies.[138]

76.   Aside from the financial impact of having to sell its production and foreign
      currency to the BCV at a substantially reduced value, the fact that the VEF
      received from the BCV could not be freely converted at the same rate or transferred
      abroad created many difficulties for Rusoro's operations, as they could not be used
      to meet foreign payment obligations. The combined effect of the Measures was
      such that Rusoro's subsidiaries were unable to obtain necessary supplies from

---

[135]   Amendment to the Law against Illegal Foreign Exchange, 13 May 2010, published in the *Gaceta Oficial* Ext. No. 5.975, 17 May 2010, **Exhibit C-200**.

[136]   *Ibid*; *see* also *Convenio Cambiario* No. 18, 1 June 2010, published in the *Gaceta Oficial* No. 39.439, 4 June 2010, **Exhibit C-201**.

[137]   Guidelines to Conduct Purchase of Securities Denominated in Foreign Currency in the System of Securities Transactions in Foreign Currency (SITME) of the Central Bank of Venezuela, 14 June 2010, Exhibit **C-202**. The SITME is a scheme for transactions with securities denominated in foreign currency whereby companies in Venezuela buy State or Pdvsa-issued US dollar-denominated bonds in VEF at the Official Exchange Rate and resell them at a discount abroad for a price in foreign currency.

[138]   Amendment to *Convenio Cambiario* No. 12 and Resolution of the BCV No. 10-07-01 of 15 July 2010, published in the *Gaceta Oficial* No. 39.485, 11 August 2010, **Exhibit C-203**, Article 4 of the Amendment to *Convenio Cambiario* No. 12.

34

overseas (e.g. consumables, machinery and engineering/geological services), which, in turn, created stoppages and an overall reduction in gold production activity at the Choco and Bloque B sites. These factors led to an overall increase in project and production costs, lose lines of credit with vendors, stretch payment terms and increase liabilities including accruing interest on overdue invoices.[139]

### 2. Venezuela Nationalised Rusoro's investments

77.   On 17 August 2011, during a programme broadcast on the State-owned channel, *Venezolana de Televisión*, President Chávez announced the "nationalisation of the gold mining industry". The President stated that the nationalisation would be aimed at combating illegal mining, the involvement of smugglers[140] in the industry, and building up Venezuela's gold reserves.[141] Referring to the intended nationalisation, President Chávez stated:

> We're going to nationalise gold. We can't keep allowing them to take it away.[142]

78.   Rusoro was confident that its operations were in full compliance with the law and understood that the threatened nationalisation would only target companies involved in illegal mining activities, which operated mostly within the remote south-eastern region of the country.[143] In this context, Rusoro's President and CEO, Andre Agapov initially welcomed the measure and the Presidential message, stating that:

---

[139]   And, in any event, the capital intensive nature of Rusoro's activities meant that it required much more foreign currency than SITME was allowed to grant to it on a monthly basis.

[140]   "Venezuela Moves to Take Over Gold Sector", *Wall Street Journal*, 18 August 2011, **Exhibit C-212.**

[141]   "Chavez Preparing Government Takeover of Venezuela's Gold Mining Industry", *Bloomberg*, 17 August 2011, **Exhibit C-211.**

[142]   *Ibid.*

[143]   "Rusoro Responds to Comments Concerning Venezuelan Gold Sector", *Rusoro News Release*, 18 August 2011, **Exhibit C-213.**

35

> We believe the Government's announcement is targeted toward the many illegal mining operations in Bolívar State that operate without Government permits and continue to cause significant environmental damage through indiscriminate deforestation and the use of mercury. Gold produced by these illegal operations is often smuggled out of the country or sold illegally, and the government is now taking action.[144]

79.    Ultimately, Rusoro's confidence in President Chávez's statements proved to be misplaced. On 16 September 2011, the President passed Supreme Decree No. 8.413 with the rank, value and force of an Organic Law (the *Nationalisation Decree*), which nationalised all Venezuelan operations involved in the exploration and production of gold.[145]

   a.    **The Nationalisation Decree**

80.    The declared aim of the Nationalisation Decree was, in conjunction with the Mining Law and other mining regulations, to provide a new regulatory framework for gold mining and gold deposits in Venezuela.[146] Under the terms of the Nationalisation Decree, all assets and operations, public or private, associated with the mining and exploitation of gold in Venezuela were declared to be of "public utility and social interest."[147]

81.    In addition, the Nationalisation Decree made provision for State control of the property and mining rights of all gold producing companies, and further stipulated, *inter alia*, that, going forward:

   • All the primary, ancillary and auxiliary activities (*i.e.*, exploration, production, storage, possession and transportation, as well as domestic and

---

[144]   *Ibid.*

[145]   Decree 8413, 23 August 2011, published in the *Gaceta Oficial* No. 39.759 on 16 September 2011, **Exhibit C-214.**

[146]   *Ibid.*

[147]   *Ibid.*, Article 4.

36

international sales and marketing) in relation to the mining of gold (the *Reserved Activities*) could only be performed by: (a) the State or companies wholly owned by the State or its affiliates; or (b) joint public-private companies, in respect of which the State held an equity participation of 55% or more, and exercised control over corporate decisions (***Mixed Companies***).[148]

- All the gold produced under the new legal framework was to be sold to the Government, who effectively gained a monopoly over the marketing of gold produced in Venezuela.[149]

- Projects and investments in the gold mining sector that were carried out on the basis of concessions, authorizations for the exercise of small-scale mining or contracts granted prior to the Nationalisation Decree, were to be transferred to Mixed Companies.[150] For this purpose, the Nationalisation Decree called for negotiations between companies currently holding mining rights and the Government for a period of 90 days from the date of its

---

[148] *Ibid*, Article 5. The Nationalisation Decree further established that:
- Mixed Companies could only be established with the approval of the National Assembly, and the Ministry of Mining would have the responsibility for determining the conditions that would govern the performance of Reserved Activities by Mixed Companies (Article 6).
- The National Executive was empowered to transfer to the Mixed Companies, the right to perform all or part of the Reserved Activities; and also to transfer ownership or other rights over the "goods of private domain" of the Republic that could be required for the efficient exercise of the Reserved Activities. The National Executive was empowered to revoke these rights when companies failed to meet their obligations under the Nationalisation Decree, or where otherwise necessary to promote the national interest (Article 9).
- The areas to be operated by each Mixed Company had to be assigned by the Ministry of Mines for a period of 20 years, subject to no more than two 10 year extensions (Article 8).

[149] *Ibid*, Article 21.

[150] *Ibid*, Article 12.

