UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RUSORO MINING LIMITED,           )
                                 )
       Petitioner,               )
                                 )
v.                               )   Civil Case No. 16-cv-02020 (RJL)
                                 )
BOLIVARIAN REPUBLIC OF           )
VENEZUELA,                       )
                                 )
       Respondent.               )
                                 )

## MEMORANDUM OPINION

March ___1st___, 2018 [Dkt. ## 1, 16]

For the third time in as many years, Respondent Bolivarian Republic of Venezuela ("Venezuela") finds itself before the U.S. District Court for the District of Columbia opposing the confirmation of an arbitral award flowing from its expropriation of foreign gold-mining assets.[1] In this case, Venezuela seeks to persuade the Court that the arbitral tribunal, constituted pursuant to provisions of the bilateral investment treaty between Canada and Venezuela, exceeded the scope of its authority in awarding damages to Rusoro Mining Limited ("Rusoro") for the expropriation of that entity's assets. In the alternative, Venezuela seeks a stay of enforcement of the arbitral award in light of a pending appeal of the award in Paris. Unfortunately for Venezuela, its third time is not a charm and for the reasons that follow, this Court will **DENY** Venezuela's Motion to Dismiss Petition and to

---

[1] *See Crystallex Int'l Corp. v. Bolivarian Rep. of Venez.*, 244 F. Supp. 3d 100 (2017); *Gold Reserve Inc. v. Bolivarian Rep. of Venez.*, 146 F. Supp. 3d 112 (2015).

Deny Confirmation of the Arbitral Award or, in the Alternative, to Stay ("Mot. to Dismiss") [Dkt. # 16], and **GRANT** Rusoro's Petition to confirm the Award ("Petition") [Dkt. #1].

## BACKGROUND

Rusoro Mining Limited ("Rusoro") is a Canadian corporation listed on the Toronto Stock Exchange. *See Rusoro Mining Ltd. v. Bolivarian Rep. of Venez.*, ICSID Case No. ARB(AF)/12/5, Award ¶ 11 (Aug. 22, 2016), Friedman Decl., Ex. 2 [Dkt. # 1-2] ("Award"). Its principal business is the exploration and production of gold. *Id.* ¶ 12. Between 2006 and 2008, Rusoro acquired controlling interests in twenty-four Venezuelan companies, which held a total of 58 mining concessions and contracts. *See id.* ¶¶ 12, 77–78. All of Rusoro's assets were in Venezuela. *Id.* ¶ 652.

On July 1, 1996, Canada and Venezuela entered into the Agreement between the Government of Canada and the Government of the Republic of Venezuela for the Promotion and Protection of Investments ("BIT" or "Treaty"). *See* Mot. to Dismiss, Ex. 2 [Dkt. #16-3]. The Treaty governs investments between the contracting parties, providing protections against expropriation and establishing a mechanism for dispute resolution. *See id.*

As relevant here, the Treaty provides for the resolution of disputes between an investor (*i.e.*, Rusoro) and a host contracting party (*i.e.*, Venezuela). Article XII.1 provides:

> Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor or an enterprise owned or controlled directly or indirectly

> by the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

*Id.* Failing amicable resolution, an investor may submit the dispute to the Additional Facility Rules of the International Centre for the Settlement of Investment Disputes ("ICSID"),[2] "provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention." *Id.* art. XII.4(b).[3] The Treaty provides that expropriation must be made "against prompt, adequate and effective compensation." *Id.* art. VII. "Such compensation," the Treaty goes on to say, "shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier." *Id.* This amount "shall be paid without delay . . . ." *Id.*

At the time of Rusoro's acquisitions, Resolution No. 96-12-02, issued by the Central Bank of Venezuela, regulated gold exports. *See* Award ¶¶ 138–39. The Resolution's "overarching principle" was the "liberty of export," *id.* ¶ 138, with only limited conditions imposed on companies seeking to export gold from the country. Namely, gold producers were required to (i) register with the Central Bank of Venezuela, (ii) obtain non-discretionary export authorization from the Central Bank of Venezuela, and (iii) sell at least 15% of their total annual gold production on the private domestic market. *See id.*

---

[2] The ICSID Additional Rules provide that "[t]he Tribunal shall have the power to rule on its competence." ICSID Arbitration (Additional Facility) Rules art. 45 Apr. 10, 2006, http://icsidfiles.worldbank.org/icsid/icsid/staticfiles/facility/partd-chap08.htm.