37

publication (the ***Negotiation Period***) to migrate into the new Mixed Company scheme.[151]

- Under the terms of the Decree, failure to agree on migration under the new scheme within the Negotiation Period would automatically trigger the termination of any mining concessions and contracts related to the Reserved Activities, and the MPM would take control of these assets and operations.[152] In such a case, the Decree provided for the payment of book value of non-amortized investments as compensation for the early termination.[153]

- The titleholders of mining rights were required to cooperate in the peaceful and orderly transfer of all operations, facilities, documents and assets related to the performance of the Reserved Activities. Failure to do so would result in the imposition of administrative and criminal sanctions and/or penalties.[154]

82.  The Nationalisation Decree had the effect of virtually paralyzing Rusoro's operations. Suppliers and contractors refused to continue providing services in the face of the uncertainty surrounding the future of the company and the outcome of the negotiations with the Government. Notwithstanding this, Rusoro maintained a cooperative attitude in response to the Nationalisation.[155] In particular, Rusoro promptly complied with all the requirements of the Nationalisation Decree, such as providing all the necessary documents and information required by the Government,[156] and (subject to a full reservation of its rights) at all times sought to

---

[151]  *Ibid*, Article 13.

[152]  *Ibid*, Article 14.

[153]  *Ibid*, Article 16.

[154]  *Ibid*, Article 15.

[155]  "Rusoro Provides Update on the Nationalization", *Rusoro News Release*, 16 December 2011, **Exhibit C-234.**

[156]  *See*, for example, Letter from Rusoro to the Vice-minister of MIBAM, 28 October 2011, **Exhibit C-226**; Letter from PDVSA to Rusoro, 18 October 2011, **Exhibit C-224**; Letter from Rusoro to members of the Negotiation Commission, 4 November 2011, **Exhibit C-228**; Letter from Rusoro to PDVSA and

38

engage in discussions with the Government to reach an amicable agreement with respect to its investments.[157]

### b.   Resolution No. 88/2011 and Resolution No. 89/2011

83.   Soon after the passage of the Nationalisation Decree, the Ministry of Mines issued Resolutions No. 88/2011 (*Resolution 88*)[158] and 89/2011 (*Resolution 89*)[159] on 7 October 2011 (published on 11 October 2011), which outlined the procedures and mechanisms by which control of Rusoro's Mining Rights and property would be transferred to the State.

84.   Resolution 88 established a Negotiation Commission to effect the transfer of all gold concessions, contracts and leases in force, from private companies to the new Mixed Companies.[160]

85.   The Resolution identified the members of the Negotiation Commission, and prescribed that the Commission would function for a period of 90 days from the date of the publication of the Nationalisation Decree in the Official Gazette (*i.e.* until 15 December 2012).[161] It further stipulated that the Negotiation Commission

---

Corporación Venezolana de Petróleo, S.A, 4 October 2011, **Exhibit C-219**; Letter from Rusoro to PDVSA and Corporación Venezolana de Petróleo, S.A., 28 September 2011, **Exhibit C-217**.

[157] "Rusoro Gives Update on New Gold Industry Law", *Rusoro News Release*, 22 September 2011, **Exhibit C-215**.

[158] Resolution No. 088/2011, 7 October 2011, published in the *Gaceta Oficial* No. 39.776, 11 October 2011, **Exhibit C-220**.

[159] Resolution No. 089/2011, 7 October 2011, published in the *Gaceta Oficial* No. 39.776, 11 October 2011, **Exhibit C-221**.

[160] Resolution No. 088/2011, 7 October 2011, published in the *Gaceta Oficial* No. 39.776, 11 October 2011, **Exhibit C-220**, Article 1.

[161] *Ibid.*, Articles 2 and 3.

39

would submit the results of its activities to the Minister of Mines within the 90 day period indicated above, for his consideration and approval.

86. Resolution 89 established an Operational Transition Committee with broad management and dispositive powers over the assets of all companies holding gold concessions, contracts and leases in Venezuela. Their mandate also lasted for a period of 90 days, until 15 December 2011.[162] Ostensibly, the aim of this measure was to guarantee the continued operation of the mining companies and to that extent, the Resolution empowered the Operational Transition Committee to intervene in the affected companies, to take possession of their assets and control of their operations.[163] The Resolution further required that during the transition period, the affected companies cooperate with the work of the Operational Transition Committee by allowing access to their facilities, documentation, assets and equipment.[164]

87. Resolution 89 appointed the members of the Operational Transition Committee, and provided that the Committee create technical working groups (*mesas técnicas operativas*). The role of these bodies was to assist in the compilation of information related to each company's current business plan, the generation of the business plan that would be used during the process for the migration to Mixed Companies, analysis of labour conditions, and assessment of the legal, financial, social and environmental conditions of the businesses.

88. The negotiation process between Rusoro and the Government began soon after the implementation of Resolutions 88 and 89. On 13 October 2011, the Vice-Minister of Mines sent a letter to Rusoro's subsidiaries informing them about the

---

[162] Resolution No. 089/2011, 7 October 2011, published in the *Gaceta Oficial* No. 39.776, 11 October 2011, **Exhibit C-221**, Article 6.

[163] *Ibid*, Article 2.

[164] *Ibid*, Article 5.

40

constitution and the appointment of the members of the technical working groups.[165]

89. Rusoro, in turn, informed the Negotiation Commission that it had formed internal negotiating teams specifically authorized to represent Rusoro and its subsidiaries in the negotiations with the Government.[166] These teams were set up to negotiate on all matters connected to the terms of the transfer of the investments to the Government, valuation and compensation for Rusoro's investments; and where applicable, the constitution of a joint venture as provided in the Nationalisation Decree.[167] Teams were also designated to coordinate the transition process, and to provide relevant documents and information to the Government during this process.[168]

90. Subject to a full reservation of rights, Rusoro was fully cooperative during the Negotiation Period, and attended all meetings convened by the Venezuelan Government officials and provided all requested documents.[169] However, meetings were convened by the Government in a haphazard manner, without notices or official announcements. No minutes or records of the meeting were prepared. Meetings were cancelled or postponed many times, without prior warning and without official notifications. Furthermore, the members of the Negotiation Commission were seldom or never in full attendance at meetings.