[3] It is undisputed that Canada is a party to the ICSID Convention and that Venezuela is not. *See* ICSID, List of Contracting States and Other Signatories of the Convention (as of January 11, 2018), https://icsid.worldbank.org/en/Documents/icsiddocs/List%20of%20Contracting%20States%20and%20Ot her%20Signatories%20of%20the%20Convention%20-%20Latest.pdf.

Resolution No. 96-12-02 remained in place until Venezuela enacted the April 2009 BCV Resolution, which "significantly altered the legal regime for the export of gold." *Id.* ¶ 145. As such, Venezuela now mandated (i) that 60% of each gold producer's quarterly gold production be sold to the Central Bank of Venezuela; and (ii) that gold producers export no more than 30% of their gold production. *Id.* ¶¶ 144, 145, 147, 501. Subsequent measures, undertaken the same year, imposed further restrictions on foreign gold mining entities, while loosening restrictions on domestic ones. *Id.* ¶¶ 148–152. Under these measures, the Central Bank paid for the gold in local currency, tied to the Official Exchange Rate, which was consistently lower than the market rate. *Id.* ¶¶ 145, 501. The Central Bank was also charged with approving all proposed exports. *Id.* ¶ 147.

The following year, Venezuela went one step further. It banned the use of the secondary currency exchange, known as the Swap Market, placing all foreign exchange transactions under the jurisdiction of the Central Bank. *See id.* ¶ 154. Shortly thereafter, Venezuela announced that Rusoro would be required to sell 50% of its gold production, and 50% of its foreign currency income, to the Central Bank. *Id.* ¶¶ 156–59.[4]

These measures finally came to a head with the government's complete expropriation of Rusoro's Venezuelan assets. On August 11, 2011, President Hugo Chavez declared the "immediate nationalization" of the Venezuelan gold mining sector. *Id.* ¶ 160. Within one month, Venezuela adopted Supreme Decree No. 8.413 ("Nationalization Decree"), in which the State asserted control over the property and mining rights of all

---

[4] The 2010 ban of the Swap Market and the additional restrictions imposed on Rusoro in that year are, collectively, described as the "2010 Measures" in this opinion.

gold-producing companies in the country. *Id.* ¶¶ 160–62. On March 31, 2012, Rusoro "formally withdrew from [its] mining areas." *Id.* ¶ 173. Rusoro's "[m]ining [r]ights and other assets" were taken by the Venezuelan Government shortly thereafter. *Id.* ¶ 174.

On July 17, 2012, Rusoro submitted a Request for Arbitration to the International Centre for Settlement of Investment Disputes ("ICSID"). *Id.* ¶ 1.[5] In its request, Rusoro alleged multiple breaches of the Treaty by Venezuela, and sought an award of compensation plus interest, legal fees and costs, as well as any other relief the Tribunal considered appropriate. *See id.* ¶ 1. Rusoro claimed that Venezuela had expropriated its investment without payment of compensation. *Id.* ¶ 179. Rusoro sought compensation in the amount of approximately $ 2.3 billion. *Id.* ¶ 180.[6] Venezuela raised jurisdictional and merits defenses. *See id.* ¶¶ 181–85, 187.