---

[165] Letter from the Vice-minister of Mines to Corporación 80.000, C.A., 13 October 2011, **Exhibit C-222.**

[166] Letter from Rusoro to the Minister of MIBAM and Members of the Negotiation Commission, 27 October 2011, **Exhibit C-225**; Letter from Rusoro to Members of the MIBAM, the Negotiation Commission and the Operational Transition Committee, 30 November 2011 **Exhibit C-230.**

[167] Letter from Rusoro to the Minister of MIBAM and Members of the Negotiation Commission, 27 October 2011, **Exhibit C-225.**

[168] *See* Letter from Rusoro to Members of the MIBAM, the Negotiation Commission and the Operational Transition Committee, 30 November 2011, **Exhibit C-230.**

[169] *See*, for example, Letter from Rusoro to the Vice-minister of MIBAM, 28 October 2011, **Exhibit C-226**; Letter from PDVSA to Rusoro, 18 October 2011, **Exhibit C-224**; Letter from Rusoro to members of the Negotiation Commission, 4 November 2011; Letter from Rusoro to PDVSA and Corporación Venezolana de Petróleo, S.A., 4 October 2011, **Exhibit C-219**; Letter from Rusoro to PDVSA and Corporación Venezolana de Petróleo, S.A., 28 September 2011, **Exhibit C-217**, Letter from Rusoro to the Negotiation Commission, 1 November 2011, **Exhibit C-227.**

41

      **c.**     **New exchange control regulations are adopted in the context of the nationalisation**

91.    Rusoro's economic difficulties persisted during the Negotiation Period. During this time, the Government implemented a new regulation regarding exchange controls. On 17 October 2011, the Exchange Agreement No. 19 was passed,[170] authorizing the acquisition by gold producers of foreign currency from BCV at the Official Exchange Rate to facilitate payments and disbursements to overseas suppliers, in order to maintain their operations during the migration process[171].

92.    In order to obtain foreign currency under the Exchange Agreement No. 19, the companies had to obtain a certificate from the Operational Transition Committee.[172] Accordingly, Rusoro submitted the required forms and followed the proper application procedures.[173] However despite complying with the prescribed procedures, neither the Operational Transition Committee nor the BCV followed up on Rusoro's requests, which meant that Rusoro was effectively unable to acquire any foreign currency from the BCV. [174]

      **d.**     **Negotiations carry on without success while Rusoro's financial situation deteriorates**

93.    Negotiations between Rusoro and the Government went on between September and December 2011 without success and the 90 day Negotiation Period expired without an offer of compensation to Rusoro.[175]

---

[170] *Convenio Cambiario* No. 19, October 13, 2011 published in the *Gaceta Oficial* No. 39.779, 17 October 2011, **Exhibit C-223**.

[171] *Ibid,* Article 1.

[172] *Ibid,* Article 2.

[173] *See,* for example, Letter from Rusoro to the Operational Transition Committee, 11 November 2011, **Exhibit C-229**; Letter from Rusoro to the BCV, 8 March 2012, **Exhibit C-242**; Letter from Rusoro to the BCV, 6 March 2012, **Exhibit C-241**.

[174] Letter from Rusoro to members of the MPM and PDVSA, 7 February 2012, **Exhibit C-239**.

[175] Letter from Rusoro to the MPM, the Minister of Industries and the Members of the Negotiation Commission, 13 December 2011, **Exhibit C-231**.

42

94.    As a result of the lack of material responses from the Government, on 15 December 2011, the last day of the Negotiation Period, Rusoro sent a letter officially notifying Venezuela of the existence of a dispute under the Treaty.[176] It outlined the various measures taken by the Government against its investments, and asserted that these measures contravened Venezuela's obligations under the Treaty and international law. The letter further emphasised the fact that Rusoro had not received an offer of compensation, despite efforts made in good faith to reach an amicable agreement with the Venezuelan State.

e.    **The Negotiation Period is extended for 90 additional days**

95. .   Without prior consultation or communication, on 15 December 2011, the day the Negotiation Period was supposed to expire, Venezuela adopted Decree No. 8683 (the *Amendment Decree*)[177] extending it for another 90 days (the *Second Negotiation Period*).

96.    Several meetings took place between Rusoro and the Government during the Second Negotiation Period, which were characterized by the same haphazardness and informality as the initial Negotiation Period. Furthermore, there were several irregularities with the process, namely:

(i)    The Operational Transition Committee and the Negotiation Commission had not been renewed after the expiration of their term under the relevant Resolutions.[178] Consequently, the purported extensions of these mandates were not published in the Official Gazette as required under Venezuelan law.[179]

---

[176]  Letter from Rusoro to the President of Venezuela, the MPM, and the Attorney General of Venezuela, 15 December 2011. **Exhibit C-233.**

[177]  Decree No. 8683, 8 December 2011, published in the *Gaceta Oficial* Ext. No. 6.063, 15 December 2011. **Exhibit C-232.**

[178]  Letter from Minister of Energy and Petroleum to President of the BCV, 23 December 2011, **Exhibit C-235.**

[179]  Letter from Rusoro to the MPM, Vice-President of Mines and PDVSA, 17 February 2012, **Exhibit C-240.**

43

    (ii)   A member of the Operational Transition Committee, which was operative until 15 December 2011, purported to individually exercise the functions of the Committee that were extinguished under the terms of the governing Resolution.[180]

    (iii)   A person who was not validly appointed, but who claimed to be a part of the Operational Transition Committee, was purporting to exercise powers over the assets of Venrus.[181]

    (iv)   Rusoro received requests relating to the negotiations, from officials from the defunct MIBAM.[182]

    (v)   No written record or minutes were taken of meetings convened during the negotiations.

    (vi)   No written offers of compensation were ever made in the context of these meetings.

97.    On 17 February 2012, Rusoro sent a letter to the Government denouncing these irregularities, where it also highlighted the severity of its financial situation which the Government's Measures had caused.[183] The extension of the Negotiation Period had exacerbated Rusoro's economic woes. During this period, Rusoro was suffering critical cash flow problems due to the unwillingness of the BCV to acquire its gold.[184] As a result, Rusoro urged the Government to instruct the BCV to acquire gold production and authorize the purchase of foreign currency at the Official Exchange Rate. The critical cash flow situation also caused Rusoro to call for an urgent meeting with the Government and to formally request a schedule for the transfer of the operations to the Government. No answer was provided to this letter.

---

[180]  *Ibid.*

[181]  *Ibid.*

[182]  *Ibid.*

[183]  *Ibid.*

[184]  Letter from Rusoro to MIBAM and PDVSA, 12 January 2012, **Exhibit C-237**.