The Tribunal was constituted on January 4, 2013. *Id.* ¶¶ 8, 16. The parties, represented by counsel (many of whom appear on the briefs before this Court), *id.* ¶ 19, participated in multiple hearings before the Tribunal, *id.* ¶¶ 62, 66, producing witnesses, experts, and documents, *id.* The Tribunal declared the proceeding closed on June 29, 2016. *See id.* ¶ 76. The panel unanimously ruled on August 22, 2016 that Venezuela "breached Art. VII of the BIT by expropriating Rusoro's investment in Venezuela without payment

---

[5] Rusoro made this request pursuant to (1) the "ICSID Additional Facility Rules of 10 April 2006," and (2) the BIT, each of which provided for the ICSID as a forum for the resolution of disputes arising under the BIT. Award ¶ 2.

[6] The precise number was $ 2,318,898,825.00. *Id.*

5

of compensation," and ordered that Venezuela pay Rusoro $ 966.5 million "as compensation for the expropriation of its investment." *Id.* ¶ 904.[7]

The Tribunal explained its reasoning at length, devoting considerable discussion in the Award to the calculation of damages. The Tribunal acknowledged that the parties agreed that (i) the proper valuation date was September 16, 2011, the day when the Nationalization Decree was issued, and (2) that the term "genuine value," as used in Article VII of the Treaty, "equates with the traditional concept of 'fair market value.'" *Id.* ¶ 647. It noted two distinct features of the damages assessment in this particular case: (i) that Rusoro, as a publicly-traded corporation, was subject to accounting and disclosure requirements, *id.* ¶ 651, thereby enhancing the reliability of their balance sheet and trading price, and (ii) that Rusoro's enterprise was confined to a single industry, gold exploitation, in a single country, Venezuela, *id.* ¶ 652. The Tribunal went on to discuss the nature of the international gold market and its correlation to the value of gold-producing companies, *id.* ¶¶ 654–58; Rusoro's investment in Venezuela, *id.* ¶¶ 659–82; the book value of that investment, *id.* ¶¶ 683–707; Rusoro's market capitalization, *id.* ¶¶ 708–714; and Rusoro's valuation of its investments, *id.* ¶¶ 715–50.

With this background established, the Tribunal acknowledged that the damages calculation was "a hypothetical exercise" because "in real life, in September 2011 no buyer having good information about the gold sector in Venezuela would have been prepared to

---

[7] The precise number was $ 966,500,000.00. *Id.* The Tribunal also ordered Venezuela to pay Rusoro $ 1,277,002.00 as compensation for the breach of the Annex of the BIT resulting from the 2010 Measures, and to pay the costs of the arbitration. *Id.*

6

buy a gold producing enterprise in that country for a fair price." *Id.* ¶ 752. It explained that "the value of gold companies is affected by the intensity of the regulatory measures adopted by host states," and it acknowledged that Venezuela's regulatory measures would have created a "chilling effect" sufficient to deter any prospective investor. *Id.* ¶¶ 753–54. As such, in analyzing the Treaty's instruction to value an expropriated asset at the time "immediately before the expropriation or at the time the proposed expropriation became public knowledge," *id.* ¶ 756 (internal quotations omitted), the Tribunal reasoned that "[t]he fair market value which the State must pay is that which an innocent, uninformed third party would pay, having no knowledge of the State's pre-expropriation (but post-investment) policy toward the expropriated company and its sector," *id.*[8]

There were six valuations proffered on the record. First, the "Investment Valuation" assessed the value of Rusoro's acquisitions and investments in Venezuela. This number came to $ 774.3 million. *Id.* ¶ 763. Second, the "Adjusted Investment Valuation" revised the "Investment Valuation" amount to account for the increase in the value of gold internationally between the time of investment and the time of expropriation. *Id.* ¶ 764. This inflated the $ 744.3 million number to $ 1.128 billion. *Id.* Third, the "Book Valuation" reflected the net book value of Rusoro's assets, totaling $ 908 million. *Id.* ¶ 766. Fourth, the "Maximum Market Valuation" reflected Rusoro's peak stock market valuation, $ 700.6 million, taken February 28, 2008. *Id.* ¶ 768. Fifth, the "Final Market

---

[8] Because it had already concluded that Venezuela's 2010 gold regulations violated the Treaty, the Tribunal excluded the effect of those regulations from its valuation of Rusoro's investment. *Id.* ¶ 756.