44

**f.      The Second Negotiation Period expires and Rusoro's Mining Rights are formally extinguished**

98.    The Second Negotiation Period expired on 14 March 2012 with no agreement between Rusoro and the Venezuelan Government. Accordingly, all Mining Rights held by Rusoro through its subsidiaries were automatically extinguished by law on 15 March 2012.[185] On the expiration of the Mining Rights, the Venezuelan State, through the relevant Ministry, was empowered to take possession of the property and control the operations previously held by Rusoro.[186]

**g.      Venezuela delays the takeover of the mining areas, leaving them in a limbo**

99.    On the date the Mining Rights expired, the Vice-Minister of Mines informed Rusoro's negotiating team that the Government would take control of the operations of the concessions including any equipment, documentation or installation within the concession areas. Rusoro was informed that this transfer would take place on 19 March 2012, and was instructed to prepare a draft document of transfer to facilitate this process. In compliance with the request, Rusoro sent the draft document of transfer to the Vice-Minister of Mines on 18 March 2012.[187]

100.   As late as 26 March 2012, Venezuelan representatives had not taken control of the concession areas, and Rusoro had still not received comments on the draft document of transfer from the Vice-Minister.[188] The Government's delays in taking possession of the mines raised difficulties for Rusoro. From the beginning of the Negotiation Period, Rusoro had maintained a presence in the facilities and

---

[185]   Decree 8413, 23 August 2011, published in the *Gaceta Oficial* No. 39.759, 16 September 2011, **Exhibit C-214**, Article 14; Decree No. 8683, 8 December 2011, published in the *Gaceta Oficial* Ext. No. 6.063, 15 December 2011, **Exhibit C-232**, Article 2.

[186]   *Ibid*, Article 15.

[187]   E-mail from Rusoro to the Vice-Minister of Mines, 18 March 2012, **Exhibit C-243**.

[188]   Letter from Rusoro to the MPM, 26 March 2012, **Exhibit C-244**.

45

guaranteed the continuity of operations, in order to mitigate damages flowing from the cessation of mining operations.[189] However, Rusoro's continued presence in the areas subject to the Nationalisation exposed it to the imposition of administrative and criminal sanctions and penalties under Venezuelan law.[190] Given this precarious legal and financial position, it became imperative to establish a precise date on which the Venezuelan authorities would take control of the operations.

101. Consequently, Rusoro wrote to the Government requesting a schedule to transfer operations before 28 March 2012 with a specific date of transfer.[191] The letter also explained that if the schedule were not received by 28 March 2012, Rusoro would have no option but to cease operations on 31 March 2012 and Rusoro's personnel would leave the mining areas. The letter also emphasized that Rusoro was no longer liable with respect to any obligations pertaining to the concessions.[192]

> **h.    Venezuela finally proceeds to take possession of the mining areas**

102. On 29 March 2012, the legal counsel of the Ministry of Mines verbally informed Rusoro's negotiating team that they would be preparing a draft handover document to be executed by some of the Venezuelan subsidiaries of Rusoro. This draft was received by e-mail on 30 March 2012, and Rusoro made comments on the draft and returned it to the Ministry's representative on the same day[193]. No response was received to Rusoro's comments on the draft. Consistent with its prior statement to the Government, Rusoro formally withdrew from the mining areas on 31 March 2012.

---

[189]  *Ibid.*

[190]  Including under Decree 8413, 23 August 2011, published in the *Gaceta Oficial* No. 39.759, 16 September 2011, **Exhibit C-214**, Article 15.

[191]  Letter from Rusoro to the Minister of the MPM, 26 March 2012, **Exhibit C-244**.

[192]  *Ibid.*

[193]  E-mail from Rusoro to the Ministry of Energy and Petroleum, 30 March 2012, **Exhibit C-245**.

46

103.  Two days later, a judge, accompanied by the Vice-Minister of Mines, conducted an unannounced inspection of the Choco 4 and Choco 10 mining areas and signed an *Acta de Toma de Posesión* which verified and recorded the transfer of these mines to the State.[194] This was done without Rusoro's knowledge or participation.

104.  On 3 April 2012, unaware of the purported signing of the *Acta de Toma de Posesión*, Rusoro submitted another letter to the Minister of Petroleum and Mining, informing him that no action had been taken by the Government at that date, disclaiming responsibility for the operations and reserving Rusoro's rights under the Treaty and under international law.[195]

105.  Rusoro then received a letter from the Vice-Minister of Mines on 10 April 2012, requesting a meeting in order to execute a document of transfer pertaining to concessions held by six of Rusoro's subsidiaries.[196] Rusoro replied on 11 April 2012, noting that the Government had not replied to its comments on the draft document of transfer sent on 30 March 2012.[197] It further stated that it would be unable to accept the Minister's invitation unless it received the Government's response to the draft document of transfer in advance. Rusoro again reserved all its rights under the Treaty, and under international law.[198] No further communication on this issue or on the issue of compensation has been received by Rusoro from the Government since then.

---

[194]  *Acta de Toma de Posesión de Choco 4 y 10*, 2 April 2012, **Exhibit C-246**.

[195]  Letter from Rusoro to the MPM, 3 April 2012, **Exhibit C-247**.

[196]  *See*, for example, Letter from the Vice-Minister of Mines to El Callao Gold Mining Company de Venezuela SCS, 10 April 2012, **Exhibit C-248**.

[197]  *See*, for example, Letter from Lamin, Laboreos Mineros, C.A. to the Vice-Minister of Mines, 12 April 2012, **Exhibit C-249**.

[198]  *Ibid.*

47

### III.    VENEZUELA'S BREACHES OF THE TREATY

106. The Measures taken by Venezuela between 2009 and 2012, including the Marketing Measures and the Exchange Measures, and further, the outright Nationalisation of Rusoro's Mining Rights, breached Venezuela's Treaty obligations towards Rusoro, including (without limitation) its obligations:

      i. to refrain from expropriating or nationalising investments except for a public purpose, under due process of law, in a non-discriminatory manner, upon payment of prompt, adequate and effective compensation and in accordance with the standards of Article VII(1) of the Treaty;

      ii. to accord Rusoro's investments fair and equitable treatment, full protection and security, and treatment no less than that required by international law as required under Article II(2) of the Treaty;

      iii. to guarantee Rusoro's right to unrestricted and free transfer of payments relating to its investments, in a freely exchangeable currency and at the market exchange rate applicable on the date of the transfer in accordance with Article VIII of the Treaty;

      iv. to ensure that Rusoro and its investments would not be subjected to treatment which is no less favourable than that which the State accords to its own investors or investments, under Article IV of the Treaty.

### A.    VENEZUELA HAS EXPROPRIATED RUSORO'S INVESTMENT WITHOUT PROMPT, ADEQUATE AND EFFECTIVE COMPENSATION CONTRARY TO THE TREATY AND INTERNATIONAL LAW

107. The Treaty provides that protected investments shall not be subject to expropriation or to measures having an effect equivalent to expropriation except: (a) for a public

48

purpose; (b) under due process of law; (c) in a non-discriminatory manner; and (d) upon payment of prompt, adequate and effective compensation.