7

Valuation" reflected the decline in market capitalization following Rusoro's initial investment in Venezuela. *Id.* ¶ 769. By this measure, Rusoro's investment was $ 125.6 million. *Id.* Sixth, Rusoro's expert, Brent Kaczmarek, calculated the value of Rusoro's expropriated assets to be $ 2.23 billion. *See id.* ¶ 770.

Ultimately, the Tribunal relied on only three of the six methods: the Maximum Market Valuation, the Book Valuation, and the Adjusted Investment Valuation.[9] In reaching the "genuine value" of the expropriated investment, the Tribunal assigned a weight to each method. It accorded 25% to the Maximum Market Valuation, 25% to the Book Valuation, and 50% to the Adjusted Investment Valuation. *Id.* ¶ 789. The weight assigned to each method reflected that method's "strengths and shortcomings." *Id.* For example, the Maximum Market Valuation had the advantage of reflecting "no subjectivity in its calculation," based, as it was, on the stock market's independent assessment. *Id.* The Maximum Market Valuation had a shortcoming, however: Rusoro achieved this marker for only "a very short period, in mid[-]2008, three years before the date of the expropriation." *Id.* Similarly, the Book Valuation represented "a conservative criterion," as it was taken directly from Rusoro's audited balance sheet, but did not account for increases in the price of gold during the relevant time period or the "development of the mining properties" under Rusoro's control. *Id.* The Adjusted Investment Valuation received the most weight, 50%, because it "reflect[ed] the value the investment would have reached on the date of expropriation, simply as a direct consequence of the increase in the price of gold and of

---

[9] The Tribunal rejected the remaining three methods: the Investment Method, *id.* ¶¶ 772–76; the Final Market Valuation, *id.* ¶¶ 777–80; and Rusoro's expert's valuation, *see id.* ¶¶ 781–86.

8

gold producing companies." *Id.* When averaged and weighted, the Quantum for the expropriated assets totaled approximately $ 966.5 million. *Id.* ¶ 790.

On October 10, 2016, Rusoro asked this Court to confirm the arbitral award. [Dkt. # 1].

## LEGAL STANDARD

The New York Convention, which is incorporated in the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 201–208,[10] provides for "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. I.1, *opened for signature* June 10, 1958, 21 U.S.T. 2517 ("New York Convention"). Here, because the Award was made in France and enforcement is sought in the United States, both of which are signatories to the New York Convention, the confirmation is governed by the Convention. *See* Petition ¶ 49; U.S. Dep't of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2007, § 2 at 12, *available at* http://www.state.gov/documents/organization/89668.pdf.

As our Circuit has recognized, "consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court[,] . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012)

---

[10] The Federal Arbitration Act permits any party to an arbitration under the Convention to seek confirmation of the arbitral award in U.S. federal district court within three years of the award. *See id.* § 207.

9

(quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). Courts "may refuse to enforce the award [brought under the New York Convention] only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)); *see* 9 U.S.C. § 207 (providing that the reviewing court "*shall* confirm the award" absent a basis under the New York Convention for denying recognition or enforcement (emphasis added)); *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 19–20 (D.D.C. 2011) (collecting cases). Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *DynCorp Aerospace Tech.*, 763 F. Supp. 2d at 20 (citing *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)). "The party resisting confirmation—in this case, Venezuela—bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V applies." *Gold Reserve, Inc. v. Bolivarian Rep. of Venez.*, 146 F. Supp. 3d 112, 120 (2015); *see also Zeiler*, 500 F.3d at 164; *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987) ("[T]he showing required to avoid summary confirmation is high."); *Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976).