108. Article VII(1) of the Treaty provides the following protection to Rusoro's investments:

> Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as 'expropriation') in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable.[199]

109. Through the Marketing Measures, the Exchange Measures and the Nationalisation Decree, Venezuela effectively deprived Rusoro of its Mining Rights, without the payment of any compensation whatsoever, let alone prompt, adequate and effective compensation. This amounts to an illegal expropriation of Rusoro's investments under the terms of the Treaty and international law.

**B.    VENEZUELA HAS FAILED TO ACCORD RUSORO'S INVESTMENTS FAIR AND EQUITABLE TREATMENT AND FULL PROTECTION AND SECURITY**

110. The Treaty provides that qualifying investments shall be accorded "fair and equitable treatment" and "full protection and security" in accordance with the principles of international law. Article II(2) of the Treaty provides:

> Each Contracting Party shall, in accordance with the principles of international law, accord investments or returns of investments of the

---

[199] Treaty, **Exhibit C-102**, Article VII(1).

49

other Contracting Party, fair and equitable treatment and full protection and security.[200]

111. Venezuela has breached this provision by frustrating Rusoro's legitimate expectations at the time that it made its investment through the enactment by the BCV and the Ministry of Finance of the Marketing and the Exchange Measures, which fundamentally changed the economic framework for the marketing of the gold produced pursuant to its Mining Rights and its subsequent arbitrary and discriminatory application of those Measures. It is widely accepted that fair and equitable treatment (*FET*) is an intentionally "broad requirement,"[201] or a "flexible" concept.[202]

112. Applying this broad standard, international tribunals have developed several specific principles. Central to the relevant jurisprudence is the concept that fair and equitable treatment requires that investors be accorded a stable and predictable investment environment, in accordance with legitimate expectations.[203] In *Rumeli v. Kazakhstan*, the tribunal identified the concrete principles of FET as follows:

> [T]he State must act in a transparent manner; – the State is obliged to act in good faith; – the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process; the State must respect procedural propriety and due process. The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations.[204]

---

[200] Treaty, **Exhibit C-102**, Article II(2).

[201] *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt* (ICSID Case No. ARB/05/15), Award, 1 June 2009, ¶ 450. Please note that all case references in this Request for Arbitration are available on-line at http://icsid.worldbank.org/ and http://italaw.com/

[202] *Jan de Nul N.V. and Dredging International N.V. v. Arab Republic of Egypt* (ICSID Case No. ARB/04/13) Award, 6 November 2008, ¶ 185.

[203] *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetteri A.S. v. Republic of Kazakhstan* (ICSID Case No. ARB/05/16), Award, 29 July 2008, ¶ 609 ("The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations").

[204] *Rumeli Telekom A.S. and Telsim Mobil v. Kazakhstan* (ICSID Case No. ARB/05/16) Award, 29 July 2008, para 609; *see also Total S.A. v. Argentina* (ICSID Case No. ARB/04/1) Decision on Liability, 27

50

113. In *Bayindir v. Pakistan,* the tribunal articulated the factors that form part of FET as follows:

> [T]he obligation to act transparently and grant due process, to refrain from taking arbitrary or discriminatory measures, from exercising coercion or from frustrating the investor's reasonable expectations. [...][205]

114. Likewise, in *Saluka v. Czech Republic*, the tribunal held that under the FET standard a foreign investor "is entitled to expect that the [host State] will not act in a way that is manifestly inconsistent, non-transparent, unreasonable."[206]

115. In this context, the failure of the Government to provide a stable and transparent framework for Rusoro's investment and its application of that framework in an arbitrary and discriminatory manner constitutes a violation of the obligation to accord fair and equitable treatment under the Treaty and international law. Further, the deliberate targeting of Rusoro as the only private gold producer in Venezuela with discriminatory regulations which favoured the Government's own joint ventures and gold enterprises are also in breach of this standard.

116. Moreover, the combined effect of the measures by the BCV and the Ministry of Finance described above, together with the delays and irregularities that characterized the Negotiation Periods, amounts to a failure to accord full legal protection and security to Rusoro's investment. The standard of "full protection and security" requires an obligation of "due diligence"[207] or "vigilance"[208] on

---

December 2010, paras 109–10 (recounting jurisprudence considering the definition); *Lemire v. Ukraine* (ICSID Case No. ARB/06/18) Decision on Jurisdiction and Liability, 14 January 2010, paras 284–85 (listing elements of the FET standard); *Biwater Gauff (Tanzania) v. Tanzania* (ICSID Case No. ARB/05/22) Award, 24 July 2008, para 602 (same).

[205] *Bayindir Insaat Turizm Ticaret ve Sayani A.Ş. v. Islamic Republic of Pakistan* (ICSID Case No. ARB/03/29) Award, 27 August 2009, para 178.

[206] *Saluka v. Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, para 309.

[207] *Asian Agricultural Products Ltd. (AAPL) v. Sri Lanka* (ICSID Case No. ARB/87/3) Award, 27 June 1990, para 85.

51

behalf of a host State with respect to the protection and security of an investment. This protection extends beyond the physical security of an investment itself to an obligation on behalf of a host State to provide "the stability afforded by a secure investment environment."[209]

**C.     VENEZUELA HAS IMPEDED THE FREE TRANSFER OF PAYMENTS RELATED TO RUSORO'S INVESTMENTS**

117.    The Treaty provides that Venezuela shall guarantee protected investors the "unrestricted" and "free" transfer of payments relating to their investments, in a freely exchangeable currency and at the market exchange rate applicable on the date of the transfer. In particular, Article VIII of the Treaty provides:

> 1. Each Contracting Party shall guarantee to an investor of the other Contracting Party the unrestricted transfer of investments and returns.
>
> [...]
>
> 2. Transfers shall be effected without delay in the convertible currency in which the capital was originally invested or in any other convertible currency agreed by the investor and the Contracting Party concerned. Unless otherwise agreed by the investor, transfers shall be made at the rate of exchange applicable on the date of transfer.
>
> 3. Neither Contracting Party may require its investors to transfer, or penalize its investors that fail to transfer, the returns attributable to investments in the territory of the other Contracting Party
>
> [...].[210]

---

[208] *American Manufacturing & Trading Inc. v. Zaire* (ICSID Case No. ARB/93/1) Award, 21 February 1997, para 6.05.

[209] *Azurix Corp. v. Argentina* (ICSID Case No. ARB/01/12) Award, 14 July 2006, para 408.

[210] Treaty, **Exhibit 102**, Article VIII.