## ANALYSIS

Mindful of the limited grounds under which it may challenge the Award, Venezuela argues that the Tribunal exceeded the scope of its consent to arbitrate, rendering the Award invalid. *See* Mot. to Dismiss at 11. Venezuela relies on Article V(1)(c) of the New York

Convention, which provides in relevant part that "[r]ecognition and enforcement of the award may be refused . . . if . . . [t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration." *Id.* Venezuela principally contends that the Tribunal's use of valuations that predate September 16, 2011, the date of expropriation, exceeds the Tribunal's jurisdictional writ. *See* Mot. to Dismiss at 2.

The jurisdictional analysis involves two steps. First, the Court must determine "the amount of deference it should grant the Tribunal's *own* determination of [the] scope [of its jurisdiction], insofar as that question was itself delegated to the Tribunal." *Gold Reserve*, 146 F. Supp. 3d at 121 (emphasis in original). Second, applying the appropriate measure of deference (if any), this Court must decide "whether the Tribunal acted within its permissible scope to arbitrate." *Id.* For the following reasons, I conclude that the Tribunal's decision is entitled to substantial deference and that it ultimately acted well within its permissible scope to arbitrate.

### Deference Owed to Tribunal's Determination of its Jurisdiction

The threshold question is whether, and to what extent, this Court owes deference to the Tribunal's determination of its jurisdiction to hear this dispute. There is a presumption that courts review arbitral tribunals' jurisdictional determinations *de novo*. *See BG Group PLC v. Rep. of Arg.*, 134 S. Ct. at 1206. This presumption may be overcome, however, when both parties have clearly and unmistakably delegated the question of "arbitrability," *i.e.*, the question whether the parties agreed to arbitrate a particular dispute, to the arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). When the parties have committed the jurisdictional determination to the arbitrator, courts "should give

11

considerable leeway to the arbitrator, setting aside his or her decision [as to the scope of his or her authority over the case at hand] only in certain narrow circumstances." *Id.* at 943. As the Second Circuit has concluded, when the parties have delegated the arbitrability issue to the arbitrator, the party resisting confirmation of the award "is not entitled to an independent judicial redetermination of that same question." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir. 2012); *see also Chevron Corp. v. Ecuador*, 795 F.3d 200, 208 (D.C. Cir. 2015); *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074–75 (9th Cir. 2013); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Contec Corp. v. Remote Sol., Co. Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005); *Terminex Int'l Co., L.P. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005).

Here, the Treaty clearly assigns the question of arbitrability to the Tribunal. The Governments of Canada and Venezuela agreed that arbitration proceedings would be governed by the ICSID Additional Facility Arbitration Rules. *See* Treaty, art. XII.4(b). Under the Treaty, when "either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention," the investor may submit the dispute to arbitration under the Additional Facility Rules of ICSID. *See id.*[11] The Additional Facility Rules, in turn, expressly provide that "[t]he Tribunal shall have the

---

[11] Canada is a party to the ICSID Convention. Venezuela is not a party to the Convention. *See* ICSID, List of Contracting States and Other Signatories of the Convention (as of January 11, 2018), *available at* https://icsid.worldbank.org/en/Documents/icsiddocs/List%20of%20Contracting%20States%20and%20Other%20Signatories%20of%20the%20Convention%20-%20Latest.pdf.

power to rule on its competence." Additional Facility Rules, art. 45(1), Petition, Ex. 5 [Dkt. # 1-6]. District Courts in our Circuit have consistently concluded that the BIT clearly and unmistakably grants tribunals the power to determine their own jurisdiction. *See Crystallex*, 244 F. Supp. 3d at 111–12; *Gold Reserve*, 146 F. Supp. 3d at 121–22.