52

118. The Exchange Measures breached Venezuela's obligation to guarantee Rusoro the unrestricted transfer of payments relating to their investments in a freely exchangeable currency, as (*inter alia*) they (i) imposed a restriction on investments and returns, in breach of Article VIII (1); and (ii) did not take into account the market rate of exchange applicable on the date of transfer, in breach of Article VIII (2)

**D.   VENEZUELA   HAS   IMPAIRED   RUSORO'S   INVESTMENTS   THROUGH DISCRIMINATORY MEASURES**

119. The Treaty provides that protected investors and investments shall not be subjected to treatment which is less favourable than that which the State accords to its own investors or investments (National Treatment). Article IV of the Treaty sets out the National Treatment standard applicable to investments and investors:

> 1. Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns of its own investors.
>
> 2. Each Contracting Party shall grant to investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to its own investors with respect to the expansion, management, conduct, operation, use, enjoyment, sale or disposal of the investment or returns.[211]

120. Venezuela has breached this provision through the Marketing Measures and the Exchange Measures, which afforded more favourable commercial and financial conditions to the entities in which the State owned 50% of shares or more. In particular, as mentioned above, the deliberate targeting of Rusoro as the only private gold producer in Venezuela with discriminatory regulations which favoured the Government's own joint ventures and gold enterprises is a clear breach of this standard under the Treaty.

---

[211]   *Ibid*, Articles IV(1) and IV(2).

53

## IV. THE PARTIES' CONSENT TO ARBITRATION UNDER THE TREATY AND THE ADDITIONAL FACILITY RULES

### A. THE REQUIREMENTS FOR ACCESS TO THE ADDITIONAL FACILITY HAVE BEEN FULFILLED

121. Article 2 of the Additional Facility Rules and Article 1 of the Arbitration Rules set out the requirements to access arbitration proceedings under the Additional Facility. Article 2 of the Additional Facility Rules provides, in the relevant part, as follows:

> The Secretariat of the Centre is hereby authorized to administer, subject to and in accordance with [the Additional Facility Rules], proceedings between a State (or a constituent subdivision or agency of a State) and a national of another State, falling within the following categories:
>
> (a) conciliation and arbitration proceedings for the settlement of legal disputes arising directly out of an investment which are not within the jurisdiction of the Centre because either the State party to the dispute or the State whose national is a party to the dispute is not a Contracting State;
>
> (b) conciliation and arbitration proceedings for the settlement of legal disputes which are not within the jurisdiction of the Centre because they do not arise directly out of an investment, provided that either the State party to the dispute or the State whose national is a party to the dispute is a Contracting State; [...].[212]

122. The relevant definitions are set out at Article 1 of the Additional Facility Rules:

> (1) 'Convention' means the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, submitted to Governments by the Executive Directors of the International Bank for Reconstruction and Development on March 18, 1965, which entered into force on October 14, 1966. [...] [(the **ICSID Convention**)]

---

[212] Additional Facility Rules. Articles 2(a) and 2(b).

54

(4) 'Contracting State' means a State for which the Convention has entered into force. [...]

(6) 'National of another State' means a person who is not, or whom the parties to the proceeding in question have agreed not to treat as, a national of the State party to that proceeding.[213]

123. Article 1 of the Arbitration Rules provides:

> Where the parties to a dispute have agreed that it shall be referred to arbitration under the Arbitration (Additional Facility) Rules, the dispute shall be settled in accordance with these Rules, save that if any of these Rules is in conflict with a provision of the law applicable to the arbitration from which the parties cannot derogate, that provision shall prevail.[214]

124. Thus the Secretariat is empowered to administer, in accordance with the Additional Facility Rules and the Arbitration Rules, arbitration proceedings: (1) for the settlement of legal disputes; (2) which are not within the jurisdiction of the Centre because either the State party or the State whose national is a party is not a Contracting State; (3) where there is an agreement of the parties that the dispute shall be referred to arbitration pursuant to the Additional Facility Rules; and (4) there is no applicable provision from which the parties cannot derogate which negates the jurisdiction of the ICSID Secretariat pursuant to the Arbitration Rules.

125. All of these requirements are satisfied in this case.

### 1.    There is a Legal Dispute

126. There is a legal dispute arising from Venezuela's violation of Rusoro's rights under the Treaty, as set out in section III above.

---

[213]  *Ibid*, Articles 1(1), 1(4) and 1(6).

[214]  *Ibid*, Article 1.

55

### 2. The Dispute is Between an ICSID Contracting State and the National of a State Which is Not a Contracting State

127. The dispute is between:

> (a) Venezuela, which became an ICSID Contracting State on 1 June 1995,[215] and remained an ICSID Contracting State at the date of the initiation of the dispute on 15 December 2011; and

> (b) Rusoro, a qualifying Canadian investor. As of the date of institution of these proceedings, Canada is not an ICSID Contracting State.[216]

### 3. The Parties Agree that the Dispute is to Be Submitted to Arbitration Pursuant to the Additional Facility Rules

128. Pursuant to Articles XII(4) and (5) of the Treaty,[217] Venezuela has unconditionally consented to submit the dispute to arbitration pursuant to the Additional Facility Rules.

129. In its Notice of Dispute delivered to Venezuela on 15 December 2011, Rusoro expressed its unconditional consent pursuant to Article XII(3) of the Treaty to submit the dispute to arbitration under the Additional Facility Rules and the Arbitration Rules in accordance with the Treaty.[218]

130. According to Article XII(6) of the Treaty, Venezuela's consent pursuant to Article XII(5) of the Treaty, together with Rusoro's consent under Article XII(3) of the

---

[215] Venezuela signed the ICSID Convention on 18 August 1993 and ratified the Convention on 2 May 1995. The ICSID Convention entered into force in Venezuela on 1 June 1995.

[216] Canada signed the ICSID Convention on 15 December 2006. However, Canada has not yet deposited its instruments of ratification in accordance with Article 69(2) of the ICSID Convention. Consequently, Canada is currently not a party to the ICSID Convention.

[217] The full text of Article XII of the Treaty is reproduced at paragraph 133, below.

[218] Letter from Rusoro to the President of Venezuela, the MPM, and the Attorney General of Venezuela, 15 December 2011, **Exhibit C-233**.

56

Treaty[219], "satisf[ies] the requirements for written consent of the parties to a dispute for the purposes [...] of the Additional Facility Rules."[220]

### 4. There Are No Applicable Provisions from Which the Parties Cannot Derogate which Negate Access to the Additional Facility

131. In accordance with Article XII(7) of the Treaty, the law applicable to the dispute consists of the provisions of the Treaty and applicable rules of international law.