As it did unsuccessfully in *Crystallex*, Venezuela seeks to refute this conclusion by pointing to the position of the Attorney General of Canada in *United Mexican States v. Cargill, Inc.*, 2011 ONCA 622 (Can. Ont. C.A. 2011) [Dkt. # 16-4]. Even assuming it would be proper to consider such extrinsic evidence, *cf. Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 523–24 (E.D.N.Y. 2017), this Court's conclusion would remain unchanged.[12]

The Canadian Attorney General's position, as the Court noted in *Crystallex*, involved "a different case (*United Mexican States v. Cargill, Inc.*), before a different court (a Canadian tribunal), based on a different bilateral investment treaty (NAFTA)." 244 F. Supp. 3d at 113. Canada has taken no such position in this litigation. *Cf. Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 183 (1982) (describing Government of Japan's position in that case). Nor am I aware of any such position by the Government of Canada concerning the BIT. Venezuela's cases are not to the contrary: they uniformly involve

---

[12] *Cargill* involved a petition to a Canadian court to set aside an arbitral award handed down pursuant to the North American Free Trade Agreement ("NAFTA") by a Toronto-based tribunal. *See id.* In *Cargill*, the Attorney General of Canada—not a party to the case—intervened at the appellate stage, filing a Factum contending that (i) the "scope of damages" that a particular tribunal convened pursuant to NAFTA may award was "a matter of jurisdiction," and (ii) that the Court of Appeal should review this jurisdictional question for "correctness." *See* Factum of the Attorney General of Canada, *Cargill*, 2011 ONCA 622 [Dkt. # 16-5]. Venezuela likens the "correctness" standard to *de novo* review. Mot. to Dismiss at 15–16.

positions taken by sovereign nations concerning the particular treaty at issue before the Court. *See, e.g., Abbott v. Abbott*, 560 U.S. 1, 16–19 (2010).

Because the parties "clearly and unmistakably" agreed to arbitrate arbitrability, this Court must, and will, give substantial deference to that decision, and will not "second-guess[] the arbitrator's construction of the parties' agreement." *Gold Reserve, Inc.*, 146 F. Supp. 3d at 121 (quoting *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de l'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 977 (2d Cir. 1974)). As such, this Court will "give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *First Options*, 514 U.S. at 943.

Turning now to Venezuela's challenges to the Tribunal's damages calculation, the Bolivarian Republic first asserts that the Tribunal improperly "valu[ed] Rusoro before the date of expropriation." Mot. to Dismiss at 19. I disagree. To be sure, the Maximum Market Valuation, dated February 28, 2008, occurred more than three years prior to the date of expropriation, and therefore fell outside the Treaty's limitations period. But, as the Award explained, this measure was not intended as a stand-in for the value on September 16, 2011, the date of expropriation. The Maximum Market Valuation was simply one *input* in the Tribunal's calculation for the "genuine value" on September 16, 2011. Indeed, although it had the virtue of objectivity, *see* Award ¶ 789, the Maximum Market Valuation *predated* the substantial, global increase in the price of gold—a trend that, under ordinary economic conditions, would have increased Rusoro's trading price, *id.* ¶ 764.

Venezuela also faults the Tribunal for its use of the Adjusted Investment Valuation, criticizing that method of valuation, the disparity between the valuation and the actual

14

market capitalization on the date of expropriation, and the use of the price of gold to increase the valuation. Mot. to Dismiss at 22–24. Venezuela similarly claims that the Book Value fails to account for the economic restrictions imposed in 2009 and 2010. *Id.* at 24–25. These are no more than disagreements as to the damages calculation, however, and "courts have no authority to disagree with [the arbitrator's] honest judgment in that respect." *Rep. of Argentina v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 360 (D.D.C. 2016) (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). Curiously, Venezuela does not explain why the Tribunal's chosen methods unduly exceeded the scope of the Tribunal's power to award damages. Perhaps it couldn't !