132. At the time of submission of the Request, there are no applicable provisions which negate access to the Additional Facility. Furthermore, as explained in the section below, all of the relevant jurisdictional requirements set out under the Treaty have been met.

### B. THE ACCESS REQUIREMENTS UNDER THE TREATY HAVE BEEN FULFILLED

133. Article XII of the Treaty contains Venezuela's offer to submit investment disputes with qualifying investors to arbitration pursuant to the Additional Facility Rules. This provision reads in its material part as follows:

> (1) Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

> (2) If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph; a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in

---

[219] Together with the consent under Article XII(12) of the Treaty of Rusoro's controlled subsidiaries holding Mining Rights. See waiver and consent letter of the controlled subsidiaries of Rusoro Mining Ltd. holding Mining Rights, 16 July 2012, **Exhibit C-253**.

[220] Treaty, **Exhibit C-102**, Article XII(6)(a)(i).

57

writing to the other Contracting Party alleging that the measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor or enterprise owned or controlled directly or indirectly by the investor has incurred loss of damage by reason of, or arising out of, that breach.

(3) An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:

(a) the investor has consented in writing thereto;

(b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind; [...]

(d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.

(4) The dispute may, by the investor concerned, be submitted to arbitration under:

(a) The International Centre for Settlement of Investment Disputes (ICSID), [...] provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or

(b) the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; [...]

(5) Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.

(6) (a) The consent given under paragraph (5) together with either the consent given under paragraph (3), or the consents given under paragraph (12), shall satisfy the requirements for:

(i) written consent of the parties to a dispute for purposes of Chapter II (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules; [...]

58

(12) (a) Where an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls, the following provisions shall apply:

(i) both the investor and the enterprise shall be required to give the consent referred to in subparagraph (3)(a); and

(ii) both the investor and the enterprise must give the waiver referred to in subparagraph (3)(b) [...] [221]

134. The requirements set out in the Treaty have been met in the present case. A dispute has arisen between Venezuela and a qualifying Canadian investor (as demonstrated in section IV above) relating to the Measures taken in breach of the Treaty that have resulted in loss or damage to Rusoro (as demonstrated in sections II and III above). This dispute has not been amicably settled within a period of six months from the date on which it was initiated, pursuant to Articles XII(1) and (2) of the Treaty. Rusoro initiated this dispute by delivering its Notice of Dispute to Venezuela on 15 December 2011, more than six months ago.[222] Despite Rusoro's attempts to engage the Venezuelan Government in a constructive dialogue, Rusoro and Venezuela have been unable to resolve the dispute amicably.

135. In its Notice of Dispute, Rusoro expressed its unconditional consent pursuant to Article XII(3)(a) of the Treaty to submit the dispute to arbitration under the Additional Facility Rules[223]. Further, Rusoro's controlled subsidiaries holding Mining Rights have consented in writing to the submission of this dispute to arbitration under the Treaty, as required by Article XII(12)(a)(i).[224] Consequently, both Venezuela and Rusoro have satisfied the requirements for consent to arbitration provided at Article XII(6) of the Treaty.

---

[221] *Ibid*, Article XII.

[222] Letter from Rusoro to the President of Venezuela, the MPM and the Attorney General of Venezuela, 15 December 2011, 15 December 2011, **Exhibit C-233**.

[223] *Ibid*.

[224] See waiver and consent letter of the controlled subsidiaries of Rusoro Mining Ltd. holding Mining Rights. 16 July 2012, **Exhibit C-253**.

59

136. In accordance with Article XII(4)(b) of the Treaty, arbitration pursuant to the Additional Facility Rules is available since one party (Venezuela) is a party to the ICSID Convention, as explained above.

137. In accordance with Articles XII(2), XII(3)(d), XII(4) and XII(a)(iii) of the Treaty, this dispute was initiated within three years from the date on which Rusoro and its relevant subsidiaries first acquired knowledge of Venezuela's breach of the Treaty, and the ensuing loss or damage to Rusoro's investment.

138. In accordance with Article XII(3)(b) and XII(12)(a)(ii) of the Treaty, Rusoro[225] and its controlled subsidiaries holding Mining Rights [226] have waived any right to initiate or continue proceedings in relation to Venezuela's Measures alleged to be in breach of the Treaty before the courts or tribunals of Venezuela or in a dispute settlement procedure of any kind.

## C.    APPROVAL OF THE SECRETARY-GENERAL

139. As set out in Article 4(1) of the Additional Facility Rules, access to arbitration is dependent on the Secretary-General's approval of the agreement providing for arbitration prior to, or at the time of, the institution of proceedings. Rusoro accordingly respectfully requests the Secretary-General's approval of the arbitration agreement established by Rusoro's acceptance (in its Notice of Dispute and this Request) of Venezuela's unconditional offer to arbitrate any dispute in relation to this investment under the Treaty pursuant to the Additional Facility Rules.[227] As required by this provision, a copy of the Treaty is attached to this Request.[228]

---

[225] See waiver letter of Rusoro Mining Ltd., 16 July 2012, **Exhibit C-252**.

[226] See waiver and consent letter of the controlled subsidiaries of Rusoro Mining Ltd. holding Mining Rights, 16 July 2012, **Exhibit C-253**.

[227] The Claimant notes that this discretion was exercised in *Gold Reserve Inc. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/09/1) and in *Vanessa Ventures Ltd. v. Bolivarian Republic of*

60

140. Article 4(2) of the Additional Facility Rules sets out two conditions to be satisfied prior to the grant of approval by the Secretary-General:

> In the case of an application based on Article 2(a), the Secretary-General shall give his approval only if (a) he is satisfied that the requirements of that provision are fulfilled at the time, and (b) both parties give their consent to the jurisdiction of the Centre under Article 25 of the Convention (in lieu of the Additional Facility) in the event that the jurisdictional requirements 'ratione personae' of that Article shall have been met at the time when proceedings are instituted.[229]

141. Both of these conditions have been satisfied. In its Notice of Dispute, Rusoro expressly consented to the jurisdiction of the Centre under Article 25 of the ICSID Convention in the event that the jurisdictional requirements *ratione personae* of that Article had been met at the time of the institution of proceedings.

142. Pursuant to Article XII(4) of the Treaty, Venezuela has also given its unconditional consent to arbitration pursuant to the ICSID Convention. Venezuela has, therefore, also given the consent required by Article 4(2)(b) of the Additional Facility Rules.