It is abundantly clear to this Court that the Tribunal, in its extensive damages analysis, *see* Award ¶¶ 634–855, did not exceed the scope of its authority under our Circuit's case law. As in *Kanuth v. Prescott, Ball & Turben, Inc.*, "there is nothing on the face of the panel's lump-sum award which suggests that the panel failed to construe the contract." 949 F.2d 1175, 1182 (D.C. Cir. 1991). "To hold otherwise would require us to inquire into precisely how and why the panel derived the lump-sum award, an inquiry clearly outside of our limited review." *Id.*; *see also Contech Const. Prods., Inc. v. Heierli*, 764 F. Supp. 2d 96, 110 (D.D.C. 2011) (holding that when examining an arbitration award "it is particularly necessary to accord the 'narrowest of readings' to the excess of authority provisions" (quoting *Kanuth*, 949 F.2d at 1180)).

Indeed, were I to review the damages calculation *de novo*, as Venezuela would have me do, I would still conclude that the Tribunal reached a reasonable quantum of damages, acting well within the powers assigned to it by the BIT. Faced with the unenviable task of

15

assessing damages for assets in a national market subject to onerous regulations, and relating to a singularly unique commodity, the Tribunal did a commendable job in reaching its damages calculation. Thus, Venezuela having failed to identify any basis under the New York Convention to deny confirmation of the Award, this Court will grant Rusoro's Petition, and confirm the Tribunal's Award.

## POSSIBLE STAY OF ENFORCEMENT

Having rejected Venezuela's jurisdictional challenge, I will now turn to its claim that this Court should stay enforcement pending the decision of the Court of Appeal in Paris concerning the validity of the Award. Under the New York Convention, district courts have discretion to stay proceedings where "a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998). Indeed, the Second Circuit's *Europcar* opinion sets out factors relevant to the decision whether to grant a stay in these circumstances. *Id.* at 317–18. Although our Circuit has not expressly adopted the *Europcar* factors, courts in this district have repeatedly drawn on them in determining when a stay of the enforcement of an arbitration award is appropriate. *See, e.g., Chevron Corp. v. Rep. of Ecuador*, 949 F. Supp. 2d 57, 71–72 (D.D.C. 2013); *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 59–60 (D.D.C. 2010); *G.E. Transp. S.P.A. v. Rep. of Albania*, 693 F. Supp. 2d 132, 137–38 (D.D.C. 2010). However, because "'the adjournment of enforcement proceedings impedes the goals of arbitration[,]' . . . a stay of confirmation should not be lightly granted." *Chevron Corp.*, 949 F. Supp. 2d at 71 (quoting *Europcar*, 156 F.3d at 317).

*Europcar* instructs courts to consider:

(1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

(2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

(3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

(4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) A balance of the possible hardships to the parties . . . ; and

(6) Any other circumstances that could tend to shift the balance in favor of or against adjournment . . . .

156 F.3d at 317–318.

The first *Europcar* factor, the expeditious resolution of disputes and the avoidance of protracted and expensive litigation, weighs heavily in Rusoro's favor. More than five years have passed since Rusoro initiated arbitration proceedings; Rusoro prevailed before the Tribunal; and Rusoro has yet to receive payment from Venezuela. Such circumstances strongly militate against the entry of a stay. *See, e.g., Gold Reserve*, 146 F. Supp. 3d at 135; *Chevron Corp.*, 949 F. Supp. 2d at 72; *G.E. Transp. S.p.A.*, 693 F. Supp. 2d at 139. Venezuela's contention that enforcement might, depending on the outcome of the foreign proceedings, simply beget more "protracted and expensive litigation," Mot. to Dismiss at

30, is unavailing in light of the extensive proceedings to date, and the goal of "immediate satisfaction of arbitral awards" set out in the BIT, ICSID Additional Facility Rules, and New York Convention, *Gold Reserve*, 146 F. Supp. 3d at 135.