## V.   CONSTITUTION OF THE ARBITRAL TRIBUNAL, APPLICABLE LAW, PLACE AND LANGUAGE OF THE ARBITRATION

143. In accordance with Article 6(1) of the Arbitration Rules, and in light of the substantial amounts that will be involved in these proceedings, the Claimant proposes that the Tribunal be composed of three arbitrators, one arbitrator to be nominated by each party within 20 days of registration and the President to be appointed by agreement of the parties within a further period of 20 days. In the

---

*Venezuela* (ICSID Case No. ARB(AF)/04/6), both claims under the Treaty. The exercise of this discretion would also be consistent with the 22 April 2010 decision in *Nova Scotia Power Incorporated v Bolivarian Republic of Venezuela* (UNCITRAL) in which the tribunal accepted Venezuela's argument that the appropriate forum for the dispute under the Treaty was the ICSID Additional Facility, and not the UNCITRAL Rules. The decision is available at http://ita.law.uvic.ca/.

[228] The Treaty is attached at **Exhibit C-102**.

[229] Additional Facility Rules, Article 4(2).

61

absence of agreement, the President shall be appointed in accordance with Article 6(4) of the Arbitration Rules.

144.   Pursuant to Article XII(7) of the Treaty, the Tribunal shall resolve the dispute in accordance with the Treaty and applicable rules of international law.[230]

145.   Rusoro proposes New York as the seat of the arbitration as a neutral seat, with hearings to be held for the sake of convenience at the facilities available to ICSID in Washington D.C. This is in compliance with Article XII(6) of the Treaty and Article 19 of the Arbitration Rules which provide that the arbitration shall be held in a State which is a party to the 1958 UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the *New York Convention*).[231]

146.   The Treaty is silent on the question of the language of the arbitration and the parties have not reached an agreement on this issue. The Claimant proposes English as the language of the arbitration, an official language of the Centre. The Claimant further proposes that documents, exhibits and authorities in Spanish may be submitted by the parties in the course of the proceedings without translation into English and has adopted this practice in the present Request.

## VI.   THE PARTIES

147.   Rusoro is a company constituted in Canada with its head office at:

> 355 Burrard Street
> Suite 520
> Vancouver, BC (V6C 2G8) - Canada

---

[230]   Treaty, **Exhibit C-102**. Article XII(7) provides:

> A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal.

[231]   The United States has been a party to the New York Convention since 29 December 1970.

62

148. The Claimant has duly authorized the listed signatories of this Request to institute and pursue arbitration proceedings on its behalf against Venezuela under the Arbitration Rules and the Treaty. [232]

149. All correspondence and notices relating to this case should be addressed to:

>     Nigel Blackaby
>     Lluís Paradell
>     Jean-Paul Dechamps
>     Freshfields Bruckhaus Deringer US LLP
>     701 Pennsylvania Avenue, NW
>     Suite 600 - 20004-2692
>     Washington, DC - United States of America
>     Tel.:   +1 202 777 4500
>     Fax:    +1 202 777 4555
>     Email: nigel.blackaby@freshfields.com
>     lluís.paradell@freshfields.com
>     jean-paul.dechamps@freshfields.com
>
>     Alejandra Figueiras
>     Noemí Fischbach
>     Gerardo Bello
>     Figueiras & Fischbach
>     Edificio Cavendes
>     Piso 8, Los Palos Grandes
>     Caracas, 1060 - Venezuela
>     Tel.: +58 212 286 39 30
>     Fax: +58 212 286 81 30
>     Email: afigueiras@alfa.net.ve
>     nfischbach@alfa.net.ve
>     gbello@alfa.net.ve
>
>     Andrés Mezgravis
>     Carolina Gonzalez
>     Mezgravis & Asociados
>     Avenida Venezuela
>     Torre Oxal. Piso 5, Ofic 5-A
>     Urbanización El Rosal
>     Caracas, 1060 - Venezuela

---

[232]   Resolution of the Board of Directors of Rusoro Mining Ltd., 28 June 2012, **Exhibit C-250** and Power of Attorney granted by Rusoro Mining Ltd., 11 July 2012, **Exhibit C-251**.

63

Tel:  +58 212 952 7371
Fax:  +58 212 952 7307
Email: aam@mezgravis.com
cgh@mezgravis.com

150. ICSID is respectfully requested to serve copies of this Request on the Respondent
at each of the following addresses:

> His Excellency Mr Hugo Chávez Frías
> President of the Bolivarian Republic of Venezuela
> Palacio de Miraflores
> Despacho del Presidente de la República
> Avenida Urdaneta
> Caracas, 1010 - Venezuela

> Ms. Cilia Flores
> Attorney General for the Bolivarian Republic of Venezuela
> Paseo los Ilustres c/c Av Lazo Marti
> Edificio Sede Procuraduría General de la República
> Santa Mónica
> Caracas, 1040 - Venezuela

> Mr. Rafael Ramírez Carreño
> Minister of People's Power for Petroleum and Mining
> Ministerio del Poder Popular del Petróleo y Minería
> Av. Libertador
> Torre Oeste, PDVSA, PH.
> Urb. La Campiña,
> Caracas, 1050 – Venezuela

## VII.   THE CLAIMANT'S REQUEST FOR RELIEF

151. On the basis of the foregoing, without limitation and reserving the Claimant's right
to supplement these prayers for relief in accordance with Article 47 of the
Arbitration Rules, the Claimant respectfully requests that the Tribunal:

>     i.    DECLARE that:

64

a) Venezuela has breached Article VII(1) of the Treaty by expropriating the Claimant's investments in Venezuela;

b) Venezuela has breached Article II(2) of the Treaty by failing to accord the Claimant's investments in Venezuela fair and equitable treatment, and full protection and security;

c) Venezuela has breached Article IV of the Treaty by impairing the Claimant's investments in Venezuela through discriminatory Measures;

d) Venezuela has breached Article VIII of the Treaty by failing to guarantee to the Claimant the unrestricted transfer of its investments and returns.

ii.   ORDER Venezuela to compensate the Claimant for its breaches of the Treaty in an amount to be determined at a later stage in these proceedings, plus interest until the date on which full payment of the award is made;

iii.   AWARD such other relief as the Tribunal considers appropriate; and

iv.   ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimant's legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal, and ICSID's Additional Facility costs.

Respectfully submitted on the 17th day of July 2012.

_____
Nigel Blackaby
Lluis Paradell
Jean Paul Dechamps
Lucía Mazzuca
FRESHFIELDS BRUCKHAUS DERINGER US LLP

65

Alejandra Figueiras
Noemi Fischbach
Gerardo Bello
Figueiras & Fischbach

Andrés Mezgravis
Carolina González
Mezgravis & Asociados

for the Claimant

66