The second factor, the status of foreign proceedings and the estimated time for those proceedings to be resolved, likewise weighs in Rusoro's favor. It is unclear when the French appellate process will conclude, but, according to an uncontested statement in a declaration attached to Rusoro's Opposition, *see* Opp'n to Motion to Dismiss or, in the Alternative, Stay ("Opp'n"), Decl. of Elie Kleiman ¶ 8 [Dkt. # 18-7], the Court of Appeal's decision is unlikely to be rendered prior to April of this year. Moreover, Venezuela may appeal an adverse decision, thereby extending the foreign proceedings further still. *Id.* With "no final resolution . . . imminent," *Gold Reserve*, 146 F. Supp. 3d at 135, delaying our own proceedings would unduly interfere with the federal policy of swift, decisive resolution of arbitral proceedings, *see Mitsubishi Motors Corp.*, 473 U.S. at 665 ("Like any other mechanism for resolving controversies, international arbitration will only succeed if it is realistically limited to tasks it is capable of performing well—the prompt and inexpensive resolution of essentially contractual disputes between commercial partners."). Venezuela points out that French courts have set aside, in part or in whole, arbitral awards on jurisdictional grounds. Mot. to Dismiss at 32. But Venezuela makes no mention of any factual similarities between those disputes and the case at bar. This factor therefore favors Rusoro.

Nor do the lesser *Europcar* factors fortify Venezuela's motion for a stay. The third factor, "whether the award sought to be enforced will receive greater scrutiny in the foreign

proceedings under a less deferential standard of review," militates only modestly in Venezuela's favor. *Europcar*, 156 F.3d at 317. Although the Paris Court of Appeal will exercise *de novo* review, that court will set aside an award "on grounds narrower than those of Article V of the New York Convention," *i.e.*, the applicable standard in this case, "and Venezuela brings the same challenges before the Paris Court of Appeal that it does before this Court." *Gold Reserve*, 146 F. Supp. 3d at 135; *see also* Kleiman Decl. ¶ 5; 2d Decl. of Thomas Bevilacqua ¶ 13 [Dkt. # 16-1].

The fourth factor, with its four sub-factors, unequivocally supports Rusoro's position. Here, the (i) foreign proceeding (*i.e.*, the appeal in France) was brought to set aside an award, (ii) that appeal followed Rusoro's filing of the instant action in this Court, and (iii) those foreign proceedings were initiated by the party challenging the award. Last, in considering whether "the foreign proceedings were intended to hinder or delay resolution of the dispute," without impugning Venezuela's intentions, this Court notes that the appellate process in France has delayed enforcement of the award. *See Gold Reserve*, 146 F. Supp. 3d at 136.

So, too, with the fifth factor, the balance of hardships, and the sixth, "any other [relevant] circumstances." As to the balance of hardships, Rusoro has not received any compensation from Venezuela, despite having had "virtually its *entire business* expropriated by the Venezuelan state." Opp'n at 35 (citing Award ¶ 652) (emphasis in original). As this District Court concluded in *Science Applications Int'l Corp. v. Hellenic Rep.*, "a country with a treasury and all the resources [of] a government," not to mention the abundant natural resources it controls, stands in a better position than a private firm,

particularly one, as here, practically devoid of assets. 13 Civ. 1070 (GK), 2017 WL 65821, at *4 (D.D.C. Jan. 5, 2017). Last, as to the sixth factor, I must note that the Bolivarian Republic has refused voluntarily to satisfy *any* of the awards entered against it under the Treaty following the nationalization of the gold industry. Opp'n at 35. What more need one say !

In sum, *Europcar* factors one and two—the ones relied on most heavily within our Circuit—both favor Rusoro, and the totality of the other four factors collectively favor Rusoro as well. As such, the *Europcar* analysis supports an immediate confirmation.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Venezuela's Motion to Dismiss Petition and to Deny Confirmation of the Arbitral Award or, in the Alternative, to Stay, **GRANTS** Rusoro's Petition, and **ORDERS** confirmation of the Award. A separate order consistent with this opinion will be issued this day.

*[signature]*
RICHARD J. LEON
United States District Judge